# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID D. WILBON, RICO M. WILBON,    )
and GEORGE J. SMITH,                )
                                    )
            Plaintiffs,             )
                                    )
        v.                          )       No. 12 CV 1132
                                    )
JOSEPH M. PLOVANICH, et al.,        )       Hon. Marvin E. Aspen
                                    )
            Defendants.             )


## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

    In their amended complaint, Plaintiffs set forth eight claims against Defendants under

42 U.S.C. § 1983: 1) false arrest, 2) unconstitutional search of Plaintiffs' persons,

3) unconstitutional search and seizure of a vehicle and its contents, 4) failure to intervene,

5) supervisory liability, 6) conspiracy, 7) malicious prosecution, and 8) indemnification.  (Am.

Compl. at 5–23.)  Presently before us are cross-motions for summary judgment.  (Defs.' Mem.,

Pls.' Mem.)  Plaintiffs have moved for partial summary judgment on counts I, II, IV, and V of

their amended complaint, (Pls.' Mem. at 1), and Defendants have moved for summary judgment

on all counts, (Defs.' Mem. at 1).  For the reasons discussed below, we deny in part and grant in

part.

# BACKGROUND

## A. Plaintiffs' Voluntary Dismissals

Before we address the motions for summary judgment we first turn to Plaintiffs' request for voluntary dismissal of certain parties and claims. (Pls.' Resp. at 4–6.)[1] First, Plaintiffs request that we approval their voluntary dismissal of officers Gorzokowski and Karczewski, without costs to Defendants. (*Id.* at 4.) Second, they request that we approve the voluntary dismissal of count III (unconstitutional search and seizure of vehicle), and count VI (conspiracy pursuant to 1983), without costs to Defendants. (*Id.*) Third, they ask that we approve the voluntary dismissal of Plovanich and Millan only from count II (unconstitutional search of persons), without costs to Defendants. (*Id.*) Finally, they ask that we approve the voluntary dismissal of certain defendants from certain parts of claims, without costs to Defendants:

1) Defendants Plovanich and Millan only from count I (false arrest) as it pertains to Rico and George only.

2) All Defendants from count I (false arrest) as it pertains to George only, and only for the time period subsequent to the time that defendants claim they found a $5 bag of cannabis while searching George Smith's vehicle.

3) Defendants Plovanich and Millan only from count VII (malicious prosecution) as it pertains to the mob action charge against Rico, and the mob action charge against George.

4) All Defendants from count VII (malicious prosecution), as it pertains to the possession of cannabis charge against George only.

---

[1] Plaintiffs included their request for voluntary dismissals in their response to Defendants' motion for summary judgment instead of filing a separate motion for voluntary dismissal, which they were required to do under Rule 41. Fed. R. Civ. P. 41(a)(1)(A)(i). Because their failure to follow proper procedure does not affect our ruling, however, we first address the voluntary dismissals before addressing the motions for summary judgment. This approach makes practical sense given the numerous claims and parties involved.

(*Id.* at 5.)  We grant without prejudice all of Plaintiffs' aforementioned voluntary dismissals.[2]

### B. Background Facts

Before delving into the facts, we first address the parties' requests to strike certain facts. Defendants ask us to strike Plaintiffs' statement of additional material facts, (Defs.' Resp. at 3), and Plaintiffs have filed a motion to strike Defendants' joint reply to Plaintiffs' response to Defendants' rule 56.1 statement of facts, (Pls.' Mot. Strike).  In addition, most of the statements of fact are disputed in whole or in part.  With exception to the undisputed facts concerning the presence of certain Defendant officers on the scene of Plaintiffs' arrest and the Defendant officers' respective roles in processing the relevant paperwork thereafter, we do not make any findings of fact.[3]  As such, the parties' requests to strike certain facts are irrelevant for purpose of the present motion.

### 1. Plaintiffs David Wilbon, Rico Wilbon, and George Smith

On the evening of April 9–10, 2010, Plaintiffs David Wilbon, Rico Wilbon, and George Smith met up around 11:00 or 11:30 p.m.  They drove a white 2001 Pontiac Aztec SUV, owned by the grandmother of George's girlfriend, to Carolyn's Lounge at N. Central Avenue and W. Bloomingdale Street in Chicago somewhere between 1:00 and 1:45 am.  (Pls.' SOF ¶ 9.) They spent some time talking with people outside Carolyn's Lounge before deciding to go to David's home on Avers Street.  (*Id.* ¶ 11.)  While en route, Rico received a call from his friend Tyrone Jones and the three Plaintiffs decided to change course to meet up with him and the other

---

[2] Despite Defendants' request that we dismiss with prejudice the claims up for voluntary dismissal, (Defs.' Reply at 2), we decline to do so in light of Rule 41, which states that unless stated otherwise, a voluntary dismissal should be granted without prejudice, (Fed. R. Civ. P. 41).
[3] We explicitly note in the background section where the relevant facts are undisputed.  Other than said undisputed facts, we cite Plaintiffs' version of the facts as it relates to Plaintiffs' activities the evening of April 9–10, 2010 and cite to Defendants' version of the facts as it relates to Defendants' activities that same evening.

three friends Tyrone was with—LeCharn Lewis, Shawn Smith, and Anthony Pleas—who were driving a silver 2004 Cadillac. (*Id*. ¶ 12.) The two groups met in front of the Chicago Police Department 15th district headquarters at 5701 W. Madison Street. (*Id*. ¶ 13.) They pulled up next to one another, but then George pulled the SUV in front of the Cadillac to clear the way for an approaching police car whose emergency lights were on. (*Id*. ¶ 62.) According to Plaintiffs, which Defendants dispute, after the police car pulled up, eight to ten officers arrived in a rush, in police vehicles and on foot from the 15th district headquarters, approached the SUV, and demanded that Plaintiffs exit the vehicle. (*Id*. ¶ 63.)[4] The officers ordered David and George to their knees and then handcuffed them as well as Rico, searched them, and ordered them to face, and place their hands on, the SUV. (*Id*. ¶ 66.) The white, female supervisory officer, the only female officer on duty, ordered the male officers to arrest all seven men—David, Rico, George, Tyrone, LeCharn, Shawn, and Anthony. (*Id*. ¶ 68.) Plaintiffs were then brought to the station where they were handcuffed to each other or the wall. (*Id*. ¶ 66.) According to Plaintiffs, no private male citizen was in the back seat of a police car who identified or claimed to have identified them, and they were not placed in a line-up. (*Id*. ¶ 67.) Plaintiffs were not told why they were arrested until they were released from custody the next morning. (*Id*. ¶ 77.)

At no point during the evening of April 9–10, 2010, state Plaintiffs, were they on the 1300 block of N. Menard. (*Id*. ¶ 14.)

---

[4] Plaintiffs state that the Defendant officers arrived in a rush, "some with guns drawn." (*Id*. ¶ 63.) Their citations to the record, however, indicate conflicting evidence as to whether any Defendants had their gun*s* drawn when they approached the SUV. David testified that the officers did not have their guns drawn. (David Dep. at 58:2-4.) Rico testified that he does not remember. (Rico Dep. at 57:5.) George testified that one officer had his gun drawn "when he got out of the car . . . once he got me out the car and occupied, that's when he put the gun back in his holster." (George Dep. at 100:10-15.)

The charges against Plaintiffs were ultimately dismissed.  On June 1, 2010, George and Rico attended court for mob action charges, and George also for cannabis possession, all of which were stricken; no further proceedings were held with regard to these matters.  (Defs.' SOF ¶¶ 111–12.)  David's charges of mob action and aggravated assault of a peace officer were not stricken until September 10, 2010.  (*Id*. ¶ 110.)  None of the Defendant officers testified against any of the Plaintiffs.  (*Id*. ¶ 113.)  Nor did the officers take action to reinstate the charges for any of the Plaintiffs after they were stricken.  (*Id*. ¶¶ 115–17.)

The City of Chicago settled a civil rights case with the four men in the Cadillac—Tyrone, LeCharn, Shawn, and Anthony—for $50,000 in a case entitled *Pleas, et al. v. Esquivel, et al.*, 11 C 7718.  (Pls.' SOF ¶ 79.)

## 2. Witness Keith A. Thornton, Jr.

Keith A. Thornton, Jr. testified that on April 9–10, 2010, at approximately 1:00 or 2:00 a.m., he was on his way to volunteer at a Chicago fire station located at 1747 North Pulaski, where Plaintiffs state he was not expected, when he drove through the 1300 block of N. Menard so as to avoid interfering with several squad cars.  (Defs.' SOF ¶ 99; Pls.' SOF ¶ 38.)  While on N. Menard, he observed people throwing objects, one of whom was an African American male with dreadlocks.  (Defs.' SOF ¶ 100.)  According to Thornton, he then called 911 and informed them that: 1) a female police officer had been hit on the head with a bottle; 2) the individual who threw the bottle was African American and had dreadlocks; 3) the individual was running south while talking on a cellular phone; and 4) the individual got into an SUV, which pulled away from the scene.  (Pls.' SOF ¶ 50; Defs.' SOF ¶¶ 100–02.)  Thornton then followed the SUV, while communicating the details of the route and the SUV's license plate, until both vehicles arrived at the 15th district station.  (Defs.' SOF ¶¶ 103–04.)

The 911 recordings provided, however, by the City of Chicago Office of Emergency Management and Communications through Defendants for the 15th and 25th districts for April 9–10, 2010 contain no 911 call from Thornton or from anyone claiming he saw a man with dreadlocks throw a bottle at a female police officer and/or who was following a dark-colored SUV. (Pls.' SOF ¶ 51.)

After parking his vehicle, Thornton entered the station and spoke with a Caucasian female lieutenant for about 1-1/2 minutes, telling her what he observed on the 1300 block of N. Menard and how he followed the SUV to the 15th district station. (Defs.' SOF ¶ 105; Pls.' SOF ¶ 54.) In the presence of the lieutenant and potentially other officers, he then identified an individual with dreadlocks standing outside the station as the individual whom he saw throw the bottle that struck an officer on the 1300 block. (Defs.' SOF ¶ 106.) According to Defendants, two officers then took Thornton to their vehicle and drove him past the individuals standing near the SUV, and Thornton identified the same individual, David, as the one who threw a bottle at the officer on the 1300 block. (*Id.* ¶ 107.) Thornton observed the officers relay his identification to other officers and then returned to the station where he spoke with other officers about his identification. (*Id.* ¶ 108–09.)

### 3. Defendant Lt. Sarah McDermott

That evening, Lt. Sarah McDermott was acting watch commander for the 15th district. (*Id.* ¶ 40.) While at the 15th district station, McDermott heard over police radio communication reports of objects being thrown at police officers on the 1300 block of N. Menard as well as an emergency request to assist officers, known as a "10-1," which was immediately cancelled. (*Id.* ¶ 41.) She also heard over police radio communication that a citizen called 911 and reported that he was following a vehicle whose occupants were involved in the events that took place on the

1300 block.  (*Id.* ¶ 42.)  Her understanding was that the witness and the vehicle he was following were near the front of the 15th district station.  (*Id.* ¶ 43.)  After speaking with the witness at the station, she understood that he observed the three men in the vehicle outside the station commit certain acts on the 1300 block of N. Menard and then followed these individuals to the 15th district station.  (*Id.* ¶ 44.)  McDermott made the initial approval of probable cause for two counts of aggravated assault of a peace officer and one count of mob action against David.  (*Id.* ¶ 45.)

### 4. Defendant officers Kushiner and Cerda

Kushiner and Cerda were working as partners that same evening when they heard police radio communication concerning bottles being thrown at officers on the 1300 block of N. Menard as well as the "10-1" emergency request that was immediately cancelled.  (*Id.* ¶¶ 71–72.)  When they arrived back at the 15th district police station, Kushiner spoke with Thornton outside the station and understood that he was an eyewitness to the events that took place on the 1300 block, that Thornton had called 911 to report what he observed, and that Thornton believed the occupants in the vehicles outside the station were involved in those events.  (*Id.* ¶¶ 75–76.)  Cerda saw this encounter and then spoke with Kushiner who informed him that Thornton had identified the individuals outside the vehicle as individuals involved in the disturbance on the 1300 block.  (*Id.* ¶¶ 77, 80.)  Kushiner requested assistance using police radio communication and walked across the street to the two civilian vehicles and had the occupants exist the vehicles. Cerda parked, activated the police vehicle emergency equipment, and also exited the vehicle. (*Id.* ¶ 79.)  Kushiner and Cerda both recognized the smell of cannabis coming from the SUV. (*Id.* ¶ 81.)  After George stated that he had a bag of weed in the SUV, Cerda searched the SUV and recovered a small bag of cannabis from the driver's side floorboard.  (*Id.* ¶¶ 82–84.)  Cerda

and Kushiner arrested George for possession of cannabis and mob action. (*Id.* ¶ 87.) Kushiner and Cerda are listed as the arresting officers on George's arrest report. (Def.'s Resp. to Pl.'s SOF ¶ 64.) Kushiner is also listed as an assisting arresting officer on David and Rico's arrest reports, and Cerda is listed as an assisting arresting officer on Rico's arrest report. (*Id.*)

Cerda generated the arrest report, and Kushiner signed a misdemeanor complaint against George for possession of cannabis, against George and Rico for mob action, and against David for mob action. (*Id.* ¶¶ 88–90, 92.)

### 5. Defendant officers Plovanich and Millan

Meanwhile that same evening, officers Plovanich and Millan were working as partners in the 25th district when they responded to a call on the 1300 block of N. Menard. (Defs.' SOF ¶¶ 5, 6, 20.) Upon arrival, they encountered some individuals who threw several bottles at them. (*Id.* ¶¶ 21–22.) Neither officer was hit nor injured and neither officer saw who threw the bottles. (Pls.' SOF ¶¶ 19–20.) After the back-up police cars arrived, the bottle-throwing stopped and people scattered. (*Id.* ¶ 21.) Most of the officers assigned to the 25th district were present. (*Id.* ¶ 27.)

No one was arrested on the 1300 block of N. Menard; Millan testified that he did not think anyone should be arrested just for drinking and talking loudly on a lawn. (*Id.* ¶ 26.) He also testified that he does not remember any female officers being on the scene, nor a 2001 white Aztec SUV or 2004 silver Cadillac on the 1300 block of N. Menard. (*Id.* ¶ 24.) When they left to return to the 25th district headquarters at 3:04 a.m., everything was calm on the scene and Plovanich and Millan had no intention of figuring out who had thrown the bottles. (*Id.* ¶ 28.) When they arrived at the 25th district headquarters, they were ordered to drive to the 15th district headquarters, where they met with acting watch commander Lt. McDermott, who informed them

that she had spoken with a witness who said he saw someone throw bottles and that one person was in custody.  (*Id.* ¶¶ 29–30.)

Based on what McDermott had communicated to them, Plovanich and Millan understood that the witness, Thornton, had followed the individual in custody from the 1300 block of N. Menard and identified him to the police.  (Defs.' SOF ¶ 23.)  No one interviewed Plovanich or Millan to find out what had happened to them on the 1300 block of N. Menard, nor did anyone ask them to view David in custody or look at his photograph to try to identify him.  (Pls.' SOF ¶¶ 31, 34.)  The officers themselves did not do so because they knew they could not identify anyone.  (*Id.* ¶ 34.)  Plovanich and Millan each signed a separate misdemeanor complaint against David for aggravated assault of a peace officer.  (Defs.' SOF ¶ 25.)

### 6. Defendant officers Esquivel and Valentin

Esquivel and Valentin were working as partners assigned to the 15th district that evening. (*Id.* ¶ 46.)  While at the 15th district station, they overhead police communication regarding bottles being thrown at officers on the 1300 block of N. Menard as well as the "10-1" emergency request that was immediately cancelled.  (*Id.* ¶ 47.)  Valentin also heard police radio communication regarding a witness who was following a vehicle containing individuals involved in the 1300 block disturbance.  (*Id.* ¶ 48.)  At some point, Valentin and Esquivel exited the station to observe what they believed was a traffic stop involving an SUV.  (*Id.* ¶ 49.)  Esquivel saw an individual in the back seat of a police car point at David and say, "He is the one who threw the bottle at the police officer."  (*Id.* ¶ 50.)  Valentin approached the SUV and learned that the witness in the back of the police car had followed the SUV to the station after observing certain individuals, who were standing near the SUV, participate in the 1300 block disturbance. (*Id.* ¶ 51.)  He then informed the other officers, including Esquivel, that the witness had

identified the individuals near the SUV as having been involved with the events on the 1300 N. Menard block. (*Id*. ¶ 52.) Valentin also heard George admit to having cannabis in the SUV and observed a bag that was recovered from the SUV. (*Id*. ¶ 53.) Valentin and Esquivel then arrested David and Rico at approximately 2:30 a.m. (*Id*. ¶ 54.) Both Valentin and Esquivel are listed as the arresting officers on David and Rico's arrest reports, and as the assisting arresting officers on George's arrest report. (Def.'s Resp. to Pl.'s SOF ¶ 64.) Once they were inside the station, Esquivel performed a custodial search on David, Rico, and George. (Defs.' SOF ¶ 55.)

### 7. Defendant officers Garcia and Silva

Officers Garcia and Silva were working as partners assigned to the 15th district that evening when they responded to the police call at the 1300 block of N. Menard. (*Id*. ¶¶ 56–57.) The officers observed individuals throwing objects, including bottles. (*Id*. ¶ 57.) After leaving the 1300 block and returning to the 15th district station, Garcia observed officers making what he believed to be a traffic stop. (*Id*. ¶¶ 58–59.) After speaking with Valentin and Esquivel, his understanding was that a witness, Thornton, had observed the arrestees on the 1300 block of N. Menard. (*Id*. ¶ 61.) Garcia and Silva assisted with the paperwork relating to the arrests. (*Id*. ¶¶ 60, 64.) Garcia prepared the misdemeanor complaints charging Rico and George with mob action and presented them to officer Kushiner for his signature as complainant, and Silva prepared a misdemeanor complaint for David. (*Id*. ¶¶ 62, 64.) Neither Garcia nor Silva handcuffed or searched David, Rico, and George, nor did they escort them into the station. (*Id*. ¶¶ 65–66.) While neither Garcia nor Silva were listed as the arresting officers for any of the Plaintiffs, (*id*. ¶¶ 68–69), Silva was listed an assisting arresting officer for all three Plaintiffs, and Garcia was listed an assisting arresting officer for Rico and George. (Def.'s Resp. to Pl.'s SOF ¶ 64).

### 8. Defendant officers Graney and Mangan

Meanwhile, officers Graney and Mangan were inside the 15th district police station when Mangan saw, through a glass window, a couple of police cars and a group of people standing in the street in front of the station. (Defs.' SOF ¶¶ 28–30.) He exited with Graney intending to secure officer safety. (*Id*. ¶¶ 30–31.) Mangan did not handcuff David, Rico, or George, nor did he see them in handcuffs. (*Id*. ¶ 32.) Mangan and Graney did not participate in the preparation of police reports generated pursuant to those arrests, nor did they sign or prepare criminal complaints for charges brought against Plaintiffs. (*Id*. ¶¶ 33–34.) Lastly, Mangan and Graney were not listed as the arresting officers, assisting or otherwise, for the arrests of David or Rico, but they were both listed as the assisting arresting officers on George's arrest report. (*Id*. ¶¶ 35–36; Def.'s Resp. to Pl.'s SOF ¶ 64.)

### 9. Defendant officers Gorzkowski and Karczweski

Gorzkowski was assigned as the watch commander for the 15th district beginning at 5:00 a.m. and thus was not present for the arrest of Plaintiffs. (Defs.' SOF ¶¶ 94–95.) Karczweski also was not present for the arrest of Plaintiffs and was not listed as an arresting officer, assisting or otherwise. (*Id*. ¶ 37.) Plaintiffs have voluntarily dismissed all claims against both Gorzkowski and Karczweski. (Pls.' Resp. at 4.)

On February 16, 2012, Plaintiffs filed their initial complaint against Defendants, and on June 5, 2012, they amended their complaint, alleging eight claims under 42 U.S.C. § 1983. (Am. Compl. at 5–23.) Defendants filed their motion for summary judgment as to all counts on November 20, 2013, and Plaintiffs filed their partial motion for summary judgment on December 2, 2013 as to counts I, II, IV, and V. (Defs.' Mem., Pls.' Mem.)

**STANDARD OF REVIEW**

Summary judgment will be granted in favor of the moving party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552 (1986). When ruling on a motion for summary judgment, we must view evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Rebolar ex rel. Rebolar v. City of Chi., Ill.*, 897 F. Supp. 2d 723, 726 (N.D. Ill. 2012). If and only if a reasonable jury could not return a verdict for the nonmovant, is summary judgment warranted. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.


**DISCUSSION**

Before we begin our analysis of each claim, we first review and summarize the conflicting facts. What exactly transpired on the evening of April 9–10, 2010 remains unclear. The two sets of facts, as portrayed by Plaintiffs and Defendants respectively, each paint a convincing picture of whether or not Defendants had the requisite scienter to arrest, search, and initiate criminal proceedings against Plaintiffs.

Plaintiffs argue that Defendants had neither the probable cause needed for the specific crimes that allegedly occurred, nor the probable cause needed for the specific perpetrators of

those crimes.  (Pls.' Mem. at 14.)[5]  They emphasize the following discrepancies in Thornton's story:

1) that he saw a female officer, but there were no female officers on the 1300 block of N. Menard;

2) that a female officer was hit on the head with a bottle, but no reports and no confirmation that any officer was hit on the head with a bottle;

3) that male officers who helped the female officer did not chase and apprehend the alleged bottle-thrower;

4) even though there were many police cars on the block, Thornton did not report what he saw to anyone at the scene;

5) that the alleged bottle-thrower ran to a dark-colored SUV, but Plaintiffs were driving a white SUV;

6) that the alleged bottle-thrower entered a vehicle with three males already in it, making it four occupants to the vehicle, but the three Plaintiffs were the only people in the SUV; and

7) that Thornton's reason for being at 1320 N. Menard Ave at 2:00 a.m. was incredible, in that he said he was driving to a fire station where he was going to volunteer, yet no one was expecting him.

(Pls.' Mem. at 14, 16.)

Defendants portray the facts in the following manner:

1) that an eyewitness, Thornton, identified David as the individual who threw bottles at an officer on the 1300 block of N. Menard;

---

[5] They emphasize that Thornton claims he observed the events at 1320 N. Menard Ave, but reported them to McDermott *almost two miles away* at the 15th District police headquarters." (Pls.' Mem. at 14.)  This distance does not undermine what Thornton allegedly saw and what he allegedly reported to McDermott.

2) that at the time he identified David, both McDermott and Kushiner were aware, based on police radio communication, that there had been a disturbance earlier that morning at the vicinity of the 1300 block of N. Menard and that the disturbance included objects being thrown at police officers;

3) that Thornton had seen an SUV, containing both George and Rico, pick up David;

4) that Thornton followed this SUV until it stopped in front of the 15th district police station;

5) that during the police stop officers approached George's SUV and could smell cannabis coming from the SUV; and

6) that when George admitted that he had a baggy of cannabis in the SUV, Cerda looked in the SUV and saw a small bag of cannabis in plain view on the floorboard of the driver's side. (Defs.' Reply at 3.)

The parties thus dispute the events leading to the arrest of Plaintiffs; one account would support a finding of probable cause and justify a resulting arrest, search, and prosecution, and the other would not. Consequently, a genuine issue of material fact exists concerning whether the arresting officers had probable cause. *Morfin v. City of East Chi.*, 349 F.3d 989, 1000 (7th Cir. 2003) (finding that the district court erred in granting summary judgment to the Defendant officers on Plaintiff's Fourth Amendment claim because the parties disputed the events leading to the arrest). Here, the facts informing Defendant officers' knowledge at the time of Plaintiffs' arrest, particularly as they relate to Thornton's credibility and the communication that took place between Defendant officers, is a matter of dispute between the parties. With these facts in mind, we first address count I, Plaintiffs' false arrest claims.

### A. Count I, False arrest

#### 1. Probable cause as to the false arrest claims

##### a. Preliminary issue as to David and George's false arrest claims concerning their mob action charges

Plaintiffs rightly point out that Defendants have not moved for summary judgment on the false arrest claims concerning the mob action charges against David and George. (Pls.' Resp. at 17, 35.) Rather, Defendants limit their argument to the fact that "there was probable cause to charge Plaintiffs with aggravated assault to a police officer (David Wilbon), Possession of Cannabis (George Smith), and Mob Action (Rico Wilbon)[.]" (Defs.' Mem. at 32.) Because Defendants have not briefed whether they had probable cause to arrest and initiate criminal proceedings against David and George for mob action charges, they have waived any argument for summary judgment on David and George's false arrest claims regarding their mob action charges. *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994) (citing *First Indiana Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). On the other hand, if Defendants had probable cause for David and George's other charges, then they would have probable cause for David and George's mob action charges. *Williams v. Rodriguez*, 509 F.3d 392, 405 (7th Cir. 2007) (finding that if an officer has probable cause to arrest a suspect for any crime, there is no Fourth Amendment violation even if the officer lacked probable cause with respect to the actual offense charged). We therefore cannot grant Plaintiffs' motion for summary judgment on David and George's false arrest claims regarding their mob action charges because, as we discuss next, we are unable to determine whether Defendants had probable cause for the other charges of aggravated assault and possession of cannabis.

As to the remaining claims, Defendants argue that Kushiner and McDermott had probable cause to arrest David; that Esquivel and Valentin had probable cause to arrest Rico; and that Kushiner and Cerda had probable cause to arrest George. (Defs.' Mem. at 6, 13, 15.) They also argue that the remaining officers involved in Plaintiffs' arrests are entitled to summary judgment because they reasonably relied on the information provided by the arresting officers as well as what they heard over police radio transmissions. (*Id*. at 9, 14, 18.) Plaintiffs counter "that there are factual issues regarding probable cause which require a trial." (Pls.' Resp. at 32.) In their own motion for summary judgment, however, Plaintiffs argue that there was no probable cause to arrest Plaintiffs. (Pls.' Mem. at 13–18.)

### b. Qualified Immunity: whether Defendants had arguable probable cause

Defendants argue that they are entitled to qualified immunity on the false arrest claims only. (Defs.' Mem. at 8–9,14, 17–18.) A Defendant officer is entitled to qualified immunity for a false arrest claim if a reasonable officer in his position could have mistakenly believed that probable cause existed. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991); *Wollin v. Gondert*, 192 F.3d 616, 625–26 (7th Cir. 1999) ("[O]nly if no reasonable officer could have mistakenly believed that he had probable cause to arrest is [qualified] immunity forfeited"). In other words, we ask whether the officers had "arguable probable cause." *Wollin*, 192 F.3d at 622–23 (citing *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). If the officers have arguable probable cause, it "cloak[s] the officers with immunity from suit." *Brooks v. City of Aurora, Ill*., 653 F3d 478, 484 (7th Cir. 2011).

Qualified immunity cannot be granted, however, where there are material issues in dispute surrounding the constitutional violation. *Morfin*, 349 F.3d at 1000 n.13 (finding that if a police officer's knowledge at the time of arrest is a matter of dispute between the parties,

summary judgment on the basis of "arguable probable cause" is inappropriate). Here, the facts

within the Defendant officers' knowledge at the time of the arrests are a matter of dispute

between the parties. When, as here,

> the arrestee challenges the officer's description of the facts and presents a factual account
> where a reasonable officer would not be justified in making an arrest, then a material
> dispute of fact exists. Where there is a genuine issue of material fact surrounding the
> question of plaintiff's conduct, we cannot determine, as a matter of law, what predicate
> facts exist to decide whether or not the officer's conduct clearly violated established law.

*Id.* (quoting *Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir. 1993)). Given the disputed material

facts as to Defendants' knowledge at the time of the arrests, we are unable to determine whether

their probable cause assessments were reasonable and thus whether there was arguable probable

cause to arrest Plaintiffs.[6] Summary judgment on the basis of arguable probable cause is

therefore inappropriate.

We discuss the disputed facts as they relate to each Defendant's knowledge at the time of

the arrest. First, we address whether Kushiner and McDermitt had arguable probable cause to

arrest David, and then we address whether the other officers were entitled to rely on Kushiner

and McDermott when making the other arrests.

### i. McDermitt and Kushiner

Defendants argue that McDermitt and Kushiner relied on police radio communications

that informed them of a 911 call as well as Thornton's statements about his observations that

evening. (Defs.' Mem. 7–8.) Whether there was a 911 call is a disputed material fact.

According to Defendants, they heard police radio communication announcing that a citizen had

called 911, but according to Plaintiffs, the records provided by the City of Chicago show that no

---

[6] Plaintiffs accurately point out that Defendants have failed to raise, and thus waive, any
argument as to the second prong of the qualified immunity test, namely, that the respective
constitutional rights were not clearly established. (Pls.' Resp. at 32–33.)

911 call occurred. (Pls.' SOF ¶ 51.) Plaintiffs also argue that there is a dispute as to whether the crime Thornton was reporting actually occurred. (Pls.' Resp. at 17.) Thornton testified that a bottle was thrown at a female officer, hitting her on the head. (Pls.' SAF ¶ 31.) According to Plovanich and Millan, however, no female officer was on the scene on the 1300 block of N. Menard and no one was hit on the head with a bottle. (*Id*. ¶ 12.) When Kushiner called the 25th district to verify whether this crime had taken place, he learned that no police officer had been hit and no police officer had been injured. (*Id*. ¶¶ 57, 60.)

The determination of probable cause rests primarily on one alleged eyewitness, Thornton, and disputed facts concerning police communication. It is unclear, based on the facts before us, whether Thornton was a reliable witness, and thus whether it was reasonable for McDermitt and Kushiner to rely on the information he provided and his identification of David.[7] Moreover, a dispute exists between Thornton and the officers as to what Thornton told them regarding his identification. (*See* Pls.' Mem. at 14.) Additionally, the parties dispute whether Thornton in fact got into a police vehicle with two officers to do a drive-by show-up. (Defs.' SOF, Pls.' Resp. to Defs.' SOF ¶ 107.)

We cannot make credibility determinations at the summary judgment stage. The conflicting evidence creates a jury question with respect to Thornton's credibility as a witness and the Defendant officers' communication between one another. Therefore, summary judgment on the basis of McDermitt and Kushiner having arguable probable cause to arrest David is inappropriate.

---

[7] We acknowledge that police officers are under no constitutional obligation to exclude every possibility that a witness is not telling the truth, unless the inconsistencies are such that a reasonable officer would become suspicious. *Beauchamp v. City of Noblesville*, 320 F.3d 733, 744–45 (7th Cir. 2003). Here, however, we do not know whether the facts within Defendants' knowledge should have led a reasonable officer to become suspicious.

### ii. Plovanich, Millan, Esquivel, Valentin, Graney, Mangan, Cerda, Silva, Garcia

Defendants argue that officers Plovanich, Millan, Esquivel, Valentin, Graney, Mangan, Cerda, Silva, and Garcia, "are entitled to qualified immunity" on Plaintiffs' false arrest claims because "they reasonably relied on information they received from Kushiner, [and]. . . McDermott . . . to establish probable cause for the arrest[s]." (Defs.' Mem. at 9–10, 14–15, 18–19.) These Defendant officers did not speak with Thornton, but rather relied on what Kushiner and/or McDermitt communicated to them: that David was present on the 1300 block of N. Menard and had thrown a bottle at a police officer; that he was picked up by an SUV containing other individuals; and that Plaintiffs admitted they were together in the SUV that night. (*Id*. at 10, 13.) Based on this information, Defendants argue that it was reasonable for them to believe that David had committed aggravated assault of a peace officer and that Rico was present at the time of the mob action. (*Id*. at 9, 13–15.) Moreover, they reasonably relied on the information relayed to them by Kushiner, who stated that he smelled and saw cannabis in the SUV and that George admitted to having cannabis in the SUV. (*Id*. at 18–19.)

"In a civil case for an arrest without probable cause, the collective knowledge doctrine means a defendant is entitled to qualified immunity if he relied in objective good faith on another officer as to the justification for the arrest." *Graham v. Blair*, 10 C 772, 2011 WL 6888528, at *6 (S.D. Ill. Dec. 28, 2011). "The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232–33, 105 S. Ct. 675, 682 (1985)). For the collective knowledge doctrine to apply, 1) the officer taking the action must act in objective

reliance on the information received, 2) the officer providing the information must have facts supporting the level of suspicion required, and 3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *Williams*, 627 F.3d at 252–53 (citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)). "[I]f there are no circumstances that would lead a reasonable officer in the defendant's position to believe the officer directing the seizure cannot be trusted to assess probable cause, the defendant can rely on the lead officer in good faith and be accorded qualified immunity for any unlawful arrest." *Graham*, 2011 WL 6888528, at *6 (citing *Hardiman v. Ford*, 41 F.3d 1510, 1994 WL 585409, at *4 (7th Cir. 1994)).

Given the facts before us, we address whether the circumstances presented to a reasonable officer in each Defendant officer's position would have caused him to question Kushiner and McDermott's probable cause assessments. *Graham*, 2011 WL 6888528, at *6. Plovanich, Millan, Garcia, and Silva were on the 1300 block of N. Menard when the bottles were thrown and determined that there was no reason to arrest anyone. Later that evening, however, officers Plovanich and Millan each signed a separate misdemeanor complaint against David, and officers Garcia and Silva were listed as assisting arresting officers on the arrest reports concerning the 1300 N. Menard block incident. A reasonable jury could find that there were circumstances present for these officers that should have led them to question Kushiner and McDermott's probable cause assessments. Summary judgment on the basis of qualified immunity for Plaintiffs' false arrest claims is inappropriate for Plovanich, Millan, Garcia, and

Silva because we are unable to determine at this stage whether the Defendant officers' reliance on Kushiner and McDermott was in good faith.[8]

The other officers were not on the 1300 block of N. Menard when the bottles were thrown, however. Instead, they relied either on police radio communication or information from other fellow officers that bottles had been thrown at officers on the 1300 block of N. Menard. As such, "a reasonable officer witnessing the scene [of Plaintiffs' arrest] and seeing other officers move to arrest [Plaintiffs] could believe that those officers were acting on probable cause, and assist in effectuating the arrest." *Duran v Sirgedas*, 240 Fed. App'x 104, 116 (7th Cir. 2007). Under these circumstances, a reasonable officer would believe there was probable cause to arrest Plaintiffs. *Id*. As such, Esquivel, Valentin, Graney, Mangan, and Cerda are entitled to qualified immunity.

### c. Whether McDermitt, Kushiner, Plovanich, Millan, Silva, and Garcia had the duty to investigate further

At times, information from or about a person claiming to be the eyewitness to a crime should lead a reasonable officer to be suspicious, and require him to pursue "reasonable avenues of investigation" especially when "it is unclear whether a crime had ever taken place." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986); *Reardon v. Wroan,* 811 F.2d 1025 (7th Cir. 1987); *see Moore v. The Marketplace Restaurant*, 754 F.2d 1336, 1345–46 (7th Cir. 1985) (stating that, "it is incumbent upon law enforcement officials to make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention"). At the same time, however, police officers "must often act swiftly, [and] cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Lipscomb v. Knapp*,

---

[8] Because we have granted Plaintiffs' voluntary dismissal of Plovanich and Millan from count I (false arrest) as it pertains to Rico and George, only David's false arrest claim remains pending against Plovanich and Millan.

No. 07 C 5509, 2009 WL 3150745, at *9 (N.D. Ill. Sep. 30, 2009) (quoting *Hensley*, 469 U.S. at 231, 105 S. Ct. at 682). Officers are under no duty to investigate further or search for exculpatory evidence "once probable cause has been established via the accusation of a credible witness." *Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006) (citing *Anderer v. Jones*, 385 F.3d 1043, 1049 (7th Cir. 2004)).

Plaintiffs argue that the information provided by Thornton should have led Defendant officers to further investigate. (Pls.' Resp. at 21.) Had Defendant officers inquired further, assert Plaintiffs, they would have learned that Thornton had no opportunity to see the person who allegedly threw a bottle at the female officer, that he was confused as to the path he claimed he followed in pursuit, and that he was not truthful about having made a 911 call, a fact easily verifiable with the police dispatcher. (Pls.' Mem. at 14.)

While true that police have no duty to investigate further once probable cause is established by the accusation of a credible witness, *Mustafa*, 442 F.3d at 548, the facts are disputed as to Thornton's credibility. More fundamentally, at the summary judgment stage, "evaluations of witness credibility are inappropriate[.]" *Washington*, 481 F.3d at 550. Additionally, the facts regarding the communication between the officers on April 9–10, 2010 are disputed as well. Whether it was incumbent upon the officers to investigate further, based on the information with which they were presented that evening, is a question for the trier of fact.

### d. Whether there was probable cause

"A finding of probable cause absolutely bars a claim for false arrest under § 1983." *Reynolds v. Jamison*, 488 F3d 756, 765 (7th Cir. 2007) (citing *Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990)). A finding of probable cause at the time of an arrest depends on whether "the facts and circumstances within the officer's knowledge . . . are sufficient to warrant

a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Brooks*, 653 F.3d at 484 (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)) (internal quotations omitted). Probable cause "does not require evidence sufficient to support a conviction, or even evidence more likely than not that the suspect committed a crime . . . [i]nstead, so long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *Guidry v. Boyd*, No. 06 C 1600, 2007 WL 2317174, at *6 (N.D. Ill. Jul. 17, 2007) (citing *U.S. v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001)) (internal citations and quotations omitted).

Here, because the facts comprising the "totality of the circumstances" are disputed, we are unable to make a finding as to whether the officers had probable cause to believe that there was a "substantial chance of criminal activity" on Plaintiffs' part. Having already discussed that, based on the disputed facts, we are not in a position to determine whether Defendants McDermott, Kushiner, Plovanich, Millan, Garcia, and Silva had arguable probable cause, we of course are not in a position to determine whether they met the higher burden of establishing probable cause. Summary judgment on the basis of probable cause to arrest is therefore inappropriate.[9]

### 2. Whether defendants caused or participated in the alleged false arrest

"An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) (italics omitted). In light of the fact that we have already found that Esquivel, Valentin, Graney,

---

[9] Having found that Esquivel, Valentin, Graney, Mangan, Cerda, Karczewski, and Gorzkowski are entitled to qualified immunity on the false arrest charge based on arguable probable cause, we need not address whether they had probable cause.

Mangan, and Cerda are entitled to qualified immunity on Plaintiffs' false arrest claims, we need not discuss whether they caused or participated in Plaintiffs' arrest. We therefore only address McDermott, Kushiner, Plovanich, Millan, Garcia, and Silva's liability.

Plaintiffs' argument that an arrest extends from when a person is not free to leave until the person is taken before a court and the judicial process takes over is incorrect. The moment for determining probable cause in the context of a false arrest is "at the time of the initial arrest," i.e. when the handcuffs are placed on the plaintiff, and not after that point. *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) ("A police officer has probable cause to arrest a person if, *at the time of the arrest*, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'") (emphasis added) (internal citations omitted); *Bass v. Hansen*, No. 09 C 1087, 2011 WL 528837, at *3 (N.D. Ill. Feb. 3, 2011) (finding that "the relevant moment for determining whether there was probable cause to arrest Plaintiff" was when the officers handcuffed her and put her in the back seat of a police vehicle).[10] Officers who were not present at the time of the arrest thus cannot be held liable.

Here, the Defendant officers who placed the handcuffs on Plaintiffs may of course be held liable for a false arrest claim since they caused the alleged constitutional deprivation, namely, the unlawful arrest. *See Jenkins*, 147 F.3d at 583. Other officers who were present for the arrests may also be held liable if their assistance was such that they caused or participated in

---

[10] As Defendants point out, the case Plaintiffs cite, *Wallace v. Kato*, 549 U.S. 384, 388–89, 127 S. Ct. 1091, 1095 (2007), does not concern false arrest claims, but rather the calculation of the statute of limitations for false imprisonment claims.

the arrest. With these standards in mind, we consider each Defendant's involvement in the arrests of each Plaintiff.

### a. Officers who merely processed paperwork: Plovanich and Millan

Because Plaintiffs have voluntarily dismissed Plovanich and Millan from count I (false arrest) as it pertains to Rico and George, we only address their liability as to David's false arrest claim. The undisputed facts indicate that Plovanich and Millan were not present when David was arrested; they did not arrive at the 15th district police station until after the arrests had taken place. (Pls.' Resp. to Defs.' SOF ¶¶ 26–27.) While they did each sign a criminal complaint against David for aggravated assault of a peace officer, (*id*. ¶¶ 24–25), this is not sufficient to constitute personal involvement in causing or participating in his arrest, *Jenkins*, 147 F.3d at 583–84 (granting summary judgment on a claim of false arrest to defendant officer who filled out paperwork after Plaintiff was already in custody and seized because said officer did not cause or participate in the arrest). Because we find that Plovanich and Millan did not cause or participate in David's arrest, we grant them summary judgment on his false arrest claim.

### b. Arresting officer Kushiner

It is undisputed that officers Esquivel and Valentin arrested David and Rico and that officers Kushiner and Cerda arrested George. (Pls.' Resp. to Defs.' SOF ¶¶ 54, 65, 87.) Because we have already found that Esquivel, Valentin, and Cerda are entitled to qualified immunity, however, we only address whether Kushiner caused or participated in Plaintiffs' alleged false arrest. We cannot grant summary judgment on the basis of Kushiner's involvement, or lack thereof, in George's arrest since, as we have discussed, there may or may not have been probable cause.

### c. Officers who were present during the arrests and/or who were listed as assisting arresting officers: McDermott, Kushiner, Silva, and Garcia

Having already found that Esquivel, Valentin, Graney, Mangan, and Cerda are entitled to qualified immunity, we need only address whether McDermott, Kushiner, Silva, and Garcia's presence at the scene of Plaintiffs' arrest was such that they caused or participated in the arrests. Defendants admit that Kushiner participated in George's arrest, but argue that the officers did not cause or participate in David's and Rico's arrest because they were merely present on the scene to provide security for the other officers. (Defs.' Mem. at 11–12, 16–17.) Plaintiffs have presented no evidence, assert Defendants, to suggest that these officers "had any interaction or physical contact with David [or]. . . Rico." (Defs.' Reply at 5–6.) Defendants add that McDermott, Silva, and Garcia "participated in the processing of David Wilbon once he reached the station, drafting of the arrest reports, and the like, but nothing more." (Defs.' Mem. at 11.) Because "none of these facts are sufficient to establish personal liability under § 1983 for false arrest," Defendants argue that these officers are entitled to summary judgment on the false arrest claim. (*Id*. at 11–12, 17.)

We disagree. While true that merely processing paperwork is not sufficient to sustain the false arrest claim, it is undisputed that these Defendants were all present during the arrests of all three Plaintiffs. The parties also do not dispute that McDermott ordered the arrests, that Kushiner was listed as an assisting arresting officer for David, that Silva was listed an assisting arresting officer for all three Plaintiffs, and that Garcia was listed an assisting arresting officer for Rico and George. (Def.'s Resp. to Pl.'s SOF ¶ 64.) Accordingly, we cannot grant summary judgment in favor of these Defendant officers who were personally responsible for ordering the arrests of, arresting, or assisting with the arrests of these respective Plaintiffs. All three of

Plaintiffs' false arrest claims remain against McDermott and Silva, David's false arrest claim remains against Kushiner, and Rico and George's false arrest claims remain against Garcia. We cannot grant summary judgment in favor of Plaintiffs because we are unable to determine whether there was probable cause for these arrests. Since these Defendants were only personally involved with the arrests of these respective Plaintiffs, however, we do grant Kushiner summary judgment as to Rico and George's false arrest claims and grant Garcia summary judgment for David's false arrest claim. *See Dishman v. Cleary*, No. 07 C 5626, 2011 WL 1261098, at *5 (N.D. Ill. Mar. 29, 2011) (finding that officers who did not have any interaction with the plaintiff at the scene of his arrest were entitled to summary judgment because they did not cause or participate in the constitutional deprivation); *see also Ortiz v. City of Chi.*, No. 09 C 2636, 2010 WL 3833962, at *8 (N.D. Ill. Sep. 22, 2010).

### B. Count II, Unconstitutional search of Plaintiffs' persons[11]

#### 1. Whether Defendants had reasonable suspicion and probable cause

In their motion for summary judgment, Defendants argue that Plaintiffs were lawfully stopped pursuant to the Supreme Court's decision in *Terry v. Ohio*, which allows officers to conduct a brief, investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed. (Defs.' Mem. at 19 (citing *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 1880 (1968)). Plaintiffs counter, however, that this was not a *Terry* stop but rather an arrest, and that because the arrest was unconstitutional so was the search incident to arrest. (Pls.' Resp. at 31, Pls.' Mem. at 19.)

---

[11] We do not address Plovanich and Millan's liability for Plaintiffs' illegal search claims since we granted Plaintiffs' request for the voluntary dismissal of Plovanich and Millan from this count.

As the Seventh Circuit has stated, "[a] difficult question often arises regarding at exactly what point a *Terry* stop matures into an arrest." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000); *United States v. Ienco*, 182 F.3d 517, 525 (7th Cir. 1999) (assessing when the officers' conduct exceeds what is allowable under *Terry* and "veers into the kind of major intrusion requiring probable cause"). In *United States v. Ienco*, the court found that an arrest occurred where, after a pat down revealed no weapons, officers removed and kept the defendant's wallet and license. *Ienco*, 182 F.3d at 525. Of particular relevance to the case before us is that because "police officers face a 'fluid situation' during a *Terry* stop," they can "graduate their responses to the demands of the particular circumstances[.]" *Swift*, 220 F.3d at 509 (citing *United States v. Weaver*, 8 F.3d 1240, 1243 (7th Cir. 1993) (internal quotations omitted)). There is, however, "no bright-line test that separates a lawful investigatory stop from an illegal arrest." *Weaver*, 8 F.3d at 1243.

Here, Defendants initially only needed reasonable suspicion to stop and search Plaintiffs, but when the decision to arrest Plaintiffs materialized, the probable cause requirement at that moment also materialized. Given the undisputed fact that Defendant officers ultimately arrested Plaintiffs, at some point during the stop their conduct clearly "exceeded the bounds of *Terry* and resulted in an arrest." *See Ienco*, 182 F.3d at 524. A search incident to an arrest, which does not require a warrant, is proper, even when the risk to the officers or to the existence of evidence is negligible. *United States v. Flores-Lopez,* 670 F.3d 803, 809 (7th Cir. 2012) (*United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 476 (1973)). We therefore must assess whether Defendants had reasonable suspicion at the time they stopped and searched Plaintiffs, and then upon Plaintiffs' arrest, whether they had probable cause.

The facts relevant to a determination of whether Defendants had reasonable suspicion and probable cause, however, are disputed. Reasonable suspicion need not rise to the level of probable cause, *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002), but it must be based on some objective manifestation that the suspect was or is involved in criminal activity, *Swift*, 220 F.3d at 506. We cannot say whether there was reasonable suspicion because we do not know whether Defendants' assessment of what transpired on the 1300 block of N. Menard was reasonable. In other words, there is conflicting evidence as to whether there were articulable facts that a crime was committed and that Plaintiffs committed the crime. Whether it was reasonable for the Defendant officers to suspect that David committed a crime informs the question of whether there was a valid *Terry* stop and subsequent search incident to arrest. Such facts inform the question of whether Defendants had the right to stop and search not only David, but also Rico and George, keeping in mind George's admission that he had cannabis in the SUV.[12] Whether the totality of the circumstances known to these Defendant officers presented the reasonable suspicion required for these officers to stop and search Plaintiffs, is a question for the trier of fact. For the reasons discussed above, we are also unable to determine whether Defendants had probable cause to arrest Plaintiffs. As such, it is for the trier of fact to decide whether there was a valid search incident to a legal arrest.

### 2. Whether Defendants caused or participated in the search of Plaintiffs

Having granted Plaintiffs' voluntary dismissal of Plovanich and Millan from count II, we address the involvement of the remaining Defendant officers in the alleged unconstitutional

---

[12] Plaintiffs' argument about the discrepancy between the fact that Defendants claim they smelled burnt cannabis, yet found no evidence of burnt cannabis, only fresh cannabis, (Pls.' Resp. at 20), is not determinative as to whether Defendants had reasonable suspicion and probable cause to search George. The presence of fresh cannabis does not rule out the possibility that there had also been burnt cannabis present moments before the stop.

search.  Although Defendants argue that Graney and Mangan were not present at the time

Plaintiffs were taken into custody and searched, they admit that the officers were on the scene for

Plaintiffs' arrests.  (Def.'s Reply at 7.) The facts are unclear as to which Defendant officers

search which Plaintiffs.  According to Plaintiffs, they "cannot relate exactly who came to each

side of the vehicle, who ordered them out of the vehicle, who told them to get on their knees,

who hand-cuffed them, who searched them, who took them in custody to the police headquarters

and put them in a cell, and so forth."  (Pls.' Mem. at 19–20.)  Without these facts, we are not in a

position to rule on the unconstitutional search of persons claim with respect to the remaining

Defendant officers who were present on the scene of Plaintiffs' arrest: McDermott, Kushiner,

Silva, Garcia, Cerda, Esquivel, Valentin, Graney, and Mangan.[13]  Accordingly, we only dismiss

Plovanich and Millan from count II.


### C. Count IV, Failure to intervene

An officer who is present and fails to intervene to prevent other law enforcement officers

from infringing the constitutional rights of citizens is liable under § 1983 if that officer had

reason to know: 1) that a citizen has been unjustifiably arrested, or 2) that any constitutional

violation has been committed by a law enforcement official; and the officer had a realistic

opportunity to intervene to prevent the harm from occurring.  *Smith v. Augustine*, 07 C 81, 2009

WL 481639, at *7 (N.D. Ill. Feb. 25, 2009) (citing *Chavez v. Illinois State Police*, 251 F.3d 612,

652 (7th Cir. 2001)); *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (finding that officers

who are not directly responsible for the unconstitutional conduct cannot just idly stand by while

---

[13] Although we found that Esquivel, Valentin, Graney, Mangan, and Cerda are entitled to qualified immunity for Plaintiffs' false arrest claim, we cannot address whether they are entitled to qualified immunity for the unconstitutional search claim since Defendants did not assert this argument in their briefs.

the misconduct is occurring). This language reiterates the long-established rule that § 1983's personal responsibility requirement is satisfied if an official "acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) (citing *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)); *Edwards v. Two Unknown Male Chi. Police Officers*, 623 F. Supp. 2d 940, 950 (N.D. Ill. 2009).

Plaintiffs' § 1983 failure to intervene claim against Defendants is premised on their § 1983 claims for false arrest and illegal search. (Pls.' Mem. at 19.) They argue that "Defendants Graney, Mangan, Esquivel, Valentin, Kushiner, Cerda, Silva, Garcia, and McDermott were all present, so they either engaged in the false arrest and illegal search, or they failed to intervene in the unconstitutional conduct." (Pls.' Resp. at 25.) In particular, according to Plaintiffs, "Plovanich and Millan had the opportunity to speak out when McDermott . . . asked them to sign criminal charges against David Wilbon, which resulted in his further detention and arrest[.]" (Pls.' Mem. at 20.) Defendants respond that they are not liable because "Plaintiffs' constitutional rights were not violated" and Plaintiffs have not established "that the Defendant Officers stood by acting in reckless disregard for Plaintiffs' constitutional rights while their fellow officers violated these rights." (Defs.' Resp. 16–17.)

Because we have already found that Plovanich and Millan were not present for the alleged underlying constitutional violations, namely, the false arrest and illegal search claims, these Defendants clearly did not have the opportunity to intervene. With regard to Plovanich and Millan signing the charges against David, Plaintiffs' argument is misplaced. Signing the charges is an affirmative act, not an omission. Having already found that signing the charges against David was insufficient for purposes of establishing that Plovanich and Millan either caused or participated in his arrest, and the fact that they were not present for the arrest and search of

Plaintiffs, we grant Plovanich and Millan summary judgment as to Plaintiffs' failure to intervene claim. With regard to the underlying false arrest claims, we already found that Esquivel, Valentin, Graney, Mangan, and Cerda are entitled to qualified immunity because they reasonably relied on the other officers. They are thus also not liable for Plaintiffs' failure to intervene claim.

With regard to the remaining officers, we consider whether their failure to stop the alleged false arrests and unconstitutional searches was in deliberate or reckless disregard of Plaintiffs' constitutional rights. *Jones v. Navia*, No. 09-CV-6968, 2010 WL 4878869, at *7 (N.D. Ill. Nov. 23, 2010). Based on the facts presented, with regard to both the underlying false arrest claims and the underlying unconstitutional search claims, no reasonable trier of fact could find that the Defendant officers acted with deliberate or reckless disregard to Plaintiffs' constitutional rights. *Id.* (finding that the "Assisting Officers bore no personal responsibility for the alleged deprivation of Plaintiff's constitutional rights" because their "failure to stop the allegedly unconstitutional actions of Arresting Officers during the arrest was neither deliberate, nor reckless"). Even with respect to Silva and Garcia, who were present on the 1300 block, and to McDermott and Kushiner, who spoke with Thornton and may or may not have had a reason to question his reliability as an eye-witness, their failure to stop the other officers from conducting the arrests and searches does not rise to the level of disregard required to sustain Plaintiffs' failure to intervene claim. We therefore grant summary judgment in favor of all Defendants as to count IV, failure to intervene.

### D. Count VII, Malicious prosecution

Only Defendants move for summary judgment on Plaintiffs' malicious prosecution claims. We granted Plaintiffs' request for the voluntary dismissal of: 1) Plovanich and Millan

from count VII as it pertains to Rico and George's mob action charges; and 2) all Defendant officers from count VII as it pertains to George's possession of cannabis charge. Additionally, neither Defendants nor Plaintiffs have not moved for summary judgment on David and George's malicious prosecution claims regarding their mob action charges. As such, we do not consider these claims at this time. For purposes of Defendants' summary judgment motion, we are left with the following claims against the following Defendants: Plovanich and Millan's liability for David's malicious prosecution claim as it relates to his aggravated assault charge and the other Defendants' liability for Rico's malicious prosecution claims as it relates to his mob action charge.

To succeed on a claim of malicious prosecution under Illinois law, each Plaintiff must prove that he was subjected to a judicial proceeding for which there was no probable cause, that each Defendant officer instituted those proceedings maliciously, that the proceedings were terminated in each Plaintiff's favor, and that he was injured. *McDade v. Stacker*, 106 Fed. Appx. 471, 475 (7th Cir. 2004). "[A]ctions for malicious prosecution are generally disfavored, and bringing one against a police officer is anomalous. Police officers don't prosecute, prosecutors do." *Lipscomb v. Knapp*, 07 C 5509, 2009 WL 3150745, at *11 (N.D. Ill. Sept. 30, 2009) (internal citations omitted)(finding that the officer defendant—who arrested the plaintiff, proofread a report regarding the events leading to the arrest, and was in contact with the state's attorney—did not play a significant role in causing the prosecution). A plaintiff who merely demonstrates that he was arrested and detained without probable cause has not made out a claim for malicious prosecution. *Id.* (citing *Sneed v. Rybicki*, 146 F.3d 478, 481 (7th Cir. 1998); *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)). With these standards in mind, we address whether Plovanich and Millan had probable cause to initiate the proceedings against

David for his aggravated assault charge and whether the other Defendant officers had probable cause to initiate the proceedings against Rico for his mob action charge. We then address whether the respective Defendants played a significant role in instituting these prosecutions.

### 1. Whether Defendant officers had probable cause

Defendants argue that they are entitled to summary judgment because there was probable cause to charge David with aggravated assault to a peace officer and Rico with mob action. (Defs.' Mem. at 32.) "[T]he existence of probable cause to arrest is an absolute bar to a malicious prosecution claim." *Redmon v. Schockweiler*, 45 F.3d 432, 1994 WL 661404, at *2 (7th Cir. 1994) (citing *Biddle v. Martin*, 992 F.2d 674, 678 (7th Cir. 1993); *Fernandez v. Perez*, 937 F.2d 368, 371 (7th Cir. 1991)). Because the facts are disputed as to whether Defendant officers had probable cause for David's aggravated assault charge and for Rico's mob action charge, we cannot determine whether they had probable cause to initiate prosecutions of those charges.

### 2. Whether Defendant officers played a significant role in causing the prosecution of David for his aggravated assault charge and Rico for his mob action charge

For their malicious prosecution claims, Plaintiffs must prove that Defendant officers instituted those proceedings against them maliciously. *McDade*, 106 Fed. Appx. at 475. Specifically, "Illinois law requires that, in order to commence or continue a criminal proceeding, the defendant must have initiated the criminal proceeding or his participation in it must have been of so active and positive a character as to amount to advice and cooperation." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir. 2001) (internal quotations omitted). "Police officers may be liable for malicious prosecution if they either signed a criminal complaint or played a significant role in causing the prosecution of the plaintiff . . . [w]hen arguing the latter, a

plaintiff must show that the officer used improper influence on the prosecutor or made knowing misstatements to the prosecutor in order to secure the prosecution." *Davis v. Fenimore*, No. 09 CV 939, 2010 WL 1489988, at *4 (N.D. Ill. Apr. 13, 2010) (citing *Reed*, 77 F.3d at 1053).

The parties agree that no Defendant officer testified against Plaintiffs at any of their court hearings. (Defs.' SOF ¶¶ 110–13.) Nor did they take action to seek to reinstate the charges brought against Plaintiffs after they were stricken by the court. (*Id*. ¶¶ 115–16.) We assess, however, whether there is other evidence to indicate that Defendants' conduct was so active and positive that it amounted to advice and cooperation. We first address the involvement of Defendants who signed the criminal complaints against Plaintiffs and then we assess whether the other Defendants played a significant role in causing the prosecution of Plaintiffs.

### a. Officers who signed complaints: Plovanich, Millan, Kushiner

It is undisputed that Plovanich and Millan signed the criminal complaints against David for aggravated assault of a peace officer. (Defs.' SOF ¶¶ 24–26.) Because we are unable to determine whether there was probable cause to arrest David for aggravated assault of a peace officer, we are not able to determine whether Plovanich and Millan had probable cause at the time they signed the complaint. For this same reason, we are unable to determine Kushiner's liability for signing the criminal complaint against Rico for mob action because he may or may not have had probable cause at the time he signed the complaint. (*Id*. ¶¶ 88–90, 92.)[14]

---

[14] We do not consider Kushiner's liability as to David and George's malicious prosecution claims for their mob action charges because neither Defendants nor Plaintiffs moved for summary judgment on these claims.

### b. McDermott, Silva, Garcia, Graney, Cerda, Esquivel, Valentin, and Mangan did not play a significant role in causing the prosecution of David for his aggravated assault charge and Rico for his mob action charge

We now turn to the involvement of the other Defendant officers who did not sign complaints against David and Rico, but who may have "played a significant role in causing [their] prosecution[.]" *Davis*, 2010 WL 1489988, at *4. To prove that Defendants played a significant role in causing the prosecution of Plaintiffs, Plaintiffs "must show that the officer used improper influence on the prosecutor or made knowing misstatement to the prosecution." *Id.* (citing *Reed*, 77 F.3d at 1053). Plaintiffs' argument that McDermott "called the shots" in terms of ordering the Plaintiffs' arrests, that Esquivel and Valentin were the lead arresting officers, and that the other Defendants escorted Plaintiffs into the police station and completed paperwork, including the criminal charges, (Pls.' Resp. at 35), are not facts that indicate that these Defendants "used improper influence on the prosecutor or made knowing misstatement to the prosecution," *Davis*, 2010 WL 1489988, at *4.

We now turn to the involvement of Defendant officers McDermott, Silva, Garcia, Graney, Cerda, Esquivel, Valentin, and Mangan in David and Rico's prosecutions, Kushiner's involvement in David's prosecution, and Plovanich and Millan's involvement in Rico's prosecution. The undisputed facts indicate that these Defendants did not sign the complaints against these Plaintiffs. (Pls.' Resp. to Defs.' SOF ¶¶ 24–26, 88–90, 92.) Nor did the Defendants testify against Plaintiffs, attend any criminal proceedings again them, or seek to reinstate the charges after they were stricken. (*Id.* ¶¶ 113–17.) There is no evidence to suggest that these Defendant officers "used improper influence on the prosecutor or made knowing misstatement to the prosecution." *Davis*, 2010 WL 1489988, at *4. Accordingly, no reasonable trier of fact could find that these Defendants either instituted or actively continued the

proceedings against David and Rico.  *See Drain*, 2001 WL 3489874, at *6–7 (granting summary

judgment to defendant officers where they did not sign the complaint or have any involvement

with plaintiff's subsequent prosecution, and there was no other evidence that their conduct was

so active and positive that it amounted to advice and cooperation).  We therefore grant these

Defendants summary judgment on David's malicious prosecution claim as it pertains to his

aggravated assault of a peace officer charge and Rico's malicious prosecution claim as it pertains

to his mob action charge.

In sum, the following malicious prosecution claims remain: David's malicious

prosecution claim against Plovanich and Millan for his aggravated assault of a peace officer

charge, and Rico's malicious prosecution claim against Kushiner for his mob action charge.

David and George's malicious prosecution claim as to their mob action charges, which we have

not considered at this summary judgment stage, also remain.


### E. Count V, Mcdermott's supervisory liability

Plaintiffs allege that McDermott has both direct, personal liability and supervisory

liability.  Not only was she "instrumental in deciding to arrest [Plaintiffs]," but she also "failed to

use her authority to stop the constitutional violation."  (Pls.' Mem. at 30.)

Defendant City acknowledges its responsibility under the theory of *respondeat superior*,

and argues that, having admitted said responsibility, Plaintiffs cannot have a "second bite at the

apple" by claiming that McDermott "negligently entrusted the other Defendant officers to

properly fulfill their police duties and responsibilities."  (Defs.' Mem. at 28.)  Plaintiffs' claim,

however, is not that McDermott is liable under a theory of *respondeat superior*, but rather that

she is liable under the theory of supervisory liability.  (Pls.' Mem. at 30.)  For supervisory

liability to attach, a defendant supervisor must have been "personally responsible for the deprivation of the constitutional right." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *see also Ramirez-Lluveras v. Pagan-Cruz*, 833 F. Supp. 2d 151, 156 (DPR 2011) (explaining that "a supervisor may not be held liable for a subordinate's violation of Constitutional rights under a theory of *respondeat superior*").[15] "To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Matthews*, 675 F.3d at 708 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)).

Thus, although McDermott "cannot be liable for any constitutional violations committed by her officers simply by virtue of [her] supervisory role," she could be liable if she was "personally involved" in the arrests of Plaintiffs. *See Morfin*, 349 F.3d at 1001. Plaintiffs specifically allege that she "knew about the unconstitutional conduct and facilitated it, approved it, condoned it, or turned a blind eye for fear of what he [sic] might see." (Pls.' Mem. at 21.) McDermott's failure to stop the unconstitutional acts of the other Defendant officers provides the "causal connection or affirmative link between the action complained about and the official sued . . . necessary for § 1983 recovery." (*Id.*)

---

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S. Ct. 1937, 1952 (2009) ("In a § 1983 suit . . . where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Under *Iqbal*, when a plaintiff sues an official under § 1983 for conduct "arising from his or her superintendent responsibilities," the plaintiff must establish not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well. *Iqbal*, 556 U.S. at 677, 129 S. Ct. at 1949.

Nothing prohibits Plaintiffs from bringing a claim against McDermott for direct, personal liability and, in the alternative, a claim for supervisory liability.[16]  Having said that, summary judgment as to McDermott's supervisory liability is improper because Plaintiffs have not established whether there was probable cause to arrest Plaintiffs and thus whether there was any constitutional violation for McDermott to facilitate, approve, or condone.  *See Matthews*, 675 F.3d at 706.  The conflicting evidence creates a jury question with respect to whether McDermott is liable under a theory of supervisory liability.

### F. Plaintiffs' claims against the City of Chicago and Count VIII, indemnification

Summary judgment as to the City of Chicago's liability, (Defs.' Mem. at 4), is improper since the liability of its officers has yet to be established.  The same reasoning applies to count VIII, indemnification, which the parties failed to brief even though Defendants moved for summary judgment "on all counts."  (*Id*. at 1.)  Thus, summary judgment is improper as to the City of Chicago's liability and Plaintiffs' indemnification claim.

---

[16] To the extent that Defendants are arguing that Plaintiffs may not sue both McDermott and also the City of Chicago under a theory of supervisory liability, that argument is also misplaced.  The focus of the supervisory liability is McDermott's own personal knowledge of the events that affected Plaintiffs and whether she was personally responsible for those events.  The City's liability, however, is not limited to McDermott's personal knowledge and participation, but rather whether Plaintiffs' deprivation is caused by an express policy, a widespread practice or custom, or the deliberate act of a policymaking official.  *Almaraz v. Haleas,* 602 F. Supp. 2d 920, 926 (N.D. Ill. 2008) (*citing Ienco v. City of Chi.,* 286 F.3d 994, 998 (7th Cir. 2002).  McDermott is not the policymaking official of the City "so any liability of the City based on the act of a policymaking official would be distinct from [McDermott's] liability."  *Almaraz,* 602 F. Supp. 2d at 926.

# CONCLUSION

In preparation for trial, we summarize which claims remain against the following Defendant officers as well as the City of Chicago:

## Count I (False Arrest)

The following claims remain:

1. Plaintiff David Wilbon against Lt. McDermott, Kushiner, and Silva;

2. Plaintiff Rico Wilbon against Lt. McDermott, Kushiner, Garcia, and Silva;

3. Plaintiff George Smith against Lt. McDermott, Kushiner, Garcia, and Silva for the forcible detention initiated at gunpoint, in the period prior to the time that Defendant officers claim they found a $5 bag on cannabis in the SUV.

## Count II (Unconstitutional Search of Persons)

All other Defendant officers remain except Plovanich and Millan.

## Count V (Supervisory Liability)

Plaintiffs' claim against McDermott remains.

## Count VII (Malicious Prosecution)

The following claims remain:

1. Plaintiff David Wilbon against Plovanich and Millan for aggravated assault of a peace officer and against all Defendants for mob action;

2. Plaintiff Rico Wilbon against Kushiner for mob action;

3. Plaintiff George Smith against all Defendants for mob action, except Plovanich and Millan who have been voluntarily dismissed.

**Count VIII (Indemnification)**

This claim remains.

It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: Chicago, Illinois
September 9, 2014