# EXHIBIT A

KEITH THORNTON, JR. - June 10, 2013

1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

3

4    DAVID D. WILBON, ET AL.,        )
                                      )
5            Plaintiffs,      )   No. 12 C 1132
                                      )
6    vs.                       )   Volume I
                                      )
7    JOSEPH M. PLOVANICH, ET AL., )   Pages 1 - 190
                                      )
8            Defendants.       )
     _____)

9

10

11

12

13          Videotaped Deposition of

14             KEITH THORNTON, JR.

15              June 10, 2013

16

17

18

19   Reported by:

20   SERENA WONG, CSR# 10250

21   ------------------------------------------------------

22             JAN BROWN & ASSOCIATES

23      WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25          (415) 981-3498 or (800) 522-7096

---

2

1                    I N D E X

2

3                                           Page

     Examination by Ms. Dymkar              6, 184

4

     Examination by Ms. Pinkston            180, 187

5

     Reporter's Certificate                 190

6

7

8

                    INDEX OF EXHIBITS

9

10   Plaintiff's                            Page

     Exhibit 1    Driver's license          11

11                (Attorney's Eyes Only)

12   Exhibit 2    Affadavit of Keith Thornton, Jr.    38

13   Exhibit 3    Google map page           74

14   Exhibit 4    Google map page           83

15

16

17

18

19

20

21

22

23

24

25

3

1    BE IT REMEMBER that, pursuant to Notice of

2  Taking Deposition, on Monday, June 10, 2013,

3  commencing at the hour of 10:17 a.m., at 201 Wilshire

4  Boulevard, 2nd Floor, Santa Monica, California 90401,

5  before me, Serena Wong, a Certified Shorthand

6  Reporter in the State of California there personally

7  appeared:

8

9              KEITH THORNTON, JR.,

10   called as a witness by the Defendants, who being by

11     me first duly sworn, was thereupon examined and

12        interrogated as is hereinafter set forth.

13

14                  --o0o--

15

16    KRISTIN PINKSTON, Attorney at Law, and DANA

17  PESHA, of the City of Chicago, 30 N. LaSalle Street,

18  Suite 900, Chicago, Illinois 60602, appeared as counsel

19  on behalf of the Defendants, City of Chicago.

20  Tel: (312) 744-9212

21  e-mail:  kristin.belcher@cityofchicago.org

22  (Video conference appearance)

23

24

25

4

1    IRENE K. DYMKAR, Attorney at Law, of the Law

2  Offices of Irene K. Dymkar, 300 W. Adams Street, Suite

3  330, Chicago, Illinois, 60606, appeared as counsel on

4  behalf of the Plaintiff, George Smith.

5  Tel: (312) 345-0123

6  (Video conference appearance)

7

8       Also present were John Arel, the

9  videographer, and George Smith, plaintiff, (video

10  conference appearance).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KEITH THORNTON, JR. - June 10, 2013

5

```
 1        JUNE 10, 2013, MONDAY, 10:17 A.M.
 2             V O L U M E   I
 3           P R O C E E D I N G S
 4                --oOo--
```
10:17:34  6        THE VIDEOGRAPHER:  Good morning.  We are on
10:17:37  7   the record.  Here marks the beginning of Videotape No. 1
10:17:40  8   in the deposition of Mr. Keith Thornton in the matter of
10:17:44  9   David D. Wilson (sic), et al., versus City of Chicago, et
10:17:50 10   al.  Case number is 12C1132.  Today's date is Monday, June
10:17:54 11   10th, in the year 2013, and the time on the monitor is
10:17:58 12   10:18 a.m.  We are located at 201 Wilshire Boulevard,
10:18:01 13   second floor, in Santa Monica, California.
10:18:04 14        The videographer today is John Arel,
10:18:08 15   certified court videographer, of Jan Brown & Associates
10:18:11 16   Worldwide Deposition & Videography Services, (800)
10:18:17 17   522-7096.  The court reporter today is Serena Wong of Jan
10:18:19 18   Brown & Associates.
10:18:21 19        Would counsel, please, identify yourselves
10:18:26 20   and state whom you represent.
10:18:28 21        MS. DYMKAR:  My name is Irene Dymkar.  I
10:18:32 22   represent the plaintiffs in this action.  Seated next to
10:18:34 23   me, to the left, is George Smith.  He's one of the
10:18:38 24   plaintiffs in this action.
10:18:41 25        MS. PINKSTON:  Good morning.  My name is

KEITH THORNTON, JR. - June 10, 2013

6

10:18:44  1   Kristin Pinkston, and I represent the defendants in this
10:18:45  2   matter.
10:18:46  3        MS. PESHA:  Good morning.  My name is Dana
10:18:52  4   Pesha, and I represent the defendants in this matter.
10:18:58  5        THE VIDEOGRAPHER:  If there are no
10:19:05  6   stipulations, would the reporter please swear in the
10:19:09  7   witness.
10:19:09  8
10:19:09  9        KEITH THORNTON, JR.
10:19:09 10   was called as a witness, and having been first duly
10:19:09 11   sworn, was examined and testified as follows:
10:19:09 12
10:19:09 13        EXAMINATION
10:19:09 14   BY MS. DYMKAR:
10:19:12 15        Q    Okay.  Could you, please, state your full
10:19:15 16   name for the record and spell your first name and last
10:19:17 17   name and tell us if you have a middle initial?
10:19:23 18        A    Yes.  Keith, K-E-I-T-H, Thornton,
10:19:32 19   T-H-O-R-N-T-O-N, middle initial A.
10:19:34 20        Q    And you are a junior?
10:19:36 21        A    That is correct.
10:19:40 22        Q    Did you bring a driver's license with you
10:19:41 23   today?
10:19:43 24        A    Yes, I did.
10:19:47 25        Q    Okay.  Could we see your driver's license,
```

7

10:19:58  1    please?

10:20:10  2         A    **There's my driver's license.  (Indicating).**

10:20:13  3         Q    Okay.  You're covering it with your hand,

10:20:14  4    sir.

10:20:16  5         A    **I'm covering my address, ma'am.**

10:20:18  6         Q    I would like to see your driver's license,

10:20:23  7    sir.  We need to verify who you are.

10:20:24  8              MS. PINKSTON:  I'm just going to object for

10:20:27  9    the record.  He's presented a driver's license, California

10:20:29 10    issue, and you can see the name and the driver's license

10:20:32 11    number.  He's only covered the address.

10:20:34 12              MS. DYMKAR:  I cannot see a number, and I

10:20:37 13    cannot see the name, and he's covering the bottom half of

10:20:41 14    it.

10:20:43 15         Q    BY MS. DYMKAR:  I -- I would like to have a

10:20:46 16    copy of the driver's license so we can verify who it is we

10:20:52 17    are talking to today.  Would the court reporter be allowed

10:21:01 18    to copy the driver's license?

10:21:01 19         A    **(No verbal response.)**

10:21:01 20         Q    Sir?

10:21:04 21         A    **Yes, ma'am?**

10:21:06 22         Q    I would like to have a copy of your

10:21:11 23    driver's license, please, so we can verify who you are.

10:21:15 24         A    **They verified that, ma'am.**

10:21:17 25         Q    I would like to have a copy of your

8

10:21:21  1    driver's license.  I -- all I could see was a last name

10:21:23  2    and the State of California.  I would like to have a copy

10:21:32  3    of your driver's license so we can verify who you are.

10:21:32  4    Will you --

10:21:32  5

10:21:34  6              MS. PINKSTON:  I'm just going to object.

10:21:34  7         Q    BY MS. DYMKAR:  -- give your driver's

10:21:36  8    license to the court reporter, so the court reporter could

10:21:40  9    copy it for us?  And if you want it to be for attorney's

10:21:45 10    eyes only, it can be for attorney's eyes only, but I need

10:21:48 11    to have a picture ID with identifying information about

10:21:52 12    you to verify who you are, sir.

10:21:53 13              MS. PINKSTON:  I'm just going to object to

10:21:56 14    -- to this line of questioning.  If necessary, defendants

10:21:59 15    will file a protective order in order to protect

10:22:00 16    Mr. Thornton's address.

10:22:03 17              I think that, if the officer -- the court

10:22:06 18    reporter wants to take a look at the driver's license and,

10:22:08 19    as an officer of the Court, verify that it is his driver's

10:22:12 20    license, that should be sufficient for you to understand

10:22:15 21    who you're deposing at this time.

10:22:16 22              MS. DYMKAR:  No.  I would like a copy of

10:22:19 23    the driver's license.  The court reporter does not work

10:22:23 24    for us or or for the Court or for -- for anyone, other

10:22:26 25    than for us for the purposes of this deposition.

9

10:22:28 1      Q     BY MS. DYMKAR:  I would like to have a copy
10:22:33 2 of your license.  Are you refusing to give us a copy of
10:22:35 3 your license?
10:22:37 4      **A     For the sake of my safety, ma'am, because I**
10:22:42 5 **fear for my life, I will do just that, by giving her my**
10:22:45 6 **name, and she can verify that.**
10:22:47 7      Q     Okay.  I'm -- I am not agreeing to that.  I
10:22:50 8 would like to have a copy of your license.  I would like
10:22:53 9 you to give that to the court reporter to make a copy.  As
10:22:57 10 I said, it could be for attorney's eyes only, but I need
10:23:06 11 to have a picture ID that verifies who you are.
10:23:08 12      Will you give your license to the court
10:23:13 13 reporter to copy, to give to the attorneys in this action?
10:23:15 14      **A     She can verify the address, ma'am.  Yes,**
10:23:18 15 **ma'am.**
10:23:20 16      Q     Okay.  No.  You're not answering my
10:23:20 17 question, sir.  My question is --
10:23:21 18      **A     I'm answering it.**
10:23:29 19      Q     -- whether you will -- will you give her
10:23:31 20 your driver's license to copy, so that we can verify who
10:23:31 21 you are?
10:23:35 22      **A     Yes, I will.**
10:23:37 23      Q     You will give her your driver's license?
10:23:40 24      **A     I just answered that.**
10:23:42 25      Q     Okay.  I -- I'm sorry.  There is a delay in

10

10:23:43 1 the questions and answers.
10:23:45 2      Did you say you will give her your driver's
10:23:50 3 license to copy for attorney's eyes only?
10:23:53 4      **A     I did say that.  Yes, I did.**
10:23:56 5      Q     Okay.  Could you give it to her now, so the
10:24:30 6 copy could be made?
10:24:30 7      THE COURT REPORTER:  Do you -- could -- do
10:24:30 8 you -- do you want to go off the record, so I can get a
10:24:30 9 copy made?
10:24:30 10      MS. DYMKAR:  Sure.  If you could get a copy
10:24:30 11 made and then assure us that you will give it to the
10:24:30 12 attorneys, for the attorney --
10:24:30 13      THE VIDEOGRAPHER:  We're going off the
10:24:33 14 record at 10:24 a.m.
10:28:21 15      (Brief recess.)
10:28:31 16      THE VIDEOGRAPHER:  Stand by, please.  We're
10:28:38 17 back on the record at 10:28 a.m.
10:28:40 18      MS. DYMKAR:  I had made the request, now
10:28:44 19 that we have a photocopy of deponent's driver's license,
10:28:51 20 that that be marked as Exhibit 1 for identification, with
10:28:56 21 the understanding that Exhibit 1 is going to be for
10:28:57 22 attorney's eyes only.
10:28:59 23      So I do need to inquire of the court
10:29:04 24 reporter, Ms. Wong, whether you're going to be marking the
10:29:09 25 photocopy as Exhibit 1 and providing that photocopy to the

10:29:11 attorneys in this case.
10:29:13 MS. PINKSTON: And defendants are objecting
10:29:16 to a copy of the driver's license being marked as
10:29:21 Exhibit 1.
10:29:23 THE COURT REPORTER: Okay. Normal
10:29:40 procedure is I mark the driver's license, and then counsel
10:29:40 can move for a protective order with the judge and the
10:29:40 judge can decide. Is that --
10:29:40 MS. PINKSTON: Thank you.
10:29:40 (Exhibit 1 was marked.)
10:29:41 MS. DYMKAR: I -- okay. I am going to ask
10:29:45 my client to leave the room for a couple of minutes. I
10:29:49 would like to see a copy of that driver's license to
10:29:53 verify that this is, in fact, Mr. Thornton.
10:29:54 MS. PINKSTON: I'm objecting for the same
10:29:59 reasons, and I've asked that -- you know, I've objected
10:30:02 that we're moving for a protective order.
10:30:03 MS. DYMKAR: I am trying to verify the
10:30:07 identity of this witness before we spend several hours at
10:30:08 deposition. I --
10:30:10 MS. PINKSTON: He has stated his name under
10:30:13 oath, and there's an officer of the court present, in the
10:30:16 room, that can verify that this is the person that it says
10:30:18 on the driver's license.
10:30:19 MS. DYMKAR: She's -- the court reporter is

10:30:22 not qualified to verify the identity of -- of a person.
10:30:25 So I am going to ask my client to leave the room for a
10:30:30 couple of minutes, and I am going to ask that the
10:30:37 photocopy of the driver's license be presented to us on
10:30:38 the screen.
10:31:17 Is that acceptable, Ms. Wong?
10:31:17 THE COURT REPORTER: Can we go off the
10:31:17 record for a second? I'm going to call my office and
10:31:17 figure out how to proceed in this situation. Do you mind?
10:31:17 MS. DYMKAR: I'm not sure -- what is it
10:31:17 that you have to do, now, Ms. Wong?
10:31:17 THE COURT REPORTER: I just don't want to
10:31:17 overstep my boundaries as a court reporter. I -- and I
10:31:17 just want to verify with my office if -- if this is okay
10:31:17 for me to do.
10:31:21 MS. DYMKAR: Let me just say it this way.
10:31:26 If we were in person, this would be a normal thing to ask,
10:31:28 Mr. Thornton would hand me the driver's license, I would
10:31:32 look at it, I would go out of the room, photocopy it, give
10:31:34 it back to him.
10:31:35 We are dealing with distance here, so we
10:31:38 have to rely on the court reporter to do it, but that
10:31:42 doesn't mean I -- that I should not be able to see the
10:31:45 driver's license to verify Mr. Thornton's identity.
10:31:47 And if the issue has to do with my client

10:31:50 being in the room, I could ask him to leave for a couple
10:31:53 of minutes.
10:31:53 THE COURT REPORTER: Okay. I just --
10:31:55 MS. PINKSTON: Defendants have a standing
10:31:57 objection to this. You know, Ms. Dymkar has acknowledged
10:32:00 that it will be attorney's eyes only. Defendants have
10:32:03 also stated on the record that we will be moving for a
10:32:05 protective order, and, so, therefore, I think this
10:32:09 direction is improper, based upon those objections, and
10:32:12 you know, we will seek court intervention should this
10:32:18 continue.
10:32:19 MS. DYMKAR: My request to the court
10:32:21 reporter is to show us the photocopy of the driver's
10:32:32 license.
10:32:37 THE COURT REPORTER: Okay. That's fine. I
10:32:37 -- I think that -- that's fine.
10:32:38 MS. DYMKAR: I -- I believe Mr. Thornton
10:32:41 has agreed that we could see the driver's license, as long
10:32:53 as it was for attorney's eyes only.
10:32:53 THE COURT REPORTER: Oh, okay. I thought
10:32:53 you were going to have the plaintiff step out.
10:32:55 MS. DYMKAR: I could ask him to step out --
10:32:55 THE COURT REPORTER: Okay.
10:32:55 MS. DYMKAR: -- yes, if that -- why don't
10:32:59 you step out for a couple of minutes, Mr. Smith.

10:32:59 (George Smith leaves room.)
10:33:08 MS. DYMKAR: Okay. Mr. Smith has now left
10:33:10 the room, and this will be subject to the protective
10:34:07 order.
10:34:07 THE COURT REPORTER: Okay. I'm -- I'm
10:34:07 going to hold up the driver's license. Can you see it?
10:34:07 MS. DYMKAR: It's very difficult, but --
10:34:20 MS. PINKSTON: And I just want to state for
10:34:20 the --
10:34:20 MS. DYMKAR: I cannot read it.
10:34:20 THE COURT REPORTER: Would you like me to
10:34:20 read --
10:34:21 MS. PINKSTON: I just want to state for the
10:34:26 record that defense counsel can read it.
10:34:27 MS. DYMKAR: I am reading -- I am trying to
10:34:35 read it. It says it expires on 9/17/2017. The number of
10:34:48 the license is F5007488 (sic), and it says Keith Anthony
10:34:51 Thornton, Jr.
10:34:54 I cannot read the address. It's a number,
10:34:56 National Boulevard, and then some -- some unit number
10:34:59 after that, Los Angeles, California, and the ZIP code that
10:35:01 I can't read.
10:35:07 Could you read that to me?
10:35:09 MS. PINKSTON: This is all subject to
10:35:20 protective order.

KEITH THORNTON, JR. - June 10, 2013

15

| | |
|---|---|
| 10:35:21 | 1 MS. DYMKAR: Ms. Wong, will you be reading |
| 10:35:37 | 2 it to me or have Mr. Thornton read it to me? |
| 10:35:42 | 3 THE COURT REPORTER: Yeah. Do you mind |
| 10:35:42 | 4 reading -- |
| 10:35:42 | 5 THE WITNESS: Huh-uh. |
| 10:35:44 | 6 THE COURT REPORTER: Okay. 535 National |
| 10:35:57 | 7 Boulevard, Unit 10, in Los Angeles, California, 90034, and |
| 10:35:59 | 8 the driver's license number is F5007486. |
| 10:36:21 | 9 MS. DYMKAR: Okay. And the expiration date |
| 10:36:25 | 10 is 9/17/17? |
| 10:36:25 | 11 THE COURT REPORTER: The expiration date is |
| 10:36:25 | 12 -- let's see. Yeah, 9/17/17. |
| 10:36:40 | 13 MS. DYMKAR: Is there an issuance date? |
| 10:36:47 | 14 THE COURT REPORTER: Yes. 11/29/2012. |
| 10:36:50 | 15 MS. DYMKAR: Okay. Ms. Wong, you will be |
| 10:36:54 | 16 providing us a photocopy of that license? |
| 10:36:59 | 17 THE COURT REPORTER: Yes. |
| 10:37:00 | 18 MS. DYMKAR: Okay. All right. I am going |
| 10:37:13 | 19 to have George Smith come back into the room right now. |
| 10:37:13 | 20 THE COURT REPORTER: Okay. Can you make |
| 10:37:13 | 21 sure and speak into the mic, because I'm having a hard |
| 10:37:13 | 22 time hearing you. |
| 10:37:16 | 23 MS. DYMKAR: Okay. What I said was I was |
| 10:37:17 | 24 going to have the -- one of the plaintiffs, George Smith, |
| 10:37:28 | 25 come into the room now. |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

16

| | |
|---|---|
| 10:37:28 | 1 THE COURT REPORTER: Okay. Great. |
| 10:37:30 | 2 (George Smith enters room.) |
| 10:37:31 | 3 Q BY MS. DYMKAR: Now, Mr. Thornton, the |
| 10:37:37 | 4 information on that driver -- driver's license is correct? |
| 10:37:42 | 5 **A Yes, it is.** |
| 10:37:53 | 6 Q So the issuance date and the address are |
| 10:37:53 | 7 correct? |
| 10:37:56 | 8 **A I just answered that question. Yes, it** |
| 10:37:58 | 9 **is.** |
| 10:38:02 | 10 Q All right. Then we can -- we can begin in |
| 10:38:05 | 11 a more formal way. I want to reintroduce myself. I'm |
| 10:38:09 | 12 Irene Dymkar. I'm the attorney for David Wilbon, Rico |
| 10:38:13 | 13 Wilbon, and George Smith. I was the attorney for Anthony |
| 10:38:18 | 14 Pleez, LaShawn Lewis, Sean Smith, and Tyrone Jones in a |
| 10:38:21 | 15 case that's been settled with the City of Chicago. |
| 10:38:22 | 16 George Smith is present in the room. He's |
| 10:38:26 | 17 one of the plaintiffs in this action. Also present are |
| 10:38:29 | 18 two attorneys from the City of Chicago. Kristin Pinkston |
| 10:38:33 | 19 is present right now. Dana Pesha has been in and out of |
| 10:38:35 | 20 the room. |
| 10:38:36 | 21 Sir, is it your understanding that either |
| 10:38:40 | 22 Ms. Pesha or Ms. Pinkston represent you today? |
| 10:38:42 | 23 **A No.** |
| 10:38:45 | 24 Q Are you represented by an attorney -- |
| 10:38:46 | 25 **A No.** |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

17

| | | |
|---|---|---|
| 10:38:49 | 1 | Q      -- today? |
| 10:38:51 | 2 | Okay.  I'm going to be asking you a series |
| 10:38:55 | 3 | of questions.  I want to go over some basic rules on how |
| 10:38:57 | 4 | you're to answer the questions so that we can proceed |
| 10:38:58 | 5 | smoothly. |
| 10:39:00 | 6 | First of all, it's important that you |
| 10:39:04 | 7 | understand my questions.  So if you don't understand |
| 10:39:07 | 8 | something I'm asking you or you don't hear it for some |
| 10:39:10 | 9 | reason, you need to say something, either you don't hear |
| 10:39:13 | 10 | it or you don't understand it or you want to have it |
| 10:39:16 | 11 | rephrased.  Because if you answer the question, then we're |
| 10:39:18 | 12 | going to assume that you heard the question and that you |
| 10:39:19 | 13 | understood it.  Okay? |
| 10:39:24 | 14 | A      Okay. |
| 10:39:27 | 15 | Q      Okay.  Also, you are to answer in complete |
| 10:39:32 | 16 | words, as you are doing right now, yes, no, or, you know, |
| 10:39:37 | 17 | a fuller answer.  The court reporter can't take down if |
| 10:39:40 | 18 | you shrug your shoulders or if you make sounds, like |
| 10:39:45 | 19 | uh-huh, huh-uh.  So all your answers have to be in |
| 10:39:45 | 20 | complete words. |
| 10:39:48 | 21 | Is that understood? |
| 10:39:52 | 22 | A      Yes. |
| 10:40:00 | 23 | Q      Okay.  When I ask you a question, it may be |
| 10:40:03 | 24 | obvious to you what I'm asking you.  You have to wait for |
| 10:40:07 | 25 | me to ask the complete question.  Similarly, I need to |

KEITH THORNTON, JR. - June 10, 2013

18

| | | |
|---|---|---|
| 10:40:10 | 1 | wait for you to answer completely.  And that's so the |
| 10:40:13 | 2 | court reporter can take down both what my question is and |
| 10:40:16 | 3 | what your answer is.  Okay? |
| 10:40:20 | 4 | A      Yes. |
| 10:40:22 | 5 | Q      In other words, in real conversation, |
| 10:40:25 | 6 | sometimes we talk at the same time, we talk over each |
| 10:40:27 | 7 | other.  We can't do that when we're at deposition.  Okay? |
| 10:40:31 | 8 | A      Yes. |
| 10:40:34 | 9 | Q      Have you ever given a deposition before? |
| 10:40:37 | 10 | A      No. |
| 10:40:38 | 11 | Q      Pardon me.  No? |
| 10:40:40 | 12 | A      No. |
| 10:40:43 | 13 | Q      Okay.  There's a lot of interference in the |
| 10:40:46 | 14 | sound.  I don't know if you hear us really well.  It's |
| 10:40:49 | 15 | very hard to hear you because there's some type of a motor |
| 10:40:53 | 16 | or a fan that's interfering.  So if I ask you to repeat |
| 10:40:57 | 17 | yourself, it's because I couldn't hear you over that |
| 10:40:58 | 18 | interference.  Okay? |
| 10:41:03 | 19 | A      Yes. |
| 10:41:06 | 20 | Q      Now, Mr. Thornton, do you know that |
| 10:41:09 | 21 | plaintiffs issued a subpoena for your deposition on May 6, |
| 10:41:12 | 22 | 2013? |
| 10:41:14 | 23 | A      Yes. |
| 10:41:20 | 24 | Q      Okay.  And you, in fact, e-mailed me on May |
| 10:41:27 | 25 | 4th, about 1:09 p.m., saying that you wanted to talk to me |

19

| | | |
|---|---|---|
| 10:41:30 | 1 | about the subpoena; right? |
| 10:41:35 | 2 | **A      That is the correct answer, yes.** |
| 10:41:37 | 3 | Q      I'm sorry.  I didn't hear you. |
| 10:41:38 | 4 | **A      I said "yes."** |
| 10:41:40 | 5 | Q      Could you repeat -- yes.  Okay. |
| 10:41:46 | 6 | And then I e-mailed you back that same day, |
| 10:41:50 | 7 | May 4, 2013, and then we spoke to each other; right? |
| 10:41:52 | 8 | **A      Yes.** |
| 10:41:55 | 9 | Q      We spoke to each other about the -- about |
| 10:41:57 | 10 | the subpoena; right? |
| 10:42:00 | 11 | **A      Not about the subpoena.  About the actual** |
| 10:42:04 | 12 | **actions of that day.** |
| 10:42:08 | 13 | Q      We did talk about the subpoena, too; right? |
| 10:42:14 | 14 | **A      That I never received it?  Yes.** |
| 10:42:15 | 15 | Q      We -- we talked about the subpoena coming |
| 10:42:19 | 16 | to your home at 4814 West Wabansia. |
| 10:42:24 | 17 | **A      That wouldn't be my home, ma'am.** |
| 10:42:26 | 18 | Q      Okay.  That's where you grew up; right? |
| 10:42:29 | 19 | **A      That is correct.** |
| 10:42:32 | 20 | Q      We'll get back to that in -- in a minute. |
| 10:42:41 | 21 | Are you -- you know that there are proceedings June 12th |
| 10:42:42 | 22 | regarding the subpoena; right? |
| 10:42:43 | 23 | **A      I don't understand that.** |
| 10:42:45 | 24 | Q      You -- you understand there's a court |
| 10:42:50 | 25 | proceeding -- a contempt proceeding on June 12th regarding |

20

| | | |
|---|---|---|
| 10:42:51 | 1 | the subpoena? |
| 10:42:53 | 2 | **A      Yes.** |
| 10:42:57 | 3 | Q      I have sent you various e-mails about the |
| 10:43:01 | 4 | court date and have e-mailed you those papers. |
| 10:43:04 | 5 | Do you agree with that, that you have |
| 10:43:07 | 6 | received the papers by e-mail? |
| 10:43:09 | 7 | **A      They're, more than likely, in my e-mail,** |
| 10:43:12 | 8 | **yes.** |
| 10:43:19 | 9 | Q      And, in fact, I -- would you agree that |
| 10:43:21 | 10 | I've e-mailed you -- I've e-mailed you on May 5th, May |
| 10:43:24 | 11 | 19th, May 27th, June 3rd, and June 6th?  Would that be |
| 10:43:26 | 12 | consistent with your recollection of when you have |
| 10:43:29 | 13 | received e-mails from me? |
| 10:43:31 | 14 | **A      I would say so.** |
| 10:43:34 | 15 | Q      Okay.  Are you going to be appearing in |
| 10:43:40 | 16 | court to object to the subpoena, on June 12th? |
| 10:43:41 | 17 | **A      I never received --** |
| 10:43:44 | 18 | MS. PINKSTON:  I'm going to object to that |
| 10:43:47 | 19 | question, because it mischaracterizes what the proceeding |
| 10:43:49 | 20 | is on June 12th. |
| 10:43:51 | 21 | Go ahead. |
| 10:43:53 | 22 | THE WITNESS:  I've never received a |
| 10:43:57 | 23 | subpoena. |
| 10:43:58 | 24 | Q      BY MS. DYMKAR:  Okay.  You did receive, by |
| 10:44:04 | 25 | e-mail, a copy of the petition or the motion for rule to |

21

10:44:09 1    show cause regarding the subpoena; correct?

10:44:10 2         MS. PINKSTON:  Objection, asked and

10:44:19 3    answered.

10:44:20 4         Q    BY MS. DYMKAR:  Sir?

10:44:23 5         A    Ma'am?

10:44:25 6         Q    I need to have an answer to the question.

10:44:27 7         A    Could you repeat that -- that question?

10:44:32 8         Q    Okay.  You received papers regarding a

10:44:39 9    motion for a rule to show cause regarding the subpoena;

10:44:41 10   correct?

10:44:45 11        A    If that's what you sent, ma'am.

10:44:47 12        Q    Well, you're agreeing with -- you did agree

10:44:50 13   to that, right, just a few minutes ago, that you did

10:44:51 14   receive?

10:44:52 15        A    I said if that's what you sent.

10:44:53 16        Q    Receive the papers?

10:45:02 17        A    If that's what you sent.

10:45:04 18        Q    Okay.  You're aware that we are in court on

10:45:05 19   June 12th?

10:45:05 20        MS. PINKSTON:  Objection.  Asked and

10:45:15 21   answered.

10:45:15 22        Q    BY MS. DYMKAR:  Sir?

10:45:16 23        A    Ma'am?

10:45:18 24        Q    Even when there's an objection, you still

10:45:20 25   -- you still have to answer the question even when there's

22

10:45:21 1    an objection.

10:45:24 2         A    Well, the thing is, ma'am, I answered that

10:45:26 3    question.  You've asked me several times already.

10:45:29 4         Q    Are you going to be appearing in court on

10:45:31 5    June 12th?

10:45:36 6         A    I -- I have no way of getting to court.

10:45:38 7         Q    Will you -- will you have an attorney

10:45:41 8    appear for you on June 12th?

10:45:44 9         A    No, ma'am.

10:45:46 10        Q    Are you willing to waive any objections you

10:45:48 11   might have to the subpoena and proceed on that subpoena

10:45:52 12   today?  In other words, have this be your subpoenaed

10:45:56 13   deposition right now?

10:46:00 14        A    You would have to explain that.

10:46:01 15        Q    Pardon me?

10:46:05 16        A    Could you, please, explain that.

10:46:08 17        Q    I'm asking whether we could consider this

10:46:12 18   deposition now your subpoenaed deposition.

10:46:13 19        MS. PINKSTON:  I'm going to object to the

10:46:16 20   line of this questioning.  It's harassing.  At this point,

10:46:19 21   you've been shown an address that was issued in November

10:46:23 22   of 2012 showing that he is a California resident, making

10:46:27 23   your rule to show cause even more frivolous in terms of

10:46:30 24   the fact that you know now that your subpoena was not

10:46:33 25   personally served on him and that he is not within the

KEITH THORNTON, JR. - June 10, 2013

23

| 10:46:33 | 1 | Court's jurisdiction. |

10:46:34 2          MS. DYMKAR:  Okay.  That's --

10:46:35 3          MS. PINKSTON:  This is harassing.

10:46:39 4          MS. DYMKAR:  That's a speaking objection.

10:46:40 5          MS. PINKSTON:  And this needs -- this needs

10:46:42 6    to end.  This depo -- the deposition is not over whether

10:46:46 7    or not you have a valid rule to show cause.  This is a

10:46:48 8    discovery deposition.  Move on.

10:46:50 9          Q     BY MS. DYMKAR:  My question to you, sir,

10:46:52 10   are you willing to waive any objections to the subpoena

10:46:57 11   and move on that subpoena today and consider this your

10:47:00 12   subpoenaed deposition, so that we only have one

10:47:03 13   deposition?

10:47:05 14         A     What is -- what's taking place right now?

10:47:08 15   Absolutely.

10:47:11 16         Q     I'm sorry.  Could you repeat that, please?

10:47:11 17         A     I can hear you very --

10:47:16 18         Q     You said "absolutely."  What did you say

10:47:19 19   before "absolutely"?

10:47:21 20         A     If this deposition that we're currently

10:47:25 21   right now -- and what -- and what do you want to know from

10:47:26 22   there?

10:47:28 23         Q     Could that be -- would you consider having

10:47:32 24   this be your subpoenaed deposition?

10:47:35 25         A     It's not a problem with me, ma'am.

---

KEITH THORNTON, JR. - June 10, 2013

24

10:47:36 1          Q     And -- and -- pardon me?

10:47:44 2          A     It is not a problem for me.

10:47:45 3          Q     Okay.  So I'm going to repeat the question

10:47:48 4    again and make sure you understand, because there have

10:47:50 5    been some objections.  You're willing to waive objections

10:47:55 6    to that subpoena and proceed today with this deposition as

10:47:56 7    being your subpoenaed deposition?

10:47:59 8          MS. PINKSTON:  And I'm going to object to

10:47:59 9    foundation and the fact that you're asking him to waive

10:47:59 10   any legal rights or objections when he has not -- he is

10:48:05 11   not represented in this deposition.

10:48:06 12         Q     BY MS. DYMKAR:  Sir, your answer?

10:48:11 13         A     No.

10:48:14 14         Q     So you're willing to appear for another

10:48:16 15   subpoenaed deposition in the future?

10:48:26 16         A     If I have to, yes.

10:48:28 17         Q     You do not want to consider this to be your

10:48:29 18   subpoenaed deposition?

10:48:30 19         A     No, ma'am.

10:48:36 20         MS. PINKSTON:  Objection, harassing.

10:48:37 21         Q     BY MS. DYMKAR:  All right.  Your date of

10:48:41 22   birth is █████████ ███ ██████ is that correct?

10:48:44 23         A     Is that what the license said, ma'am?

10:48:46 24         Q     Pardon me?

10:48:48 25         A     The license, driver's license.

KEITH THORNTON, JR. - June 10, 2013

25

| | | |
|---|---|---|
| 10:48:50 | 1 | Q    No.  This is not from your driver's |
| 10:48:51 | 2 | license, sir. |
| 10:48:53 | 3 | A    No.  It was on there. |
| 10:48:58 | 4 | Q    I understand it was on there.  It's also on |
| 10:49:00 | 5 | other official documents. |
| 10:49:01 | 6 | A    So if it's official, then it should -- it |
| 10:49:02 | 7 | should be right. |
| 10:49:02 | 8 | Q    Is that your -- is that your date of birth? |
| 10:49:06 | 9 | A    It should be accurate, ma'am.  That's |
| 10:49:07 | 10 | right. |
| 10:49:08 | 11 | Q    Okay.  And what is your Social Security |
| 10:49:09 | 12 | number? |
| 10:49:10 | 13 | MS. PINKSTON:  I'm going to object. |
| 10:49:13 | 14 | Plaintiff is in the room.  He's asked that his identity |
| 10:49:16 | 15 | not be revealed.  We've already made the driver's license |
| 10:49:21 | 16 | attorney's eyes only, and defendants will be moving for a |
| 10:49:23 | 17 | protective order.  These are inappropriate questions with |
| 10:49:24 | 18 | plaintiff in the room. |
| 10:49:25 | 19 | MS. DYMKAR:  All right.  I will ask my |
| 10:49:28 | 20 | client to leave for a couple of minutes and I'll ask the |
| 10:49:35 | 21 | same question again. |
| 10:49:40 | 22 | (Plaintiff steps out of room.) |
| 10:49:41 | 23 | Q    BY MS. DYMKAR:  Mr. Smith has left the |
| 10:49:44 | 24 | room.  Could you tell us what your Social Security number |
| 10:49:45 | 25 | is? |

KEITH THORNTON, JR. - June 10, 2013

26

| | | |
|---|---|---|
| 10:49:48 | 1 | A    I don't have my Social Security on me. |
| 10:49:51 | 2 | Q    Okay.  Does it start with ▮▮▮▮? |
| 10:49:53 | 3 | A    That may be it, ma'am.  I don't have it on |
| 10:49:55 | 4 | me to verify it. |
| 10:49:56 | 5 | Q    Is it? |
| 10:49:57 | 6 | A    I -- |
| 10:49:58 | 7 | Q    Do you know your Social Security number? |
| 10:50:01 | 8 | A    I would tell you if I knew it. |
| 10:50:04 | 9 | Q    You're saying you don't know your Social |
| 10:50:04 | 10 | Security number? |
| 10:50:06 | 11 | A    I'm saying I do not know my Social Security |
| 10:50:11 | 12 | number. |
| 10:50:13 | 13 | Q    All right.  I would like to get Mr. Smith |
| 10:50:20 | 14 | back in the room. |
| 10:50:35 | 15 | (Mr. Smith enters room.) |
| 10:50:36 | 16 | Q    BY MS. DYMKAR:  I would like to get a |
| 10:50:38 | 17 | description of you for the record. |
| 10:50:41 | 18 | You are an African-American male; is that |
| 10:50:41 | 19 | correct? |
| 10:50:43 | 20 | A    It's on the information that you were -- |
| 10:50:48 | 21 | being received on the driver's license. |
| 10:50:50 | 22 | Q    Okay.  But we're looking at you on a -- on |
| 10:50:51 | 23 | a video camera. |
| 10:50:55 | 24 | You are an African-American male? |
| 10:50:57 | 25 | A    The driver's license that will be sent over |

27

| | |
|---|---|
| 10:51:01 1 | to you, ma'am, it verifies all of that. |
| 10:51:02 2 | Q Okay. What's your height and weight? |
| 10:51:07 3 | A It's on the driver's license, ma'am. |
| 10:51:10 4 | Q Could you tell me what your height and |
| 10:51:12 5 | weight is, please, for the record? |
| 10:51:14 6 | A It's on the driver's license, ma'am. |
| 10:51:16 7 | Q Are you refusing to tell me your height and |
| 10:51:21 8 | weight? |
| 10:51:33 9 | A (No verbal response.) |
| 10:51:36 10 | Q Are you refusing to tell me your height and |
| 10:51:36 11 | weight? |
| 10:51:39 12 | A I'm refusing to do nothing. I'm just |
| 10:51:41 13 | letting you know that the information was provided for you |
| 10:51:42 14 | already. |
| 10:51:45 15 | Q Now, as you appear today, do you have any |
| 10:51:47 16 | facial hair? |
| 10:51:50 17 | A Do I have any facial hair? |
| 10:51:50 18 | Q Yes. |
| 10:51:53 19 | A I shaved this morning. I would say |
| 10:51:55 20 | clean-shaven. |
| 10:51:58 21 | Q Okay. And on April 10, 2010, did you have |
| 10:52:00 22 | any facial hair? |
| 10:52:04 23 | A When -- when was that? What date? |
| 10:52:09 24 | Q April 10, 2010, the date of this incident. |
| 10:52:11 25 | A I don't recall back to the incident. And I |

28

| | |
|---|---|
| 10:52:14 1 | would probably say no, I normally do not have facial |
| 10:52:21 2 | hair. |
| 10:52:23 3 | Q Could you tell us a phone number we could |
| 10:52:27 4 | reach you at to discuss your testimony in the future? |
| 10:52:34 5 | A Yes. (312) 203-4205, the same number that |
| 10:52:39 6 | I provided to you, ma'am, when you talked to me. |
| 10:52:40 7 | MS. PINKSTON: And I'm just going to ask |
| 10:52:44 8 | that that be made subject to the protective order as well. |
| 10:52:44 9 | Q BY MS. DYMKAR: Okay. That was |
| 10:52:50 10 | (312) 203-4205, sir? |
| 10:52:52 11 | A That's correct. |
| 10:52:56 12 | Q I'm sorry. Yes? |
| 10:52:58 13 | A Prior to this going on, you said you would |
| 10:53:01 14 | allow me to answer my questions, so you would be able to |
| 10:53:04 15 | hear them, and you're talking over me, and that's probably |
| 10:53:07 16 | why you cannot hear me. |
| 10:53:08 17 | So my answer to your question -- |
| 10:53:08 18 | Q Okay. |
| 10:53:10 19 | A -- was that is correct. |
| 10:53:20 20 | Q Okay. Good. Now, you consider 4814 West |
| 10:53:23 21 | Wabansia one of your residences? |
| 10:53:23 22 | A No. |
| 10:53:24 23 | MS. PINKSTON: Objection. Mischaracterizes |
| 10:53:25 24 | prior testimony. |
| 10:53:26 25 | Q BY MS. DYMKAR: That's the residence |

KEITH THORNTON, JR. - June 10, 2013

29

| | |
|---|---|
| 10:53:29 1 | address you gave to the police on April 10, 2010, the date |
| 10:53:31 2 | of this incident; right? |
| 10:53:42 3 | A     2010, yes.   This is 2013. |
| 10:53:44 4 | Q     And your father, Keith A. Thornton, Sr., |
| 10:53:47 5 | has owned that property since 1991; is that correct? |
| 10:53:53 6 | MS. PINKSTON:  Objection.  Foundation. |
| 10:53:54 7 | THE WITNESS:  I don't know too much about |
| 10:54:02 8 | what my father has done, ma'am.  He does own the property. |
| 10:54:03 9 | Q     BY MS. DYMKAR:  He does own the property; |
| 10:54:04 10 | right? |
| 10:54:05 11 | A     That's correct. |
| 10:54:07 12 | Q     Okay.  And is Deidre Thornton your mother? |
| 10:54:09 13 | A     Yes, it is. |
| 10:54:11 14 | Q     Your father, Keith Thornton, and Deidre |
| 10:54:16 15 | Thornton live at 4814 West Wabansia? |
| 10:54:21 16 | A     Yes, they do. |
| 10:54:23 17 | Q     And you lived there since you were about |
| 10:54:24 18 | three years old? |
| 10:54:25 19 | A     I would say so. |
| 10:54:31 20 | MS. PINKSTON:  Objection, mischaracterizes. |
| 10:54:32 21 | Q     BY MS. DYMKAR:  Just -- I think counsel |
| 10:54:35 22 | spoke at the same time you spoke.  You said you would |
| 10:54:38 23 | believe so? |
| 10:54:43 24 | A     That's correct. |
| 10:54:46 25 | Q     How many units are there at 4814 West |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

30

| | |
|---|---|
| 10:54:49 1 | Wabansia? |
| 10:54:53 2 | A     There are two units. |
| 10:54:58 3 | Q     Do family members live in both units? |
| 10:55:02 4 | A     That is correct. |
| 10:55:05 5 | Q     Who is Ebony Marshall? |
| 10:55:11 6 | A     Ebony Marshall is my sister. |
| 10:55:14 7 | Q     Who lives in the upstairs or second floor |
| 10:55:16 8 | apartment? |
| 10:55:27 9 | A     That would be my grandmother. |
| 10:55:29 10 | Q     What's your grandmother's name? |
| 10:55:32 11 | A     Could you have your client leave the room, |
| 10:55:44 12 | please? |
| 10:55:50 13 | Q     Okay. |
| 10:55:53 14 | MS. DYMKAR:  Why don't you leave the room. |
| 10:55:53 15 | (George Smith leaves the room.) |
| 10:55:54 16 | Q     BY MS. DYMKAR:  What's your grandmother's |
| 10:55:55 17 | name? |
| 10:55:57 18 | A     And I would like to know exactly what any |
| 10:56:01 19 | of this has to do with the case. |
| 10:56:04 20 | Q     I ask the questions, unfortunately, in the |
| 10:56:09 21 | deposition.  I need to know who lives at that location, |
| 10:56:11 22 | because there's been confusion about where you live and |
| 10:56:15 23 | who lives at that location.  I want to clarify that once |
| 10:56:15 24 | and for all. |
| 10:56:18 25 | So what is your grandmother's name? |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

31

| | | |
|---|---|---|
| 10:56:19 | 1 | MS. PINKSTON:  I'm going to object to this |
| 10:56:21 | 2 | line of questioning.  It's not relevant, and the confusion |
| 10:56:28 | 3 | has been cleared up by the information that was provided |
| 10:56:28 | 4 | at the very beginning of this deposition, including |
| 10:56:32 | 5 | showing his California driver's license. |
| 10:56:34 | 6 | And should Mr. Thornton answer any more of |
| 10:56:37 | 7 | these questions about his family members, we're also going |
| 10:56:40 | 8 | to be moving for that to be the subject of the protective |
| 10:56:42 | 9 | order as well. |
| 10:56:44 | 10 | Q      BY MS. DYMKAR:  Could you tell us your |
| 10:56:46 | 11 | grandmother's name? |
| 10:56:47 | 12 | A      No, ma'am. |
| 10:56:50 | 13 | Q      You are refusing? |
| 10:56:55 | 14 | A      Yes, I am. |
| 10:56:59 | 15 | Q      Who else lives on the second floor? |
| 10:57:01 | 16 | A      My grandmother. |
| 10:57:04 | 17 | Q      She lives alone? |
| 10:57:06 | 18 | A      Grandmother. |
| 10:57:08 | 19 | Q      Does she live alone? |
| 10:57:12 | 20 | A      Yes, she does. |
| 10:57:16 | 21 | Q      Who lives in the first floor apartment? |
| 10:57:20 | 22 | A      My mother, my father, my sister. |
| 10:57:22 | 23 | Q      That sister being Ebony Marshall? |
| 10:57:29 | 24 | A      That's correct. |
| 10:57:33 | 25 | Q      Do you own a 2001 Chevy Cavalier? |

KEITH THORNTON, JR. - June 10, 2013

32

| | | |
|---|---|---|
| 10:57:36 | 1 | A      I do not. |
| 10:57:37 | 2 | Q      Does your father? |
| 10:57:44 | 3 | A      Yes, he does. |
| 10:57:47 | 4 | Q      And your father, just to clarify that, he |
| 10:57:50 | 5 | is Keith A. Thornton, Sr.; right? |
| 10:57:52 | 6 | A      You repeated that several times.  I said |
| 10:57:55 | 7 | "yes." |
| 10:57:57 | 8 | Q      And Deidra Thornton is your mother? |
| 10:58:01 | 9 | A      I answered that one as well. |
| 10:58:03 | 10 | Q      Is Deidra Thornton your mother? |
| 10:58:03 | 11 | A      Answered that question. |
| 10:58:04 | 12 | MS. PINKSTON:  It's been asked and |
| 10:58:07 | 13 | answered. |
| 10:58:07 | 14 | BY MS. DYMKAR:  Pardon me? |
| 10:58:13 | 15 | A      I answer that already, ma'am. |
| 10:58:16 | 16 | Q      Do you own a 1998 Ford Expedition? |
| 10:58:21 | 17 | A      I own no vehicles, ma'am. |
| 10:58:24 | 18 | Q      Have you owned a 1998 Ford Expedition? |
| 10:58:35 | 19 | A      No, I have not. |
| 10:58:37 | 20 | Q      Okay.  I'm going to ask Mr. Smith to come |
| 10:58:37 | 21 | back in the room. |
| 10:58:44 | 22 | (Mr. Smith enters room.) |
| 10:58:57 | 23 | Q      BY MS. DYMKAR:  Did you go to Prosser High |
| 10:58:57 | 24 | School? |
| 10:59:00 | 25 | A      Yes, I did. |

KEITH THORNTON, JR. - June 10, 2013

33

| 10:59:02 | 1 | Q | Did you graduate in 2007? |
| 10:59:05 | 2 | A | Yes, I did.  High honors. |
| 10:59:08 | 3 | Q | Are you in college -- I'm sorry.  What did |
| 10:59:09 | 4 | | you say? |
| 10:59:12 | 5 | A | Very high honors. |
| 10:59:14 | 6 | Q | Are you in college now? |
| 10:59:17 | 7 | A | No, I am not. |
| 10:59:18 | 8 | Q | Are you in school now? |
| 10:59:24 | 9 | A | No, I am not. |
| 10:59:26 | 10 | Q | Are you working now? |
| 10:59:30 | 11 | A | Yes, I am. |
| 10:59:33 | 12 | Q | Where are you employed? |
| 10:59:36 | 13 | A | I don't feel that I need to let that be |
| 10:59:39 | 14 | | known. |
| 10:59:42 | 15 | Q | You're refusing to answer where you're |
| 10:59:46 | 16 | | employed? |
| 10:59:51 | 17 | A | Yes, ma'am. |
| 10:59:55 | 18 | Q | On what grounds? |
| 11:00:02 | 19 | A | There's a client in the room. |
| 11:00:07 | 20 | | MS. DYMKAR:  Can I ask you to leave? |
| 11:00:09 | 21 | | I will ask Mr. Smith to leave again so I |
| 11:00:14 | 22 | | can get an answer to my question, Mr. Thornton. |
| 11:00:20 | 23 | | (George Smith leaves the room.) |
| 11:00:28 | 24 | Q | BY MS. DYMKAR:  Where are you employed? |
| 11:00:30 | 25 | A | I'm employed by the Los Angeles City Police |

KEITH THORNTON, JR. - June 10, 2013

34

| 11:00:35 | 1 | | Department. |
| 11:00:37 | 2 | Q | What's your title? |
| 11:00:40 | 3 | A | A police officer. |
| 11:00:44 | 4 | Q | How long have you been a police officer? |
| 11:00:48 | 5 | A | Since December of last year. |
| 11:00:48 | 6 | Q | December? |
| 11:00:49 | 7 | A | That is correct. |
| 11:00:53 | 8 | Q | Did you say December or Sept -- December of |
| 11:00:56 | 9 | | last year? |
| 11:00:58 | 10 | | MS. PINKSTON:  I just want to make an |
| 11:01:01 | 11 | | objection now.  I don't know what the laws of California |
| 11:01:05 | 12 | | are in terms of his personal identification, but I just |
| 11:01:08 | 13 | | want to make an objection as to any applicable California |
| 11:01:13 | 14 | | laws regarding his personal identification, if |
| 11:01:16 | 15 | | Mr. Thornton is, in fact, a police officer. |
| 11:01:16 | 16 | | Go ahead. |
| 11:01:17 | 17 | | MS. DYMKAR:  Ms. Pinkston, are you -- are |
| 11:01:19 | 18 | | you representing Mr. Thornton? |
| 11:01:21 | 19 | | MS. PINKSTON:  No.  But I am an officer of |
| 11:01:24 | 20 | | the court, and I believe it's my duty to state that for |
| 11:01:30 | 21 | | the record. |
| 11:01:33 | 22 | Q | BY MS. DYMKAR:  Are you a patrol officer? |
| 11:01:40 | 23 | A | Yes, I am. |
| 11:01:44 | 24 | Q | To what unit are you assigned? |
| 11:01:50 | 25 | A | There is no unit, ma'am. |

KEITH THORNTON, JR. - June 10, 2013

35

| | | |
|---|---|---|
| 11:01:52 | 1 | Q    Okay.  Are you assigned to a certain |
| 11:01:53 | 2 | district? |
| 11:01:54 | 3 | A    That is correct. |
| 11:01:55 | 4 | Q    What's the district? |
| 11:02:01 | 5 | A    18. |
| 11:02:01 | 6 | Q    18? |
| 11:02:04 | 7 | A    That is correct. |
| 11:02:11 | 8 | Q    Okay.  And that is what part of the City of |
| 11:02:13 | 9 | Los Angeles?  Is there a neighborhood that that pertains |
| 11:02:17 | 10 | to or is referenced by that district? |
| 11:02:20 | 11 | A    That is correct. |
| 11:02:22 | 12 | Q    What is the neighborhood? |
| 11:02:22 | 13 | A    South Central L.A. |
| 11:02:33 | 14 | Q    Were you in school when you and I spoke on |
| 11:02:38 | 15 | May 4th, 2013? |
| 11:02:40 | 16 | A    That is correct.  Yes, I was. |
| 11:02:45 | 17 | Q    Where were you in school? |
| 11:02:51 | 18 | A    Online courses at Concordia University. |
| 11:02:52 | 19 | Q    I'm sorry.  You said Concordia? |
| 11:03:00 | 20 | A    That is correct. |
| 11:03:03 | 21 | Q    What are you studying? |
| 11:03:05 | 22 | A    I don't know what I'm studying.  Just |
| 11:03:11 | 23 | studying.  I like school.  I take random classes. |
| 11:03:13 | 24 | Q    Are you studying journalism? |
| 11:03:20 | 25 | A    No, I am not. |

KEITH THORNTON, JR. - June 10, 2013

36

| | | |
|---|---|---|
| 11:03:22 | 1 | Q    And you're not taking classes this summer? |
| 11:03:25 | 2 | A    No, I am not. |
| 11:03:29 | 3 | Q    When will you be back in Chicago? |
| 11:03:35 | 4 | A    No idea.  I don't plan on coming back. |
| 11:03:37 | 5 | Q    Did you -- did you indicate to me, when we |
| 11:03:43 | 6 | spoke on May 4, 2013, that you were likely to come back to |
| 11:03:46 | 7 | Chicago within a month after school was over? |
| 11:03:56 | 8 | A    After you threatened me. |
| 11:03:57 | 9 | Q    Excuse me.  How did -- how did I threaten |
| 11:03:58 | 10 | you? |
| 11:04:00 | 11 | A    By telling me I -- I -- I had better be in |
| 11:04:01 | 12 | Chicago. |
| 11:04:02 | 13 | Q    You said that you would be in Chicago |
| 11:04:09 | 14 | within the month and that was not truthful? |
| 11:04:13 | 15 | A    No, ma'am.  It didn't happen. |
| 11:04:16 | 16 | Q    Pardon me? |
| 11:04:21 | 17 | A    I said, ma'am, it did not happen. |
| 11:04:24 | 18 | Q    What -- what didn't happen?  I -- |
| 11:04:29 | 19 | A    Being able to come to Chicago. |
| 11:04:31 | 20 | Q    I asked you if you would be coming to |
| 11:04:34 | 21 | Chicago within a month; right? |
| 11:04:36 | 22 | A    You told me to be coming to Chicago. |
| 11:04:37 | 23 | Q    Or -- excuse me.  You said you would be |
| 11:04:40 | 24 | coming within a month -- |
| 11:04:40 | 25 | A    Possibly. |

KEITH THORNTON, JR. - June 10, 2013

37

| | | |
|---|---|---|
| 11:04:41 | 1 | Q -- correct? |
| 11:04:45 | 2 | A Possibly. |
| 11:04:47 | 3 | Q And you're saying now that that was not |
| 11:04:48 | 4 | truthful? |
| 11:04:52 | 5 | A I just told you your answer. I said I |
| 11:04:59 | 6 | possibly would be coming to Chicago. |
| 11:05:01 | 7 | Q Have you been to Chicago in the last month? |
| 11:05:07 | 8 | A No, ma'am. |
| 11:05:13 | 9 | Q Have you ever been arrested? |
| 11:05:19 | 10 | A No, ma'am. |
| 11:05:21 | 11 | Q I'm going to ask Mr. Smith to come back in |
| 11:05:23 | 12 | the room. |
| 11:05:55 | 13 | (Mr. Smith enters room.) |
| 11:05:58 | 14 | Q BY MS. DYMKAR: Mr. Thornton, how was this |
| 11:06:03 | 15 | deposition today arranged? |
| 11:06:07 | 16 | A By you, number one, contacting me, |
| 11:06:11 | 17 | threatening me, and sending me all types of e-mails and, |
| 11:06:19 | 18 | then, also communicating with Kristin Pinkston -- |
| 11:06:19 | 19 | Q Okay. |
| 11:06:20 | 20 | A -- that I -- |
| 11:06:22 | 21 | Q Why was -- I'm sorry. |
| 11:06:26 | 22 | A No. I'm sorry. Continue. |
| 11:06:28 | 23 | Q Why is this deposition taking place in |
| 11:06:32 | 24 | Santa Monica? |
| 11:06:41 | 25 | A Why wouldn't it be? |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

38

| | | |
|---|---|---|
| 11:06:43 | 1 | Q Who chose Santa Monica? Was that you? |
| 11:06:53 | 2 | A I chose Santa Monica. |
| 11:06:55 | 3 | Q Who chose the date June 10th? |
| 11:06:57 | 4 | A I did. |
| 11:07:00 | 5 | Q Why did this deposition have to take place |
| 11:07:01 | 6 | on June 10th? |
| 11:07:04 | 7 | A Because it's my free day and my off day, |
| 11:07:09 | 8 | and I wanted to be here for this, seeing that I cannot be |
| 11:07:22 | 9 | in Chicago. |
| 11:07:24 | 10 | Q Did you have e-mails going back and forth |
| 11:07:29 | 11 | between you and either Ms. Pinkston or Ms. Pesha? |
| 11:07:33 | 12 | A No, ma'am. |
| 11:07:37 | 13 | Q Was all your communication by telephone? |
| 11:07:48 | 14 | A That is correct, ma'am. |
| 11:07:50 | 15 | MS. DYMKAR: I'm wondering, Ms. Wong, if |
| 11:08:01 | 16 | you could mark the affidavit that you have as Exhibit 2. |
| 11:08:10 | 17 | (Exhibit 2 was marked.) |
| 11:08:11 | 18 | THE COURT REPORTER: Okay. It's in front |
| 11:08:12 | 19 | of the witness. |
| 11:08:12 | 20 | MS. DYMKAR: Okay. |
| 11:08:15 | 21 | Q BY MS. DYMKAR: Mr. Thornton, this is a |
| 11:08:19 | 22 | document that purports to be the affidavit of Keith |
| 11:08:21 | 23 | Thornton, Jr. |
| 11:08:23 | 24 | Do you see that? |
| 11:08:24 | 25 | MS. PINKSTON: Counsel, did you bring |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

39

| | |
|---|---|
| 11:08:26 | 1 |
| 11:08:27 | 2 |
| 11:08:31 | 3 |
| 11:08:31 | 4 |
| 11:08:34 | 5 |
| 11:08:35 | 6 |
| 11:08:36 | 7 |
| 11:08:38 | 8 |
| 11:08:40 | 9 |
| 11:08:43 | 10 |
| 11:08:50 | 11 |
| 11:08:57 | 12 |
| 11:09:01 | 13 |
| 11:09:03 | 14 |
| 11:09:07 | 15 |
| 11:09:08 | 16 |
| 11:09:14 | 17 |
| 11:09:16 | 18 |
| 11:09:19 | 19 |
| 11:09:26 | 20 |
| 11:09:29 | 21 |
| 11:09:32 | 22 |
| 11:09:32 | 23 |
| 11:09:36 | 24 |
| 11:09:39 | 25 |

1  copies for defense counsel?

2      MS. DYMKAR:  I thought you had it since you

3  drafted it.  Sorry.

4      Q    BY MS. DYMKAR:  Do you have that in front

5  of you, sir, affidavit of Keith Thornton, Jr.?

6      A    I do.

7      Q    Have you seen that document before?

8      A    Yes, ma'am.

9      Q    Who prepared that document?

10      A    I did.  I helped, and I said this is what I

11  wanted to do, and I wanted to do this on the 10th, and I

12  informed Ms. Pinkston how do I send the affidavit and how

13  do I do this affidavit.

14      Q    Did you type up this affidavit?

15      A    That is correct.

16      Q    You typed it up?

17      A    That is correct.

18      Q    Did Ms. Pinkston tell you what to say?

19      A    No, ma'am.  But I expressed my concerns to

20  her, and she told me she does not represent me.

21      Q    Okay.  What is a third-party witness?

22      A    A third-party witness?

23      Q    Yes.

24      A    I don't know, ma'am.  I'm not an attorney

25  or a lawyer.

40

| | |
|---|---|
| 11:09:43 | 1 |
| 11:09:45 | 2 |
| 11:09:47 | 3 |
| 11:09:47 | 4 |
| 11:09:49 | 5 |
| 11:09:50 | 6 |
| 11:09:55 | 7 |
| 11:09:59 | 8 |
| 11:10:12 | 9 |
| 11:10:15 | 10 |
| 11:10:18 | 11 |
| 11:10:20 | 12 |
| 11:10:24 | 13 |
| 11:10:26 | 14 |
| 11:10:33 | 15 |
| 11:10:35 | 16 |
| 11:10:43 | 17 |
| 11:10:45 | 18 |
| 11:10:47 | 19 |
| 11:10:50 | 20 |
| 11:10:50 | 21 |
| 11:10:54 | 22 |
| 11:10:57 | 23 |
| 11:11:01 | 24 |
| 11:11:05 | 25 |

1      Q    Okay.  Do you see No. 3 -- Paragraph 3 of

2  this affidavit says, "I am named as a third-party witness

3  in the above-stated matter"?

4      A    That's correct.

5      Q    Do you see that?

6      A    And this same information, when I was

7  living at 4814 West Wabansia, when I went to court for

8  David Wilbon, which was a few years ago, had the exact

9  same information, same case number, same everything.

10      Q    When you went to court, the criminal case

11  against David Wilbon had the same case number?

12      A    The same name, the same information was on

13  there, that's correct.

14      Q    So you got the caption from the criminal

15  case against David Wilbon for which you went to court?

16      A    Several -- several different things on that

17  one.  I don't have it in front of me, ma'am.

18      Q    The caption in this affidavit, where did

19  you get the caption from?

20      A    I don't know what "caption" stands for,

21  ma'am.

22      Q    Okay.  The -- the top part, the first three

23  or four inches of the affidavit, where it has "United

24  States District Court, Northern District of Illinois,

25  Eastern Division," how did you know that was the court

41

```
11:11:09  1    we're in?
11:11:11  2         A    That information was relayed by Ms. Kristin
11:11:16  3    Pinkston.  She gave me the phone number to call the court.
11:11:20  4         Q    So you called the court and -- and you
11:11:22  5    said, "What is the name of the case that I'm a witness
11:11:23  6    in"?
11:11:25  7         A    Yes, I did.  I gave them my name.  I spoke
11:11:28  8    to an assistant, who was a female, and she gave me
11:11:30  9    information.
11:11:36  10        Q    Okay.  So you said, "I am Keith Thornton,
11:11:37  11   Jr.  I'm a witness in a case.  I need to know the name of
11:11:38  12   the case"?
11:11:43  13        A    The judge and all of that information,
11:11:44  14   ma'am.
11:11:48  15        Q    But did you say, "I am Keith Thornton, Jr.
11:11:52  16   I am a witness in a case, and I need to know the name of
11:11:52  17   the case"?
11:11:53  18        A    That's correct, ma'am.
11:11:56  19        Q    And you're saying the court clerk said to
11:11:59  20   you that, "The name of the case is David D. Wilbon, et
11:12:05  21   al., plaintiffs, versus Joseph M. Plovanich, et al."?
11:12:08  22        A    She read out information as I was asking
11:12:10  23   her about the different dates that you were originally
11:12:12  24   sending me e-mails about, and all that information, I was
11:12:24  25   able to get off of there.
```

42

```
11:12:26  1         Q    Now, you said you're not an attorney, so
11:12:30  2    you don't know what a third-party witness is; right?
11:12:30  3         A    That's correct.
11:12:33  4         Q    So why is -- can you explain to me why this
11:12:38  5    is in your affidavit that you swore to?
11:12:42  6         A    Yes, ma'am.  Because I sent that --
11:12:42  7         Q    Okay.  Please --
11:12:44  8         A    Will you allow me?
11:12:44  9         Q    I'm sorry.  What?
11:12:46  10        A    Will you allow me?
11:12:48  11        Q    You were chopped -- you chopped up.  I'm
11:12:49  12   sorry.
11:12:51  13        A    You're not chopped up, and I can hear you
11:12:52  14   very well.
11:12:54  15        Q    Okay.  Well, we can't hear you very well.
11:12:56  16   Obviously, you have -- you've got a much better connection
11:12:59  17   than we do, because we're having -- I'm having difficulty
11:13:00  18   understanding you.
11:13:07  19        A    And which part are you questioning, ma'am?
11:13:10  20        Q    No. 3 of your affidavit, "I am named as a
11:13:13  21   third-party witness in the above-stated matter."  You put
11:13:15  22   that in the affidavit; right?
11:13:17  23        A    That's correct.
11:13:20  24        Q    Why?
11:13:24  25        A    Because that is on the original document
```

43

11:13:31  1   that I received at -- when I did use -- in Chicago.

11:13:32  2         Q      You chopped up.  "That was in the original

11:13:38  3   document," and then I didn't get the rest.  That was in

11:13:40  4   what original document?

11:13:45  5         A      The very first -- whatever, 5555 West Grand

11:13:47  6   Avenue, the one that I went to, I received that several

11:13:51  7   years ago, and I know that I am a witness within that

11:13:56  8   case.

11:13:58  9         Q      The criminal case?

11:14:07 10         A      If that's what it's called, yes, ma'am.

11:14:10 11         Q      Paragraph 4 where you say, "I currently

11:14:12 12   reside more than 5-" -- "more than 100 miles outside the

11:14:19 13   city limits of Chicago, Illinois," why you did you say you

11:14:23 14   live more than 100 miles?

11:14:25 15         A      Because you spoke to me on the phone and

11:14:29 16   was asking about my whereabouts, and you actually relayed

11:14:36 17   that information over to me indirectly by stating, if you

11:14:39 18   weren't here, you need to verify where I was located.  And

11:14:42 19   I asked you if we could do this, what we're doing here

11:14:46 20   today.  And you said, "I need to know if you are over

11:14:48 21   these certain amount of miles."

11:14:49 22         Q      You're saying that I said to you that you

11:14:53 23   had to be more than 100 miles away from Chicago?

11:14:56 24         A      No.  You wanted to ver- -- you said -- I

11:14:59 25   don't know what you said, actually.  You were just -- a

44

11:15:01  1   lot of screaming and a lot of -- a lot of different things

11:15:05  2   you were doing.

11:15:07  3         Q      You're saying I was screaming to you over

11:15:08  4   the phone?

11:15:10  5         A      Threats on top of your threats and a lot of

11:15:12  6   other things, ma'am.

11:15:13  7         Q      No.  But you said I was screaming.  That

11:15:17  8   means a really loud voice.  You said that I was screaming

11:15:17  9   on the --

11:15:19 10         A      That's correct, and you --

11:15:19 11         Q      -- phone to you?

11:15:20 12         A      Yes, ma'am.

11:15:26 13         Q      This would be on May 4, 2013?

11:15:28 14         A      Whatever day that was.  I do not recall,

11:15:38 15   ma'am.  It was the only time I spoke to you.

11:15:41 16         Q      I would like to ask you about the context

11:15:53 17   you've had with the City of Chicago attorneys.  You spoke

11:15:56 18   to two attorneys about a year ago about this -- this civil

11:15:58 19   rights case; right?

11:16:01 20         A      That's correct.

11:16:03 21         Q      Okay.  And you had -- one was an

11:16:07 22   African-American female and one was an Indian-American

11:16:08 23   male --

11:16:09 24         A      That's correct.

11:16:12 25         Q      -- correct?

45

```
11:16:15  1        And that was -- you came downtown for that
11:16:16  2   conversation?
11:16:18  3        A    That's correct.
11:16:19  4        Q    When did that take place?
11:16:24  5        A    I do not recall.
11:16:26  6        Q    It was in 2012?
11:16:30  7        A    No, ma'am.  I don't believe it --
11:16:32  8        Q    2011?
11:16:33  9        A    I don't recall the year, but I went down
11:16:37 10   there, ma'am.
11:16:39 11        Q    It was not 2013?
11:16:45 12        A    No, ma'am.
11:16:47 13        Q    And the attorney, do you recall her name
11:16:49 14   being Andrea Cook?
11:16:51 15        A    That is correct.
11:16:55 16        Q    Okay.  She prepared a statement at that
11:16:55 17   time?
11:16:57 18        A    I don't know what you mean by "prepared a
11:17:00 19   statement."  She just asked me my story, and I told her my
11:17:03 20   story, exactly what happened that day.
11:17:06 21        Q    Did you sign a statement?  Did you sign a
11:17:07 22   statement?
11:17:13 23        A    I do not recall.
11:17:16 24        Q    And do you recall telling me on May 4, 2013
11:17:18 25   that you may have signed a statement at that time --
```

46

```
11:17:20  1        A    Can you repeat that, please?
11:17:25  2        Q    -- when you met with Andrea Cook?
11:17:26  3        Do you recall telling me on May 4, 2013
11:17:32  4   that you may have signed a statement prepared by Andrea
11:17:32  5   Cook?
11:17:33  6        A    2013, I was not in the City of Chicago
11:17:35  7   ma'am.
11:17:40  8        Q    When you and I spoke on May 4, 2013, do you
11:17:43  9   recall telling me that you may have signed a statement
11:17:45 10   prepared by Andrea Cook?
11:17:48 11        A    She asked me a series of questions, and I
11:17:50 12   -- just like what you're doing now, and I told her exactly
11:17:56 13   what happened that day.  I do not recall, seeing that it
11:18:02 14   was so long ago, as I signed anything.
11:18:05 15        Q    You spoke to Andrea Cook for about an hour?
11:18:08 16        A    I would say around that time frame, yes.
11:18:11 17        Q    And you only spoke to her once?
11:18:18 18        A    Yes, ma'am.
11:18:19 19        Q    Do you recall speaking to an investigator
11:18:27 20   named Rashaun McGee, R-A-S-H-A-U-N, McGee, on February 18,
11:18:28 21   2012?
11:18:30 22        A    At the time, I didn't know he was an
11:18:37 23   investigator.  He actually acknowledged himself as more of
11:18:42 24   a police officer with the City of Chicago.
11:18:43 25        Q    Did he say he was an investigator?
```

47

| | |
|---|---|
| 11:18:46 | 1 |

```
11:18:46   1          A       No, he did not.  I just told you what he
11:18:50   2   said.  He threatened my family and he told me several
11:18:54   3   times that he was with the City of Chicago.
11:18:58   4          Q       And you met him in a coffee shop at
11:19:00   5   Brickyard Mall?
11:19:02   6          A       Did you hear what I just said?  Can you
11:19:06   7   confirm what I just said?  Did you hear that part, ma'am?
11:19:07   8          Q       What part, sir?
11:19:10   9          A       The part where he confirmed himself working
11:19:15  10   for the City of Chicago as a police officer.
11:19:17  11          Q       I understand that that is your opinion of
11:19:18  12   what he said to you.
11:19:21  13          A       So is that a yes or a no from you, ma'am?
11:19:23  14          Q       You don't get to ask me questions,
11:19:24  15   unfortunately.
11:19:25  16          A       Excellent.
11:19:34  17          Q       I'm the one asking questions.  Okay?
11:19:35  18              THE COURT REPORTER:  Can we go off the
11:19:37  19   record for a second?
11:19:37  20              MS. DYMKAR:  Sure.
11:19:38  21              THE VIDEOGRAPHER:  We're going off the
11:30:22  22   record at 11:19 a.m.
11:30:45  23              (Brief recess.)
11:30:46  24              THE VIDEOGRAPHER:  We're back on the record
11:30:52  25   at 11:30 a.m.
```

48

```
11:30:55   1          Q       BY MS. DYMKAR:  Sorry about that.
11:31:02   2   Mr. Thornton, Rashaun McGee identified himself as having
11:31:08   3   been hired by me, Irene Dymkar, did he not?
11:31:11   4          A       No, ma'am.
11:31:15   5          Q       And he talked to you over the phone before
11:31:17   6   you met in person; is that correct?
11:31:21   7          A       That's correct, ma'am.
11:31:23   8          Q       He gave you his card, didn't he?
11:31:26   9          A       He did not give me a card.
11:31:27  10          Q       Did you ask him for a card?
11:31:30  11          A       No, ma'am.  He left a phone number at my
11:31:33  12   residence.
11:31:36  13          Q       And you con- -- you called that phone
11:31:36  14   number?
11:31:38  15          A       That is correct.
11:31:42  16          Q       And that was his office number or his cell
11:31:43  17   phone number?
11:31:45  18          A       I want to say it was a cell phone.  He
11:31:50  19   picked up, and that's who I spoke to.
11:31:53  20          Q       Now, did you speak to Rashaun McGee before
11:31:59  21   or after you spoke to City Attorney Andrea Cook?
11:32:01  22          A       He was the very first person that I spoke
11:32:05  23   to before anyone.
11:32:08  24          Q       And then Andrea Cook was the second person
11:32:09  25   you spoke to regarding this case?
```

49

```
11:32:14  1        A      That's correct.
11:32:17  2        Q      You refused to meet with Rashaun McGee
11:32:20  3   after you met with him in the coffee shop; right?
11:32:23  4        A      That is correct.
11:32:27  5        Q      He asked you to give a statement, a written
11:32:30  6   statement?
11:32:33  7        A      That's correct.
11:32:36  8        Q      And when you spoke to Mr. McGee in the
11:32:39  9   Brickyard Mall, he was taking notes, wasn't he?
11:32:47 10        A      That's correct.
11:32:50 11        Q      Now, when you refused to meet with him
11:32:52 12   again, was that before or after you spoke to Attorney
11:32:55 13   Andrea Cook?
11:32:59 14        A      That was after I had spoken to her, ma'am.
11:33:01 15   Because she identified herself --
11:33:01 16        Q      So you --
11:33:03 17        A      -- with the City of Chicago, which is when
11:33:07 18   I met downtown in their office and actually knew that it
11:33:10 19   was someone factual that I was actually speaking to.
11:33:12 20              And considering the fact that he had
11:33:16 21   identified himself with City of Chicago and had lied, I
11:33:18 22   didn't know who I was speaking to.  So I'm not going to
11:33:21 23   give a written statement or any type of statement, for
11:33:24 24   that matter, to him ever again.
11:33:28 25        Q      After you met with him at the coffee shop,
```

50

```
11:33:31  1   you went to California for a couple of weeks?
11:33:36  2        A      Yes, ma'am.
11:33:37  3        Q      And is it when you came back that you met
11:33:40  4   with Andrea Cook?
11:33:48  5        A      Yes, ma'am.
11:33:50  6        Q      And we've already established, you've
11:33:53  7   spoken to me on the phone once; is that correct?
11:33:57  8        A      That's correct.  Actually, twice we got --
11:33:58  9        Q      On May 4th?
11:33:59 10        A      Actually, it was twice.  We got
11:34:05 11   disconnected, and either you or I called each other back.
11:34:06 12        Q      Okay.  But it was really the same
11:34:08 13   conversation.  It was just interrupted at the beginning;
11:34:10 14   right?
11:34:13 15        A      Not the same conversation.  It was two
11:34:15 16   separate conversations.
11:34:25 17        Q      They were within minutes of each other?
11:34:25 18        A      Within the same hour, ma'am.
11:34:27 19        Q      We spoke to each other, there was a
11:34:30 20   disconnection, and then I called you back within a minute
11:34:33 21   or two; correct?
11:34:36 22        A      That is correct.
11:34:40 23        Q      And we spoke for about an hour?
11:34:42 24        A      I would say it was much more than that,
11:34:43 25   ma'am.
```

KEITH THORNTON, JR. - June 10, 2013

51

```
11:34:46   1         Q      Okay.  And you told me what you knew and
11:34:50   2    what you had observed on April 10, 2010; right?
11:34:54   3         A      That's correct.
11:34:59   4         Q      Now, you had a telephone call with Attorney
11:35:03   5    -- City Attorney Dana Pesha in February of this year; is
11:35:04   6    that correct?
11:35:06   7         A      Yes, ma'am.
11:35:08   8         Q      Now, between the time you spoke to Andrea
11:35:12   9    Cook and the time you spoke to Andrea -- excuse me, spoke
11:35:16  10    with Dana Pesha, had you spoken to anybody -- any of the
11:35:17  11    city attorneys?
11:35:20  12         A      No, ma'am.
11:35:24  13         Q      Did she call you or did you call her?
11:35:33  14         A      She called me.
11:35:37  15         Q      At that 312 number?
11:35:38  16         A      I don't think it was a 312 number, because
11:35:42  17    I didn't have that number at that time.  It was an old
11:35:47  18    number that I had, which was a 630 number.
11:35:50  19         Q      Do you recall giving me a 630 number?
11:35:55  20         A      I don't -- I do -- yes, I did.
11:35:57  21         Q      And that was an old number?
11:36:03  22         A      Yes, it is.
11:36:05  23         Q      When Dana Pesha called you, how long were
11:36:07  24    you on the phone --
11:36:08  25         A      Not very long.
```

KEITH THORNTON, JR. - June 10, 2013

52

```
11:36:09   1         Q      -- the first time --
11:36:11   2         A      Not very long.
11:36:13   3         Q      Okay.  What did she say to you and what did
11:36:14   4    you say to her?
11:36:16   5         A      She asked me if I ever met with an Andrea
11:36:23   6    Cook.  I said, "Yes," and all she said was, "At that time,
11:36:27   7    you" -- she just informed me that, I believe, that there
11:36:32   8    -- that I was still a witness within this case and that --
11:36:35   9    I don't know the exact words, but the -- it basically
11:36:42  10    boiled down to your client had made another case against
11:36:47  11    the officers, and that was that.  So I may be contacted.
11:36:52  12    And that's the only time I ever spoke to Dana Pesha.
11:36:55  13         Q      Did she tell you you would not have to
11:36:57  14    attend a deposition?
11:37:01  15         A      No, she did not.
11:37:03  16         Q      Did you tell her where you lived?
11:37:07  17         A      No, I did not.
11:37:10  18         Q      Did you talk about whether you would have
11:37:12  19    to attend a deposition --
11:37:12  20         A      No --
11:37:12  21         Q      -- at that point?
11:37:15  22         A      No, I did not.  That conversation never
11:37:19  23    arose about any deposition.
11:37:22  24         Q      Do you recall telling me on May 4, 2013
11:37:25  25    that you were told by Ms. Pesha that you would not have to
```

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

53

| | |
|---|---|
| 11:37:27 1 | attend a deposition? |
| 11:37:34 2 | A    That's incorrect, ma'am. |
| 11:37:36 3 | Q    Did Ms. Pesha explain to you that there |
| 11:37:42 4 | were actually two cases against the police department? |
| 11:37:44 5 | A    I don't recall. |
| 11:37:46 6 | Q    Did she tell you that the first case, |
| 11:37:49 7 | involving four individuals, had settled with the City of |
| 11:37:49 8 | Chicago? |
| 11:37:53 9 | A    No, she did not. |
| 11:37:57 10 | Q    What was your understanding regarding -- |
| 11:38:00 11 | you said something about bringing another case.  What was |
| 11:38:02 12 | your understanding about what was happening now |
| 11:38:04 13 | regarding -- |
| 11:38:07 14 | A    Because I was a little confused as to -- I |
| 11:38:10 15 | knew that I had been subpoenaed several years ago for the |
| 11:38:13 16 | actual David Wilbon.  And I showed up, as mentioned, at |
| 11:38:20 17 | 5555 West Grand.  So that was one case, for my knowledge. |
| 11:38:22 18 | And upon her saying it was another reopened |
| 11:38:25 19 | case, I said, "Well, that was already handled several |
| 11:38:31 20 | years ago."  She said, "No.  There is another case." |
| 11:38:33 21 | Q    And you were talking about the criminal |
| 11:38:37 22 | case for which you came to court? |
| 11:38:41 23 | A    That is correct. |
| 11:38:43 24 | Q    Did she explain to you that this was a |
| 11:38:44 25 | civil case? |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

54

| | |
|---|---|
| 11:38:46 1 | A    She did tell me that they were two separate |
| 11:38:55 2 | cases, yes, ma'am. |
| 11:38:57 3 | Q    Did you ever under -- come to understand or |
| 11:39:01 4 | learn that there was a case involving four other people, |
| 11:39:03 5 | four other African-American men? |
| 11:39:07 6 | A    I learned that way back during the criminal |
| 11:39:11 7 | case, when I went down to court and they put up my |
| 11:39:15 8 | information, and they said -- they listed everyone who was |
| 11:39:25 9 | on that case, yes, ma'am. |
| 11:39:27 10 | Q    But you only came to court as a witness |
| 11:39:29 11 | against David Wilbon; right? |
| 11:39:33 12 | A    That is correct. |
| 11:39:36 13 | Q    And you knew that our investigator -- or a |
| 11:39:40 14 | different investigator came to your family home at |
| 11:39:43 15 | 4814 West Wabansia several times in February of this year; |
| 11:39:45 16 | right? |
| 11:39:46 17 | A    That is correct.  An investigator from |
| 11:39:48 18 | where, I did not -- |
| 11:39:49 19 | Q    You spoke to -- pardon me? |
| 11:39:51 20 | A    An investigator from where, I did not |
| 11:39:57 21 | know.  It was just an individual identifying himself to |
| 11:40:02 22 | have a check for Mr. Keith Thornton, Jr., and "I need to |
| 11:40:07 23 | give him his check."  That's all he said. |
| 11:40:09 24 | Q    Did you tell Ms. Pesha that an investigator |
| 11:40:15 25 | had come to your home with a check? |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

55

| 11:40:17 | 1 | A | Don't recall. |

11:40:18  2       MS. PINKSTON:  Objection.  Mischaracterizes

11:40:22  3  his testimony.

11:40:23  4       THE WITNESS:  No, ma'am.

11:40:23  5       Q  BY MS. DYMKAR:  Pardon me?

11:40:26  6       A  I do not recall telling her that.  It was a

11:40:32  7  very quick conversation with Dana Pesha.

11:40:39  8       Q  Since that conversation in February, have

11:40:41  9  you spoken to anybody in the City Attorney's Office?

11:40:41  10       A  I spoke to Chris --

11:40:41  11       Q  You said that you have not spoke -- sorry.

11:40:41  12  Go ahead.

11:40:47  13       A  Thank you.  I spoke to Kristin Pinkston,

11:40:49  14  ma'am.

11:40:51  15       Q  When did you first speak to her?

11:40:54  16       A  Probably along the same times of -- after

11:40:58  17  speaking to Dana Pesha.

11:40:59  18       Q  Okay.  And that was in February of this

11:41:00  19  year?

11:41:03  20       A  I don't recall the specific date, but it

11:41:06  21  was this year, yes, ma'am.

11:41:08  22       Q  Okay.  Was it close in time to your

11:41:11  23  conversation with Dana Pesha?

11:41:16  24       A  I just said yes, ma'am.

11:41:17  25       Q  How many times have you spoken to Kristin

56

11:41:23  1  Pinkston by phone?

11:41:25  2       A  I don't recall the exact number, but I

11:41:32  3  would say somewhere between five to ten times that I've

11:41:35  4  called her.

11:41:37  5       Q  And why have you called her five to ten

11:41:38  6  times?

11:41:40  7       A  Asking her if there were people coming from

11:41:43  8  the City, knocking on my door, claiming that they were

11:41:47  9  going to give me a check and threatening my family,

11:41:51  10  because I don't know who they were, and she said there was

11:41:52  11  no one from --

11:41:52  12       Q  Okay.  And --

11:41:54  13       A  Excuse me.  She said there was no one ever

11:41:58  14  coming from the City of Chicago, which led me to believe

11:42:01  15  this was the same type of incident that was taking place

11:42:05  16  as the person you said you hired, the investigator, who

11:42:12  17  did the same nonsense several years ago.

11:42:15  18       Q  What was the threat that was made by this

11:42:20  19  person -- by this investigator with the check in February

11:42:24  20  of this year?

11:42:30  21       A  To my sister, who is Ebony Marshall, "I

11:42:34  22  need to speak to Keith Thornton, who I know lives here.

11:42:37  23  So you need to give him" -- "you need to have him come

11:42:41  24  down here right now," after them informing you -- and this

11:42:45  25  is after I've actually spoken to you several times, to

KEITH THORNTON, JR. - June 10, 2013

57

11:42:47 1  say, "I do not reside in that location," and them coming
11:42:51 2  to the door every other day saying the same thing, "I need
11:42:54 3  to give him a check.  And if you guys do not give me his
11:42:59 4  information, then he will be sued," and every -- all types
11:43:03 5  of other things.  "He'll be arrested.  He'll have a fine.
11:43:05 6  He'll go to jail."
11:43:08 7      Q    Okay.  So you're saying that the person who
11:43:12 8  came to your house -- do you recognize the name David
11:43:13 9  Harris?
11:43:15 10     A    I don't know that name.  All I know is it
11:43:17 11  was a person that came to the door.
11:43:19 12     Q    So you're saying he said you would be sued,
11:43:22 13  you would be arrested, you would be thrown in jail if you
11:43:26 14  didn't take the check and the papers he had?
11:43:32 15     A    I wasn't at the residence, ma'am, and
11:43:34 16  it's --
11:43:35 17     Q    So who --
11:43:35 18     A    -- it's --
11:43:35 19     Q    -- who's telling --
11:43:35 20     A    -- it's --
11:43:36 21     Q    -- who's telling you that there was a
11:43:39 22  threat?
11:43:41 23     A    Who's saying that it's a threat?
11:43:41 24     Q    That was -- yes.
11:43:43 25     A    I'm saying that it's a threat, because I

KEITH THORNTON, JR. - June 10, 2013

58

11:43:52 1  spoke to my sister.
11:43:53 2      Q    Okay.  So you're saying it was Ebony
11:43:56 3  Marshall who said that the investigator who came with a
11:44:03 4  check for you said that you would (inaudible)?
11:44:04 5      A    Can you repeat that?
11:44:06 6          MS. PINKSTON:  Objection to the extent it
11:44:08 7  mischaracterizes his testimony.
11:44:08 8          Go ahead.
11:44:09 9      Q    BY MS. DYMKAR:  I'm trying to understand
11:44:14 10  where you -- how you arrived at the belief that someone
11:44:18 11  threatened.
11:44:20 12     A    It's harassment and it's threatening to
11:44:23 13  come to a residence.  Okay?  To continuously keep doing it
11:44:26 14  and to never identify yourself as who you are, but to say,
11:44:30 15  "I have a check for Mr. Thornton."  And since he does not
11:44:33 16  live here, to continuously keep coming back and say,
11:44:35 17  "Well, if you don't get this information that I need, he's
11:44:39 18  going to be in big trouble.  He's going to be going to
11:44:41 19  jail.  He's going to be doing all types of different
11:44:43 20  things."  That's a threat.
11:44:46 21     Q    Okay.  So your sister, Ebony Marshall, told
11:44:51 22  you that the investigator who came to the door with a
11:44:53 23  check said that you would be arrested and thrown in jail
11:44:58 24  if you didn't accept the check and the papers he had?
11:45:16 25     A    That is correct.

KEITH THORNTON, JR. - June 10, 2013

59

| | | |
|---|---|---|
| 11:45:18 | 1 | Q Do you recall your conversation with me on |
| 11:45:22 | 2 | May 14, the conversation that lasted for more than an |
| 11:45:24 | 3 | hour, that you said you didn't understand why somebody was |
| 11:45:26 | 4 | paying you for your testimony? |
| 11:45:31 | 5 | A That's correct. |
| 11:45:32 | 6 | Q And do you remember I told you that the $45 |
| 11:45:35 | 7 | was (inaudible) -- |
| 11:45:37 | 8 | A You're breaking up, ma'am. |
| 11:45:38 | 9 | Q -- as a witness fee? |
| 11:45:43 | 10 | A You're breaking up. I'm sorry. |
| 11:45:46 | 11 | Q Do you recall when you said, "I don't know |
| 11:45:50 | 12 | why someone is trying to pay me for my testimony," I told |
| 11:45:56 | 13 | you, "We are required to give you a witness fee and |
| 11:46:00 | 14 | transport fee of $45"? |
| 11:46:02 | 15 | A That's correct. You told me the -- the |
| 11:46:05 | 16 | second time, the second conversation, that second |
| 11:46:08 | 17 | disconnected call, you did inform me of that towards the |
| 11:46:12 | 18 | end of the conversation. |
| 11:46:14 | 19 | Q And that -- those conver- -- those two |
| 11:46:17 | 20 | conversations, once again, we are talking about the two |
| 11:46:21 | 21 | conversations you and I had on May 4 of this year that was |
| 11:46:34 | 22 | interrupted by -- a few minutes after we were cut off; |
| 11:46:34 | 23 | right? |
| 11:46:47 | 24 | A Yes. |
| 11:46:50 | 25 | Q When you spoke to Ms. Pinkston five or ten |

KEITH THORNTON, JR. - June 10, 2013

60

| | | |
|---|---|---|
| 11:46:59 | 1 | times, you said all those phone calls were initiated by |
| 11:46:59 | 2 | you? |
| 11:46:59 | 3 | A Yes, they were. |
| 11:46:59 | 4 | MS. PINKSTON: Objection. Attorney-client. |
| 11:46:59 | 5 | Go ahead. |
| 11:47:01 | 6 | Q BY MS. DYMKAR: Did you ask Ms. Pinkston |
| 11:47:04 | 7 | for advice on what to do with plaintiff's money to |
| 11:47:05 | 8 | subpoena you for a deposition? |
| 11:47:07 | 9 | A You have to repeat that question because |
| 11:47:12 | 10 | you broke up. |
| 11:47:17 | 11 | Q Were you asking Ms. Pinkston for |
| 11:47:25 | 12 | (inaudible)? Did you hear me, sir? |
| 11:47:33 | 13 | A We cannot hear you at all. |
| 11:47:45 | 14 | Q You cannot hear me at all. Okay. We're |
| 11:47:57 | 15 | going to get some assistance. |
| 11:47:58 | 16 | THE COURT REPORTER: Do you want to go off |
| 11:47:59 | 17 | the record? |
| 11:47:59 | 18 | MS. PINKSTON: Yeah. |
| 11:48:01 | 19 | THE VIDEOGRAPHER: This is the end of Media |
| 11:48:07 | 20 | No. 1 in the deposition of Mr. Keith Thornton. We're off |
| 11:48:09 | 21 | the record, and the time is 11:48 a.m. |
| 11:53:21 | 22 | (Brief recess.) |
| 11:54:02 | 23 | THE VIDEOGRAPHER: We are back on the |
| 11:54:06 | 24 | record at 11:54 a.m. This marks the beginning of |
| 11:54:12 | 25 | Videotape No. 2 in the deposition of Keith Thornton. |

KEITH THORNTON, JR. - June 10, 2013

61

11:54:12 1        MS. DYMKAR:  Okay.  Thank you.

11:54:14 2    Q      BY MS. DYMKAR:  My last question to you

11:54:19 3  Mr. Thornton was, when you called the city attorney five

11:54:24 4  or ten times, was that to get advice on what to do

11:54:28 5  regarding the subpoena that plaintiffs were trying to

11:54:30 6  serve on you?

11:54:32 7        MS. PINKSTON:  Objection, form.  Go ahead.

11:54:34 8        THE WITNESS:  My questions to Ms. Pinkston,

11:54:37 9  when I talked to her all several of those times, were,

11:54:42 10  No. 1, who were the individuals that were coming to my

11:54:46 11  family's home.  And that was several conversations,

11:54:51 12  because it happened several times, and what type of case

11:54:58 13  was this.  And, then, No. 3, what information -- what

11:55:01 14  would I have to do, considering that I do not reside

11:55:05 15  within the City of Chicago or Illinois, which I referred

11:55:08 16  to her several times.

11:55:09 17    Q      BY MS. DYMKAR:  Okay.  So you were calling

11:55:12 18  her for advice; right?

11:55:12 19    A      Not --

11:55:13 20        MS. PINKSTON:  Objection.  Mischaracterizes

11:55:16 21  testimony.

11:55:18 22        THE WITNESS:  I was clarifying, if that was

11:55:23 23  from the City of Chicago, who was coming to my house.

11:55:24 24    Q      BY MS. DYMKAR:  And did you ask her what

11:55:25 25  you should do?

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

---

KEITH THORNTON, JR. - June 10, 2013

62

11:55:33 1    A      No, I did not.

11:55:35 2    Q      How did you know to call the Ms. Pinkston?

11:55:38 3    A      The same office that Ms. Dana Pesha called

11:55:45 4  me from, that's the same number that I called.

11:55:49 5    Q      Your understanding is that that -- these

11:55:52 6  attorneys were representing the police officers in this

11:55:52 7  case?

11:55:55 8    A      That's correct.

11:56:00 9    Q      Did you tell Ms. Pinkston that you were --

11:56:01 10  what your -- what your employment was in?

11:56:05 11    A      I told them nothing.  I told them the same

11:56:16 12  thing I told you, no address, no work, no anything.

11:56:19 13    Q      Do you recall telling me when we spoke on

11:56:24 14  May 4, 2013 that you were in school on the West Coast?

11:56:27 15    A      I didn't say on the West Coast.

11:56:28 16    Q      Do you recall that you said you were in

11:56:29 17  school?

11:56:32 18    A      I did say in school.  Yes, I did.

11:56:36 19    Q      And the "in school" is this online course

11:56:37 20  that you were taking?

11:56:41 21    A      That's correct.

11:56:47 22    Q      And am I correct, online course, that is a

11:56:50 23  course you can take at any location as long as you have a

11:56:50 24  computer?

11:56:54 25    A      That's correct.

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

63

| | | | |
|---|---|---|---|
| 11:56:56 | 1 | Q | Had you ever been sued? |
| 11:57:03 | 2 | A | No, ma'am. |

3   Q   Starting from when you finished high
school, could you tell me where you've been employed?

5   A   Could you repeat that question?

6   Q   You graduated from high school; right?

7   A   Yes, I did.

8   Q   Okay.  Did you attend any college while you
were in Chicago?

10   A   I went to a few colleges, yes.

11   Q   And what were the few colleges you went to?

12   A   I went to Malcolm X College.  I went to
Wright College, Truman College.  They're all city
colleges.  I've done online classes, so I don't know if
you would actually say that I was at, actually, all of
those facilities because some of those were online
classes.  I've gone to Oakton College and Concordia
University.

19   Q   Did you receive any associate's degree or
certificate?

21   A   Not as of yet.

22   Q   What did you study at these various
colleges?

24   A   General studies.

25   Q   After you graduated from high school,

64

1   before you went to the current location, where were you
employed?

3   A   Oh, boy.  I had a few different jobs.
Craig Therapeutics, which is a driving company, Medex
Ambulance Company, Superior Ambulance Company.  That's all
I can recall as of now.  I had a few different jobs.

7   Q   Were these temporary jobs?

8   A   They were.

9   Q   Were they through a temporary agency?

10   A   I don't know what "temporary agency" stands
for.

12   Q   Did someone find a job for you?  Did you
work through an agency?

14   A   No, ma'am.

15   Q   What caused you to move to your current
location?

17   A   I'm a police officer, ma'am.

18   Q   Why did you move from Chicago?

19   A   Because that's who hired me, and this is
where I wanted to come for my career.

21   Q   You had previously intended to be a
fireman; is that correct?

23   A   No, ma'am.  I did firefighting as a
volunteer for a number of years.

25   Q   Throughout high school; correct?

KEITH THORNTON, JR. - June 10, 2013

65

11:59:55  1    A    Throughout elementary and high school.

11:59:58  2    Q    And you logged a large number of hours

12:00:00  3  volunteering for the fire department?

12:00:04  4    A    I did community service, over 15,000 hours

12:00:06  5  of community service, that's correct.

12:00:08  6    Q    And that was at the fire department; right?

12:00:12  7    A    That was with the fire department and other

12:00:15  8  community service places, yes.

12:00:20  9    Q    It was primarily the fire department at

12:00:23  10  Pulaski, 1800 North Pulaski.

12:00:25  11    A    Not just there.  It was a lot of different

12:00:27  12  places all across the city, ma'am.

12:00:30  13    Q    Did you ever work at the fire station at

12:00:31  14  1747 North Pulaski?

12:00:33  15    A    That is correct.

12:00:35  16    Q    That's Engine 76?

12:00:35  17    A    Yes, ma'am.

12:00:40  18    Q    And did you work for Captain Frank Cambria?

12:00:41  19    A    Yes, I did.

12:00:43  20    Q    Was it not your intention, when you were in

12:00:47  21  high school and thereafter, to be a firefighter?

12:00:52  22    A    I wanted to be in public safety.

12:00:58  23    Q    Did you intend to be a firefighter?

12:01:00  24    A    When I was younger, I wanted to be a

12:01:03  25  firefighter or police officer or paramedic.

KEITH THORNTON, JR. - June 10, 2013

66

12:01:08  1    Q    Do you recall talking to me on May 4, 2013

12:01:11  2  and saying that you wanted to be a firefighter?

12:01:14  3    A    When I was younger.

12:01:16  4    Q    Did you not say that you were waiting to

12:01:19  5  come back to Chicago to be a firefighter?

12:01:29  6    A    No, I did not.

12:01:30  7    Q    Do you recall telling me that you were

12:01:32  8  studying journalism?

12:01:34  9    A    No.  You said that you read one of my

12:01:38  10  articles that was published by the Chicago Tribune, and

12:01:42  11  you said, "It says here, in the article, that years ago

12:01:46  12  you were supposed to do broadcast journalism."  That's

12:01:50  13  what you told me.

12:01:52  14    Q    And you don't -- so you're saying that you

12:01:55  15  did not say that you're studying journalism now?

12:01:58  16    A    I did not say that.  I've taken a lot of

12:02:01  17  different classes.  Some have been journalism classes,

12:02:04  18  some have been math classes.  But there's no specific

12:02:06  19  degree for your journalism.

12:02:09  20    Q    Did you ever take the firefighter's exam?

12:02:14  21    A    No, I did not.

12:02:15  22    Q    Did you continue volunteering at the fire

12:02:17  23  station after high school?

12:02:25  24    A    Yes, I did.

12:02:29  25    Q    On May -- excuse me.  April 10, 2010, were

KEITH THORNTON, JR. - June 10, 2013

67

| | | |
|---|---|---|
| 12:02:31 | 1 | you employed at that time? |
| 12:02:34 | 2 | A   Can you repeat that -- that date? |
| 12:02:38 | 3 | Q   April 10, 2010, were you employed? |
| 12:02:40 | 4 | A   I can't recall that.  I don't have that |
| 12:02:44 | 5 | information, but I was never -- there was only very few |
| 12:02:48 | 6 | times in my life where I've been unemployed, I didn't have |
| 12:02:50 | 7 | -- either working as a student or doing something.  So I |
| 12:02:54 | 8 | would say I was employed. |
| 12:02:57 | 9 | Q   And when I refer to April 10, 2010, I'm -- |
| 12:03:10 | 10 | I'm referring to the early morning hours that this |
| 12:03:02 | 11 | incident occurred.  Okay? |
| 12:03:05 | 12 | A   Yes, ma'am. |
| 12:03:13 | 13 | Q   Starting the day before, on April 9, 2010, |
| 12:03:16 | 14 | starting at about noon that day, what were you doing? |
| 12:03:20 | 15 | A   I don't recall. |
| 12:03:25 | 16 | Q   Do you recall that that -- the day of the |
| 12:03:27 | 17 | arrest that this is -- that this case is based on, on |
| 12:03:31 | 18 | April 10, was a Saturday? |
| 12:03:34 | 19 | A   Yes, ma'am. |
| 12:03:36 | 20 | Q   The afternoon of April 9, 2010, what were |
| 12:03:37 | 21 | you doing? |
| 12:03:39 | 22 | A   I do not recall. |
| 12:03:42 | 23 | Q   You were 21 years old at the time? |
| 12:03:45 | 24 | A   If that adds up to that, yes, ma'am. |
| 12:03:48 | 25 | Q   Well, let's try to figure it out.  April 10 |

KEITH THORNTON, JR. - June 10, 2013

68

| | | |
|---|---|---|
| 12:03:59 | 1 | 2010, do you think you were 21? |
| 12:04:00 | 2 | A   I would say so. |
| 12:04:02 | 3 | Q   Were you in school at the time? |
| 12:04:05 | 4 | A   April, I would say I was in school. |
| 12:04:06 | 5 | Q   Where? |
| 12:04:09 | 6 | A   I don't know where.  I had -- I would say |
| 12:04:15 | 7 | City College of Chicago. |
| 12:04:17 | 8 | Q   Could you tell us what you were doing the |
| 12:04:20 | 9 | evening of April 9, 2010? |
| 12:04:23 | 10 | A   The evening?  No, I could not.  I don't |
| 12:04:27 | 11 | recall that, ma'am. |
| 12:04:30 | 12 | Q   At approximately 1:00 or 2:00 a.m. on April |
| 12:04:33 | 13 | 10, 2010, what were you doing then? |
| 12:04:38 | 14 | A   I was coming from a gas station. |
| 12:04:41 | 15 | Q   Had you come from home to go to the gas |
| 12:04:42 | 16 | station? |
| 12:04:44 | 17 | A   Yes, I did. |
| 12:04:49 | 18 | Q   And your home is 4814 West Wabansia; right? |
| 12:04:49 | 19 | A   That's correct. |
| 12:04:53 | 20 | Q   Did you have a fire department radio in |
| 12:04:54 | 21 | your car? |
| 12:04:55 | 22 | A   No, I did not. |
| 12:04:57 | 23 | Q   Did you have a police radio in your car? |
| 12:05:02 | 24 | A   No, I did not. |
| 12:05:07 | 25 | Q   What kind of car were you driving? |

KEITH THORNTON, JR. - June 10, 2013

69

```
12:05:10   1        A     A Camry at the time.
12:05:11   2        Q     Is that a car you owned?
12:05:16   3        A     I did not own that.  My father owned the
           4   vehicle.
12:05:20   5        Q     What year Camry?
12:05:23   6        A     I don't recall ma'am.  I would tell you
12:05:27   7   messed-up information.  I don't recall the year.  Maybe --
12:05:29   8   it was in the '90s.
12:05:31   9        Q     What color was it?
12:05:38  10        A     It was a white car.
12:05:40  11        Q     You went to Melrose Park to get gas?
12:05:41  12        A     That's correct.
12:05:44  13        Q     Why did you go to Melrose Park to get gas?
12:05:46  14        A     Because that's where I always go, because
          15   it's the cheapest gas.
12:05:52  16        Q     How many miles, if you know, is that from
          17   your home at 4814 West Wabansia?
12:05:57  18        A     I have no idea, ma'am.
12:06:00  19        Q     It's several miles, is it not?
12:06:03  20        A     It's a few miles.
12:06:05  21        Q     What were you doing just before you left
          22   home to go to Melrose Park to get gas?
12:06:10  23        A     I was at my house.
12:06:12  24        Q     What were you doing at your house?
12:06:13  25        A     I don't recall what I was doing at my
```

```
12:06:20   1   house.  I was at my house, ma'am, getting ready to go.
12:06:24   2        Q     You went to Melrose Park to get gas.  Do
12:06:25   3   you know what route you took?
12:06:28   4        A     To get gas?  I took -- I don't know
12:06:34   5   specifically, but I'm quite sure I took -- I don't know
12:06:37   6   what street that -- the gas station is on.  It's in
12:06:44   7   Melrose Park.
12:06:46   8        Q     What major street is it near?
12:06:53   9        A     Cicero would be one street.
12:06:55  10        Q     You said Cicero in the City of Chicago?
12:06:59  11        A     Yes, it is.  That's where I started from.
12:07:02  12        Q     Okay.  Your home at 4814 West Wabansia is
12:07:05  13   right at -- it's right near the corner of Cicero and
          14   Wabansia; correct?
12:07:07  15        A     That's correct.
12:07:10  16        Q     So you took Cicero to what street?
12:07:13  17        A     I don't recall what route I went there.
12:07:16  18        Q     What major street was the gas station on?
12:07:21  19        A     The major street was North Avenue.
12:07:23  20        Q     And it was North Avenue and -- and what, is
12:07:24  21   the gas station --
12:07:26  22        A     I have no idea what the streets are in
12:07:28  23   Melrose Park.
12:07:30  24        Q     Had you been to this gas station before?
12:07:33  25        A     I go there all the time when I was in
```

KEITH THORNTON, JR. - June 10, 2013

71

| | | |
|---|---|---|
| 12:07:39 | 1 | Chicago.  Everybody does within that area, because it's |
| 12:07:41 | 2 | very cheap. |
| 12:07:43 | 3 | Q    What kind of a gas station is it?  What |
| 12:07:46 | 4 | brand? |
| 12:07:55 | 5 | A    I don't recall. |
| 12:07:55 | 6 | Q    Did you go west on North Avenue to get to |
| 12:07:58 | 7 | the gas station? |
| 12:08:00 | 8 | A    Did I go west? |
| 12:08:00 | 9 | Q    Yeah. |
| 12:08:03 | 10 | A    Yes, I did. |
| 12:08:08 | 11 | Q    So you went to Cicero, turned north -- |
| 12:08:10 | 12 | excuse me. |
| 12:08:13 | 13 | Wabansia is north of North Avenue; right? |
| 12:08:16 | 14 | A    Can you repeat that? |
| 12:08:18 | 15 | Q    Wabansia runs parallel to North Avenue, and |
| 12:08:22 | 16 | it's north of North Avenue; right? |
| 12:08:22 | 17 | A    That's correct. |
| 12:08:28 | 18 | Q    So you went east to Cicero and south to |
| 12:08:32 | 19 | North, and then west on North? |
| 12:08:34 | 20 | A    And west on North. |
| 12:08:38 | 21 | Q    And do you know whether the gas station -- |
| 12:08:42 | 22 | you said the gas station is on North Avenue? |
| 12:08:48 | 23 | A    That's correct. |
| 12:08:51 | 24 | Q    Where did you go after you got gas? |
| 12:08:54 | 25 | A    Where did I go when I got gas?  I was |

KEITH THORNTON, JR. - June 10, 2013

72

| | | |
|---|---|---|
| 12:09:01 | 1 | heading to the firehouse. |
| 12:09:04 | 2 | Q    And that's the firehouse at 1747 North |
| 12:09:05 | 3 | Pulaski? |
| 12:09:06 | 4 | A    Yes, it would have been. |
| 12:09:07 | 5 | Q    Why were you going there? |
| 12:09:10 | 6 | A    Because I was going to volunteer.  The guys |
| 12:09:14 | 7 | are usually up around that time, and I simply wanted to go |
| 12:09:19 | 8 | there for my -- just to go there, as I always had. |
| 12:09:21 | 9 | Q    Were you on a schedule for your |
| 12:09:23 | 10 | volunteering at the fire station? |
| 12:09:26 | 11 | A    They work one day on and two days off, but |
| 12:09:30 | 12 | I would go -- it didn't depend on what shift.  I would |
| 12:09:33 | 13 | always go there just to volunteer.  If it was an off day |
| 12:09:35 | 14 | from school or if I wasn't working or if I wasn't busy |
| 12:09:38 | 15 | with my family, I would go and volunteer within the |
| 12:09:41 | 16 | community and at a firehouse.  That was an off time for |
| 12:09:47 | 17 | me.  That was my Saturday, and that's when I was going. |
| 12:09:49 | 18 | Q    Were you on any schedule with the fire |
| 12:09:50 | 19 | department? |
| 12:09:52 | 20 | A    No, I was not. |
| 12:09:55 | 21 | Q    Did they know you were coming? |
| 12:09:57 | 22 | A    I'm quite sure they probably didn't.  I |
| 12:10:00 | 23 | just came when I felt like it. |
| 12:10:02 | 24 | Q    What were your duties at the fire |
| 12:10:03 | 25 | department? |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

73

```
12:10:08   1        A      Pretty much opening the doors, helping out,
12:10:15   2    dishes, cleaning, that type of ordeal.
12:10:19   3        Q      So when you left the gas station, did you
12:10:23   4    go east on North Avenue?
12:10:25   5        A      I went down to the Main Street.  I don't
12:10:33   6    recall the street, if it were Augusta or Division.
12:10:37   7        Q      The gas station -- am I right with the
12:10:40   8    address, that it's 1747 North Pulaski?
12:10:42   9        A      That's correct.
12:10:43  10        Q      The fire department?
12:10:44  11        A      That's correct.
12:10:45  12        Q      That means it's north of North Avenue;
12:10:47  13    correct?
12:10:48  14        A      That's correct.
12:10:50  15        Q      Okay.  So why didn't you go east on North
12:10:59  16    Avenue after Pulaski?
12:11:01  17        A      Because I simply didn't want to.
12:11:04  18        Q      That was a more -- most direct route;
12:11:04  19    right?
12:11:06  20        A      I mean, there are -- you could have all
12:11:09  21    types of direct routes, but it's the way that I wanted to
12:11:12  22    go.  I like driving, and that's what I did.
12:11:17  23        Q      So my question to you is whether the direct
12:11:23  24    route to the fire station at 1747 North Pulaski would have
12:11:26  25    been for you to go east on North Avenue.
```

KEITH THORNTON, JR. - June 10, 2013

74

```
12:11:27   1        MS. PINKSTON:  Objection.  Asked and
12:11:31   2    answered and foundation.
12:11:33   3        THE WITNESS:  I just answered that, ma'am.
12:11:38   4    And, no, there would have been an even more direct route.
12:11:39   5    I could have went to Grand Avenue, took Grand down and
12:11:42   6    arrived right at that location, or Armitage Avenue.
12:11:44   7    There's a number of different routes that you can get to
12:11:48   8    where you want to go.  That's just --
12:11:51   9        MS. DYMKAR:  Okay.  I'm going to mark one
12:11:58  10    of the maps that's there.  I don't know if the -- the
12:11:59  11    court reporter -- it's -- it's a map that -- that shows
12:12:05  12    the Eisenhour Expressway.  I would mark that as -- this
12:12:42  13    would be Exhibit 3.
12:12:44  14        THE COURT REPORTER:  Okay.  Hold on.
12:12:44  15        (Exhibit 3 was marked.)
12:12:44  16        THE COURT REPORTER:  All right.
12:12:46  17        Q      BY MS. DYMKAR:  I want you to take a look
12:12:49  18    at Exhibit 3, which is a Google map of the area we've been
12:12:55  19    talking about.
12:12:58  20        Is this map -- it is familiar to you,
12:12:59  21    right, this area?
12:13:01  22        A      Yes, it is.
12:13:01  23        Q      Okay.  And --
12:13:02  24        MS. PINKSTON:  I'm just going to make a
12:13:07  25    standing objection to Exhibit 3 on the basis of time.  It
```

75

| | |
|---|---|
| 12:13:11 | 1 |
was printed on June 9, 2013, and the incident date was
April 10, 2010, and we just don't have any foundation that
this is similar to what it was at the incident date.

Go on.  Thank you.

Q        BY MS. DYMKAR:  All right.  I want you to
take a look at West North Avenue on this map.  Is that
where West North Avenue was on February 10 -- excuse me --
April 10, 2010?

A        I would say it is, ma'am.  Yes, it is.

Q        All right.  So what you've been talking
about, as far as where you went for gas, would have been
actually west on North Avenue, to the -- to the left part
of this map we have; right?

A        That would be west.

Q        Okay.  West of Thatcher Woods?

A        Say that last part.

Q        West of Thatcher.

A        That's correct.

Q        And when you came from the gas station, you
were going east on North Avenue, and the gas -- excuse me
-- the fire department --

A        That's incorrect.

Q        Excuse me.  Did you -- did you go east on
North Avenue at all?

A        No, I did not.  Maybe pulling out of the

76

gas station, but I came down Division Street.  Now that
I'm looking at this map, it was Division.

Q        So how was your route?  You were on West
North Avenue, and you were headed towards 1747 North
Pulaski?

A        That's correct.

Q        How did you get on Division Street?

A        I would say by pulling out of the gas
station, going south on whatever street that was to
Division, coming back east, down Division.

Q        Okay.  Do you know what -- what north-south
street you went down?

A        I told you I don't know the streets in the
suburbs.  I just don't know them.

Q        Okay.  Well, looking at this map, was it
1st Avenue?

A        I don't know.

MS. PINKKAR:  Objection.  He -- this is
asked and answered in terms of what his memory is.  So at
this point in time, I guess I'm going to make an objection
as to speculation.

Q        BY MS. DYMKAR:  Sir?

A        I just answered that question.  I do not
know, ma'am.  I don't recall.

Q        When you headed south, was it east or west

KEITH THORNTON, JR. - June 10, 2013

77

```
12:15:32   1   of Thatcher?
12:15:36   2        A      When I headed south -- can you repeat that?
12:15:39   3        Q      When you headed south from North Avenue,
12:15:42   4   was it east or west of Thatcher?
12:15:46   5        A      I don't know where Thatcher Woods begins or
12:15:47   6   ends.
12:15:49   7        Q      Do you see Thatcher Woods on -- on this
12:15:54   8   map?
12:15:58   9        A      I would say it's west of there.  I don't
12:16:00  10   even recall the Woods.
12:16:04  11        Q      Okay.  And you -- you went south and then
12:16:05  12   you went east on Division?
12:16:11  13        A      That is correct.
12:16:13  14        Q      Did you intend to stop at home before you
12:16:14  15   went to the fire station?
12:16:17  16        A      No, I did not.  I was going -- if -- if I
12:16:23  17   had to go there, if they called me, I would go.  Maybe
12:16:25  18   I'll ride past, but that's -- I wanted to go to the
12:16:28  19   firehouse to see how the -- the guys were doing over
12:16:28  20   there.
12:16:31  21        Q      When you left home, was anybody awake at
12:16:32  22   your home?
12:16:38  23        A      I'm quite sure they were.  I can't recall.
12:16:44  24        Q      So you were going east on Division.  You're
12:16:48  25   sure it was not Augusta.  I heard you say something about
```

KEITH THORNTON, JR. - June 10, 2013

78

```
12:16:49   1   Augusta.
12:16:52   2        A      Yeah.  Now that I'm looking at a map, I
12:16:55   3   don't know if it was Augusta or Division, but it was the
12:16:59   4   closest street to where this incident took place.  So if
12:17:03   5   the incident is at 1320 North Menard, from what I'm
12:17:07   6   looking at at this map, it would be Division that I was
12:17:16   7   on, because that was the absolute main street I was on.
12:17:17   8        Q      In your -- the number of years that you
12:17:25   9   lived at 4814 West Wabansia, you were familiar with
12:17:26  10   Division and Augusta?
12:17:27  11        A      No.
12:17:29  12        Q      You had been on them several times?
12:17:32  13        A      No, no, not at all.  And as you can see, me
12:17:35  14   and my entire family, we go outside of the City.  I'm
12:17:37  15   living out of the City, because it's -- it's just where I
12:17:42  16   grew up and I wanted to get out of that environment.
12:17:45  17              I grew up there, but I was involved in a
12:17:56  18   lot of -- everything that you can imagine, as far as
12:17:56  19   community service, of getting out of that neighborhood.
12:17:59  20   So I would not say that I'm -- I knew about all the
12:17:59  21   different streets.
12:18:13  22        Q      When you came up Division Street, what was
12:18:13  23   your intended route to the fire station?
12:18:16  24        A      Take that towards Grand Avenue, have Grand
12:18:22  25   cut over, like I usually do, and Grand will basically lead
```

KEITH THORNTON, JR. - June 10, 2013

79

| | |
|---|---|
| 12:18:27 1 | you right into like -- it's -- it's Grand -- you go right |
| 12:18:30 2 | there. I -- I don't know the streets, ma'am. I don't |
| 12:18:34 3 | have that in front of me, but I will get to Pulaski. It |
| 12:18:36 4 | goes straight to Pulaski. You can go there a number of |
| 12:18:40 5 | different routes. |
| 12:18:44 6 | Q You would take Division to Grand to |
| 12:18:44 7 | Pulaski? |
| 12:18:46 8 | A Division to -- you can either take it to |
| 12:18:50 9 | Pulaski or you could take it to several different streets, |
| 12:18:51 10 | ma'am. |
| 12:18:53 11 | Q No. I'm trying to -- you mentioned Grand? |
| 12:18:56 12 | A Yeah. Grand. You could also get to Grand, |
| 12:18:58 13 | as well. |
| 12:18:59 14 | Q So you were intending to go from Division |
| 12:19:02 15 | to -- what was your intention? What was your intended |
| 12:19:02 16 | route? |
| 12:19:05 17 | A My intention was to get to Pulaski so I |
| 12:19:08 18 | could arrive at the firehouse, ma'am. |
| 12:19:10 19 | Q So you were going to go east on Division to |
| 12:19:12 20 | Pulaski? |
| 12:19:15 21 | A That is correct. |
| 12:19:19 22 | Q And what -- how were you dressed that |
| 12:19:20 23 | night? |
| 12:19:23 24 | A I don't know how I was dressed. I don't |
| 12:19:26 25 | know how I was dressed that day. |

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

80

| | |
|---|---|
| 12:19:30 1 | Q Did you have a certain dress that you would |
| 12:19:33 2 | have when you would go to the fire station? |
| 12:19:38 3 | A That would be in my vehicle with me. |
| 12:19:40 4 | Q What -- what was that attire? |
| 12:19:43 5 | A Just a T-shirt and some blue pants. |
| 12:19:46 6 | Q But that's not what you were wearing at the |
| 12:19:47 7 | time? |
| 12:19:50 8 | A I -- I don't recall what I was wearing. |
| 12:19:52 9 | Q I'm a little confused. You said that you |
| 12:19:56 10 | had your clothes in -- in the car. Why were you not |
| 12:19:59 11 | wearing the T-shirt and blue jeans. |
| 12:20:00 12 | MS. PINKSTON: Objection. Mischaracterizes |
| 12:20:01 13 | prior testimony. |
| 12:20:02 14 | THE WITNESS: As I just informed you, |
| 12:20:07 15 | ma'am, I don't know what I was wearing at that time. |
| 12:20:09 16 | Q BY MS. DYMKAR: But your -- your usual |
| 12:20:11 17 | clothes that you wore at the fire station was T-shirt and |
| 12:20:14 18 | jeans? |
| 12:20:17 19 | A To and from the firehouse, yes. I'm not |
| 12:20:22 20 | going to wear it to there. I'm not a firefighter. |
| 12:20:25 21 | It's the same thing now going to a police station. I |
| 12:20:28 22 | don't wear my uniform to a police station. |
| 12:20:29 23 | Q Did you have a uniform -- |
| 12:20:29 24 | A No. |
| 12:20:31 25 | Q -- that you wore at the fire station? |

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

81

```
12:20:32   1              A         No, I didn't.    No, I didn't.    We could --
12:20:35   2       I'm just a volunteer.   I could wear shorts, if I wanted
12:20:39   3       to.   I could wear jeans.    I could wear shoes.    You could
12:20:44   4       wear whatever you wanted there.    I was just a volunteer.
12:20:47   5              Q     And you usually wore a T-shirt and blue
12:20:47   6       jeans?
12:20:50   7              A     That's correct, with -- with just -- you
12:20:54   8       could have boots or you could have shoes.
12:20:56   9              Q     Okay.   And some of the work that you did at
12:20:59  10       the fire station was manual labor; right?
12:21:02  11              A     No.   It wasn't manual labor.
12:21:09  12              Q     Did you shine the -- the engine and truck?
12:21:11  13              A     No.   I didn't shine anything.    I sprayed it
12:21:17  14       with a water hose.
12:21:20  15              Q     As you're driving east on Division, did you
12:21:22  16       see any police cars?
12:21:25  17              A     Coming up to -- do you want me to look at
12:21:27  18       the map to be specific with you?
12:21:28  19              Q     Sure.
12:21:33  20              A     Coming on Division, where I was at, once I
12:21:43  21       was passing Austin Street, that's when I saw several
12:21:47  22       police cars, and I knew they were police cars because they
12:21:50  23       had flashing blue lights.    The fire department does not
12:21:52  24       have that.   There were a number of cars coming from Austin
12:21:58  25       when I was between Austin and Central.
```

82

```
12:22:00   1              Q     Okay.   Were they coming --
12:22:00   2              A     They were --
12:22:05   3              Q     -- north on Austin or south?
12:22:07   4              A     I didn't see anything north on Austin.    I
12:22:11   5       saw people behind me when I was on Division.    That would
12:22:12   6       be west, as well as east.
12:22:14   7              Q     Okay.   I think I'm a little confused what
12:22:17   8       you just said.   You're on Division going east.    You saw
12:22:20   9       police cars coming towards you on Division?
12:22:26  10              A     Coming up to Menard Avenue, when I was
12:22:29  11       going to that location, I'm -- I'm getting ready to pass
12:22:34  12       that street.   It's a side street.    There were squad cars
12:22:38  13       coming in both directions.
12:22:41  14              Q     So they were coming from east to west on
12:22:43  15       Division, and from west to east on Division?
12:22:45  16              A     That is correct.
12:22:47  17              Q     Okay.   So you saw them in front of you and
12:22:48  18       you saw them behind you?
12:22:51  19              A     Yes.   And that's when I proceeded on to
12:22:54  20       Menard Avenue, to get out of their way, because they --
12:22:56  21              Q     And they had flashing lights?
12:22:57  22              A     They did.
12:22:59  23              Q     Okay.   So you -- when did you first see the
12:23:06  24       police cars?   Were you east of Austin or west of Austin?
12:23:09  25              A     I was between Austin and Central, so that
```

83

```
12:23:11   1   would put me east of Austin.
12:23:13   2                MS. DYMKAR:  Okay.  I'm wondering if we
12:23:17   3   could have the court reporter mark the other map as
12:23:17   4   Exhibit 4.
12:23:41   5                (Exhibit 4 was marked.)
12:23:42   6        Q      BY MS. DYMKAR:  This is a -- this is more
12:23:48   7   of a blowup of the area.  Do you still recognize the
12:23:53   8   street?  It's more -- more of a blowup.
12:23:59   9        A      Not quite.  I don't even see the -- I don't
12:23:59  10   even see it.
12:24:00  11                MS. PINKSTON:  I'm going to make the same
12:24:05  12   standing objection to Exhibit 4 that I made to Exhibit 3,
12:24:07  13   as in time, because this was also printed on June 9, 2013,
12:24:12  14   and the incident date was April 10, 2010.
12:24:13  15        Q      BY MS. DYMKAR:  Okay.  Do you see West
12:24:17  16   Avenue on this map?
12:24:22  17        A      I do not see North Avenue.
12:24:24  18        Q      On Exhibit 4?
12:24:25  19        A      I do not see North --
12:24:25  20        Q      It's on the top.
12:24:30  21        A      There's no North Avenue.  There's Le Moyne
12:24:40  22   Street.
12:24:43  23        Q      Do you see, north of Le Moyne, there's West
12:24:43  24   -- West North Avenue?
12:24:46  25        A      There's no North Avenue.
```

84

```
12:24:47   1        Q      Something is cut off in your -- in what you
12:24:56   2   have.  Could you possibly hold it up to the camera?
12:25:10   3        A      (Witness complies.)
12:25:10   4                MS. PINKSTON:  Yeah, it is cut off.
12:25:10   5        Q      BY MS. DYMKAR:  Okay.  Thank you.
12:25:14   6        Okay.  You see West Division on there;
12:25:15   7   right?
12:25:16   8        A      I do.
12:25:19   9        Q      Okay.  You're on Division, and you pass
12:25:19  10   Austin.
12:25:21  11        Do you see North Austin Boulevard?
12:25:25  12        A      Austin?  I do see Austin.  Yes, I do.
12:25:29  13        Q      Okay.  Where were you when you first saw
12:25:33  14   the police cars?
12:25:36  15        A      I said I was right -- it had -- I don't
12:25:39  16   know what street this is.  Where did the incident take
12:25:42  17   place?  Was it Menard?
12:25:44  18        Q      Don't you recall where the incident took
12:25:46  19   place, yourself, sir?
12:25:49  20        A      It says 1320 North Menard.  I'm asking is
12:25:52  21   that the location.  I don't know the exact location.
12:25:54  22        Q      How many streets east of North Austin
12:25:58  23   Boulevard were you on Division when you first saw police
12:25:58  24   cars?
12:26:00  25        A      I don't know, but I was very close to where
```

85

| | |
|--|--|
|12:26:04|1 the incident took -- where the actual incident took place.|
|12:26:07|2 And if that's Menard Avenue, then I was just, from right|
|12:26:12|3 there, turning onto that location.|
|12:26:15|4 Q How many police cars did you see coming|
|12:26:16|5 towards you?|
|12:26:18|6 A I didn't count them specifically on my|
|12:26:18|7 fingers, ma'am. All I knew is there were police cars|
|12:26:20|8 coming. And being an individual who wants to go into law|
|12:26:25|9 enforcement, I wanted to get out of their way.|
|12:26:27|10 Q Was it more than one car?|
|12:26:29|11 A Police cars, with an S, is plural. Yes,|
|12:26:32|12 ma'am.|
|12:26:33|13 Q Okay. And they had flashing lights; right?|
|12:26:35|14 A Blue lights, as stated, ma'am.|
|12:26:37|15 Q And then you also saw cars coming from|
|12:26:39|16 behind you, from Austin Boulevard, coming east on|
|12:26:45|17 Division; right?|
|12:26:46|18 A Can you repeat that last part?|
|12:26:48|19 Q You had cars coming towards you, riding --|
|12:26:51|20 driving west on Division; right?|
|12:26:55|21 A They were behind me and they were in front|
|12:26:56|22 of me. That would be east and west, yes.|
|12:27:01|23 Q How many cars were behind you?|
|12:27:03|24 A Ma'am, there were a lot of cars. More than|
|12:27:05|25 -- more than five, including -- including tactical cars|

86

| | |
|--|--|
|12:27:16|1 that don't have lights on top, no light bars, and the same|
|12:27:19|2 thing was coming in front of me. There were a lot of|
|12:27:19|3 police cars.|
|12:27:21|4 Q Why didn't you pull over on Division to let|
|12:27:23|5 the cars go by?|
|12:27:24|6 A What did -- what did you say?|
|12:27:26|7 Q Why didn't you pull over -- stop and pull|
|12:27:27|8 over on Division?|
|12:27:28|9 A Because the closest street to me was|
|12:27:34|10 Menard, and I was in the -- the most outer portion, which|
|12:27:37|11 is the left lane, and I got out of their way. I see them|
|12:27:40|12 coming from this direction, I saw them coming from the|
|12:27:42|13 other, towards each other. I made a turn right there to|
|12:27:44|14 stop right into that zone.|
|12:27:46|15 Q So you turned left in front of the cars|
|12:27:50|16 coming towards you down Menard?|
|12:27:52|17 A Can you repeat?|
|12:27:54|18 Q There were cars coming toward you -- police|
|12:27:55|19 cars coming toward you; right?|
|12:27:56|20 A That's correct.|
|12:28:01|21 Q And you turned in front of them, left --|
|12:28:02|22 A They were not -- they were not like|
|12:28:05|23 directly in front of me, within five, ten feet, ma'am.|
|12:28:07|24 They were -- they were not that close, where I could make|
|12:28:12|25 a left-hand turn.|

KEITH THORNTON, JR. - June 10, 2013

87

| | | |
|---|---|---|
| 12:28:13 | 1 | Q    Back to my question.  Why didn't you just |
| 12:28:16 | 2 | pull over on Division to get out of their way? |
| 12:28:19 | 3 | A    I didn't pull onto Division because I was |
| 12:28:24 | 4 | in the left lane going eastbound, and the easiest way that |
| 12:28:25 | 5 | I want to get out of their way, because I thought |
| 12:28:28 | 6 | something was going on on Division, is to just pull right |
| 12:28:32 | 7 | there onto the side street. |
| 12:28:35 | 8 | Q    And is North Menard where you pulled down? |
| 12:28:37 | 9 | A    If that's the incident and that's -- I |
| 12:28:40 | 10 | didn't know it was where the incident was taking place, |
| 12:28:43 | 11 | but, yes, that's the street I pulled down towards and |
| 12:28:45 | 12 | pulled over to the right side of the street. |
| 12:28:47 | 13 | Q    Okay.  So as soon as you turned onto |
| 12:28:50 | 14 | Menard, you pulled over to the right? |
| 12:28:51 | 15 | A    Can you repeat? |
| 12:28:54 | 16 | Q    As soon as you turned onto North Menard, |
| 12:28:56 | 17 | you pulled over to the right? |
| 12:29:00 | 18 | A    Yes, I did.  I can't recall, but I want to |
| 12:29:03 | 19 | say it was a one-way street.  I don't even recall that, |
| 12:29:07 | 20 | but I honestly do believe it.  But I -- I went to the |
| 12:29:13 | 21 | right, because at the time of me pulling over to the right |
| 12:29:15 | 22 | to think I was getting out of the officers' way, that's |
| 12:29:18 | 23 | when several cars were already parked on Menard, at the |
| 12:29:23 | 24 | end of the block.  And then the cars behind me, that |
| 12:29:33 | 25 | turned into the street onto Menard, they went flying right |

KEITH THORNTON, JR. - June 10, 2013

88

| | | |
|---|---|---|
| 12:29:34 | 1 | through there, and I was stuck in between all of it. |
| 12:29:37 | 2 | Q    When you turned onto Menard, you were going |
| 12:29:41 | 3 | the right way on a one-way street? |
| 12:29:43 | 4 | A    I was going the right way.  Yes, I was. |
| 12:29:46 | 5 | Q    Did you pull over on Menard as soon as you |
| 12:29:48 | 6 | turned onto Menard? |
| 12:29:51 | 7 | A    There was -- like I just said, there is -- |
| 12:29:53 | 8 | there's no way that you could possibly do that.  It's a |
| 12:29:58 | 9 | very narrow street, but I believe it was a one-way going |
| 12:30:02 | 10 | northbound.  I pulled over as far as I could to the |
| 12:30:05 | 11 | right-hand side, and -- |
| 12:30:09 | 12 | Q    How close to Division did you pull over? |
| 12:30:12 | 13 | A    What are you talking -- it wasn't close to |
| 12:30:14 | 14 | Division.  It was, like, in the middle of a block. |
| 12:30:18 | 15 | Q    So you drove down the middle of that first |
| 12:30:23 | 16 | block north of Division and pulled over? |
| 12:30:25 | 17 | A    Yes, I did, because no officers were behind |
| 12:30:31 | 18 | me at the time. |
| 12:30:33 | 19 | Q    Okay.  Did you pull into a parking place? |
| 12:30:35 | 20 | A    There was no parking spots.  The whole |
| 12:30:40 | 21 | block was occupied. |
| 12:30:43 | 22 | Q    So you never got to another intersection |
| 12:30:46 | 23 | north of Division before you pulled over?  You pulled over |
| 12:30:48 | 24 | during that -- in that first block; right? |
| 12:30:50 | 25 | A    No, I did not.  And I'm looking at it right |

KEITH THORNTON, JR. - June 10, 2013

89

| | |
|---|---|
| 12:30:53 | 1 now, and I -- I obviously know exactly where you're trying |
| 12:30:55 | 2 to go with this.  I was on the same block as these |
| 12:30:59 | 3 individuals. |
| 12:31:00 | 4 Q      Okay.  Well, then you have to answer my |
| 12:31:00 | 5 question. |
| 12:31:02 | 6 Did you pull over right after you pulled |
| 12:31:06 | 7 onto Menard, or did you keep driving? |
| 12:31:08 | 8 A      I kept driving, ma'am. |
| 12:31:08 | 9 MS. PINKSTON:  Asked and answered at least |
| 12:31:14 | 10 three times. |
| 12:31:15 | 11 Q      BY MS. DYMKAR:  Did you see police cars in |
| 12:31:16 | 12 front of you? |
| 12:31:18 | 13 A      No, I did not.  I said, once I arrived |
| 12:31:23 | 14 getting extremely close to that location, there were squad |
| 12:31:27 | 15 cars already parked on the block facing me, which would be |
| 12:31:32 | 16 southbound, and officers were already outside of the car. |
| 12:31:38 | 17 Q      Okay.  So where were these cars north of -- |
| 12:31:41 | 18 do you see on the map where the first street is Potomac? |
| 12:31:42 | 19 A      That is correct. |
| 12:31:45 | 20 Q      Were they north of Potomac or south of |
| 12:31:46 | 21 Potomac? |
| 12:31:48 | 22 A      Well, there were -- there were cars that |
| 12:31:51 | 23 came from Division.  There were cars that were north of |
| 12:31:55 | 24 Potomac.  There were definitely cars north of Potomac, |
| 12:31:59 | 25 because they were already parked there, and there were |

KEITH THORNTON, JR. - June 10, 2013

90

| | |
|---|---|
| 12:32:03 | 1 still cars coming in from north of Potomac that didn't |
| 12:32:03 | 2 concern me. |
| 12:32:07 | 3 I was -- as close as I was to a car on the |
| 12:32:10 | 4 right side of me that was parked, and the police cars were |
| 12:32:15 | 5 on the left side of me.  They were jumping out and running |
| 12:32:15 | 6 to their scene. |
| 12:32:19 | 7 Q      Did you pull over south of Potomac or north |
| 12:32:20 | 8 of Potomac? |
| 12:32:22 | 9 A      North of Potomac. |
| 12:32:25 | 10 Q      Why didn't you turn down Potomac to get out |
| 12:32:26 | 11 of the way? |
| 12:32:29 | 12 A      Because I kept going down the street. |
| 12:32:32 | 13 Q      Towards where you saw police cars? |
| 12:32:35 | 14 A      I did not see police cars.  I told you that |
| 12:32:36 | 15 several times. |
| 12:32:39 | 16 Q      Okay.  Then I misunderstood you.  I thought |
| 12:32:42 | 17 you said there were police cars already on the block. |
| 12:32:44 | 18 A      When I got to that -- to this location -- I |
| 12:32:47 | 19 didn't even -- it wasn't even 1320 of where I -- where my |
| 12:32:51 | 20 vehicle was parked.  I never made it to 1320.  If that's |
| 12:32:54 | 21 where the incident took place, I wasn't at that residence. |
| 12:32:57 | 22 I was towards the tip of that block.  That's where the |
| 12:33:00 | 23 incident took place of what I saw. |
| 12:33:01 | 24 Q      Okay.  So you were close to -- |
| 12:33:05 | 25 A      I was close to the corner -- I was very |

KEITH THORNTON, JR. - June 10, 2013

91

```
12:33:09   1    close to the corner of Potomac and Division, but I was on
12:33:15   2    Menard.  But I was nowhere near the actual 1320.
12:33:16   3         Q    Okay.  I'm a little bit confused, because
12:33:20   4    you said you were near Potomac and Division, and I'm not
12:33:22   5    sure how you could be near both.
12:33:24   6         A    Or excuse me.  Potomac and Menard.
12:33:27   7         Q    Okay.  You were north of Potomac on Menard
12:33:32   8    near the intersection of Potomac and Menard?
12:33:32   9         A    That's correct.
12:33:34  10         Q    And you were pulled over to the right?
12:33:35  11         A    That -- that's correct.  In the middle of
12:33:37  12    the street, still.
12:33:39  13         Q    Okay.  What kind of buildings were over to
12:33:40  14    your right on the east side of the --
12:33:42  15         A    I don't recall that, but I want to say it's
12:33:45  16    bungalows.  It was maybe some apartment.  I cannot recall
12:33:48  17    that.
12:33:51  18         Q    Did you see any commercial buildings?
12:33:53  19         A    I cannot recall that, ma'am.
12:33:54  20         Q    Did you see any churches?
12:33:58  21         A    I don't recall that.
12:34:00  22         Q    Your recollection was they were residential
12:34:04  23    buildings to the -- to the left side of the street and
12:34:06  24    residential buildings on the east side of the street?
12:34:06  25         A    That's correct.
```

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

92

```
12:34:07   1         MS. PINKSTON:  Objection.  Mischaracterizes
12:34:10   2    prior testimony.
12:34:12   3         Q    BY MS. DYMKAR:  Is that correct?
12:34:14   4         A    It was a residential street, yes.
12:34:17   5         Q    And I'm just trying to determine where
12:34:20   6    these residences were.  They were on the west side and
12:34:21   7    they were on the east side?
12:34:24   8         A    That's correct, ma'am.
12:34:30   9         Q    And you pulled over -- how far were you
12:34:32  10    from the intersection of Potomac and Menard?
12:34:32  11         A    Oh, geez.
12:34:32  12         MS. PINKSTON:  Objection, asked and
12:34:34  13    answered.
12:34:36  14         THE WITNESS:  Do you want feet?
12:34:36  15         Q    BY MS. DYMKAR:  Yes, please.
12:34:41  16         A    I don't know, really, how to do feet here,
12:34:47  17    but I would say I was maybe seven houses down on a block.
12:34:52  18    The houses -- the houses there are about 25 by 75.  So if
12:34:56  19    you do that, I was not midway through the block, but I was
12:35:01  20    one-fourth through it, pulled over.
12:35:02  21         Q    Why did you pull over where you pulled
12:35:03  22    over?
12:35:05  23         A    Because, then, the officers that were
12:35:11  24    behind me initially came flying through on the left side,
12:35:16  25    so I got to the right, and I stopped my vehicle, and
```

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

93

```
12:35:20   1    that's when I noticed that there was other vehicles up
12:35:24   2    there stopped at -- I could not go that way.  There's no
12:35:28   3    way you could continue going northbound on that street,
12:35:30   4    because there were police vehicles stopped there on that
12:35:30   5    street.
12:35:35   6         Q    Was it your understanding that the -- that
12:35:37   7    there was a disturbance of some sort?
12:35:39   8         A    Once I hit that block, yes, I did.
12:35:41   9         Q    Which block?
12:35:46  10         A    Menard to 1300 block.
12:35:48  11         Q    And did you say that the -- that the
12:35:51  12    disturbance was further north of where you were?
12:35:54  13         A    It was.
12:36:01  14         Q    Was -- did you say it was mid block -- mid
           15    block between -- if you look on this map, Potomac and
12:36:03  16    Hirsch?
12:36:10  17         A    I would -- yes, it was.
12:36:12  18         Q    Did you see any of the numbers on the
12:36:13  19    houses near where you were?
12:36:15  20         A    No, I did not, ma'am.  I wasn't looking.
12:36:16  21         Q    Were you trying to leave the area?
12:36:22  22         A    Yes, I was.
12:36:24  23         Q    Did you get out of your vehicle?
12:36:25  24         A    No, I did not.
12:36:26  25         Q    Is there a bar on that block?
```

KEITH THORNTON, JR. - June 10, 2013

94

```
12:36:29   1         A    I have no idea.
12:36:31   2         Q    Did you remember telling a police officer
12:36:33   3    that there was a bar on that block?
12:36:36   4         A    I don't recall.
12:36:38   5         Q    You don't recall saying that or --
12:36:38   6         A    No.
12:36:38   7         Q    -- it didn't happen?
12:36:50   8         A    I don't recall ever speaking of a bar.
12:36:50   9         Q    You said that police -- police officers
12:36:54  10    were getting out of their car and running -- would it be
12:36:56  11    north of Menard towards the center of the block --
12:37:00  12         A    The ones who were already on the street --
12:37:00  13         Q    -- between Potomac and Hirsch?
12:37:01  14         A    The ones who were already on the street,
12:37:04  15    they all bypassed me.  The ones who were coming from
12:37:07  16    behind me, they flew in front of me.  So there was no one
12:37:09  17    running from behind me.
12:37:11  18         Q    Okay.  So -- and when you say "flew," you
12:37:14  19    mean in their cars?  The cars passed you?
12:37:15  20         A    Yes.  And they went to the middle of the
12:37:16  21    street.
12:37:17  22         Q    And there were no police cars parked behind
12:37:19  23    you; right?
12:37:27  24         A    No.
12:37:29  25         Q    Did you see any of the officers with their
```

KEITH THORNTON, JR. - June 10, 2013

95

| | |
|---|---|
| 12:37:30 | 1 guns drawn? |
| 12:37:31 | 2 A No. I don't think there -- I didn't see |
| 12:37:33 | 3 any officers with their guns out. |
| 12:37:35 | 4 Q You said that there were both marked cars |
| 12:37:37 | 5 and unmarked cars? |
| 12:37:41 | 6 A That's correct. |
| 12:37:43 | 7 Q How many cars would you estimate were there |
| 12:37:47 | 8 north of where you were? |
| 12:37:49 | 9 A I have no idea, because if you go further |
| 12:37:52 | 10 down the street northbound, there was a ton of cars. They |
| 12:37:54 | 11 were parked. Some of them didn't have lights. I don't |
| 12:37:55 | 12 know. I didn't recall that. |
| 12:37:58 | 13 Q Well, was it more like three or four cars, |
| 12:37:58 | 14 or was it more like -- |
| 12:38:00 | 15 A It was more -- a lot -- it was a lot more |
| 12:38:04 | 16 than three or four cars that were there. |
| 12:38:06 | 17 Q I just want to get your best estimate. Was |
| 12:38:08 | 18 it like 10 to 15 cars? |
| 12:38:10 | 19 MS. PINKSTON: Objection. Based on his |
| 12:38:13 | 20 prior testimony, this would be speculation at this point. |
| 12:38:15 | 21 THE WITNESS: I have no idea. I can't tell |
| 12:38:15 | 22 you that. |
| 12:38:17 | 23 Q BY MS. DYMKAR: Were there more than ten |
| 12:38:19 | 24 cars or fewer than ten cars? |
| 12:38:20 | 25 A I have no idea, ma'am. But considering |

KEITH THORNTON, JR. - June 10, 2013

96

| | |
|---|---|
| 12:38:24 | 1 that when I was coming down Division, there were a few |
| 12:38:29 | 2 cars behind me and a few before, I would say that there |
| 12:38:34 | 3 were well over that amount. |
| 12:38:36 | 4 Q Were their sirens on? |
| 12:38:38 | 5 A Coming onto that street, yes, it was. When |
| 12:38:41 | 6 I was on Division, yes, there was. Once I hit the 1300 |
| 12:38:50 | 7 block of Menard, there probably was sirens, there probably |
| 12:38:55 | 8 was not. I don't recall. |
| 12:38:59 | 9 Q Did you see any private citizens on foot? |
| 12:39:01 | 10 A There were a lot of -- I don't -- I don't |
| 12:39:04 | 11 know if I could call them citizens, but there were a lot |
| 12:39:08 | 12 of private individuals out on the block. |
| 12:39:11 | 13 Q Why would you not call them citizens? |
| 12:39:13 | 14 A I don't know who they were. |
| 12:39:16 | 15 Q How many people did you see on foot in -- |
| 12:39:19 | 16 north of you on that 1300 block? |
| 12:39:20 | 17 A Are you talking about the police officers |
| 12:39:22 | 18 as well? |
| 12:39:28 | 19 Q Private citizens. |
| 12:39:30 | 20 A There were at least over 10 to 15 |
| 12:39:31 | 21 individuals. |
| 12:39:33 | 22 Q Could you tell if there was a party of some |
| 12:39:33 | 23 sort? |
| 12:39:36 | 24 A I don't know about what was going on there, |
| 12:39:37 | 25 but I would assume that there was a party going on at a |

KEITH THORNTON, JR. - June 10, 2013

97

```
12:39:39   1    location.
12:39:41   2          Q     Did you initially think that there was a
12:39:42   3    block party going on?
12:39:44   4          A     I -- no, ma'am.  Block parties don't have
12:39:47   5    any cars on their blocks, and it's closed down where you
12:39:49   6    can't even enter the street.
12:39:53   7          Q     When the police cars passed you or were in
12:39:56   8    front of you, did you try to back up at that time?
12:40:04   9          A     No, I didn't.  I stayed to the right, and I
12:40:05  10    let them do their job.
12:40:05  11          Q     Why didn't you try to back up on --
12:40:05  12          A     Because I let them do their job, and I let
12:40:08  13    them come in while they had their lights on, and they were
12:40:14  14    coming northbound on the street, and my job is to pull to
12:40:17  15    the right in there on the side of me, because they needed
12:40:20  16    to get in there to do what they had to do.  Backing up
12:40:23  17    would have made me cause an accident.
12:40:25  18          Q     Once they passed -- as you said, they flew
12:40:27  19    by you, using your words --
12:40:28  20          A     That's correct.
12:40:30  21          Q     -- why didn't you back up, then, to go to
12:40:31  22    Division?
12:40:34  23          A     Because northbound, I could not -- as I had
12:40:37  24    already stated, I could -- the complete street, which is a
12:40:41  25    very narrow street, was completely blocked by squad cars,
```

KEITH THORNTON, JR. - June 10, 2013

98

```
12:40:43   1    by police officers, and by a lot of different individuals
12:40:49   2    who -- now, at this point, I know who -- David Wilbon was
12:40:52   3    a part of that.  That's who I saw with the whole bottle
12:40:55   4    incident.  He threw this.
12:40:57   5          I can't go northbound anymore.  So now I'm
12:41:00   6    going to back up to whatever street this was, which is
12:41:03   7    Potomac, and get out of there, because that's the only
12:41:05   8    route that I can get out.
12:41:06   9          Q     Okay.  But that's -- that's what I was
12:41:10  10    asking you, and now I'm a little confused by your answer.
12:41:13  11    Once the police cars flew by you towards the center of
12:41:18  12    that block, why didn't you back up to Potomac and leave?
12:41:21  13          A     I did do that.
12:41:25  14          Q     As soon as the police cars flew by you, you
12:41:28  15    backed up and went down Potomac?
12:41:29  16          MS. PINKSTON:  Objection.  Mischaracterizes
12:41:32  17    his prior testimony.
12:41:34  18          THE WITNESS:  Ma'am, I've answered this
12:41:39  19    question several times.  The officers came past me going
12:41:43  20    northbound while I was parked to the right.  They jumped
12:41:50  21    out.  And in that time period, I observed a big mob out
12:41:52  22    there of individuals that they were going to.  Several
12:41:56  23    officers were in foot pursuit way north of me jumping over
12:41:58  24    gates, going -- doing their thing, and I knew something
12:42:00  25    was taking place.
```

KEITH THORNTON, JR. - June 10, 2013

99

12:42:02    1      And within that short period of time, I
12:42:06    2 observed this individual with dreadlocks at the time, now
12:42:11    3 identified as David Wilbon, throw a bottle at an officer,
12:42:14    4 who I knew was an officer, didn't know a badge number,
12:42:17    5 didn't who it was, didn't know this, but it struck an
12:42:21    6 officer, by the uniform, and he did it.  And he ran
12:42:25    7 southbound, while I was backing up, on the west side of my
12:42:29    8 car while I was backing up, and he went out to the
12:42:32    9 intersection, on his cell phone, and that's where this
12:42:34   10 started.
12:42:35   11      Q    BY MS. DYMKAR:  All right.  I'm taking it a
12:42:37   12 piece at a time, so, you know, we -- you know, you can --
12:42:41   13 you can (inaudible) --
12:42:41   14      A    You're --
12:42:43   15      Q    -- the whole story, or we can just take it
12:42:47   16 a piece at a time, because I think we'll -- we'll be more
12:42:48   17 -- it will be more efficient if we can just break it down
12:42:52   18 into -- into smaller time frames.
12:42:57   19      After the police cars passed you by, you
12:42:59   20 did not back up at that point to go down Potomac;
12:43:03   21 right?
12:43:11   22      A    I said that.  To ensure that no other
12:43:14   23 police cars were coming, I stayed there for a few extra
12:43:16   24 seconds.  If you want to know that I was there for
12:43:19   25 seconds, yeah.

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

100

12:43:23    1      Q    And you said you saw individuals throwing
12:43:25    2 objects?
12:43:25    3      A    That's correct.
12:43:27    4      Q    Were there numerous individuals throwing
12:43:27    5 objects?
12:43:31    6      A    There was a lot -- I saw two foot pursuits.
12:43:34    7 I saw several officers take off in different locations,
12:43:38    8 going after two suspects.  They did what they did.  I
12:43:39    9 don't know what they did.
12:43:42   10      I saw several people throwing bottles, but
12:43:44   11 they were a little bit further, and the closest one that
12:43:49   12 was nearest to my car was David Wilbon, with his
12:43:52   13 dreadlocks, and I believe he had on a red coat at the
12:43:57   14 time, and that's who I saw throwing the bottle, who I --
12:43:59   15      Q    Did you know David Wilbon on April 10,
12:44:00   16 2010?
12:44:01   17      A    Excuse me?
12:44:03   18      Q    Did you know a David Wilbon on April 10,
12:44:05   19 2010?
12:44:06   20      A    No, I did not.
12:44:07   21      Q    So any of your observations that you made
12:44:12   22 on the 1300 block of North Menard were not of somebody you
12:44:14   23 knew to be David -- David Wilbon; right?
12:44:16   24      A    All of my observations -- can you repeat
12:44:17   25 that?

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

101

```
12:44:20   1        Q      Your observations on the 1300 block of
12:44:24   2   North Menard -- at that time, you did not know an
12:44:26   3   individual named David Wilbon?
12:44:28   4        A      No, I did not.
12:44:30   5        Q      All right.  My question to you was whether
12:44:34   6   you saw numerous individuals throwing objects.
12:44:42   7        A      Yes, I did.
12:44:44   8        Q      How many objects did you see being thrown?
12:44:48   9        A      From who?
12:44:50  10        Q      You said you saw individuals throwing
12:44:51  11   objects, bottles --
12:44:53  12        A      I just saw a lot of different things going
12:44:55  13   up from people's hands.
12:45:01  14        Q      Okay.  How many bottles or cans did you see
12:45:03  15   being thrown?
12:45:03  16        A      I don't recall specifically, but --
12:45:03  17        Q      Okay.
12:45:03  18        A      -- it was a big mob.
12:45:05  19        Q      Was it like five, four, less?
12:45:10  20        A      I would say it was five or more.  There was
12:45:12  21   people in there inside of gates, inside of whatever
12:45:15  22   residence that was.  I assume it was 1320.  There was
12:45:20  23   people there standing at -- at the location, inside of a
12:45:24  24   gate.  There was people all around on the right side and
12:45:27  25   the left side, and then there was a big mob of people
```

KEITH THORNTON, JR. - June 10, 2013

102

```
12:45:31   1   right in the middle of the street.  They were all -- a lot
12:45:33   2   of them were throwing different things, and the closest
12:45:36   3   one to me was David Wilbon.
12:45:40   4        Q      As I said, you don't -- you didn't know any
12:45:43   5   individual named David Wilbon --
12:45:48   6        A      I have never heard or -- no, I do not.
12:45:51   7        Q      Okay.  Was 1320 North Menard -- did you see
12:45:54   8   an address 1320 North Menard?
12:45:56   9        A      No.  I wasn't looking at addresses, ma'am.
12:45:59  10        Q      All right.  So the only reference you had
12:46:02  11   to 1320 is seeing that on this map; right?
12:46:05  12        A      Yeah.  If that's accurate, then that's
12:46:07  13   where I was at just prior to that --
12:46:10  14        Q      There's no indication that it's you who was
12:46:11  15   at 1320 North Menard; right?
12:46:13  16        A      Could you repeat?
12:46:15  17        Q      The map that says 1320 North Menard --
12:46:16  18        A      Correct.
12:46:18  19        Q      Right.  You don't know what address you
12:46:20  20   were in front of, do you?
12:46:22  21        A      Absolutely not, but I was not right in
12:46:26  22   front of the exact location.
12:46:28  23        Q      You were how many houses down from the --
12:46:29  24        A      I don't know --
12:46:29  25        Q      -- from the exact location?
```

103

```
12:46:31  1      A      -- how many houses I was down.  I have no
12:46:42  2  idea how many houses I was down, but I was few houses down
12:46:42  3  from it.
12:46:43  4      Q      By "a few," do you mean two, three, four --
12:46:43  5      A      I have no idea.
12:46:43  6      THE COURT REPORTER:  Wait, wait.  I'm
12:46:43  7  sorry.  Can you just, please, wait for her to finish,
12:46:43  8  because I'm not getting her full question.
12:46:44  9      Q      BY MS. DYMKAR:  Was it two, three, or four
12:46:49 10  houses south of where you believe was the center of the
12:46:50 11  action?
12:46:51 12      A      Yes, ma'am.
12:46:54 13      Q      1320 North Menard, would that be on the
12:46:56 14  west side of the street or the east side of the street, to
12:47:02 15  your knowledge?
12:47:07 16      A      I don't recall.  I don't know that
12:47:11 17  location.
12:47:14 18      Q      Okay.  So 1320, other than seeing it on
12:47:18 19  this plan, you're not relating to us as having occurred at
12:47:18 20  1320 North Menard --
12:47:19 21      A      That's correct.
12:47:19 22      Q      -- (inaudible) at this map; right?
12:47:20 23      A      I saw the most people on the right side at
12:47:23 24  a house, and I saw people on the left side.  They were
12:47:24 25  everywhere.
```

104

```
12:47:25  1      Q      Okay.  But they were at the house -- houses
12:47:28  2  on the east side of the street, and there were houses on
12:47:30  3  the west side of the street; right?
12:47:31  4      A      That's correct.
12:47:34  5      Q      And then did you see any bottles or
12:47:36  6  any other objects hit any officers?
12:47:39  7      A      Yes, I did.
12:47:42  8      Q      Okay.  You -- what was the object?
12:47:44  9      A      From David Wilbon, are we talking about
12:47:45 10  now?
12:47:47 11      Q      I would prefer that you give another
12:47:50 12  description to him, because at that point, you don't know
12:47:54 13  the name of the person who's on the street; right?
12:47:57 14      MS. PINKSTON:  I'm going to object to you
12:47:59 15  instructing the witness how to testify.
12:48:00 16      Q      BY MS. DYMKAR:  Did you know a David Wilbon
12:48:04 17  on April 10, 2010, before you turned onto North Menard?
12:48:05 18      MS. PINKSTON:  Objection.  Asked and
12:48:07 19  answered.
12:48:07 20      THE WITNESS:  I answered that several
12:48:08 21  times, ma'am.
12:48:20 22      Q      BY MS. DYMKAR:  All right.  Did you see any
12:48:21 23  object hit any officer?
12:48:24 24      A      I answered that several times.  Yes, I did.
12:48:28 25      Q      How many officers were hit with an object?
```

KEITH THORNTON, JR. - June 10, 2013

105

| | | |
|---|---|---|
| 12:48:30 | 1 | A    I saw this individual throw a bottle, and |
| 12:48:36 | 2 | it struck an officer in the head. |
| 12:48:38 | 3 | Q    And you believe that the officer was a |
| 12:48:39 | 4 | female officer; right? |
| 12:48:42 | 5 | A    I do believe it was a female officer, due |
| 12:48:43 | 6 | to the hair. |
| 12:48:47 | 7 | Q    And did this officer fall to the ground? |
| 12:48:50 | 8 | A    The officer stumbled around, did not fall |
| 12:48:53 | 9 | completely to the ground, stumbled around and turned |
| 12:48:56 | 10 | around, and they were all looking.   Several officers ran |
| 12:48:59 | 11 | to the officer's aid, and they were talking. |
| 12:49:01 | 12 | And as I'm now backing up and I see him run |
| 12:49:04 | 13 | right past me, I said, "Oh, no," and then that's when I |
| 12:49:07 | 14 | called 911. |
| 12:49:09 | 15 | Q    Okay.   Did you get a good look at that |
| 12:49:11 | 16 | woman officer's face? |
| 12:49:12 | 17 | A    No, I did not. |
| 12:49:13 | 18 | Q    Do you know what color hair she had? |
| 12:49:18 | 19 | A    No, I did not.   It was dark on the block. |
| 12:49:20 | 20 | Q    Was she white or -- or African-American -- |
| 12:49:20 | 21 | A    I -- |
| 12:49:20 | 22 | Q    -- or Hispanic? |
| 12:49:25 | 23 | A    She definitely wasn't black.   I don't know |
| 12:49:27 | 24 | if she was -- she was light-skinned.   That could be |
| 12:49:28 | 25 | anything. |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

106

| | | |
|---|---|---|
| 12:49:30 | 1 | Q    Okay.   So she could be white?   She could |
| 12:49:31 | 2 | have been Hispanic? |
| 12:49:32 | 3 | A    That's correct. |
| 12:49:33 | 4 | Q    She had a -- a uniform on? |
| 12:49:34 | 5 | A    That's correct. |
| 12:49:37 | 6 | Q    Okay.   You said that she -- can you |
| 12:49:40 | 7 | describe in more detail?   She stumbled, but you didn't see |
| 12:49:41 | 8 | her fall to the ground? |
| 12:49:43 | 9 | A    And she turned around towards -- facing |
| 12:49:51 | 10 | south, to see where the bottle came from, because it |
| 12:49:51 | 11 | struck the back of her head, and that's when maybe two or |
| 12:49:58 | 12 | three officers, who were male officers, came to her and |
| 12:50:01 | 13 | kind of held her up.   And then they were just |
| 12:50:03 | 14 | conversating, like, "Where did that basically come from." |
| 12:50:05 | 15 | Q    How far was the woman officer from you or |
| 12:50:06 | 16 | how far were you from the woman officer? |
| 12:50:14 | 17 | A    That was pretty close.   Maybe about two -- |
| 12:50:15 | 18 | two -- two houses, a house and a half. |
| 12:50:16 | 19 | Q    Okay.   And before, you said that you |
| 12:50:19 | 20 | thought that a city lot was about 25 feet wide? |
| 12:50:23 | 21 | A    That's correct. |
| 12:50:25 | 22 | Q    So are we talking about -- about 40 feet or |
| 12:50:25 | 23 | so? |
| 12:50:35 | 24 | A    I would say 30, 35 feet, ma'am. |
| 12:50:36 | 25 | Q    You were sitting -- you were still in your |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

car at the time?

A I never got out of my car one time, ma'am.

Q Did you see any other officer, in addition to the woman officer, being hit with a bottle?

A No, I did not see anyone specifically hit, but they were throwing all types of different things. I saw bottles at the officers. I'm quite sure several were struck with it. But the one that I can identify, that I actually saw firsthand, was the one that I'm telling you about.

Q Did you ever find out the identity of that woman officer who was hit?

A No, I didn't. It's not my job.

Q When you -- you said you called 911. When you called 911, did you tell the dispatcher that a woman officer had been hit in the head?

A I told the dispatcher -- when I got out to that street, when I finally backed up, I told him, "I'm at this location. There's a lot of police over here. I don't know what's going on, and an individual just threw a bottle, and it struck an officer in the head."

The officer who I -- excuse me. The dispatcher or call-taker informed me the location, "Can you describe him?" I gave a very detailed description, which I cannot recall at this time. If you have the 911

tape, you could do that.

And she said, "Okay. Be careful."

I said, "I'm going to -- I'm -- I'm right here," so I gave her everything.

And then that's when a vehicle came and picked him up while he was on his cell phone.

Q Okay. We're going to -- we're going to take this a -- a piece at a time.

The person who threw the bottle at the woman officer, how far was he from you?

A He was right in front of my vehicle. I -- if there was -- there's another car -- a car length. He was not too far from my -- my vehicle at all, standing on the most east part of the street while she was in the middle of the street.

I think it just froze.

Q Did any of the officers that came to the woman officer's aid -- did any of them chase the person who had thrown the bottle?

A No. They were looking bewildered. They didn't know -- they -- they were tending to her, and she was looking around and talking to them. And I would assume she was saying, "I just got struck by a bottle."

And me seeing this guy, I just called 911. I'm not going to jump out and get involved in -- get in

109

12:53:15 1  between all of that, because they're -- like I said, that
12:53:19 2  was not the only incident taking place at that time.
12:53:21 3  There were several other officers -- I don't know what
12:53:24 4  they were doing.  They were chasing.  They had people
12:53:25 5  against cars.  I wasn't getting involved in that.
12:53:32 6        Q     Did you tell the officers at the scene
12:53:32 7  that --
12:53:34 8        A     I didn't talk to any --
12:53:35 9        Q     -- you had seen this happen?
12:53:37 10       A     I didn't talk to any officers at the scene.
12:53:38 11       Q     Okay.  Why not?
12:53:42 12       A     I just stated that, ma'am.  I backed up,
12:53:44 13 let them do their job, and I was going to the police
12:53:48 14 station.  And I saw this individual, and that's who -- I
12:53:51 15 wanted to relay that information over, because that's the
12:53:53 16 most appropriate thing to do.
12:53:56 17       Q     When you -- you said you were going to the
12:53:58 18 police station.  What police station were you going to?
12:54:01 19       A     Initially, I was going to go to the 25th
12:54:05 20 District Police Station, just to report this.  But I was
12:54:09 21 on the phone, and this guy decided to go his route, and I
12:54:11 22 got a license plate number, and he took me to the 15th
12:54:12 23 District.
12:54:14 24       Q     Did you write down the license plate
12:54:14 25 number?

110

12:54:17 1        A     I didn't write it down.  I told the -- the
12:54:21 2  call-taker while I was on the phone with her.
12:54:25 3        Q     Did you tell the dispatcher that the woman
12:54:26 4  officer had been hit?
12:54:32 5        A     I did.  Yes, I did.
12:54:34 6        Q     You said you gave a description to the
12:54:37 7  dispatcher of the person who had thrown the bottle.  What
12:54:38 8  was the description that you gave?
12:54:40 9        A     I can't recall exactly how he looked, what
12:54:43 10 he was wearing.  But I do know he was an African-American,
12:54:46 11 dark-skinned.  Don't know his height, don't know his
12:54:49 12 weight.  I did probably give that, because I gave a very
12:54:52 13 detailed description of him.  He had dreadlocks.  I do
12:54:55 14 recall that, and I want to say he had on a red coat.
12:54:59 15 That's all I can remember at this time.
12:55:02 16       Q     Okay.  Now, did you see other people --
12:55:05 17 other private citizens at the scene with dreadlocks?
12:55:12 18       A     No, ma'am.
12:55:15 19       Q     Is it, in your experience, living not too
12:55:19 20 far n that neighborhood, there are -- it's a popular
12:55:21 21 hairstyle for African-American males --
12:55:27 22       A     No, ma'am.
12:55:27 23       Q     -- the dreadlocks?
12:55:28 24       A     No, ma'am.  I'm African-American, and s you
12:55:30 25 can tell right now with this video conference, I have

KEITH THORNTON, JR. - June 10, 2013

111

| | |
|---|---|
| 12:55:32 | 1  nice, clean-cut haircut.  So, no, ma'am. |
| 12:55:34 | 2          MS. PINKSTON:  And I just want to make an |
| 12:55:37 | 3  objection to that question.  That mischaracterizes prior |
| 12:55:39 | 4  testimony and there's no foundation. |
| 12:55:41 | 5          BY MS. DYMKAR:  Okay.  We -- we know that |
| 12:55:44 | 6  you're clean-cut, sir, but you have seen dreadlocks in |
| 12:55:46 | 7  your neighborhood on -- |
| 12:55:46 | 8      A   I have not. |
| 12:55:48 | 9      Q   -- other African-American males? |
| 12:55:48 | 10      A   I have not. |
| 12:55:50 | 11          MS. PINKSTON:  Objection.  Ischaracterizes |
| 12:55:53 | 12  prior testimony, that this is his neighborhood. |
| 12:55:54 | 13      Q   BY MS. DYMKAR:  I didn't -- I saw your |
| 12:55:57 | 14  mouth moving, but nothing -- no sound. |
| 12:56:03 | 15      A   I said "no, ma'am." |
| 12:56:09 | 16      Q   So is it -- is it your testimony that |
| 12:56:10 | 17  dreadlocks is an unusual hairstyle? |
| 12:56:14 | 18      A   No.  If someone chooses to have dreadlocks, |
| 12:56:17 | 19  it's just like what I choose to have. |
| 12:56:19 | 20      Q   Now, could you describe the red coat that |
| 12:56:20 | 21  this person had on? |
| 12:56:22 | 22      A   I can't describe the red coat.  All I knew |
| 12:56:26 | 23  is it was a red coat.  I wasn't right up on the guy.  I |
| 12:56:29 | 24  wasn't wearing it. |
| 12:56:30 | 25      Q   Was it a leather coat? |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

---

KEITH THORNTON, JR. - June 10, 2013

112

| | |
|---|---|
| 12:56:33 | 1      A   I want to say that it was a leather coat, |
| 12:56:37 | 2  but I cannot even recall that situation.  So I can't |
| 12:56:38 | 3  comment to that. |
| 12:56:41 | 4      Q   Was it -- when you say "coat," did you -- |
| 12:56:45 | 5  do you mean something that was longer, like down to, you |
| 12:56:47 | 6  know, your knees or down to your hips? |
| 12:56:50 | 7      A   No.  It definitely wasn't down to his knees |
| 12:56:53 | 8  or his hips.  It was around his waist. |
| 12:56:58 | 9      Q   Did the coat have any kind of writing on |
| 12:56:58 | 10  it? |
| 12:57:00 | 11      A   I don't recall that, and I don't -- I -- I |
| 12:57:06 | 12  don't recall that.  All I saw was red. |
| 12:57:07 | 13      Q   And you believe you gave a -- a height and |
| 12:57:10 | 14  weight to the dispatcher? |
| 12:57:12 | 15      A   I gave a whole lot more to the dispatcher, |
| 12:57:15 | 16  because I was actually there several years ago.  So if you |
| 12:57:21 | 17  could pull that up, you would -- you would hear it. |
| 12:57:23 | 18      Q   This person that you saw throw the bottle, |
| 12:57:25 | 19  did he throw it with his right hand or left hand? |
| 12:57:29 | 20      A   I don't recall that. |
| 12:57:33 | 21      Q   Did you see him throw only one bottle? |
| 12:57:42 | 22      A   I saw him throw one bottle. |
| 12:57:46 | 23      Q   When you called 911, did you tell the |
| 12:57:49 | 24  dispatcher what direction this person was walking in? |
| 12:57:51 | 25      A   He wasn't walking.  He was running, and, |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

113

| | |
|---|---|
| 12:57:55 | 1 |

1    yes, I did tell her that.

12:57:58  2        Q       When this individual threw the bottle, was

12:57:59  3    he standing with other people at the time?

12:58:01  4        A       No, he was not.  He was in the middle of

12:58:07  5    the street, with a -- with a crowd, closer to -- the most

12:58:11  6    closest person to me, but as he started running, he was

12:58:16  7    definitely by himself, on his cell phone.

12:58:20  8        Q       Did you see other people running south,

12:58:21  9    past your car --

12:58:22  10       A       Not one person.

12:58:23  11       Q       -- in addition to this one --

12:58:26  12       A       No -- no person went south.  He was the

12:58:29  13   only individual.

12:58:31  14       Q       Everybody else ran north or east?

12:58:33  15       A       Everyone else stayed at that scene and

12:58:36  16   stayed in front of the east locations and the west

12:58:39  17   locations, which are residents, and were either in the

12:58:43  18   middle of that block, and that's all I saw, because I

12:58:45  19   wasn't looking that direction.  I was turned around,

12:58:45  20   backing up.

12:58:47  21       He was the only individual on the west side

12:58:53  22   of my car unning past me.

12:58:55  23       Q       Do you know approximately what time it was?

12:58:57  24       A       I don't recall the exact time.  No, I do

12:59:02  25   not.  I know it was very, very early.

114

12:59:04  1        Q       What do you mean by "very early"?

12:59:08  2        A       In the morning, day.  I would say that's

12:59:10  3    either -- either you could say it's very late or -- or

12:59:13  4    very early.  I don't recall the time.

12:59:15  5        Q       How close was it to midnight?

12:59:19  6        A       I don't recall.

12:59:21  7        Q       This person you saw throw the bottle, did

12:59:23  8    you see him drinking any alcohol?

12:59:30  9        A       No, I did not.

12:59:33  10       Q       After you called 911 and gave a description

12:59:40  11   and the direction the person was running in, did you back

12:59:44  12   up and go down Potomac?

12:59:45  13       A       I don't believe it was -- it was the street

12:59:49  14   that was Potomac.  It was -- do you want to continue now?

12:59:52  15   Because you're asking me all these extra questions now.

12:59:56  16       He stood there for almost a minute on the

13:00:01  17   south side of Division, on his cell phone.  He stayed

13:00:02  18   planted there.

13:00:05  19       I stopped at the intersection, and I was

13:00:08  20   giving a very detailed description.  And that's when a

13:00:11  21   vehicle, which was an SUV at the time -- I can't describe

13:00:15  22   the SUV right now, but I did describe it once I called 911

13:00:18  23   and I gave a license plate.  They picked them up, and that

13:00:25  24   SUV was occupied, I want to say, by three males.

13:00:26  25       And they picked them him up, and that's

115

| | |
|---|---|
| 13:00:30 | 1 when I fully backed out onto that street and followed |
| 13:00:35 | 2 them, and I -- I do not think -- it definitely wasn't |
| 13:00:39 | 3 Menard that we went down.  I don't even think Menard goes |
| 13:00:41 | 4 through. |
| 13:00:48 | 5      Q      When you backed up your car, did you back |
| 13:00:49 | 6 up for a block and a half? |
| 13:00:52 | 7      A      I -- no, I did not.  I backed straight down |
| 13:00:55 | 8 to the first street that was there. |
| 13:00:59 | 9      Q      Potomac? |
| 13:00:59 | 10     A      Yes, ma'am. |
| 13:01:01 | 11     Q      And then you went down Potomac? |
| 13:01:02 | 12     A      Yes.  And then they turned -- whatever |
| 13:01:11 | 13 street is just west of the -- excuse me -- east.  The very |
| 13:01:17 | 14 first -- the very first side street that's east of Menard, |
| 13:01:20 | 15 the car went southbound on that street, And it stopped for |
| 13:01:22 | 16 a moment, and that's where -- that's where I was behind |
| 13:01:24 | 17 them. |
| 13:01:25 | 18     Q      Okay.  The street -- do you recognize the |
| 13:01:29 | 19 street just east of Menard as being Massasoit? |
| 13:01:32 | 20     A      If -- if that was the street. |
| 13:01:38 | 21     Q      Okay.  So I'm a little bit confused.  You |
| 13:01:42 | 22 -- you backed down to Potomac, and then you turned east on |
| 13:01:43 | 23 Potomac? |
| 13:01:48 | 24     A      That's correct. |
| 13:02:02 | 25     Q      And you saw this man in the red coat.  You |

116

| | |
|---|---|
| 13:02:06 | 1 saw him running towards Potomac? |
| 13:02:08 | 2      A      Now we're -- now we're backing up, now, |
| 13:02:12 | 3 because now you're going -- you mentioned the vehicle.  He |
| 13:02:14 | 4 was in the vehicle.  So we're backing up again? |
| 13:02:16 | 5             He was at the corner -- not even the |
| 13:02:21 | 6 corner.  He was standing there across the street, on the |
| 13:02:24 | 7 south side of the street, on his cell phone.  That went on |
| 13:02:27 | 8 for at least 20 to 30 seconds, while I'm on the phone with |
| 13:02:30 | 9 911, giving his description. |
| 13:02:35 | 10            At that time, an SUV comes east -- or, |
| 13:02:39 | 11 excuse me -- from the west, and they stop, pick him up, he |
| 13:02:43 | 12 jumps in -- in the back of the vehicle. |
| 13:02:45 | 13     Q      The SUV was dark-colored? |
| 13:02:46 | 14     A      Yes, it was. |
| 13:02:47 | 15     Q      And there were three individuals in the |
| 13:02:48 | 16 car? |
| 13:02:52 | 17     A      Yes, it was, ma'am. |
| 13:02:53 | 18     Q      Okay.  Please, bear with me.  I'm trying to |
| 13:02:55 | 19 take it a step at a time. |
| 13:02:57 | 20            Did you back up to Potomac and go east on |
| 13:03:01 | 21 Potomac, or did you back up to Division and go east on |
| 13:03:02 | 22 Division? |
| 13:03:04 | 23     A      I don't -- whatever the first street was |
| 13:03:06 | 24 right there, that's where I went. |
| 13:03:08 | 25     Q      Okay.  So looking at this map, it was |

KEITH THORNTON, JR. - June 10, 2013

117

| | |
|---|---|
| 13:03:10 | 1 |
| 13:03:12 | 2 |
| 13:03:15 | 3 |
| 13:03:19 | 4 |
| 13:03:21 | 5 |
| 13:03:25 | 6 |
| 13:03:33 | 7 |
| 13:03:38 | 8 |
| 13:03:40 | 9 |
| 13:03:43 | 10 |
| 13:03:44 | 11 |
| 13:03:46 | 12 |
| 13:03:49 | 13 |
| 13:03:59 | 14 |
| 13:03:59 | 15 |
| 13:04:01 | 16 |
| 13:04:03 | 17 |
| 13:04:05 | 18 |
| 13:04:12 | 19 |
| 13:04:17 | 20 |
| 13:04:19 | 21 |
| 13:04:23 | 22 |
| 13:04:25 | 23 |
| 13:04:27 | 24 |
| 13:04:30 | 25 |

1   Potomac; right?
2          A      Yeah.   I -- it would be Potomac.
3          Q      Okay.   Now, this man in the coat -- let me
4   just ask you another question about this coat.   Did this
5   coat have a hood?
6          A      I don't recall, and I don't think so.
7          Q      Okay.   So this man in the red coat, did he
8   go south to Potomac or south to Division?
9          A      He didn't do anything, because he was
10  already in the SUV.   Now, it's the SUV, whoever was
11  driving the SUV, that --
12         Q      Okay.   Where did the SUV come to pick him
13  up?
14         A      Potomac, from the west.
15         Q      Okay.
16         A      Towards Menard, on the south side of the
17  street.
18         Q      Okay.   Now, do you recall talking to me on
19  May 4, 2013, and telling me that an SUV came to pick up
20  this man on Division?
21         A      If I said that, then that's -- that's the
22  street that I felt that it was there.   They did go down
23  to Division.
24         Q      Okay.   Well, I don't want to put words in
25  your mouth.   Which one was it?   Did the SUV come down --

KEITH THORNTON, JR. - June 10, 2013

118

| | |
|---|---|
| 13:04:32 | 1 |
| 13:04:32 | 2 |
| 13:04:35 | 3 |
| 13:04:39 | 4 |
| 13:04:43 | 5 |
| 13:04:46 | 6 |
| 13:04:48 | 7 |
| 13:04:53 | 8 |
| 13:05:00 | 9 |
| 13:05:02 | 10 |
| 13:05:03 | 11 |
| 13:05:07 | 12 |
| 13:05:08 | 13 |
| 13:05:09 | 14 |
| 13:05:11 | 15 |
| 13:05:14 | 16 |
| 13:05:16 | 17 |
| 13:05:16 | 18 |
| 13:05:18 | 19 |
| 13:05:20 | 20 |
| 13:05:23 | 21 |
| 13:05:28 | 22 |
| 13:05:30 | 23 |
| 13:05:33 | 24 |
| 13:05:35 | 25 |

1          A      Whatever street was to the south of my
2   location --
3          Q      -- Potomac or did it come down Division?
4          A      Whatever street was right there to the
5   immediate south of my location, that's the street that --
6   that we were on.   We didn't go down a whole block or two
7   blocks.
8          Q      Okay.   If I understand it correctly, you
9   were north of Potomac.   So the first street just south of
10  you would have been Potomac.
11         A      That's correct.
12         Q      Now, was the SUV on Division or Potomac?
13         MS. PINKSTON:  Objection.  Asked and
14  answered at this point.  I mean, he's very clearly stated
15  for the record that he doesn't recall what street it was,
16  that it was the street closest south.  I mean, this has
17  gone on long enough.
18         Q      BY MS. DYMKAR:  Do you recall telling me,
19  on May 4, 2013 --
20         A      I don't recall telling you anything, ma'am.
21  I -- I recall telling -- after hearing your threats, while
22  I'm driving and I'm pulled over -- I'm telling you exactly
23  what I'm telling you now.
24         Q      What was the threat that I made to you?
25         A      Excuse me?  What was the --

KEITH THORNTON, JR. - June 10, 2013

119

13:05:36   1      Q      Did you -- did you say I made a threat to
13:05:36   2   you?
13:05:39   3      A      Oh, yeah. You made plenty of them.
13:05:40   4      Q      Okay. What was the threat I made to you?
13:05:44   5      A      That you would have me put into jail, you
13:05:47   6   would have me -- all types of different things. I don't
13:05:49   7   -- I don't know your lingo. And you were very -- come on,
13:05:50   8   ma'am.
13:05:52   9      Q      I -- you say that I said to you, during
13:05:56  10   this more than an hour we were talking, I said I was going
13:05:57  11   to put you in jail?
13:05:58  12      A      Yes, you did, if you didn't come back here
13:06:04  13   to -- it was a deposition on that Monday, and I talked --
13:06:07  14      Q      I said I would put you in jail?
13:06:09  15      A      That you would have me -- yes, whatever
13:06:12  16   term that you used.
13:06:15  17      Q      Why did you keep talking to me, then, if I
13:06:16  18   was threatening you?
13:06:18  19      A      Because you downgraded after -- after I
13:06:20  20   started telling you my -- my story.
13:06:31  21      Q      I downgraded. What do you mean?
13:06:31  22      A      Yeah, your attitude. Your attitude. The
13:06:33  23   same one that you've been exemplifying as of now.
13:06:33  24      Q      And how would you describe that attitude,
13:06:37  25   sir?

KEITH THORNTON, JR. - June 10, 2013

120

13:06:50   1      A      Very nasty, ma'am.
13:06:50   2      Q      All right. You saw the man throw the
13:06:50   3   bottle, run south. And while he was running, he was on
13:06:51   4   his cell phone?
13:06:54   5      A      Correct.
13:06:59   6      Q      And did he wait at the intersection of
13:07:01   7   Potomac and Menard?
13:07:02   8      A      It wasn't at the intersection. It wasn't
13:07:06   9   at an intersection. It was across the street on the south
13:07:11  10   side of the street, and there's no intersection there.
13:07:14  11      They're -- it's -- it was some type of
13:07:18  12   property there, and he was right there in -- at the --
13:07:20  13   the curb on the street, standing there on the phone
13:07:24  14   looking to see where he was at.
13:07:26  15      Q      Okay. I'm -- I'm confused. There is an
13:07:29  16   intersection at Potomac and Menard; right?
13:07:33  17      A      He wasn't at the intersection, ma'am.
13:07:34  18      Q      Okay. Where -- after -- when he was
13:07:38  19   talking on the phone, did he go to a corner somewhere?
13:07:42  20      A      He went to the south side of -- if it's
13:07:45  21   Potomac, he went to the south side of Potomac while
13:07:49  22   standing in the street closest to the curb, and he was
13:07:52  23   west of that location. So he was not directly at the
13:07:54  24   corner.
13:07:55  25      Q      He was west of Menard?

KEITH THORNTON, JR. - June 10, 2013

121

```
13:07:59   1          A      That is correct, by like a half of a house
13:08:02   2   length, which is not at the curb.
13:08:07   3          Q      Is it -- did the SUV come from the east or
13:08:08   4   from the west?
13:08:10   5          A      It came from the west.
13:08:14   6          Q      It came from the west and picked him up at
13:08:17   7   the corner of Potomac and Menard?
13:08:19   8          A      It wasn't at the corner.  It was a house
13:08:20   9   length away from the corner.
13:08:21  10          Q      All right.
13:08:23  11          MS. DYMKAR:  Could we take a five- or
13:08:25  12   ten-minute break?
13:08:26  13          MS. PINKSTON:  Sure.
13:08:28  14          MS. DYMKAR:  All right.  Is that okay at
13:08:33  15   your end?
13:08:33  16          THE COURT REPORTER:  Yeah.
13:08:33  17          MS. DYMKAR:  Ms. Wong?
13:08:33  18          THE COURT REPORTER:  Yes.
13:08:35  19          THE VIDEOGRAPHER:  This marks the end of
13:08:39  20   Videotape No. 2 in the deposition of Mr. Keith Thornton.
13:08:42  21   We're going off the record, and the time is 1:08 p.m.
13:50:00  22          (Brief recess.)
13:50:27  23          THE VIDEOGRAPHER:  We are back on the
13:50:30  24   record at 1:50 p.m., and this marks the beginning of
13:50:37  25   Videotape No. 3 in the deposition of Mr. Keith Thornton.
```

KEITH THORNTON, JR. - June 10, 2013

122

```
13:50:39   1          Q      BY MS. DYMKAR:  Mr. Thornton, we just had a
13:50:43   2   -- a lunch break.  Did you speak to Ms. Pesha or
13:50:45   3   Ms. Pinkston during the lunch break?
13:50:49   4          A      No, ma'am.
13:50:52   5          Q      Back to when you saw this man with
13:50:58   6   dreadlocks throw the bottle, you said that he was in -- in
13:51:02   7   front of your vehicle; is that correct?
13:51:03   8          A      That's correct, ma'am.
13:51:05   9          Q      So his back was to you as he was throwing
13:51:06  10   the bottle?
13:51:09  11          MS. PINKSTON:  Objection.  Leading and
13:51:11  12   mischaracterizes prior testimony.
13:51:15  13          Q      BY MS. DYMKAR:  Was his back to you?
13:51:17  14          A      Yes, it was, ma'am.
13:51:19  15          Q      And then after he threw the bottle, he
13:51:25  16   turned around and -- you said he ran towards the corner of
13:51:27  17   Potomac and Menard?
13:51:31  18          A      That is correct.
13:51:35  19          Q      As he ran past your car, was he running
13:51:38  20   past the driver's side or the passenger's side?
13:51:40  21          A      I already told you that.  It was on the
13:51:44  22   driver's side, ma'am.  My vehicle was parked to the right
13:51:45  23   of the street.
13:51:48  24          Q      Did he stop at the -- the driver's door?
13:51:51  25          A      I did not say that.
```

123

| | |
|---|---|
| 13:51:53 | 1        Q     So the answer is "no"? |
| 13:51:54 | 2        A     The answer is "no." He took off running |
| 13:51:59 | 3 from the front of the vehicle and continued to run until |
| 13:52:06 | 4 he stopped at the intersection. |
| 13:52:08 | 5        Q     Did you finish the sentence? Because we |
| 13:52:09 | 6 didn't hear anything. |
| 13:52:10 | 7        A     I did finish the sentence. |
| 13:52:13 | 8        Q     All right. How did you end the sentence? |
| 13:52:16 | 9 Because you said he was running and then it went -- we |
| 13:52:19 | 10 didn't hear anything. |
| 13:52:21 | 11        A     He was in front as he threw the bottle |
| 13:52:26 | 12 standing in a position, and he turned around and proceeded |
| 13:52:30 | 13 southbound from that location passing my driver's door, |
| 13:52:34 | 14 while I was backing up at that time, now, and he went to |
| 13:52:38 | 15 the corner to -- at that time. |
| 13:52:42 | 16        Q     When he ran past your car, was he on the |
| 13:52:44 | 17 phone at that time? |
| 13:52:45 | 18        MS. PINKSTON: Objection. Asked and |
| 13:52:45 | 19 answered. |
| 13:52:47 | 20        THE WITNESS: I told you before several |
| 13:52:51 | 21 times, he was on the phone at that point. As soon as he |
| 13:52:55 | 22 turned around and started jogging back, he opened up his |
| 13:52:57 | 23 phone, and he was on the phone all the way through the |
| 13:53:04 | 24 entire time he was standing a half of a house away from |
| 13:53:06 | 25 the intersection there. |

124

| | |
|---|---|
| 13:53:08 | 1        Q     BY MS. DYMKAR: Okay. Was he holding the |
| 13:53:10 | 2 phone in his left hand or right hand? |
| 13:53:14 | 3        A     I don't recall. |
| 13:53:17 | 4        Q     How long did he wait at Potomac and Menard |
| 13:53:21 | 5 -- or near the intersection of Potomac and Menard before |
| 13:53:24 | 6 this SUV came by? |
| 13:53:27 | 7        A     At least 30 seconds to 40 seconds. It was |
| 13:53:28 | 8 very quick. |
| 13:53:36 | 9        Q     And when you backed up into Potomac, which |
| 13:53:41 | 10 way were you turned? Were you turned towards the east? |
| 13:53:43 | 11        A     When I was backing up, I was still facing |
| 13:53:45 | 12 northbound. |
| 13:53:49 | 13        Q     Right. And, then, when you got to Potomac, |
| 13:53:50 | 14 which direction did your car go? |
| 13:53:57 | 15        A     My vehicle -- the rear end of my vehicle |
| 13:53:58 | 16 would have been going to the left of me, which is west. |
| 13:54:00 | 17 So I was facing east. |
| 13:54:03 | 18        Q     Okay. So did you pull up in front of this |
| 13:54:05 | 19 man who was throwing the bottle? |
| 13:54:07 | 20        A     No, I had not. I stayed on the north part |
| 13:54:11 | 21 of the street while the SUV was picking him up at that |
| 13:54:12 | 22 time. |
| 13:54:15 | 23        Q     And he got into the back of the SUV? |
| 13:54:18 | 24        A     He did, on the right side behind the |
| 13:54:26 | 25 passenger. |

KEITH THORNTON, JR. - June 10, 2013

125

| | |
|---|---|
| 13:54:28 | 1 | Q   Did you make eye contact with him at the |
| 13:54:29 | 2 | corner of -- |
| 13:54:32 | 3 | A   No, I did not.  He did not see me.  He |
| 13:54:35 | 4 | didn't care.  He just wanted to get into the vehicle and |
| 13:54:37 | 5 | get away from the crime he had just committed. |
| 13:54:38 | 6 | Q   Did you have a discussion with him about |
| 13:54:41 | 7 | this -- |
| 13:54:44 | 8 | A   I never talked to him. |
| 13:54:44 | 9 | THE COURT REPORTER:  Wait.  Can you just |
| 13:54:44 | 10 | please wait for her to finish. |
| 13:54:48 | 11 | THE WITNESS:  Never spoke with him. |
| 13:54:49 | 12 | Q   BY MS. DYMKAR   okay.   Now, the three people |
| 13:54:54 | 13 | who were in this dark-colored SUV, were they -- had you |
| 13:54:58 | 14 | seen any of them at the 1300 block of North Menard? |
| 13:54:59 | 15 | MS. PINKSTON:  Objection.  Form, |
| 13:55:02 | 16 | mischaracterizes prior testimony, and leading as to the |
| 13:55:05 | 17 | color of the vehicle. |
| 13:55:08 | 18 | MS. DYMKAR:  I'm allowed to lead, so -- |
| 13:55:10 | 19 | MS. PINKSTON:  I'm also allowed to make my |
| 13:55:12 | 20 | form objections, and this is a leading question. |
| 13:55:13 | 21 | MS. DYMKAR:  And you're also giving a |
| 13:55:15 | 22 | speaking objection, and I would object to that. |
| 13:55:19 | 23 | Q   BY MS. DYMKAR:  Sir, did you -- did you see |
| 13:55:22 | 24 | any of the -- the three people who were in the vehicle? |
| 13:55:27 | 25 | A   Not until the point until we arrived at the |

KEITH THORNTON, JR. - June 10, 2013

126

| | |
|---|---|
| 13:55:28 | 1 | police station. |
| 13:55:29 | 2 | Q   Were they men? |
| 13:55:32 | 3 | A   I believe they were all men, yes. |
| 13:55:34 | 4 | Q   Had you seen them on the 1300 block of |
| 13:55:35 | 5 | North Menard? |
| 13:55:41 | 6 | A   No, I did not. |
| 13:55:45 | 7 | Q   What happened after this dark-colored SUV |
| 13:55:49 | 8 | picked up the man who had thrown the bottle? |
| 13:55:50 | 9 | MS. PINKSTON:  Objection.  Form, leading, |
| 13:55:55 | 10 | mischaracterizes prior testimony. |
| 13:55:57 | 11 | THE WITNESS:  They went down a side street, |
| 13:56:01 | 12 | stopped there for several seconds, as stated.  Whatever |
| 13:56:07 | 13 | street that is from that point, which is an east-west |
| 13:56:09 | 14 | street, they went west, which I believe is Central now, |
| 13:56:14 | 15 | and then proceeded southbound on Central at a -- driving |
| 13:56:19 | 16 | at the right speeds, stopping at the lights and stop |
| 13:56:26 | 17 | signs.  And I stayed on the line with the 911 call-taker |
| 13:56:28 | 18 | giving the description of everything I saw at that point, |
| 13:56:30 | 19 | including the license plate. |
| 13:56:30 | 20 | Q   BY MS. DYMKAR:  Okay.  I'm a little |
| 13:56:36 | 21 | confused about where -- was the -- the car was eastbound |
| 13:56:38 | 22 | on Potomac.  Did it continue on Potomac all the way to |
| 13:56:39 | 23 | Central, or -- |
| 13:56:39 | 24 | A   I -- |
| 13:56:42 | 25 | Q   You said something about a side street. |

127

| | |
|---|---|
| 13:56:44 | 1  I'm confused as to where the side street comes in. |
| 13:56:47 | 2        A      Ma'am, I stated to you, on Potomac, the |
| 13:56:50 | 3  very first street, which is east -- excuse me -- yeah, |
| 13:56:57 | 4  east of Menard, which you stated was Massasoit, they |
| 13:57:03 | 5  turned right onto there, which would be going southbound, |
| 13:57:09 | 6  and stopped. |
| 13:57:11 | 7        Q      Okay.  I asked you if it was Massasoit. |
| 13:57:13 | 8  Was it Massasoit?  I don't want to put words in your |
| 13:57:13 | 9  mouth. |
| 13:57:16 | 10       A      Whatever street that is, that's the street |
| 13:57:18 | 11 that it was, the side street, the very first street that |
| 13:57:19 | 12 is just east of Menard. |
| 13:57:22 | 13       Q      Did it go down the wrong way down Massasoit |
| 13:57:24 | 14 or the right way down Massasoit? |
| 13:57:26 | 15       A      I don't recall.  I want to say that it was |
| 13:57:28 | 16 the right way.  I don't even recall if IT was a two-way, |
| 13:57:31 | 17 but I want to say it was the right way. |
| 13:57:32 | 18       Q      Okay.  You don't know whether it was |
| 13:57:34 | 19 one-way or two-way? |
| 13:57:40 | 20       A      I do not recall. |
| 13:57:43 | 21       Q      Was Potomac one-way or two-way? |
| 13:57:44 | 22       A      I believe -- and I stated that before, I |
| 13:57:49 | 23 believe it was going northbound. |
| 13:57:52 | 24       Q      Potomac is an east-west street; correct? |
| 13:57:53 | 25       A      Or -- excuse me.  Yeah, that's east-west. |

128

| | |
|---|---|
| 13:57:55 | 1  Menard is what I'm speaking of. |
| 13:57:57 | 2        Q      Okay.  What about Potomac? |
| 13:58:02 | 3        A      I do not recall that one, ma'am. |
| 13:58:06 | 4        Q      But the car was going east on Potomac -- |
| 13:58:06 | 5        A      That's -- |
| 13:58:07 | 6        Q      -- went to Massasoit, turned right on |
| 13:58:08 | 7  Massasoit? |
| 13:58:08 | 8        A      That is correct. |
| 13:58:12 | 9        Q      Then turned left on Division -- left or |
| 13:58:14 | 10 east on Division? |
| 13:58:19 | 11       A      The very first street from Massasoit, the |
| 13:58:26 | 12 south street -- I don't know what street that is.  It |
| 13:58:27 | 13 didn't go all -- I don't know -- I don't see the streets |
| 13:58:27 | 14 on here. |
| 13:58:32 | 15       Q      Okay.  Could you -- could you look at the |
| 13:58:33 | 16 map? |
| 13:58:36 | 17       A      I'm looking at the map. |
| 13:58:37 | 18       Q      Okay. |
| 13:58:38 | 19       MS. PINKSTON:  I'm just going to object to |
| 13:58:41 | 20 referring to the map, because the street that we're |
| 13:58:44 | 21 referring to as Massasoit is not labeled on this map. |
| 13:58:45 | 22       MS. DYMKAR:  Well, we'll just call it the |
| 13:58:49 | 23 first street to the east, then, and everybody will be |
| 13:58:49 | 24 happy. |
| 13:58:53 | 25       Q      BY MS. DYMKAR  The first street to the |

129

```
13:58:58   1    east, they went down that street?  Am I correct that they
13:59:00   2    went down -- the SUV went to Division?
13:59:02   3           A      Correct.
13:59:07   4           Q      And then this dark SUV turned east on
13:59:07   5    Division?
13:59:08   6                  MS. PINKSTON:  Objection.  Mischaracterizes
13:59:09   7    prior testimony --
13:59:11   8                  THE WITNESS:  No.  No, ma'am.
13:59:13   9                  MS. PINKSTON:  -- as to color.
13:59:13  10                  THE WITNESS:  No, ma'am.
13:59:15  11           Q      BY MS. DYMKAR:  Okay.  Which way on -- on
13:59:17  12    Division did it go?
13:59:19  13           A      I don't know if it were Division or not,
13:59:23  14    but I know they went down to Central.
13:59:25  15           Q      From looking at this map, can you tell from
13:59:27  16    this map what street --
13:59:35  17           A      No, I cannot.
13:59:38  18           Q      Okay.  I'm real confused, then.  You're
13:59:43  19    saying possibly it was Thomas, looking at this map?
13:59:46  20           A      Yes, it could have.  I don't recall.
13:59:59  21           Q      Okay.  So the car -- the SUV went south on
13:59:59  22    the street east of Menard, and it turned east on Division
14:00:01  23    or Thomas?
14:00:02  24           A      That's correct.  And then turned onto
14:00:05  25    Central and went southbound.
```

130

```
14:00:09   1           Q      And you followed the car down Massasoit --
14:00:14   2    or excuse me -- down the street that's to the east of
14:00:15   3    Menard?
14:00:15   4           A      That's correct.
14:00:19   5           Q      So you went south on that street, and then
14:00:23   6    you continued to either Division or Thomas, and turned
14:00:27   7    east on either Division or Thomas?
14:00:30   8           A      That is correct.
14:00:35   9           Q      How far were you from the SUV when you were
14:00:38  10    going down the street to east of Menard?
14:00:48  11           A      No more than two car lengths, ma'am.
14:00:51  12           Q      Are there speed bumps on that street
14:00:53  13    that's --
14:00:54  14           A      I don't recall, and I don't think there
14:00:56  15    were.
14:00:59  16           Q      You have to wait until I ask my question.
14:00:59  17    Okay?
14:01:01  18           A      Well, I thought it was complete.
14:01:04  19           Q      Well, it wasn't.  Are there speed bumps on
14:01:11  20    the street to the east of Menard?  I'm done.
14:01:15  21           A      Thank you.  I don't know.
14:01:17  22           Q      Now, you said you were talking to the
14:01:24  23    dispatcher.  From the time you first called 911, you just
14:01:26  24    stayed on the phone with the dispatcher?
14:01:28  25           A      Negative.  I was speaking to a call-taker,
```

131

14:01:30 1 and I stayed on line with the call-taker.
14:01:32 2      Q     What's your understanding of the difference
14:01:33 3 between a call-taker and a dispatcher?
14:01:36 4      A     Call-taker takes the calls.  Dispatcher is
14:01:38 5 completely different.
14:01:42 6      Q     So the call-taker -- did you -- are you
14:01:47 7 familiar with how communication -- 911 communication is
14:01:50 8 done on the police communication?
14:01:52 9      A     Not in Chicago, ma'am.
14:01:53 10      Q     Pardon me?
14:02:01 11      A     Not in Chicago.
14:02:03 12      Q     Did you ever talk to a dispatcher?
14:02:05 13      A     No, I did not.  I spoke to the call-taker.
14:02:09 14 When you call 911, the person that picks up is the
14:02:15 15 call-taker, and I stayed on the line with her.
14:02:26 16      Q     You followed this SUV down Central.  Now,
14:02:34 17 is there a light at Central in Augusta?
14:02:36 18      A     I'm quite sure there is a light.
14:02:39 19      Q     Was the light green or red?
14:02:45 20      A     I don't recall.
14:02:47 21      Q     As you were riding behind this car, could
14:02:51 22 you see to the west four individuals in the car?
14:02:52 23      A     Yes, I could.
14:02:55 24      Q     So there were two in front and two in back?
14:03:01 25      A     That is correct.

132

14:03:04 1      Q     Now, when you got to Central and Chicago
14:03:07 2 Avenue, was there a light there?
14:03:11 3      A     There is a light there.
14:03:13 4      Q     Was it green or was it red?
14:03:14 5      A     Don't recall.
14:03:17 6      Q     Was there any point when there was a red
14:03:19 7 light that you were pulled up behind this car?
14:03:23 8      A     I don't recall.  I'm not going to say
14:03:26 9 something I don't know at this point in time.
14:03:29 10      Q     Do you recall anything about the license
14:03:31 11 number that you gave to the call-taker?
14:03:35 12      A     I do not recall.
14:03:37 13      Q     Was it an Illinois plate?
14:03:40 14      A     It was an Illinois plate.  Yes, it was.
14:03:51 15      Q     When the dark-color SUV got to the
14:03:52 16 (inaudible), did it stay on Central?
14:03:56 17      MS. PINKSTON:  Objection.  Misleading and
14:03:57 18 mischaracterizes prior testimony as to the color of the
14:03:58 19 SUV.
14:04:00 20      THE WITNESS:  It stayed on Central the
14:04:03 21 whole way down to Madison.  Madison was the first time
14:04:03 22 that it ever went to a different street, which was
14:04:06 23 Madison.
14:04:05 24      Q  BY MS. DYMKAR:  What was the farthest that
14:04:07 25 you were behind this vehicle?

133

```
14:04:10   1          A      Stated, two vehicle lengths, ma'am.
14:04:12   2          Q      Okay.  You were never more than two
          3   vehicles behind?
14:04:14   4          A      That's correct.  And there was no traffic
14:04:15   5   on the street.
14:04:18   6          Q      Was there ever any time when a vehicle got
14:04:21   7   between you and the car in front of you?
14:04:25   8          A      Negative.
14:04:29   9          Q      So the SUV then turned down Madison, west
14:04:29  10   on Madison?
14:04:32  11          A      That is correct.  It stopped and made a
14:04:39  12   right-hand turn that was legal and proceeded westbound in
14:04:43  13   the most northern lane of Madison, and it stopped right
14:04:48  14   across the street from the police station.
14:04:50  15          Q      And were you still on the phone with the
14:04:50  16   call-taker?
14:04:52  17          A      Yes, I was.
14:04:54  18          Q      Now, what information had you given to the
14:05:00  19   call-taker?  You said that you had given the call-taker a
14:05:02  20   description of the man who had thrown the bottle?
14:05:02  21          A      That's correct.
14:05:04  22          Q      And you said that it had hit a female
14:05:12  23   officer, I guess, knocking her -- not knocking her over,
14:05:15  24   but hitting her on the head; right?
14:05:16  25          MS. PINKSTON:  Objection.  Mischaracterizes
```

134

```
14:05:16   1   prior testimony.
14:05:20   2          Q      BY MS. DYMKAR:  Did you say that it hit --
14:05:21   3   a bottle hit the officer in the head?
14:05:24   4          A      Yes, I did.
14:05:26   5          Q      And did you give a description of the
14:05:28   6   vehicle that you were following?
14:05:30   7          A      Yes, I did.
14:05:32   8          Q      And you gave a license number?
14:05:33   9          A      Yes, I did.
14:05:35  10          Q      And did you say that there were four
14:05:35  11   individuals in the vehicle?
14:05:38  12          A      Yes, I did.
14:05:42  13          Q      Now, I know we talked before about the
14:05:48  14   description of the man who was -- who threw the bottle.
14:05:55  15   You know what description you gave to the call-taker?  Did
14:05:56  16   you give a height and weight?
14:05:57  17          MS. PINKSTON:  Objection.  Asked and
14:06:00  18   answered.
14:06:03  19          THE WITNESS:  Ma'am, I'm sure she asked me
14:06:04  20   at that point, "Could you describe him."  That's what I
14:06:13  21   described.  I can't recall at this time.
14:06:14  22          Q      BY MS. DYMKAR:  What did you see -- what
14:06:21  23   were your observations of this SUV when it was in front of
14:06:23  24   the 15th District Police Department?
14:06:23  25          A      It actually pulled up.  I crossed the
```

135

| 14:06:26 | 1 | street, north side of the street. There was a car. I |
| 14:06:29 | 2 | don't know what type of car, but it was parked. It had |
| 14:06:33 | 3 | its music playing, and there were several individuals |
| 14:06:35 | 4 | there. I don't even -- I don't know if it was two or |
| 14:06:38 | 5 | three of them. I don't know the individuals, but they |
| 14:06:43 | 6 | were African-American, and they were basically -- once |
| 14:06:46 | 7 | they pulled up, they apparently knew them as friends, I |
| 14:06:50 | 8 | would assume. And I -- they all got out. The SUV parked |
| 14:06:53 | 9 | right behind them -- backed up, parked behind them. They |
| 14:06:57 | 10 | got out and just started dancing around. |
| 14:06:58 | 11 | Q      Okay. Now, when you say "dancing," are you |
| 14:07:01 | 12 | really -- are you really referring to dancing? I mean, |
| 14:07:09 | 13 | are you just sort of describing the way they were walking, |
| 14:07:11 | 14 | or were they actually dancing? |
| 14:07:12 | 15 | A      I don't understand your question. |
| 14:07:14 | 16 | Q      They were dancing; right? They were |
| 14:07:15 | 17 | playing music and they were dancing -- they were actually |
| 14:07:16 | 18 | dancing; right? |
| 14:07:17 | 19 | A      Yes, ma'am. |
| 14:07:21 | 20 | Q      Okay. So in the first car, you said there |
| 14:07:24 | 21 | were two or three African-American men. They were already |
| 14:07:26 | 22 | outside the car when -- when the SUV pulled up? |
| 14:07:30 | 23 | A      No. They -- from what I recall, their |
| 14:07:33 | 24 | windows were down, their music was playing, and they |
| 14:07:36 | 25 | pulled up on a side of the vehicle. Those individuals, |

136

| 14:07:41 | 1 | who I do not -- can't -- can't describe them, they were |
| 14:07:44 | 2 | inside the vehicle, and all got out once the SUV pulled |
| 14:07:46 | 3 | up. |
| 14:07:49 | 4 | Q      Okay. You said that the SUV backed into a |
| 14:07:51 | 5 | place behind the car that was already there? |
| 14:07:54 | 6 | A      It pulled directly on the side of it, which |
| 14:07:58 | 7 | was the left side of the parked vehicle. They talked for |
| 14:08:03 | 8 | maybe a second. They backed up, and then they were in the |
| 14:08:07 | 9 | rear of the parked vehicle. And then they all got out, |
| 14:08:11 | 10 | walked up to the left side, which is in the -- in the |
| 14:08:15 | 11 | street of Madison, and they were dancing to the music |
| 14:08:18 | 12 | coming from the vehicle of the car that was originally |
| 14:08:20 | 13 | parked there. |
| 14:08:26 | 14 | Q      Were the two cars in parking spaces? |
| 14:08:27 | 15 | A      I don't -- what do you mean by "parking |
| 14:08:30 | 16 | spaces"? They were at the corner, and they were parked |
| 14:08:34 | 17 | where -- like where a bus would come. |
| 14:08:37 | 18 | Q      Were they parked in a bus lane? |
| 14:08:37 | 19 | A      I don't -- |
| 14:08:39 | 20 | Q      Were they near a bus stop? |
| 14:08:41 | 21 | A      It was towards the corner right there. |
| 14:08:44 | 22 | Q      Okay. Were they in parking places? |
| 14:08:47 | 23 | MS. PINKSTON: Objection. Foundation. |
| 14:08:47 | 24 | THE WITNESS: I just answered that |
| 14:08:48 | 25 | question, ma'am. |

137

| | | |
|---|---|---|
| 14:08:50 | 1 | Q      BY MS. DYMKAR:  Were they in the parking |
| 14:08:53 | 2 | lane, or were they in a traffic lane? |
| 14:08:56 | 3 | A      They were not in a traffic lane. |
| 14:09:01 | 4 | Q      Okay.  In -- on Madison, there is -- there |
| 14:09:03 | 5 | is a median in the middle of the road; right? |
| 14:09:04 | 6 | A      That's correct. |
| 14:09:06 | 7 | Q      And north of the median, there are two |
| 14:09:08 | 8 | traffic lanes and a parking lane; right? |
| 14:09:09 | 9 | A      That is correct. |
| 14:09:11 | 10 | Q      And south of the median, there are two |
| 14:09:13 | 11 | traffic lanes and a parking lane; right? |
| 14:09:16 | 12 | A      Yes, that is correct. |
| 14:09:19 | 13 | Q      Now, were there any other cars parked in |
| 14:09:24 | 14 | that parking lane near where these two cars were parked? |
| 14:09:26 | 15 | A      No, not at all. |
| 14:09:30 | 16 | Q      No?  It was totally unparked? |
| 14:09:32 | 17 | A      Yes, it was.  No other vehicles were |
| 14:09:34 | 18 | there. |
| 14:09:36 | 19 | MS. PINKSTON:  I'm just going to object to |
| 14:09:40 | 20 | mischaracterizing prior testimony as to the parking lane. |
| 14:09:41 | 21 | Q      BY MS. DYMKAR:  The other car that was |
| 14:09:46 | 22 | there, do you recall whether -- what color that car was? |
| 14:09:49 | 23 | A      Don't recall it.  At that time, I saw that |
| 14:09:51 | 24 | they were parking, and then that's when I got off the |
| 14:09:54 | 25 | phone, and I just went over the median into the station |

138

| | | |
|---|---|---|
| 14:10:00 | 1 | and said, "Here's your guys, right here." |
| 14:10:04 | 2 | Q      Now, the two or three people -- two or |
| 14:10:07 | 3 | three African-American men who were in the car that was |
| 14:10:13 | 4 | already in front of the 15th District, did you recognize |
| 14:10:17 | 5 | any of them as having been on the 1300 block of North |
| 14:10:17 | 6 | Menard? |
| 14:10:20 | 7 | A      No, I did not. |
| 14:10:22 | 8 | Q      Now, you -- you did park your car before |
| 14:10:24 | 9 | you went into the 15th District; right? |
| 14:10:25 | 10 | A      Yes, I did. |
| 14:10:26 | 11 | Q      Where did you park your car? |
| 14:10:30 | 12 | A      I believe there was a funeral home also on |
| 14:10:32 | 13 | the north side of the street.  I parked it right down |
| 14:10:34 | 14 | there. |
| 14:10:36 | 15 | Q      Okay.  Is that approximately a half a block |
| 14:10:40 | 16 | away from the two cars that were across from the police |
| 14:10:41 | 17 | station? |
| 14:10:43 | 18 | A      It's towards the middle of the block, right |
| 14:10:50 | 19 | across from the doors of the station, yes, ma'am. |
| 14:10:58 | 20 | Q      Did you see four individuals get out of the |
| 14:10:59 | 21 | SUV? |
| 14:11:02 | 22 | A      Yes, I did. |
| 14:11:04 | 23 | Q      Okay.  And they began dancing in the street |
| 14:11:05 | 24 | too? |
| 14:11:07 | 25 | A      They began dancing right at the car with |

KEITH THORNTON, JR. - June 10, 2013

139

| | | |
|---|---|---|
| 14:11:10 | 1 | the rest of the several individuals that were in the car |
| 14:11:13 | 2 | as well. |
| 14:11:19 | 3 | Q    So they were dancing in the traffic lanes? |
| 14:11:21 | 4 | A    That is correct, as oddly as it seems. |
| 14:11:25 | 5 | Q    Did they have any bottles in their hands? |
| 14:11:30 | 6 | A    No, they did not. |
| 14:11:33 | 7 | Q    Do you recall telling me on May 4, 2013 |
| 14:11:36 | 8 | that these men had bottles in their hands? |
| 14:11:43 | 9 | A    No, I did not. |
| 14:11:45 | 10 | Q    When you're parked half a block away, you |
| 14:11:47 | 11 | then said you went into the police station? |
| 14:11:49 | 12 | A    That is correct. |
| 14:11:50 | 13 | Q    Did you talk to any officers before you |
| 14:11:51 | 14 | went into the station? |
| 14:11:54 | 15 | A    Yes, I did.  Whoever was at the counter. |
| 14:11:56 | 16 | Q    Okay.  Before you got into the station, did |
| 14:11:57 | 17 | you talk to any officers? |
| 14:12:00 | 18 | A    No.  There was no officers outside of the |
| 14:12:03 | 19 | police station. |
| 14:12:06 | 20 | Q    Once you entered the police station, who |
| 14:12:07 | 21 | did you speak to? |
| 14:12:09 | 22 | A    I don't know who I spoke to, but it was a |
| 14:12:14 | 23 | person that was at the desk, and I informed them what was |
| 14:12:16 | 24 | going on.  They said, "Give me a second," and all I know |
| 14:12:21 | 25 | is they -- who I recall is a lieutenant came out, who was |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

140

| | | |
|---|---|---|
| 14:12:25 | 1 | a female.  I believe she was Caucasian. |
| 14:12:28 | 2 | And those were really the only two that I |
| 14:12:30 | 3 | had spoken to at that point. |
| 14:12:32 | 4 | Q    Okay.  The person at the desk, was that |
| 14:12:34 | 5 | person wearing a white shirt? |
| 14:12:36 | 6 | A    No. |
| 14:12:38 | 7 | Q    So a blue shirt? |
| 14:12:38 | 8 | A    That is correct. |
| 14:12:39 | 9 | Q    Do you know the name of the person you |
| 14:12:41 | 10 | spoke to when you first entered the police station? |
| 14:12:45 | 11 | A    I do not. |
| 14:12:47 | 12 | Q    That person said, "Just a minute," and then |
| 14:12:50 | 13 | a -- you said a lieutenant came out.  Are you sure that it |
| 14:12:54 | 14 | was a lieutenant, not a sergeant? |
| 14:12:56 | 15 | A    I don't recall.  I definitely believe it |
| 14:12:57 | 16 | was a lieutenant. |
| 14:12:58 | 17 | Q    Do you recall her name? |
| 14:13:00 | 18 | A    No, I do not. |
| 14:13:02 | 19 | Q    Did she have a name tag on? |
| 14:13:03 | 20 | A    I'm quite sure she did. |
| 14:13:07 | 21 | Q    Do you recognize the name Sara McDermott? |
| 14:13:11 | 22 | A    No, I do not. |
| 14:13:13 | 23 | Q    What, if anything, did she say to you and |
| 14:13:15 | 24 | what did you say to her? |
| 14:13:19 | 25 | A    I told her exactly what I told you, "There |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

141

14:13:26   1    are a lot of police officers on Menard.  I don't know what
14:13:31   2    was going on, but the individual that threw a" -- "threw a
14:13:34   3    bottle and struck an officer.  And I've been on the phone
14:13:39   4    with 911 from that point, and they just drove and they're
14:13:42   5    right outside, across the street parked, and they're
14:13:43   6    dancing."
14:13:46   7            And she said, "Give me a second."  She
14:13:51   8    verified something on the radio.  And, then, at that time,
14:13:57   9    they had me sit down into a room, and that was it.
14:13:59  10        Q      Okay.  I'm a little confused, because you
14:14:03  11    said to her that you saw an individual who threw a bottle
14:14:05  12    and struck a police officer; right?
14:14:05  13        A      Correct.
14:14:07  14        Q      And then you said, "They are across the
14:14:11  15    street."  You were really talking about one individual who
14:14:14  16    you had seen do something that you believed to be wrong?
14:14:14  17        A      That's correct.
14:14:16  18            MS. PINKSTON:  Objection.  Leading and
14:14:20  19    mischaracterizes prior testimony.
14:14:22  20            THE WITNESS:  The individual --
14:14:22  21        Q      BY MS. DYMKAR:  When you're talking to
14:14:25  22    Lieutenant McDermott, were you still on the phone with --
14:14:26  23    with the 911 call-taker?
14:14:28  24        A      No.  I hung up and said, "I'm in a police
14:14:29  25    station now."

KEITH THORNTON, JR. - June 10, 2013

142

14:14:31   1        Q      This conversation with the lieutenant, did
14:14:35   2    it take place in -- in the lobby, or did you come -- go to
14:14:36   3    any inner room or inner office?
14:14:41   4        A      It was in the lobby.  In the lobby.
14:14:43   5        Q      Was anyone else present when you were
14:14:46   6    speaking to the lady lieutenant?
14:14:48   7        A      Honestly, I don't recall.
14:14:49   8        Q      Was she taking any notes while she was
14:14:52   9    talking to you?
14:14:57  10        A      I don't recall that.
14:15:02  11        Q      From where you were talking to the lady
14:15:06  12    lieutenant, were there -- were there windows through which
14:15:07  13    you could see the outside?
14:15:09  14        A      Yes, there were.
14:15:12  15        Q      And you saw these two cars across the
14:15:13  16    street still there?
14:15:14  17        A      Yes, ma'am.
14:15:18  18        Q      And the four individuals from the dark SUV
14:15:21  19    and the two to three individuals from the other vehicle
14:15:24  20    were still outside dancing?
14:15:25  21            MS. PINKSTON:  Objection.  Leading as to
14:15:29  22    color of SUV and mischaracterizes prior testimony.
14:15:31  23            THE WITNESS:  I know that the two cars were
14:15:36  24    still there and individuals were standing at that time
14:15:36  25    near the -- near the first vehicle.

143

```
14:15:39   1         Q       BY MS. DYMKAR:  "First vehicle" meaning the
14:15:43   2    vehicle who had -- was there before the SUV got there?
14:15:44   3         A       That's correct.
14:15:46   4         Q       Okay.  So they weren't dancing anymore.
14:15:48   5    They were standing at this point?
14:15:49   6         A       Yes.  And at that point, I wasn't paying
14:15:52   7    attention to them.  I was giving exactly what happened,
14:15:56   8    and they had me sit in a room.
14:15:59   9         Q       Okay.  Did this lady lieutenant ever take
14:16:00  10    you into her office?
14:16:01  11         A       No, ma'am.
14:16:03  12         Q       Did you ever go into a watch commander's
14:16:05  13    office?
14:16:09  14         A       No.  No, ma'am.
14:16:12  15         Q       You said something about she got on the
14:16:18  16    radio to verify something.  What did you hear her say into
14:16:19  17    the radio?
14:16:21  18         A       Don't recall.  All I know is she got on the
14:16:23  19    radio.
14:16:25  20         Q       Did she acknowledge that she knew what you
14:16:29  21    were talking about when you mentioned a disturbance on
14:16:29  22    North Menard?
14:16:37  23         A       Yes, she did.
14:16:37  24         Q       So -- okay.  When she got on the radio, did
14:16:38  25    you hear any of her conversation with whoever she was
```

KEITH THORNTON, JR. - June 10, 2013

145

```
14:17:53   1    show-up."  And I sat in there.  And she said, "Just stay
14:17:56   2    here while we investigate a few things, and we'll come and
14:17:59   3    get you."
14:18:01   4         Q         How long was this conversation that you had
14:18:03   5    with the lady lieutenant in the lobby?
14:18:14   6         A        I would say about a minute and a half.
14:18:19   7         Q        Did you tell her that the female officer
14:18:21   8    had actually been hit in the head?
14:18:24   9         A        I did tell her, yes, I did.
14:18:26   10        Q        All right.  Do you know whether she knew
14:18:28   11   the name of this female officer?
14:18:34   12        A        No, I don't think she did.
14:18:36   13        Q        You said, at that point, after you finished
14:18:40   14   talking to her, you were put in a room -- you were put in
14:18:40   15   a room?
14:18:44   16        A        I was, with computers.  I don't know what
14:18:47   17   kind of room it was, but it was with other computers, and
14:18:51   18   two other officers were taking reports.
14:18:53   19        Q        Did you go outside with the lady
14:18:55   20   lieutenant?
14:18:55   21        A        No, I didn't.  They had me stay there the
14:18:59   22   entire time, ma'am.
14:19:01   23        Q        Okay.  You didn't go out with, like, the
14:19:04   24   lady lieutenant or any -- any officer; right?
14:19:08   25        A        For this part, I did not.  I did wind up
```

KEITH THORNTON, JR. - June 10, 2013

146

```
14:19:12   1    going to a -- after some time went on, I did go out to do
14:19:18   2    a field show-up, yes, I did.
14:19:21   3         Q         I'm trying to get the sequence of what
14:19:24   4    happened.  They put you in a room.  What did you do in
14:19:25   5    that room?
14:19:26   6         A        I sat there.
14:19:29   7         Q        Had anybody -- strike that.  Had the
14:19:32   8    lieutenant asked you your name?
14:19:35   9         A        Yes.  They took my ID.
14:19:37   10        Q        The lieutenant took your ID?
14:19:38   11        A        That's correct.
14:19:39   12        Q        That was your driver's license?
14:19:45   13        A        That is correct.
14:19:46   14        Q        And you were in a room with computers.  You
14:19:49   15   said there were a couple of officers doing some -- some
14:19:51   16   paperwork of some sort?
14:19:51   17        A        Correct.
14:19:54   18        Q        Were they doing any paperwork having to do
14:19:55   19   with the reason you were there?
14:19:57   20        A        I would -- I would highly doubt that,
14:19:58   21   ma'am.
14:20:00   22        Q        Okay.  They were -- they were engaged in --
14:20:01   23   in some other paperwork.
14:20:02   24                 Did they talk to you?
14:20:04   25        A        No, ma'am.
```

KEITH THORNTON, JR. - June 10, 2013

147

| | | |
|---|---|---|
| 14:20:05 | 1 | Q How long were you in -- sitting in this |
| 14:20:07 | 2 | room? |
| 14:20:09 | 3 | A I don't recall, but I would say probably a |
| 14:20:17 | 4 | good 20, 25 minutes, ma'am. |
| 14:20:20 | 5 | Q During that 20 to 25 minutes, did any |
| 14:20:21 | 6 | officers speak to you at all? |
| 14:20:23 | 7 | A That is correct. |
| 14:20:24 | 8 | Q They did not? |
| 14:20:25 | 9 | A They did. |
| 14:20:26 | 10 | Q They did? |
| 14:20:27 | 11 | A Yes. |
| 14:20:30 | 12 | Q Okay. So during the 20 to 25 minutes, who |
| 14:20:31 | 13 | spoke to you? |
| 14:20:33 | 14 | A A female officer came to me with her |
| 14:20:37 | 15 | partner, who was a male, and she said that, "Would you |
| 14:20:41 | 16 | like to come with us? We're going to put you in the back |
| 14:20:44 | 17 | seat of our squad car, go around the block. The |
| 14:20:46 | 18 | individuals that are standing at the vehicle, we just want |
| 14:20:51 | 19 | you to identify who threw the bottle." |
| 14:20:54 | 20 | I said, "Okay. Not a problem." |
| 14:20:55 | 21 | Q Okay. What was the name of the female |
| 14:20:56 | 22 | officer? |
| 14:20:56 | 23 | A I don't recall. |
| 14:20:59 | 24 | Q What did she look like? |
| 14:21:00 | 25 | A I don't recall. I want to say she was |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

148

| | | |
|---|---|---|
| 14:21:03 | 1 | Caucasian. Don't recall. |
| 14:21:04 | 2 | Q How old was she? |
| 14:21:07 | 3 | A Don't recall. |
| 14:21:09 | 4 | Q What color was her hair? |
| 14:21:15 | 5 | A Don't recall. |
| 14:21:17 | 6 | Q How tall was she? |
| 14:21:18 | 7 | A Don't recall, ma'am. |
| 14:21:19 | 8 | Q Was she in a uniform? |
| 14:21:20 | 9 | A Yes, she was. |
| 14:21:22 | 10 | Q Did she have a name tag? |
| 14:21:31 | 11 | A I'm quite sure she did. |
| 14:21:33 | 12 | Q Do you know -- did this off- -- these two |
| 14:21:36 | 13 | officers, female and male officer, say anything about |
| 14:21:38 | 14 | having been on the 1300 block of North Menard? |
| 14:21:41 | 15 | A No. They just simply said, "Don't worry. |
| 14:21:44 | 16 | We're going to put you in the back of the squad car, and |
| 14:21:47 | 17 | we're going to drive past, and if you see anybody that |
| 14:21:50 | 18 | matches the description that you gave us, let us know." |
| 14:21:53 | 19 | And that's exactly what they did. |
| 14:21:57 | 20 | Q Okay. The male officer -- was the male |
| 14:21:59 | 21 | officer Caucasian? African-American? |
| 14:22:02 | 22 | A He wasn't African-American. I don't know |
| 14:22:07 | 23 | what he was. |
| 14:22:07 | 24 | Q How old was he? |
| 14:22:09 | 25 | A I have no idea. |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

149

| | | |
|---|---|---|
| 14:22:09 | 1 | Q   What was his name? |
| 14:22:09 | 2 | A   I do not know. |
| 14:22:10 | 3 | Q   What color was his hair? |
| 14:22:11 | 4 | A   I do not know. |
| 14:22:13 | 5 | Q   What was his height and weight? |
| 14:22:23 | 6 | A   Don't know. |
| 14:22:25 | 7 | Q   In that 20 to 25 minutes you were in the |
| 14:22:29 | | room, did the lieutenant come in to talk to you at all? |
| 14:22:32 | 9 | A   No, ma'am.  No officers talked to me in the |
| 14:22:35 | 10 | 25 minutes that I was within the room, except the two |
| 14:22:38 | 11 | officers that came to get me, which was the male and |
| 14:22:40 | 12 | female, to go and do the show-up. |
| 14:22:43 | 13 | Q   Did you call the fire station to tell them |
| 14:22:43 | | you were coming? |
| 14:22:46 | 15 | A   No, I was not. |
| 14:22:48 | 16 | Q   Did -- did you ever tell lieutenant -- the |
| 14:22:51 | 17 | lieutenant that you were a firefighter? |
| 14:22:53 | 18 | A   She asked me where was I going, because she |
| 14:22:56 | 19 | was -- I was concerned about my safety at that point with |
| 14:22:59 | 20 | doing a show-up, and I told her I wanted to go to -- I was |
| 14:23:06 | 21 | going to the firehouse and -- I did tell her that. |
| 14:23:09 | 22 | And at that point, I was very scared, so |
| 14:23:13 | 23 | she said to wait.  This was after everything had taken |
| 14:23:16 | 24 | place, and she had me wait in the room.  And she said, |
| 14:23:19 | 25 | "Let them" -- I guess they cleared the scene there, and |

150

| | | |
|---|---|---|
| 14:23:24 | 1 | then that's when I left the scene. |
| 14:23:27 | 2 | Q   Cleared -- cleared what scene? |
| 14:23:34 | 3 | A   Cleared the scene so I could leave. |
| 14:23:34 | 4 | Q   Outside? |
| 14:23:34 | 5 | A   Excuse me? |
| 14:23:37 | 6 | Q   I'm sorry.  Cleared what scene?  The scene |
| 14:23:38 | 7 | outside? |
| 14:23:40 | 8 | A   There was a scene outside, yes, ma'am, with |
| 14:23:46 | 9 | the several individuals who were standing outside. |
| 14:23:48 | 10 | Q   Okay.  Did you go with the female/male |
| 14:23:50 | 11 | officers to their car? |
| 14:23:53 | 12 | A   Yes, I did.  They took me to their vehicle. |
| 14:23:55 | 13 | It was parked right outside in the front. |
| 14:23:59 | 14 | Q   And it was facing east? |
| 14:24:01 | 15 | MS. PINKSTON:  Objection.  Leading. |
| 14:24:05 | 16 | THE WITNESS:  It was facing east. |
| 14:24:07 | 17 | Q   BY MS. DYMKAR:  You got in the back seat? |
| 14:24:08 | 18 | A   Yes, I did. |
| 14:24:11 | 19 | Q   And which way did the -- the car drive? |
| 14:24:19 | 20 | A   It drove east and turned at the end of the |
| 14:24:19 | 21 | block. |
| 14:24:24 | 22 | This just went out. |
| 14:24:25 | 23 | THE COURT REPORTER:  Can we go off the |
| 14:24:26 | 24 | record for a second? |
| 14:24:26 | 25 | MS. DYMKAR:  Yeah.  Sure. |

151

| | |
|---|---|
| 14:24:27 | 1 |

THE VIDEOGRAPHER:  We're going off the
record at 2:24 p.m.

(Brief recess.)

THE VIDEOGRAPHER:  We're back on the record
at 2:26 p.m.

Q    BY MS. DYMKAR:  Okay.  You said that you
were -- you drove in a -- was it a marked car --

A    Yes, it was.

Q    -- marked squad car?

A    Yes, it was.

Q    Did you happen to see the beat number on
the -- on the top of the car?

A    No, ma'am.

Q    You said that the -- was it the male
officer or the female officer driving?

A    The female officer was driving.  The male
officer was in the passenger's seat.

Q    Where did they make a U-turn?

A    I don't know what street that is, but it's
the one that's directly east of that location.

Q    Just east of Menard?

A    I have no -- I -- I have no idea what the
streets are.  You walk straight outside of the station,
the first street east of that location is where we made
the U-turn.

Line timestamps:
- 14:24:27  1
- 14:24:28  2
- 14:25:57  3
- 14:25:58  4
- 14:26:02  5
- 14:26:05  6
- 14:26:08  7
- 14:26:08  8
- 14:26:10  9
- 14:26:10  10
- 14:26:17  11
- 14:26:18  12
- 14:26:20  13
- 14:26:26  14
- 14:26:31  15
- 14:26:34  16
- 14:26:36  17
- 14:26:39  18
- 14:26:40  19
- 14:26:42  20
- 14:26:43  21
- 14:26:44  22
- 14:26:50  23
- 14:26:53  24
- 14:26:55  25

152

Q    So when they made a U-turn, did they then
come on Madison going west?

A    That is correct.

Q    Where -- where did the squad car go then?

A    It pulled up to the left side of the
individuals at the corner.

Q    Of the -- when you say "the individuals,"
how many individuals are you talking about?

A    I don't know the exact amount of
individuals, but it was the people from the SUV as well as
the individuals from the car.

Q    So there was six or seven individuals?

A    I would say so.

Q    Were there any other people in the
vicinity, private citizens?

A    No, there were not.

Q    Did you ever see any women?

A    I can't recall.  I want to say there was a
female within it.  I don't know.

Q    A female as one of the seven?

A    I want to say it -- it was, but I cannot
recall at this time.

Q    The individuals that you saw, is it safe to
say there were six or seven of them?

A    Yes, ma'am.

Line timestamps:
- 14:26:58  1
- 14:27:00  2
- 14:27:05  3
- 14:27:07  4
- 14:27:12  5
- 14:27:19  6
- 14:27:23  7
- 14:27:25  8
- 14:27:26  9
- 14:27:29  10
- 14:27:33  11
- 14:27:34  12
- 14:27:36  13
- 14:27:41  14
- 14:27:43  15
- 14:27:44  16
- 14:27:47  17
- 14:27:49  18
- 14:27:53  19
- 14:27:56  20
- 14:27:58  21
- 14:28:05  22
- 14:28:12  23
- 14:28:14  24
- 14:28:16  25

KEITH THORNTON, JR. - June 10, 2013

153

14:28:17 1    Q       Okay.  What were they doing?

14:28:21 2    A       They were standing on a -- at the hood --
14:28:26 3    actually, from the hood on the side of their vehicle, and
14:28:29 4    I believe they were in handcuffs.

14:28:31 5    Q       Did they have their hands on the vehicle?

14:28:33 6    A       No.  They were in handcuffs.

14:28:34 7    Q       So they were handcuffed behind?

14:28:36 8    A       Yes, that is correct.

14:28:39 9    Q       Were they handcuffed to each other?

14:28:43 10   A       I don't recall all of that, ma'am.

14:28:45 11   Q       So their -- as you're going down the
14:28:48 12   street, their backs were to you?

14:28:50 13   A       Excuse me.  Were their backs towards me?

14:28:51 14   Q       Yeah.

14:28:53 15   A       No, ma'am.  They were facing me.

14:28:54 16   Q       You said something about they -- they were
14:28:55 17   at the hood?

14:28:59 18   A       They were towards the front of the car
14:29:06 19   facing me, and they had handcuffs on.

14:29:09 20   Q       Up until this point, had you said anything
14:29:15 21   to any officer identifying any of these individuals as
14:29:18 22   having been on the 1300 block of North Menard?

14:29:19 23   A       Yes, ma'am.

14:29:20 24   Q       What did you say?

14:29:22 25   A       "I don't know who any of the other ones

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

154

14:29:25 1    are, but that one right there in the red with the
14:29:31 2    dreadlocks, dark-skinned, that's the individual."

14:29:35 3    Q       Okay.  When did you first say that,
14:29:42 4    pointing to an individual?  Was that when you were in the
14:29:44 5    car with the man and woman officer, or was it before that?

14:29:46 6    A       That is correct, when I was in the vehicle.

14:29:48 7    Q       Okay.  Up until that time when you were
14:29:52 8    talking to the lady lieutenant, had you pointed out any
14:29:52 9    individual outside?

14:29:55 10   A       Yes.  I told her it was a male over there,
14:29:57 11   described him.  I'm quite -- I knew exactly what he was
14:30:00 12   wearing, more so than just his coat, and I described
14:30:01 13   everything.

14:30:03 14           At this point, I don't recall any of that,
14:30:08 15   but I did explain that.

14:30:10 16   Q       Okay.  So we're -- we're talking about your
14:30:12 17   conversation with the lady lieutenant?

14:30:12 18   A       Yes.

14:30:17 19   Q       What did you say to her regarding -- strike
14:30:17 20   that.

14:30:19          When you were talking to the lady
14:30:21 22   lieutenant, did you point anybody out to her?

14:30:22 23   A       No, I did not.  I said, "On the corner
14:30:26 24   right there, there's a group."  It's clearly big windows
14:30:29 25   at the police station.  They're the only individuals that

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

155

| 14:30:34 | 1 | were out there, and I said, "The guy right there, with the |
| 14:30:36 | 2 | dreadlocks and everything that he was wearing, is the |
| 14:30:42 | 3 | individual who just threw a bottle that struck an officer |
| 14:30:44 | 4 | over on Menard." |
| 14:30:46 | 5 | That's when she got on the radio, verified, |
| 14:30:49 | 6 | did what she did. And then she walked away and said, |
| 14:30:53 | 7 | "Okay. Thank you," and told me to take a seat inside of a |
| 14:30:56 | 8 | room, and they'll get with us in a -- get with me in a |
| 14:30:57 | 9 | second. |
| 14:30:59 | 10 | Q    Okay.  Let's go back to what you just said. |
| 14:31:04 | 11 | You said that she verified what they did.  You know that |
| 14:31:06 | 12 | she got on the radio; right? |
| 14:31:06 | 13 | A    That's correct. |
| 14:31:08 | 14 | Q    Did you hear anything she said to anybody |
| 14:31:11 | 15 | on the radio? |
| 14:31:13 | 16 | A    No.  I -- all I know is she was talking to |
| 14:31:17 | 17 | 25.  I know that kept coming up. |
| 14:31:19 | 18 | Q    Okay.  The 25th District; right? |
| 14:31:20 | 19 | A    That is correct. |
| 14:31:21 | 20 | Q    Okay.  But you couldn't hear what she was |
| 14:31:25 | 21 | saying to the person on the other end of the radio or what |
| 14:31:27 | 22 | they were saying her; right? |
| 14:31:32 | 23 | A    No.  It's been too long, ma'am. |
| 14:31:34 | 24 | Q    No.  My question is, at that time, could |
| 14:31:35 | 25 | you hear what she was saying? |

KEITH THORNTON, JR. - June 10, 2013

156

| 14:31:37 | 1 | A    Yeah.  I could hear what she was saying, |
| 14:31:40 | 2 | but I don't recall it.  So I'm not going to put words in |
| 14:31:45 | 3 | her mouth. |
| 14:31:50 | 4 | Q    Okay.  When you pulled up with the man and |
| 14:31:57 | 5 | woman officer next to the two cars in the parking lane, |
| 14:32:03 | 6 | were you in the -- you were in one of the traffic lanes; |
| 14:32:05 | 7 | right? |
| 14:32:06 | 8 | MS. PINKSTON:  Objection to form.  That was |
| 14:32:11 | 9 | leading, mischaracterizes testimony on many accounts. |
| 14:32:12 | 10 | Q    BY MS. DYMKAR  Were you in a traffic lane? |
| 14:32:13 | 11 | A    Yes, we were. |
| 14:32:17 | 12 | Q    Were you in the traffic lane closest to the |
| 14:32:19 | 13 | median or the traffic lane closest to the -- |
| 14:32:25 | 14 | A    I don't recall.  Don't recall. |
| 14:32:28 | 15 | Q    The people who were lined up -- you said |
| 14:32:31 | 16 | there were six or seven of them, and one of them could |
| 14:32:32 | 17 | have been a woman; right? |
| 14:32:33 | 18 | A    Yes. |
| 14:32:36 | 19 | Q    And they were all in handcuffs facing you? |
| 14:32:38 | 20 | A    That is correct. |
| 14:32:40 | 21 | Q    Were any of them on their knees? |
| 14:32:45 | 22 | A    No. |
| 14:32:47 | 23 | Q    What, if anything, did you say to either of |
| 14:32:47 | 24 | the two officers in the car? |
| 14:32:50 | 25 | A    I just told you that three minutes ago, |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

157

| | | |
|---|---|---|
| 14:32:53 | 1 | ma'am, "That's the guy right there" -- |
| 14:32:54 | 2 | Q    Tell me exactly what you said. |
| 14:32:57 | 3 | A    "That's the guy right there in the red with |
| 14:33:00 | 4 | the dreadlocks, dark-skinned.  That's him right there." |
| 14:33:03 | 5 | At that point, they pulled up.  They talked |
| 14:33:05 | 6 | to one of the officers there and said -- they told them |
| 14:33:08 | 7 | exactly what I said, and we left. |
| 14:33:13 | 8 | Q    How long were you near the two parked cars |
| 14:33:15 | 9 | with the male and female officer? |
| 14:33:20 | 10 | A    At least 30 seconds. |
| 14:33:22 | 11 | Q    Did you ever say anything to the man and |
| 14:33:27 | 12 | woman officer about any of the other people -- the people |
| 14:33:31 | 13 | other than the man in dreadlocks? |
| 14:33:33 | 14 | A    Yes.  "I don't know who they are.  They had |
| 14:33:35 | 15 | nothing to do with what I was reporting.  It's only the |
| 14:33:45 | 16 | one individual." |
| 14:33:47 | 17 | Q    When you left with the man and the woman |
| 14:33:49 | 18 | officer, where did you go? |
| 14:33:52 | 19 | A    They did another U-turn at the next street, |
| 14:33:56 | 20 | which was west of that location, and we parked right back |
| 14:33:59 | 21 | in front of the police station. |
| 14:34:04 | 22 | Q    Were you ever on foot? |
| 14:34:05 | 23 | A    Yes. |
| 14:34:07 | 24 | Q    After you -- strike that. |
| 14:34:09 | 25 | After you entered the police station, were |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

158

| | | |
|---|---|---|
| 14:34:15 | 1 | you ever on foot walking across the street to see the -- |
| 14:34:17 | 2 | to view the people who were being detained? |
| 14:34:20 | 3 | A    No.  I never went to -- are you asking me |
| 14:34:23 | 4 | -- I don't understand that question now.  Are you asking |
| 14:34:30 | 5 | me did I walk over there and actually get their image by |
| 14:34:31 | 6 | foot? |
| 14:34:31 | 7 | Q    Yes. |
| 14:34:37 | 8 | A    No, ma'am. |
| 14:34:47 | 9 | Q    How far were you from the six or seven |
| 14:34:54 | 10 | individuals, all male except for one, when you said, "It's |
| 14:34:56 | 11 | the" -- "it's the man in the red"? |
| 14:34:56 | 12 | A    We were -- |
| 14:34:58 | 13 | MS. PINKSTON:  I'm going to object.  It's |
| 14:35:06 | 14 | growing increasingly as far as mischaracterizing the |
| 14:35:06 | 15 | testimony.  You asked him if there was a female at the |
| 14:35:08 | 16 | scene.  He said yes, and now it's grown into one of the |
| 14:35:12 | 17 | people against the car was a female.  It mischaracterizes |
| 14:35:14 | 18 | entirely what he said. |
| 14:35:14 | 19 | MS. DYMKAR:  All right. |
| 14:35:15 | 20 | MR. BLASCHKE:  And it's leading. |
| 14:35:15 | 21 | Q    BY MS. DYMKAR:  Why don't -- why don't I |
| 14:35:17 | 22 | ask you.  One of the people in the handcuffs you believe |
| 14:35:18 | 23 | was a female? |
| 14:35:18 | 24 | MS. PINKSTON:  Objection.  Leading, |
| 14:35:21 | 25 | mischaracterizes prior testimony. |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

159

14:35:22  1        Q      BY MS. DYMKAR:  Sir?

14:35:24  2        A      What question do you have?  You just asked

14:35:25  3    three of them.

14:35:25  4        Q      Pardon me?

14:35:27  5        A      What question are you asking me now?

14:35:30  6        Q      Was one of the six or seven people in

14:35:32  7    handcuffs that you viewed a female?

14:35:34  8        A      I said there's a possibility.  I was not

14:35:37  9    paying attention to any of the other suspects, because the

14:35:41 10    one that I knew who was dressed the way that he was with

14:35:44 11    the dreadlocks was easily identifiable, and that's the guy

14:35:48 12    who I told the officers were.  So do I know who the other

14:35:51 13    ones were?  Absolutely not.

14:35:56 14        Q      How far from them were you when you viewed

14:35:56 15    them?

14:35:59 16        A      If I pulled my squad right up to -- right

14:36:03 17    next to them, not even -- not even a foot.  That's how far

14:36:05 18    we were, right next to them.

14:36:06 19        Q      I didn't understand your answer.  You were

14:36:08 20    a foot away from them?

14:36:17 21        A      Not even a foot.  We were very close.

14:36:19 22        Q      Do you ever recall talking to an officer

14:36:21 23    named Mark Kushner?

14:36:23 24        A      I probably did talk to an officer.  I don't

14:36:25 25    know their names.

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

---

KEITH THORNTON, JR. - June 10, 2013

160

14:36:27  1        Q      Okay.  Do you recall speaking to a white

14:36:29  2    officer with glasses?

14:36:32  3        A      I don't recall, ma'am.

14:36:35  4        Q      You don't recall if you did?

14:36:37  5        A      I spoke to an officer after that who took

14:36:40  6    my driver's license.

14:36:44  7        Q      Okay.  I'm talking about outside the police

14:36:48  8    department, outside the police station.  Did you speak to

14:36:50  9    a white officer with glasses?

14:36:56 10        A      No, I don't recall that.

14:37:02 11        Q      Do you recall speaking to an officer named

14:37:05 12    Esquivel?

14:37:10 13        A      No, ma'am.

14:37:12 14        Q      Do you recall speaking to any Hispanic

14:37:14 15    officers --

14:37:14 16        A      I --

14:37:15 17        Q      -- that morning?

14:37:18 18        A      -- do not recall, ma'am.

14:37:22 19        Q      Okay.  When you say you don't recall, I

14:37:23 20    just want to be clear.  You're saying you don't recall if

14:37:25 21    you did, or you don't -- you don't recall that you did?

14:37:27 22        A      I spoke to officers inside a police station

14:37:30 23    once I was done with the show-up, and I do not recall who

14:37:32 24    I was talking to.

14:37:36 25        Q      Once you got out of the car that had the

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

161

```
14:37:39    1    male and female officer, did you see them again in the
14:37:39    2    station?
14:37:44    3         A        No, I did not.
14:37:48    4         Q        Do you know whether -- from anything you
14:37:51    5    heard once you got in the station, whether the man or
14:37:54    6    woman officer said anything to anybody in the station --
14:37:54    7         A        I have --
14:37:56    8         Q        -- about what was said to them?
14:37:59    9         A        I have no idea.  I went back into the room.
14:38:02   10    No one was in there at that time, and I sat there for a
14:38:05   11    few hours.
14:38:10   12         Q        When you pulled up in front of the six or
14:38:16   13    seven individuals in handcuffs, and you pointed out a
14:38:20   14    person who was wearing -- in dreadlocks wearing red, did
14:38:22   15    the man or woman officer talk to any of the officers
14:38:26   16    outside of the vehicle?
14:38:28   17         A        I'm quite sure -- they went outside.  I was
14:38:31   18    inside, so I do not know who they spoke to, if they spoke
14:38:33   19    to anyone.
14:38:34   20         Q        Okay.  So this was -- I'm talking about
14:38:37   21    when you were in the car.  When you were in the car, and
14:38:40   22    you said something to the man and the woman about
14:38:44   23    identifying someone.  Did they, at that time, say anything
14:38:46   24    to the officers who were outside the vehicle?
14:38:49   25         A        I believe the male passenger just gave a
```

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

KEITH THORNTON, JR. - June 10, 2013

162

```
14:38:54    1    thumbs-up.  They did a U-turn.  They took me into the
14:38:57    2    station, sat me down in a room, and then they proceeded to
14:39:01    3    go outside.  Don't know what took place after that.
14:39:02    4         Q        Okay.  You said that the male officer gave
14:39:06    5    a thumbs-up.  Did you mean actually made a gesture with
14:39:07    6    the thumb?
14:39:08    7         A        That is correct, ma'am.
14:39:26    8         Q        Okay.  But that officer -- strike that.
14:39:31    9    When you went into the station -- strike
14:39:31   10    that again.
14:39:40   11              Did you ever notice the lady lieutenant
14:39:42   12    take notes to what you were saying?
14:39:43   13         A        I have no idea.
14:39:45   14         Q        Do you recall speaking to me on May 4,
14:39:48   15    2013, saying that she took a statement from you?
14:39:50   16         A        Yes.  And I've already stated that to you.
14:39:53   17    I told her what happened, and that's when I first got to
14:39:53   18    the station.
14:40:00   19         Q        Okay.  And you don't know if she was
14:40:02   20    writing down what you were saying at that time?
14:40:03   21         A        I don't know, ma'am.
14:40:05   22         Q        Okay.  You went back to the station, said
14:40:11   23    you were put in a room for a number of hours?
14:40:14   24         A        It was a few hours.  Yes, it was.
14:40:15   25         Q        Okay.  Did anybody speak to you during that
```

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

163

14:40:16 1    time?

14:40:18 2           A      No, ma'am.  I went out to the desk and

14:40:23 3    said, "How long is -- am I going to be here."  And the

14:40:25 4    individual who was at the desk, who was a blue shirt --

14:40:28 5    don't recall who it was -- they said, "Give me a second."

14:40:32 6    They went to the back.  They told me to take a seat.  I

14:40:37 7    sat back down of the room, and two officers came

14:40:49 8    out.  And at that time, they asked -- that's when they

14:40:49 9    took my license and got all of my information and said,

14:40:50 10   "If we need you, we will contact you."

14:40:52 11          Q      Okay.  Is that the first time that you

14:40:55 12   showed your license to the police officers, any police

14:40:56 13   officer?

14:40:58 14          A      I want to say it was the second time.  When

14:41:04 15   I first got there, they took it, and the second time --

14:41:07 16   excuse me.  The first time when I got there, they -- I

14:41:10 17   showed it to them, because they wanted to ask who I was,

14:41:14 18   and gave it right back.  And the second time was when they

14:41:17 19   actually took it, and they were taking notes at that time.

14:41:25 20          And then asked -- are you talking?

14:41:26 21          Q      No, I'm not.

14:41:27 22          A      Okay.

14:41:29 23          Q      I'm not.  I'm waiting for you to finish.

14:41:31 24          A      They asked for my phone number, and that

14:41:34 25   they would contact me if they needed me, and whatever.

164

14:41:38 1    And at that time, it was very -- time had really went

14:41:42 2    past.  It was very early now.

14:41:44 3           Q      Going back to when you were left off in

14:41:46 4    front of the -- the 15th District by the male and female

14:41:51 5    officer, they told you to go in the station?

14:41:53 6           A      They walked me to the station.  Yes, they

14:41:53 7    did.

14:41:54 8           Q      Okay.  And, then, as far as you knew, they

14:41:55 9    went back out again?

14:42:02 10          A      Yes, they did.

14:42:04 11          Q      Was it your understanding that they spoke

14:42:09 12   to the police who were detaining the six or seven

14:42:10 13   individuals?

14:42:10 14          A      I have no idea, ma'am.

14:42:11 15          MS. PINKSTON:  Objection.  Foundation,

14:42:11 16   leading.

14:42:14 17          THE WITNESS:  I have no idea.  I was not

14:42:16 18   out there, and I did not see that, and I've stated that.

14:42:19 19   I sat down in the room, and I saw nothing else of what was

14:42:21 20   taking place outside.

14:42:24 21          Q      BY MS. DYMKAR:  Did you ever say that any

14:42:28 22   of the individuals, other than the man in dreadlocks in

14:42:31 23   the red jacket, had been involved at all in any criminal

14:42:31 24   activity?

14:42:34 25          A      No, I did not.  It was only the one

KEITH THORNTON, JR. - June 10, 2013

165

14:42:37 1   individual.

14:42:41 2       Q    And did you ever say that you saw any of

14:42:44 3   the six -- any of the individuals other than the one with

14:42:47 4   dreadlocks at the 1300 block of North Menard?

14:42:51 5       A    No, I did not.

14:42:53 6       Q    When you were sitting in the station for a

14:42:56 7   number of hours, did anybody come and take a written

14:42:59 8   statement from you as to what happened?

14:43:01 9       A    For the third time, ma'am, the only time I

14:43:06 10   saw someone writing a written -- whatever they were

14:43:10 11   writing was when -- the second time when I gave two

14:43:12 12   officers my driver's license and we were at the desk.

14:43:15 13   Prior to me leaving, they took all of my information and

14:43:18 14   my phone number. They were also writing other different

14:43:20 15   things on there. I don't know what they were writing.

14:43:22 16       Q    Okay. But did they ask you what happened?

14:43:24 17       A    No, ma'am.

14:43:26 18       Q    Okay. All -- all they asked you, after you

14:43:28 19   had been waiting there for a couple of hours, was to

14:43:32 20   identify who you were and how you could be contacted?

14:43:35 21       A    That's correct.

14:43:38 22       Q    Was one of those officers one named

14:43:40 23   Esquivel?

14:43:44 24       A    I told you I do not recall any names.

14:43:49 25       Q    Do you recall the name Valentine?

KEITH THORNTON, JR. - June 10, 2013

166

14:43:51 1       A    I don't recall any names.

14:43:54 2       Q    Was it your understanding that the officers

14:43:57 3   who came in to talk to you were the ones who were writing

14:43:59 4   up the reports for this incident?

14:43:59 5       A    I have no idea.

14:44:00 6       MS. PINKSTON:  Objection.  Foundation,

14:44:00 7   leading.

14:44:07 8       THE WITNESS:  No idea, ma'am.

14:44:20 9      Q    BY MS. DYMKAR:  When you were inside the

14:44:23 10   station, did you see the man with dreadlocks and red

14:44:27 11   jacket that you had pointed outside the station?

14:44:29 12       A    No. The room that they took me to, you

14:44:32 13   cannot see outside.

14:44:36 14       Q    Did you ever speak to any of the officers

14:44:43 15   who -- speak to any officers who said they had been on the

14:44:48 16   1300 block of North Menard?

14:44:50 17       A    No, ma'am.

14:44:51 18       Q    Do you know whether you had any contact

14:44:54 19   with an officer named Cronovich?

14:44:56 20       A    No, ma'am.

14:44:58 21       Q    Do you know if you had any contact with an

14:44:59 22   officer named Milan?

14:45:01 23       A    No, ma'am. I -- I rarely had any type of

14:45:06 24   conversations with any officers. It was just the

14:45:09 25   lieutenant, the guy who was working the desk when I

167

```
14:45:11   1   initially went to the station.  And he gave me to the
14:45:13   2   lieutenant, and the individ -- the two officers who drove
14:45:23   3   me to the incident for the show-up, and then the last two
14:45:25   4   officers who came out to get my information.  Those are
14:45:28   5   the only two officers that I ever talked to.
14:45:30   6         Q        Okay.  Just so -- I -- I don't mean to --
14:45:33   7   to repeat it, but just to sum it up, there isn't any
14:45:36   8   officer in the 15th District where you gave the entire
14:45:39   9   story of what you knew and what you saw?
14:45:41  10         A        I only spoke to the lieutenant, and she may
14:45:44  11   have had a few officers on the side of her while I was
14:45:47  12   telling her what happened when I first got there.
14:45:47  13         MS. PINKSTON:  And I'm going to object
14:45:54  14   because that mischaracterizes his prior testimony.
14:45:57  15         Q        BY MS. DYMKAR:  When you were getting ready
14:46:00  16   to leave the station, were you told when you would be
14:46:06  17   going to court?
14:46:08  18         A        No, I was not.
14:46:10  19         Q        This gentleman who has been identified
14:46:14  20   sitting my left, George Smith, do you recall seeing him
14:46:16  21   the morning of April 10, 2010?
14:46:17  22         A        I don't recall.
14:46:19  23         Q        He doesn't -- you don't recognize him as
14:46:22  24   anybody you saw that morning?
14:46:25  25         A        It wasn't the guy that threw the bottle, so
```

168

```
14:46:26   1   I don't recall who he was.
14:46:28   2         Q        And you're -- you're not claiming he was at
14:46:30   3   the scene of the 1300 block of North Menard, are you?
14:46:33   4         A        I don't know if he was at the scene of --
14:46:36   5   of Menard, but I did not see him at the scene of Menard.
14:46:37   6         MS. PINKSTON:  To the point that it
14:46:45   7   mischaracterizes his testimony, objection.
14:46:46   8         Q        BY MS. DYMKAR:  Were you told, when you
14:46:49   9   left the police station, that you would have to go to
14:46:49  10   court at some point?
14:46:53  11         A        Yes, I was.
14:46:55  12         Q        Were you told how you would be notified?
14:46:58  13         A        They just told me they -- they didn't tell
14:47:01  14   me that.  They just said, "We'll -- we'll take your phone
14:47:03  15   number."  They got my information off my driver's license,
14:47:08  16   and that was pretty much it.  So I assumed they would call
14:47:09  17   me.
14:47:10  18         Q        Did you go to court?
14:47:11  19         A        Yes, I did.
14:47:12  20         Q        How many times?
14:47:15  21         A        One time.
14:47:18  22         Q        Was that on September 10, 2010?
14:47:20  23         A        Can you repeat -- I don't know the date.
14:47:22  24   But can you repeat that date?
14:47:25  25         Q        September 10, 2010.
```

KEITH THORNTON, JR. - June 10, 2013

169

```
14:47:27   1         A        I don't know the time, ma'am, but whenever
14:47:32   2    the criminal -- supposed criminal proceeding or whatever
14:47:36   3    it is, that's when I went, and it was specifically for
14:47:41   4    David Wilbon.
14:47:43   5         Q        This incident occurred in April.  Was the
14:47:46   6    time you went to court -- is it consistent with your
14:47:51   7    recollection that it was about five months later?
14:47:52   8         A        I cannot recall.
14:47:53   9         Q        Well, was it more like --
14:47:56  10         A        Can't recall.
14:47:58  11         Q        How did you know to come to court?
14:48:00  12         A        Because I got -- it was an actual supboena
14:48:12  13    through the mail.
14:48:15  14         Q        Where did you go to court?
14:48:19  15         A        5555 West Grand Avenue, Chicago, Illinois
14:48:21  16    60639.
14:48:22  17         Q        Was it your understanding that you were
14:48:28  18    going to -- you were going to participate in a trial that
14:48:29  19    day?
14:48:32  20         A        I don't know too much about a lot of this,
14:48:35  21    but, yes, I knew I was going to testify as a witness.
14:48:39  22    That's what I thought I was going to be doing.
14:48:42  23         Q        And when you came to court, you saw the man
14:48:46  24    you had identified outside the 15th District; is that
14:48:48  25    correct?
```

KEITH THORNTON, JR. - June 10, 2013

170

```
14:48:48   1         A        That is correct.
14:48:51   2         Q        When did you first hear the name David
14:48:52   3    Wilbon?
14:48:53   4         A        When I first got in there.
14:48:55   5         Q        When you first got in where?
14:48:57   6         A        To the courtroom.  Whatever time it told me
14:49:01   7    to be there.  We weren't -- we were very quick for them to
14:49:02   8    call our case up.
14:49:05   9         Q        I'm asking you -- maybe the answer is the
14:49:09  10    same, but I'm asking you about the name David Wilbon.
14:49:11  11    When's the first time you heard that name?
14:49:12  12         A        I don't -- I don't know, ma'am.  I don't
14:49:13  13    recall.
14:49:15  14         Q        Was it before you got to court or was it
14:49:16  15    when you got to court?
14:49:20  16         A        It was on the subpoena.
14:49:24  17         Q        Had you heard that name before you saw it
14:49:24  18    on the subpoena?
14:49:33  19         A        No, ma'am.
14:49:38  20         Q        When you went to court, did you speak to
14:49:40  21    the State's attorney?
14:49:42  22         A        If that's who he was, yes, I did.  It was
14:49:46  23    the gentleman.  I believe he was Caucasian.
14:49:48  24         Q        Did he ask you what had happened?
14:49:50  25         A        He didn't ask me what happened, but we got
```

171

```
14:49:57  1   called up there, I stood up.  He had come to me.  And
14:50:01  2   after that, I don't know what, but they had all of us sit
14:50:02  3   back down.
14:50:06  4              And at that point, I didn't feel
14:50:07  5   comfortable with being there because of all the
14:50:11  6   individuals staring at me.  So I said, "Do I have to be
14:50:16  7   here," and he said, "No problem.  You don't have to, but
14:50:18  8   at least you came."
14:50:21  9         Q    Were you asked if you recognized anybody?
14:50:26 10         A    I wasn't asked any of those questions,
14:50:30 11   ma'am, except the -- Wilbon.  He was standing up at the
14:50:32 12   podium.
14:50:34 13         Q    So you -- were you asked if you recognized
14:50:35 14   David Wilbon?
14:50:37 15         A    That is correct, just him.
14:50:38 16         Q    Okay.  Who asked you that?
14:50:42 17         A    Whoever the gentleman was.
14:50:47 18         Q    And you said you recognized him as the
14:50:49 19   person that threw the bottle?
14:50:51 20         A    That is correct.  I did identify him.
14:50:52 21         Q    And he said, "You don't have to stay"?
14:50:56 22         A    I told him I feared for my safety, and he
14:50:58 23   said -- and they -- I don't know if it was the judge, but
14:51:02 24   they had us sit back down because of whatever took place,
14:51:07 25   and I just did not want to sit there.  And I asked him,
```

172

```
14:51:09  1   "Is there -- am I done here."  And he said, "Yes, you
14:51:13  2   are."
14:51:14  3         Q    You said that there were many people there.
14:51:20  4   Are you talking about David Wilbon's family members --
14:51:21  5         A    I don't --
14:51:21  6         Q    -- or are you talking about other criminal
14:51:22  7   defendants?
14:51:24  8              MS. PINKSTON:  Objection.  Foundation.
14:51:25  9              THE WITNESS:  I have no idea who they were,
14:51:29 10   but they were definitely with him and his party.
14:51:30 11         Q    BY MS. DYMKAR:  Were they -- were there men
14:51:32 12   or women or both?
14:51:34 13         A    Both.
14:51:36 14         Q    Did you talk to any of them?
14:51:38 15         A    No, I did not.
14:51:41 16         Q    Did they talk to you?
14:51:49 17         A    They were taunting and staring at me.
14:51:50 18         Q    Taunting, does that mean they said
14:51:51 19   something to you?
14:51:52 20         A    They were talking to each other, staring
14:51:57 21   across the courtroom about myself, while I was on the left
14:52:02 22   side of the courtroom.  And at that point, I got up,
14:52:05 23   grabbed the guy who had -- the Caucasian male.  We walked
14:52:13 24   out, and I told him, "I do not feel safe here."
14:52:15 25         Q    And this is outside the courtroom?
```

KEITH THORNTON, JR. - June 10, 2013

173

| | |
|---|---|
| 14:52:18 | 1 | A    This was in the back of the courtroom, in |
| 14:52:18 | 2 | the courtroom. |
| 14:52:22 | 3 | Q    So he said -- after you said that, he said |
| 14:52:25 | 4 | you could leave? |
| 14:52:27 | 5 | A    I said -- I asked him, "Am I -- am I done |
| 14:52:32 | 6 | here?  I came here.  I did what I had to do.  Am I done |
| 14:52:33 | 7 | here?" |
| 14:52:34 | 8 | He said, "Yes.  Everything is fine.  You |
| 14:52:41 | 9 | can go." |
| 14:52:43 | 10 | Q    Did the judge or the -- any court personnel |
| 14:52:45 | 11 | ever call out your name? |
| 14:52:48 | 12 | A    I don't recall that at all.  I know they |
| 14:52:52 | 13 | called the case up there.  I don't recall. |
| 14:52:52 | 14 | Q    Did -- |
| 14:52:52 | 15 | A    And I actually -- |
| 14:52:56 | 16 | Q    -- David Wilbon ever make contact with you |
| 14:52:57 | 17 | in court -- |
| 14:52:57 | 18 | A    No. |
| 14:52:57 | 19 | Q    -- eye contact? |
| 14:53:00 | 20 | A    He made eye contact with me, yes, he did. |
| 14:53:02 | 21 | And now that I do recall back to it, my name was called |
| 14:53:06 | 22 | and I did -- that's when I did go up to the -- I did walk |
| 14:53:06 | 23 | up there. |
| 14:53:09 | 24 | The officers were on the right side sitting |
| 14:53:13 | 25 | on -- on the benches.  I stood up there.  He made eye |

174

| | |
|---|---|
| 14:53:18 | 1 | contact with me.  We never said anything to one another. |
| 14:53:19 | 2 | Q    Okay.  What happened when you were called |
| 14:53:23 | 3 | over to the podium? |
| 14:53:25 | 4 | A    I believe the gentleman that I had asked if |
| 14:53:28 | 5 | I was done here, he went up to the podium, and they said |
| 14:53:32 | 6 | something.  And that's when he -- the judge -- I don't |
| 14:53:34 | 7 | know what the terms are called, so I can't recall that. |
| 14:53:36 | 8 | But they had us sit down. |
| 14:53:38 | 9 | And then that's when I sat down, saw the |
| 14:53:41 | 10 | party that was with Wilbon.  And then that's when I got |
| 14:53:44 | 11 | up, and I said, "Okay," and then I told the gentleman -- |
| 14:53:48 | 12 | asked him if I was done here. |
| 14:53:49 | 13 | Q    When you were in front of the judge, did |
| 14:53:52 | 14 | you hear the judge dismiss the charge? |
| 14:53:53 | 15 | A    I didn't hear any of that.  Don't recall |
| 14:53:58 | 16 | it.  Wasn't paying attention to all of that. |
| 14:53:59 | 17 | Q    Do you have -- do you recall anything that |
| 14:53:59 | 18 | the judge said? |
| 14:54:02 | 19 | A    No, ma'am. |
| 14:54:05 | 20 | Q    What time did you appear in court? |
| 14:54:09 | 21 | A    I don't recall the time.  It was in the |
| 14:54:11 | 22 | morning time. |
| 14:54:12 | 23 | Q    How long were in you court before you |
| 14:54:19 | 24 | left? |
| 14:54:21 | 25 | A    How long was I in court before I left?  I |

175

14:54:23  1   don't recall that, but I was there early.  I would say 30
14:54:28  2   minutes prior to the time, I was there.
14:54:31  3        Q     When did the Caucasian man ask you if you
14:54:33  4   recognized David Wilbon?
14:54:43  5        A     That was when I pulled him to the back.
14:54:46  6        Q     When you said that you're not comfortable
14:54:48  7   and you wanted to leave, he asked you if you recognized
14:54:49  8   him?
14:54:50  9        A     That is correct.  The gentleman that was --
14:54:50  10  he was the only --
14:54:50  11       Q     (Inaudible.)
14:54:51  12       A     Are you done?
14:54:51  13       Q     Yes.
14:54:53  14       A     He was the only one that stood up at the
14:54:58  15  podium, that was David Wilbon.  I clearly identified him
14:55:04  16  again.  He had dreadlocks.  That was the guy.  And I said,
14:55:07  17  "That's him," and I said, "It's definitely him."  No one
14:55:10  18  else was standing up there with him.
14:55:15  19             And he said, "Okay."
14:55:16  20       Q     I'm trying to understand when this
14:55:18  21  conversation with the Caucasian man took place.  So you
14:55:21  22  got called to the podium, and then you sat back down
14:55:25  23  again.  And then you grabbed the Caucasian man, said, "I'm
14:55:26  24  not comfortable."
14:55:31  25             Is it then that he asked you whether you

---

176

14:55:33  1   recognized David Wilbon?
14:55:33  2        A     That's correct.
14:55:34  3              MS. PINKSTON:  Objection.  Mischaracterizes
14:55:35  4   prior testimony.
14:55:36  5        Q     BY MS. DYMKAR:  I'm sorry.  We couldn't
14:55:41  6   hear you.
14:55:42  7        A     Yes, ma'am.
14:55:45  8        Q     Did I get the order right?  You went up to
14:55:48  9   the -- let me go through that again, just to make sure we
14:55:49  10  got the order right.
14:55:51  11             You went up to the podium, and then you sat
14:55:53  12  back down again.  And then you got the attention of the
14:55:58  13  Caucasian man, told him you're not comfortable being
14:56:02  14  there.  He asked you if you recognized David Wilbon.  You
14:56:06  15  said "yes."  And he said, "You don't have to stay"?
14:56:08  16       A     You're completely mixing up everything I'm
14:56:09  17  telling you.
14:56:12  18       Q     Then give me the sequence.  If I got it
14:56:14  19  wrong, then -- then start -- start from the beginning.
14:56:17  20  You're sitting in court, the case gets called.
14:56:17  21             What happens?
14:56:21  22       A     I step up to the podium.  Mr. Wilbon steps
14:56:30  23  up to the podium.  The male Caucasian walks up to the
14:56:33  24  judge, other person is talking with Mr. Wilbon.  I don't
14:56:36  25  know who he was with.  And at that time, he walks back

KEITH THORNTON, JR. - June 10, 2013

177

14:56:38  1    over to me, says, "Okay.  Take a seat.  We're going to be
14:56:42  2    up in a little while."
14:56:44  3              At that time, all of us, Mr. Wilbon,
14:56:52  4    whoever was representing him, I sat on the other side.  We
14:56:57  5    all took a seat.  At that time, when I took a seat where
14:56:58  6    Mr. Wilbon was, all the individuals, who -- I don't
14:57:01  7    know if it was his family.  I don't know if it was his
14:57:03  8    friends.  But it was definitely his party -- were staring
14:57:08  9    at me.  I did not feel safe.
14:57:15 10              The Caucasian guy walked back towards me,
14:57:18 11    took me to the back, and said, "Do you identify the
14:57:18 12    individual who was at the podium."
14:57:20 13              I said, "Yes, I do."  And I said, "Sir, I
14:57:24 14    have a question.  Do -- am I done here?  Because I do not
14:57:27 15    feel safe."
14:57:29 16              He said, "You're done.  Thank you.  We
14:57:32 17    appreciate it for coming up here."
14:57:33 18              That was it.
14:57:34 19         Q     Okay.
14:57:36 20         A     I left, and that was it.
14:57:40 21         Q     Now, did you ever talk to the attorney for
14:57:41 22    David Wilbon?
14:57:43 23         A     No, ma'am.
14:57:45 24         Q     Did you ever hear the name Chris Shepherd
14:57:45 25    at --

178

14:57:51  1         A     Don't recall.
14:57:56  2              MS. DYMKAR:  Sorry.  I would like to take a
14:58:00  3    five-minute -- five- to ten-minute break, look through my
14:58:03  4    notes, and speak to my client.  I might be done.
14:58:07  5              MS. PINKSTON:  Okay.
14:58:09  6              THE VIDEOGRAPHER:  Counsel, do you want to
14:58:10  7    go off the record here?
14:58:11  8              MS. DYMKAR:  Yes, please.
14:58:13  9              THE VIDEOGRAPHER:  We're going off the
14:58:14 10    record at 2:58 p.m.
15:12:24 11              (Brief recess.)
15:12:25 12              MS. PINKSTON:  Counsel for the City is
15:12:31 13    going to need a transcript.
15:14:41 14              THE VIDEOGRAPHER:  We're back on the record
15:14:47 15    at 3:14 p.m.
15:14:49 16         Q     BY MS. DYMKAR:  Just a couple of more
15:14:49 17    questions, sir.
15:14:53 18              Did you ever speak to Lieutenant -- the
15:14:59 19    lady lieutenant again after your first conversation with
15:15:06 20    her at any point in this case?
15:15:07 21         A     I don't recall.  That -- maybe the same
15:15:15 22    day, the same night.  I don't -- never afterwards.
15:15:21 23         Q     Okay.  When you had this conversation --
15:15:28 24    the conversation with the lady lieutenant in the lobby,
15:15:32 25    and you said to her that there was an individual outside

KEITH THORNTON, JR. - June 10, 2013

179

15:15:33  1   that you had seen throw the bottle, did she ask you
15:15:35  2   anything at all about the other individuals who were out
15:15:35  3   there?
15:15:37  4        A    Yes, she did.  She said, "Who -- who are
15:15:39  5   they."  I said, "I don't know who they are," but I
15:15:42  6   explained that he was in the SUV with a few of them.  They
15:15:45  7   picked him up from this location, and those guys were
15:15:49  8   already in that vehicle.  And they're just all out there
15:15:52  9   now, and they were just dancing around.  But I said, "The
15:15:57 10   one that is -- that threw the bottle is the one in the
15:15:57 11   red."
15:16:00 12        Q    Did you ever say anything to the lady
15:16:02 13   lieutenant about any of the other individuals in the SUV,
15:16:09 14   with the man with dreadlocks, as having done anything
15:16:09 15   wrong?
15:16:15 16        A    No, I did not.
15:16:17 17        Q    And did -- did you ever say to her you had
15:16:22 18   seen the other individuals in the SUV on the 1300 block of
15:16:22 19   Menard?
15:16:22 20        A    No, I did.
15:16:24 21             MS. PINKSTON:  Objection.  Mischaracterizes
15:16:27 22   prior testimony of where he picked them up.
15:16:28 23             MS. DYMKAR:  Okay.  I have no other
15:16:28 24   questions.
15:16:36 25             MS. PINKSTON:  Okay.

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

---

180

15:16:36  1             CROSS-EXAMINATION
15:16:36  2   BY MS. PINKSTON:
15:16:38  3        Q    Hello, Mr. Thornton.  I just have a few
15:16:39  4   questions for you.
15:16:40  5        A    Hi, Ms. Pinkston.
15:16:43  6        Q    I just wanted to talk about the SUV for a
15:16:45  7   moment.  Do you know for sure, as you sit here today, what
15:16:47  8   color the SUV was?
15:16:52  9        A    For sure, I don't know at this time.  I
15:16:55 10   knew when I called 911.  I gave them the exact
15:16:59 11   information, ma'am, but -- but I would -- I would not know
15:17:08 12   at this time.
15:17:09 13        Q    Okay.  And, then, for the record, can you
15:17:11 14   -- do you recall what your phone number was on April 10,
15:17:13 15   2010, when you made that 911 call?
15:17:15 16        A    Yes.  It's not the same one I have now.
15:17:19 17   I've actually had a few numbers.  I can go through both of
15:17:30 18   them.  I think it's (630) 235-7635, was one of them.
15:17:38 19   Another number I've had was (630) 460-7998.  And my number
15:17:45 20   that I have now is (312) 203-4205.
15:17:47 21        Q    Thank you.  And you believe it was one of
15:17:49 22   these three numbers that you called 911 from?
15:17:51 23        A    I'm quite sure it was a 630 number because
15:18:02 24   I didn't have a 312 number at all.
15:18:03 25        Q    When you were on the phone with the

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

181

```
15:18:07   1   call-taker for 911, did you ever ask to be anonymous or
15:18:09   2   tell the call-taker you didn't want to be identified?
15:18:26   3        A    I probably said anonymous.
15:18:29   4        Q    When you were outside the police station --
15:18:31   5   the 15th District Police Station in Madison, did you ever
15:18:34   6   see any police officers with their guns drawn?
15:18:38   7        A    No, ma'am, not at all.
15:18:39   8        Q    Now, earlier you testified that we -- that
15:18:42   9   you and I have not corresponded via e-mail, but isn't it
15:18:54  10   true that I have corresponded with you via e-mail?
15:18:54  11        A    That you've sent -- I've -- through phone
15:18:55  12   conversations?
15:18:57  13        Q    But you forwarded me e-mails from Irene
15:18:59  14   Dymkar; correct?
15:19:01  15        A    Oh, forwarding all of her e-mails.  I have
15:19:01  16   forwarded --
15:19:02  17        Q    Yes.  And then I e-mailed you concerning
15:19:03  18   your affidavit; correct?
15:19:04  19        A    Yes, ma'am.
15:19:06  20        Q    And I e-mailed you this past Friday about
15:19:10  21   the location of the deposition; correct?
15:19:10  22        A    Correct.
15:19:12  23        Q    Okay.  I just wanted to make sure that was
15:19:13  24   clear.
15:19:15  25             And earlier you testified that you drafted
```

182

```
15:19:18   1   Exhibit 2, your affidavit, this one.
15:19:19   2             Can you see it?
15:19:22   3        A    That's correct.
15:19:25   4        Q    Okay.  But isn't it true that during the
15:19:30   5   telephone conversation that you and I had the last week of
15:19:30   6   May about your affidavit, that you gave me the factual
15:19:30   7   information contained in this affidavit?
15:19:33   8        A    That's correct.
15:19:35   9        Q    Okay.  And then I put it in a format that
15:19:37  10   would be acceptable to the Court and e-mailed it to you;
15:19:38  11   correct?
15:19:41  12        A    That is correct.
15:19:46  13        Q    Okay.  And then you called me with changes
15:19:48  14   because you couldn't get the changes typed in; is that
15:19:48  15   correct?
15:19:48  16        A    That is correct.
15:19:49  17        Q    And those changes were that the spelling of
15:19:51  18   your name was incorrect?
15:19:52  19        A    That's correct.
15:19:53  20        Q    And that you wanted me to -- or you wanted
15:19:56  21   to put in information contained in paragraph 7 about not
15:19:58  22   interfering with your employment; is that correct?
15:20:01  23        A    That's correct, as well as being at the
15:20:03  24   location of where I'm at.
15:20:12  25        Q    Right.
```

KEITH THORNTON, JR. - June 10, 2013

183

| | |
|---|---|
| 15:20:13 | 1 |
| 15:20:16 | 2 |
| 15:20:16 | 3 |
| 15:20:18 | 4 |
| 15:20:22 | 5 |
| 15:20:24 | 6 |
| 15:20:27 | 7 |
| 15:20:30 | 8 |
| 15:20:34 | 9 |
| 15:20:35 | 10 |
| 15:20:36 | 11 |
| | 12 |
| 15:20:39 | 13 |
| 15:20:41 | 14 |
| 15:20:43 | 15 |
| 15:20:44 | 16 |
| 15:20:50 | 17 |
| 15:20:52 | 18 |
| 15:20:56 | 19 |
| 15:20:59 | 20 |
| 15:21:01 | 21 |
| 15:21:03 | 22 |
| 15:21:07 | 23 |
| 15:21:11 | 24 |
| 15:21:15 | 25 |

1    And you -- and I made those changes and
2    e-mailed them back to you and you approved those; correct?
3         A    That's correct.
4         Q    And you, at some point in time, signed it
5    in front of a notary and sent it back?
6         A    I did.  And the notary date was 30th of
7    May.  And I believe that was a currency exchange, and I
8    sent a copy to your office by mail.
9         Q    The original.  But you faxed me a copy on
10   the 31st; is that correct?
11        A    That's correct.
12        Q    Of May?
13        A    (No response.)
14        Q    And I just want to make sure the statements
15   contained in this affidavit are true and correct; is that
16   correct?
17        A    Absolutely, ma'am.
18        Q    Okay.  And then I just had one last
19   question.  Are you sure about the number of people in the
20   SUV being four, or was it approximately four people in the
21   SUV?
22        A    I would say at least -- I know there were
23   two passengers, and I -- I -- I kind of definitely know
24   that there was a -- a third person in there.  So that
25   would -- that would put four of them with Mr. Wilbon.

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

---

KEITH THORNTON, JR. - June 10, 2013

184

| | |
|---|---|
| 15:21:15 | 1 |
| 15:21:20 | 2 |
| 15:21:20 | 3 |
| 15:21:23 | 4 |
| 15:21:24 | 5 |
| 15:21:25 | 6 |
| 15:21:25 | 7 |
| 15:21:25 | 8 |
| 15:21:25 | 9 |
| 15:21:27 | 10 |
| 15:21:30 | 11 |
| 15:21:33 | 12 |
| 15:21:33 | 13 |
| 15:21:36 | 14 |
| 15:21:37 | 15 |
| 15:21:38 | 16 |
| 15:21:39 | 17 |
| 15:21:41 | 18 |
| 15:21:43 | 19 |
| 15:21:45 | 20 |
| 15:21:46 | 21 |
| 15:21:47 | 22 |
| 15:21:48 | 23 |
| 15:21:50 | 24 |
| 15:21:55 | 25 |

1         Q    Okay.
2         A    He made four.
3              MS. PINKSTON:  Okay.  I don't have
4    anything.
5              MS. DYMKAR:  I have a couple more questions
6    based on her questions.
7
8              REDIRECT EXAMINATION
9    BY MS. DYMKAR:
10        Q    First of all, you said that you're not sure
11   of what the color of the SUV was, but you do recall that
12   it was a dark SUV; right?
13             MS. PINKSTON:  Objection.  Leading,
14   mischaracterizes prior testimony.  You've only been the
15   one to testify to that today.
16        Q    BY MS. DYMKAR:  Sir?
17        A    Excuse me?
18        Q    What was your answer?
19        A    My question (sic) is I don't know the color
20   of the SUV.
21        Q    Okay.  Do you recall that it was a dark
22   color?
23        A    Possibly, ma'am.
24        Q    Do you recall telling me on May 4, 2013
25   that it was a dark-color SUV, but you didn't know exactly

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

185

| | |
|---|---|
| 15:21:57 | 1 |

1 what the color was?

15:21:58 2 A    I don't recall the color, ma'am.

15:21:59 3 Q    Do you recall telling me on May 4, 2013

15:22:05 4 that you did not know the color, but that it was a dark

15:22:05 5 color?

15:22:05 6 A    No, no.

15:22:06 7 MS. PINKSTON:  Objection.  Asked and

15:22:07 8 answered.

15:22:08 9 THE WITNESS:  The same way that you're

15:22:11 10 trying to get an answer out of me in -- in saying that

15:22:13 11 that's what you said on the phone to me the same day,

15:22:13 12 ma'am.

15:22:21 13 Q    BY MS. DYMKAR:  You need to answer the

15:22:25 14 question.  You're not quite answering the question.  When

15:22:29 15 we talked on May 4, 2013, you did say at that time that

15:22:32 16 you didn't know the color of the vehicle, but that it was

15:22:33 17 a dark color; correct?

15:22:34 18 MS. PINKSTON:  Objection.  Asked and

15:22:38 19 answered.

15:22:39 20 Q    BY MS. DYMKAR:  Correct?

15:23:13 21 A    It's possibly dark, ma'am.  Yes, ma'am.

15:23:15 22 Q    Now, regarding the affidavit, which I

15:23:19 23 believe is Exhibit 2, I thought I heard you say when I was

15:23:22 24 asking you questions that you typed up this affidavit?

15:23:24 25 A    Yes, I did, within Word.  I got it, and it

186

15:23:27 1 was on a computer, and there was a correction.  I didn't

15:23:31 2 know how to do that, and I talked to Ms. Pinkston, and I

15:23:37 3 told her exactly what I wanted within it.

15:23:38 4 Q    Okay.  I understood your question just now

15:23:42 5 to Ms. Pinkston was that she drafted the affidavit and

15:23:45 6 sent it to you, and you wanted some changes.

15:23:47 7 A    That is correct, ma'am.

15:23:49 8 Q    Okay.  So you didn't type up the affidavit

15:23:51 9 yourself, did you?

15:23:55 10 A    I tried typing it up, and my computer was

15:23:57 11 messed up.  I could not change what I wanted, and I told

15:24:01 12 her exactly what I wanted, so she -- she gave me the

15:24:04 13 proper version.

15:24:07 14 Q    Okay.  When you say "change," she sent you

15:24:12 15 a document in a Word processing program; right?

15:24:14 16 A    I don't know what kind of program it was.

15:24:18 17 Q    Okay.  She sent you a document that was

15:24:22 18 already drafted with the information -- with most of the

15:24:25 19 information that appears on Exhibit 3 -- Exhibit 2;

15:24:26 20 correct?

15:24:28 21 A    That is correct, prior to me telling her

15:24:30 22 what I wanted to be within it.

15:24:33 23 Q    And then you went to a computer, tried to

15:24:37 24 make some changes, and couldn't make the changes.  Then

15:24:41 25 Ms. Pinkston made the changes for you; correct?

KEITH THORNTON, JR. - June 10, 2013

187

| | | |
|---|---|---|
| 15:24:42 | 1 | A   That is correct. |
| 15:24:44 | 2 | Q   Sent it to you and then you signed it? |
| 15:24:44 | 3 | A   That is correct. |
| 15:24:46 | 4 | Q   So when you said that you drafted this |
| 15:24:48 | | document, you don't mean you typed it; right? |
| 15:24:49 | 6 | A   I drafted it by telling her what I wanted |
| 15:25:04 | 7 | within it. |
| 15:25:05 | 8 | MS. DYMKAR:  Okay.  I have no other |
| 15:25:06 | 9 | questions. |
| 15:25:07 | 10 | MS. PINKSTON:  Okay.  I just have one |
| 15:25:08 | 11 | follow-up, Mr. Thornton. |
| 15:25:08 | 12 | |
| 15:25:08 | 13 | RECROS-EXAMINATION |
| 15:25:08 | 14 | BY MS. PINKSTON: |
| 15:25:10 | 15 | Q   Are you absolutely sure as you sit here |
| 15:25:14 | 16 | today that the SUV that picked up the man you now know to |
| 15:25:20 | 17 | be David Wilbon, the one with the red jacket and |
| 15:25:30 | 18 | dreadlocks, near Potomac and Menard, was the same SUV that |
| 15:25:30 | 19 | was in front of the 15th District Police Station? |
| 15:25:31 | 20 | A   Ms. Pinkston, I followed that SUV in very |
| 15:25:32 | 21 | close proximity all the way from the location of where it |
| 15:25:35 | 22 | picked him up all the way down Central to Madison, and |
| 15:25:40 | 23 | that is exactly, positively, 100 percent the SUV. |
| 15:25:43 | 24 | MS. PINKSTON:  Thank you.  That's all. |
| 15:25:44 | 25 | MS. DYMKAR:  No other question.  Thank you. |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

---

KEITH THORNTON, JR. - June 10, 2013

188

| | | |
|---|---|---|
| 15:25:46 | 1 | MS. PINKSTON:  Thank you for your time, |
| 15:25:49 | 2 | Mr. Thornton, and thank you for everybody on the end there |
| 15:25:53 | 3 | in California.  We appreciate your assistance today. |
| 15:25:54 | 4 | THE WITNESS:  Thank you. |
| 15:25:55 | 5 | THE VIDEOGRAPHER:  Here marks the end of |
| 15:25:57 | 6 | the today's deposition of Mr. Keith Thornton.  The total |
| 15:26:01 | 7 | number of videotapes used was three.  They will be stored |
| 15:26:03 | 8 | with Jan Brown & Associates.  And we're off the record at |
| 15:30:50 | 9 | 3:26 p.m. |
| 15:30:51 | 10 | MS. PINKSTON:  After the court reporter has |
| 15:30:55 | 11 | explained our options to us, we've decided that the |
| 15:30:59 | 12 | original would be sent to the ordering parties, not the |
| 15:31:03 | 13 | City of Chicago, counsel for defendants, and the copy will |
| 15:31:06 | 14 | be sent to the deponent, Keith Thornton, with an errata |
| 15:31:09 | 15 | sheet.  And he will have 30 days to make any corrections |
| 15:31:12 | 16 | pursuant to that errata sheet, and then the court reporter |
| 15:31:17 | 17 | will send him whatever information, instructions, and a |
| 15:31:21 | 18 | self-addressed stamped envelope so he can send that copy |
| 15:31:32 | 19 | back with the errata sheet and his signature to counsel. |
| 15:31:39 | 20 | THE COURT REPORTER:  Which counsel? |
| 15:31:40 | 21 | MS. DYMKAR:  And we're not ordering today, |
| 15:31:59 | 22 | but we're going to be making a decision within a few days. |
| 15:31:59 | 23 | (Proceedings concluded at 3:31 p.m.) |
| 15:31:59 | 24 | |
| 15:31:59 | 25 | |

JAN BROWN & ASSOCIATES  (415) 981-3498  (800) 522-7096

189

1    DECLARATION UNDER PENALTY OF PERJURY

2

3

4        I do hereby certify under penalty of perjury that I

5    have reviewed the foregoing transcript of my deposition;

6    that I have made such corrections as appear noted herein

7    in ink; that my testimony contained herein, as corrected;

8    is true and correct.

9

10       DATED this _____ day of _____, 2013,

11   at _____, California.

12

13

14

15

16

17

18

19              _____
                      Keith Thornton, Jr.

20

21

22

23

24

25

190

1    REPORTER'S CERTIFICATION

2

3        I, Serena Wong, Certified Shorthand Reporter in

4    and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7    that the proceedings was then taken before me at the time

8    and place herein set forth; that the testimony and

9    proceedings were reported stenographically by me and later

10   transcribed into typewriting under my direction; that the

11   foregoing is a true record of the testimony and

12   proceedings taken at that time.

13

14       IN WITNESS WHEREOF, I have subscribed my name on

15   this date:  6/20/13

16

17

18

19              _____
                     Serena Wong, CSR No. 10250

20

21

22

23

24

25