1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3   DAVID D. WILBON, et al.,          )
                                      )
4              Plaintiffs,            )
                                      )
5          vs.                        )  No. 12 C 1132
                                      )
6   JOSEPH M. PLOVANICH, et al.,      )  Chicago, Illinois
                                      )  September 1, 2017
7          Defendants.                )  1:41 P.M.

8              TRANSCRIPT OF PROCEEDINGS - Status
       BEFORE THE HONORABLE M. DAVID WEISMAN, Magistrate Judge
9
    APPEARANCES:
10
    For the Plaintiffs:       LAW OFFICES OF IRENE K. DYMKAR
11                            53 West Jackson Boulevard
                              Suite 733
12                            Chicago, Illinois  60604
                              BY:  MS. IRENE K. DYMKAR
13                                 MR. DANIEL HEINZ REGENSCHEIT
                                   MS. SHAMOYITA MUNNA DasGUPTA
14
    For the Defendants:       CITY OF CHICAGO, DEPARTMENT OF LAW
15                            30 North LaSalle Street
                              Suite 900
16                            Chicago, Illinois  60602
                              BY:  MS. KRISTIN M. PINKSTON
17                                 MS. DANA MARIE O'MALLEY.
                                   MS. ALLISON LYNN ROMELFANGER
18

19
                     PAMELA S. WARREN, CSR, RPR
20                      Official Court Reporter
                     219 South Dearborn Street
21                           Room 2342
                     Chicago, Illinois   60604
22                        (312) 408-5100

23

24

25

```
 1          (Proceedings had in open court.)

 2          THE COURT:  12 C 1132, Wilbon versus Plovanich and

 3   others.

 4          And everyone want to go around and identify

 5   themselves.

 6          MS. PINKSTON:  Kristin Pinkston on behalf of

 7   defendants.

 8          MS. O'MALLEY:  Dana O'Malley on behalf of defendants.

 9          MS. ROMELFANGER:  Allison Romelfanger on behalf of

10   defendants.

11          MS. DYMKAR:  Irene Dymkar for plaintiffs.

12          MR. REGENSCHEIT:  Daniel Regenscheit for the

13   plaintiffs.

14          MS. DasGUPTA:  Shamoyita DasGupta for the plaintiffs.

15          THE COURT:  And is your last name DasGupta?

16          MS. DasGUPTA:  Yes.

17          THE COURT:  Okay.  Thanks.

18          All right.  So I want to go over a couple of the

19   motions that were filed since we were last together.  I have a

20   couple of questions, and I want to discuss the Zone 12 issue.

21          That's all I plan to get done today, correct?  We'll

22   have our pretrial conference later.

23          MS. PINKSTON:  Right.

24          THE COURT:  Is there anything else on anyone's list?

25          Ms. Dymkar?
```

1    MS. DYMKAR:  I thought that there might be a ruling on

2    the show-up, but I don't know if that's today.

3    THE COURT:  Oh.  Maybe.  We'll see.  Maybe not.  I'll

4    see.

5    You may need that though for your --

6    MS. PINKSTON:  That's correct.

7    THE COURT:  Okay.

8    MS. PINKSTON:  So obviously nothing is going to happen

9    over the weekend.  But if we could have that ruling sooner

10   rather than later for the video editing.

11   THE COURT:  Thank you, and I apologize.

12   All right.  Let me first start asking questions, and

13   then we'll go through the filed motions, and then we'll talk

14   about the Zone 12.

15   So I have been looking more closely at plaintiff

16   Smith's claims.  So you were -- what claims are still -- are

17   you still proceeding on as to plaintiff Smith?

18   MS. DYMKAR:  False arrest, illegal search, malicious

19   prosecution.  And then I'm not sure if you could consider the

20   supervisory liability claim or not.  And that might be it.  I

21   don't have my chart, but I think that might be it.

22   THE COURT:  Okay.  And that would just be Lieutenant

23   McDermott, correct?

24   MS. DYMKAR:  For the supervisory liability?

25   THE COURT:  Correct.

1          MS. DYMKAR:  Yes.  And different courts handle that

2    differently when they come to trial.

3          THE COURT:  All right.  So the false arrest claim is

4    for what, the mob action or for the marijuana?

5          MS. DYMKAR:  For the mob action.

6          THE COURT:  Okay.  So if you are not pursuing a false

7    arrest -- well, let me ask the second question.  When is the

8    marijuana found based on the facts as you understand them?

9          MS. DYMKAR:  I don't know exact time.

10         THE COURT:  Not time, but in sequence of events.

11         MS. DYMKAR:  They are stopped, taken out of the car,

12   put on their knees, and then at some time after that the

13   marijuana is found.

14         THE COURT:  In the car?

15         MS. DYMKAR:  Yes.

16         THE COURT:  Okay.

17         MS. DYMKAR:  Under the driver's seat.

18         THE COURT:  So here's what I'm trying to understand.

19   If you're not pursuing anything based on the marijuana, it

20   would seem to me that plaintiff Smith's claim is limited from

21   the time he was stopped till the time the marijuana was found.

22         MS. DYMKAR:  I think that's the way we had to look at

23   it given how -- the facts unfolded, yes.

24         THE COURT:  Okay.  And then as to the malicious

25   prosecution claim, you're continuing to proceed on that as to

1  the mob action, correct?

2          MS. DYMKAR:  Right.

3          THE COURT:  How is that distinguishable from the

4  marijuana prosecution?  I know -- tell me how those are

5  distinguished.

6          MS. DYMKAR:  Well, that Holmes versus --

7          THE COURT:  Village of?

8          MS. DYMKAR:  -- Hoffman Estates --

9          THE COURT:  Uh-huh.

10          MS. DYMKAR:  -- that says that you have a separate

11  claim for each criminal charge brought against you because of

12  something that hung over your head for the time and gave you

13  some exposure to jail time or penalties.

14          There is a different definition for probable cause for

15  malicious prosecution.  And each criminal charge is subject to

16  its own claim of malicious prosecution.

17          THE COURT:  Okay.  From a damage standpoint, how long

18  did Mr. Smith have to go to court on the marijuana charge?

19          MS. DYMKAR:  It was either once or twice he went to

20  court.  I mean, both charges.  They were dismissed on the same

21  day.

22          THE COURT:  So that's what I am trying to understand.

23  If -- I understand that there are separate viable claims for

24  malicious prosecution for each charge.  But is it -- from a

25  damage component his damages are so intertwined, how can we

1    tease out the marijuana charge?  If you're going to argue to

2    the jury he had to go to court twice on the mob action, because

3    wouldn't he have to have gone twice on the marijuana charge?

4    Sounds like you're telling me he did.

5         MS. DYMKAR:  He did.  But that's not the only thing

6    you look at.  I mean, I think the Holmes case indicates that

7    you have to be concerned about criminal prosecution for each

8    charge.

9         And the mob action charge was far -- far more serious

10   than the cannabis charge, and the way it looks on your record

11   is far more serious than a cannabis charge.  And I noted that,

12   you know, if he were stopped today, he would be given a ticket.

13   I wasn't -- it is not even criminal.  It has been

14   decriminalized, at least in the City of Chicago.

15        So it is the mob action that caused him more of a

16   problem and more explanation to have to make to other people

17   having that on his record.

18        THE COURT:  So I agree with you -- the thought you're

19   having, which is there are two separate things you need to be

20   looking at.  But from the defendants's standpoint, as far as

21   damages go, how can you tease out the marijuana charge as a

22   damage component?  Because, yes, he -- you know, the law says

23   we have to look at each of these individually.  But your damage

24   claim would be he had to go to court twice.  And isn't it valid

25   for the city to say, he would have had to have gone twice for

1    the marijuana case?

2          MS. DYMKAR:  But going to court isn't the only aspect

3    of the damages.

4          THE COURT:  Correct.  And he -- and whatever other

5    things you had to say, he had to worry about this, all the

6    things that go with the malicious prosecution claim.  He had

7    the same for the marijuana.  And you're asking -- you're asking

8    to remove any reference to that, and I'm trying to understand

9    how under 403 that is appropriate.

10         MS. DYMKAR:  I think that the fact that he went to

11   court on the cannabis charge doesn't mean that he wasn't also

12   going to court and being prosecuted for the mob action case.

13         THE COURT:  Precisely.

14         MS. DYMKAR:  And --

15         THE COURT:  And vice versa.

16         MS. DYMKAR:  And there was very likely, given how

17   these things are handled in criminal court or were handled,

18   that the marijuana charge was going to be dismissed the first

19   time he went there.

20         THE COURT:  But it wasn't, right?  It was dismissed on

21   the same day as the mob action?

22         MS. DYMKAR:  Right.  And it was -- it was either the

23   first or second time he went to court that it was dismissed.

24         I don't think that that was his concern, it was the

25   mob action because it was the police making allegations that he

1   was part of a very violent disturbance that caused -- you know,

2   was dangerous to people.  And, of course, the allegation was it

3   was dangerous to the police also.

4           Holmes says they are separable.  I mean, that's --

5           THE COURT:  That's a -- I think Holmes -- I agree with

6   you, but I think Holmes stands -- similarly stands for the

7   proposition that the fact that there is a marijuana prosecution

8   over him as well is relevant.  That's what I am trying to

9   understand.

10          It is like you're trying to say, I don't want it out

11  there because the city is going to dirty him up with it, which

12  we can talk about that separately.  But as far as the charge

13  itself, Holmes says these are separate charges.  We need to

14  look at them separately.  And from a 403 standpoint, for

15  damages alone, I'm not sure how you can say, forget the

16  marijuana case was ever out there.

17          I'm not saying that they can have free rein with what

18  they want to do with it.  But if you are going to stand up in

19  front of the jury and say, he had to go to court twice and he

20  was -- you know, he was very worried about this prosecution for

21  mob action, which I understand you'll say, shouldn't the city

22  be able to say, aren't you worried about the -- weren't you

23  worried about the marijuana charge, and weren't you concerned

24  that -- I mean, didn't you have to go to court for the

25  marijuana charge as well?

1        And you're not bringing a claim on the marijuana

2  charge, are you?

3        MS. DYMKAR:  No.

4        THE COURT:  All right.  So I'm not going to -- I'm not

5  going to exclude any reference to the marijuana charge.

6        Now what can the city do with it is a little

7  different.  To me the city is limited to using that marijuana

8  charge simply to state as a fact he was charged with it and it

9  was resolved in his favor.

10       Right, it was resolved in your client's favor,

11  correct?

12       MS. DYMKAR:  That's right.

13       MS. PINKSTON:  Your Honor, that's not correct, it was

14  SOL'd.

15       THE COURT:  All right.  What was the mob action?

16       MS. PINKSTON:  Also SOL'd.  And that's part of our

17  argument with regard to the malicious prosecution claim is that

18  as far as the testimony and the certified conviction or

19  statement of disposition conviction, there is no --

20       THE COURT:  There is no evidence that --

21       MS. PINKSTON:  -- objective -- exactly.  Objective

22  evidence that it is probative of his innocence, and so that is

23  going to be an issue at trial in terms of that element of

24  malicious prosecution.

25       THE COURT:  And planning on calling the prosecutor to

1    address that issue, correct?

2         MS. DYMKAR:  I'm not sure if we're calling the

3    prosecutor.

4         THE COURT:  Okay.

5         MS. DYMKAR:  We could rely on the court papers.  We

6    can rely on what my client has to say.

7         We're also in contact with his attorney.

8         THE COURT:  But I thought the case law was pretty firm

9    that an SOL is not indicative of innocence on its own.

10        MS. DYMKAR:  There is state law that says -- well,

11   state law that came about because there was a concern as to

12   when statute of limitations started running on an SOL, since it

13   is a construct in circuit court that doesn't exist anywhere in

14   the books.

15        And so what the Court said in -- is another issue.

16   But in that issue said that you have to wait out the speedy

17   trial time, and that's when the -- when the actual dismissal by

18   operation of law, even though no one came back to court,

19   nothing ever happened, by operation of law, at that point

20   that's when you could bring the malicious prosecution claim.

21        So there is case law that says indirectly that, yes,

22   you know, you can bring a malicious prosecution case at that

23   point.  And I think that an SOL is a favorable termination,

24   which is how we -- we would describe that element.  They're

25   going to describe it indicative of innocence.  But there really

1    is no dismissal that's indicative of innocence.  You're found

2    not guilty after trial, that's not indicative of losing, and

3    you --

4         THE COURT:  No, that is because you're presumed

5    innocent, and so that -- well, I think the law says not guilty

6    at trial is indicative of innocence.

7         I think SOL can be indicative of innocence if there is

8    other extrinsic evidence explaining why it is indicative of

9    innocence.

10        MS. DYMKAR:  I think the analysis has to be the same

11   as for a nolle pros.  And in that situation --

12        THE COURT:  Well, we're just getting a little bit far

13   afield.  So we're talking about the marijuana and what we can

14   use with the marijuana charge.

15        Ms. Pinkston is saying SOL is not indicative of

16   innocence.  That got us down a little rabbit trail.

17        I'm talking about how the marijuana charge can be

18   used.  And I'm saying the city cannot use it or the defendants

19   cannot use it to, in your terms -- and I don't know if you used

20   this exact vernacular -- but to dirty up the plaintiff.  It can

21   be used to say this charge was brought against you and this

22   charge was pending and this charge was SOL'd at the same time

23   as a mob action.  And you don't have a complaint

24   about -- you're not complaining about the marijuana charge.

25   That's how it can be used.

1    But it cannot -- to your point it cannot be used to

2 dirty up the plaintiff.  You know, any -- it is just a

3 statement of fact as to these charges.

4    Does everyone -- I'm not going to ask if everyone is

5 good with that.  Does everyone understand my ruling on that?

6    MS. PINKSTON:  One moment, your Honor.

7    (Discussion off the record.)

8    MS. PINKSTON:  Your Honor, we would like to be able to

9 ask one further question of Mr. Smith with regard to the

10 marijuana, the cannabis, and that is that he does not dispute

11 that he did have possession of it.

12    So I understand no claim with regard to the marijuana

13 charge.  But we do want to go a step further in terms of the

14 possession of it because he does still have the unlawful search

15 claim.  And so a search pursuant to unlawful arrest --

16    THE COURT:  That's what -- okay.  That's why I was

17 asking about when this unlawful search of plaintiff -- as to

18 plaintiff Smith is alleging when that occurred.

19    MS. PINKSTON:  It is a disputed fact.

20    THE COURT:  All right.  So, Ms. Dymkar, your client is

21 saying the search of him and the search that he finds violative

22 occurred prior to the search of the vehicle.

23    MS. DYMKAR:  Right.

24    THE COURT:  And so the -- any search incident to

25 arrest had already happened of his person, and then they found

1   the marijuana.

2           MS. DYMKAR:  I believe so.  I believe that's how it

3   unfolded.

4           THE COURT:  Okay.  Because that's important.

5   Otherwise, if it is the converse, if they stop the car,

6   conducted an automobile search incident to the stop and then

7   found the marijuana, the claim of the unlawful search incident

8   to arrest would be answered by finding the marijuana.

9           Do you understand that logic?

10          MS. DYMKAR:  I understand what you are saying.

11          THE COURT:  Okay.

12          MS. DYMKAR:  The sequence becomes very important.

13          THE COURT:  Yeah.  Can we figure out that sequence now

14  based on the plaintiffs's testimony?  Because we have got to

15  have some conflicting -- or I don't -- we don't have to have

16  conflicting, but we have to have some semblance to say the

17  search of the vehicle occurred after the search of his person.

18  Because that, Ms. Dymkar, is what your client is complaining

19  about, correct?

20          MS. DYMKAR:  Right.

21          THE COURT:  All right.

22          MS. DYMKAR:  Is that something we could report back to

23  you or -- I don't have the transcripts with --

24          THE COURT:  Yeah.  Sure.

25          MS. PINKSTON:  So, your Honor, would you like us just

1    to send something to your proposed in-box with the citations?

2          THE COURT:  Yeah, just a brief statement from both

3    sides.  If there is a conflict of testimony, that's fine.  You

4    know, we'll deal with that.

5          But if -- if Mr. Smith is saying they searched the

6    vehicle, they found the marijuana, and then they searched me

7    incident to the arrest, and I found that problematic, there is

8    a -- that is analytically a very different claim.

9          MS. DYMKAR:  I understand, your Honor --

10          THE COURT:  Okay.

11          MS. DYMKAR:  -- perfectly.  And I am hesitant to speak

12    without having --

13          THE COURT:  I appreciate that.

14          MS. DYMKAR:  -- that right in front of me.

15          THE COURT:  That's fine.

16          MS. DYMKAR:  I guess the other issue with the cannabis

17    is when the lab report comes in, whether they describe it as --

18    whether it is -- somehow comes across as just volume, a large

19    volume of cannabis.  I mean, I did bring a picture with me so

20    the Court would get an idea of what we're talking about here.

21          THE COURT:  I have seen a lot of these pictures.  They

22    all look the same.

23          That's fine.  So I --

24          MS. PINKSTON:  I addressed it in my motion -- in my

25    response.

1          THE COURT:  Yeah.  And knowing now, Ms. Dymkar, that

2   it was -- they may use it for the purpose I just said, you may

3   decide to front it on, you know, direct and say, you did have

4   this small baggie of pot.  You know, that -- you can handle it

5   that way.

6          I'm simply saying you cannot excise that fact from

7   this case if you're pursuing your malicious prosecution claim

8   and say having the burden of a prosecution over him is a source

9   of damages, which I'm not saying it can't be, but it

10  is -- there is a balance here because he also had -- he had

11  that same fear of prosecution for the mob action.  It may have

12  been greater.  He may be able to explain on the stand why it is

13  more significant to him.  But he also had that same fear, maybe

14  of a lesser amount, as to the marijuana charge.

15         It is -- I just think there -- it is relevant, and

16  there is no -- it would be unfair to the city not to allow them

17  to inquire.  But they cannot dirty him up about it.

18         MS. DYMKAR:  Understood.

19         MS. PINKSTON:  Your Honor, may I make --

20         THE COURT:  Yes.

21         MS. PINKSTON:  Ask for two points of clarification?

22         THE COURT:  Sure.  Go ahead, and then we have got to

23  take a break.

24         MS. PINKSTON:  All right.  The first one is for the

25  brief statement of chronology with the citations to your

```
 1   proposed in-box.  Do you want one from each side or do you want
 2   a joint?
 3            THE COURT:  No, one from each side.
 4            MS. PINKSTON:  Okay.  And then the second issue then
 5   that my thought process was in this discussion is in terms of
 6   his explanation, I understand what you are saying about
 7   Ms. Dymkar being able to front the issue with the marijuana.
 8   However, my concern then is, I think, that any argument that
 9   today this would be a ticketable offense and not an arrestable
10   offense would be improper as that was not the law then.
11            THE COURT:  It -- well, there is a couple problems
12   with that.  There is a couple problems with that.  One is
13   foundation.  I don't know that Mr. Smith would be the proper
14   witness to even put that in.
15            And, second of all, I tend to agree that as to how
16   Mr. Smith perceived that issue then has to be based on what the
17   law was then.  I don't understand -- I think there is a
18   relevance issue and a potential jury confusion to say now this
19   wouldn't be a big deal, but back in 2010 -- right, that's when
20   we were --
21            MS. PINKSTON:  Correct, your Honor.
22            THE COURT:  -- in 2010 it was a bigger deal.  So
23   I tend to agree with the city on that.  Is there something I'm
24   missing, Ms. Dymkar?
25            MS. DYMKAR:  I don't think George Smith can talk about
```

1   what the law is now and what it was then.  And I don't even

2   know that he knows that it is -- we all know or attorneys who

3   practice in this area know that these charges were just

4   dismissed outright because nobody was going to prosecute

5   somebody on a nickel bag of weed.  And so it was -- but, you

6   know, so -- I'm not sure.  I'm not sure how to handle that or

7   what -- you know, what shape the testimony should take.  But it

8   wasn't anything he was concerned about.

9           THE COURT:  He can certainly testify to that if that's

10  the case.  That, of course, is a double-edged sword for the

11  jury to hear as well.

12          MS. DYMKAR:  Yes, that's true.

13          THE COURT:  All right.  I have got to take a break.  I

14  apologize.  I'll be right back.

15          MS. PINKSTON:  Yes, your Honor.

16          THE COURT:  If you guys want to go grab something,

17  feel free.

18      (Brief recess.)

19          THE COURT:  All right.  We're back on the record.  I

20  apologize for the interruption.

21          Have we closed out the discussion on the marijuana

22  issue?

23          MS. PINKSTON:  I believe so.  We just need to send the

24  citations with the chronology of the search.

25          THE COURT:  All right.  That -- yeah.

1          All right.  One other thing before we get to the
2    motions and the Zone 12 tape.
3          We're looking at the pretrial order.  We're a bit
4    confused on the scope issue, as far as scope of employment.
5    There is no stipulations listed in the pretrial order.  But the
6    city -- and I don't know if the individual defendants -- but
7    the city is saying there is no question that these officers
8    were in the scope of employment.  And the -- you know, the
9    plaintiffs are proceeding as if that is an issue at play, which
10   I understand why they would because there is no stipulation
11   that the officers were in the scope of employment.
12          And we're just trying to figure out why that isn't
13   being stipulated to, because that would answer a lot of the
14   disputes on certain jury instructions and other issues.  I
15   don't know that there is a lot of relevant evidentiary issues,
16   but that would streamline the jury decision-making process
17   somewhat if the issue is simply, you know, whether the
18   officers's conduct was lawful or not.
19          MS. PINKSTON:  Certainly, your Honor.  I believe their
20   answer to the complaint, the city's answer as well, admitted
21   that they were acting within the scope of employment under
22   color of law.
23          THE COURT:  Right.  So from a trial standpoint --
24   that's what -- I don't think anyone is disputing that.
25          From a trial standpoint, a stipulation though is there

1    for the jury -- for whatever purpose it may be relevant, the

2    jury knows that fact.

3         MS. PINKSTON:  We can stipulate to that.

4         THE COURT:  Okay.  All right.  There is one other

5    thing I was thinking about.

6         MS. PINKSTON:  With the pretrial order, your Honor?

7         THE COURT:  Yeah, there is a couple things in the

8    pretrial order that we'll get to when we review that.  But

9    there is one other issue that I was thinking we could get

10   resolved today that made sense to me.

11        Maybe we'll come back.  We'll see.

12        MS. PINKSTON:  I will say the defendants inadvertently

13   failed to include a verdict form with their jury instructions.

14        THE COURT:  Okay.

15        MS. PINKSTON:  I --

16        MS. O'MALLEY:  We're evaluating plaintiffs's.  So to

17   the extent we'll agree to it, we'll advise the Court before the

18   pretrial conference.  We just need to look at one more thing

19   and get the approval of our deputy, so --

20        THE COURT:  Okay.

21        MS. O'MALLEY:  But we're hoping to be able to reach

22   agreement on that before the pretrial.

23        THE COURT:  Okay.  All right.  So next I have got the

24   plaintiffs's motion in limine, defendants's testimony regarding

25   their knowledge of the 1300 North Menard event.

1       And then defendants's response to that.

2       And I think a lot of that plays in to the issue of

3   Zone 12 recordings themselves. So I kind of want to talk

4   through those issues, as well as the punitive damage issue.

5   But we'll get to that next.

6       All right. So plaintiffs's motion in limine, this is

7   436, seeks to preclude defendants from testifying beyond their

8   deposition testimony regarding any details about the incident

9   on 1300 Menard.

10      I am not aware of any case law or rule of evidence

11  that would say that a witness cannot testify about events

12  beyond what they testified to at a deposition. So that general

13  proposition is going to be denied. And the plaintiffs don't

14  cite to anything to support that.

15      But this gets to what I think is the bigger issue of

16  the Zone 12 recordings, and that is this: As I understand it,

17  the officers, defendant officers said, I can't recall exactly

18  what I heard, but I know I heard radio chatter prior to the

19  incident at hand for this trial, the arrest of the plaintiffs.

20  At the deposition none of the officers -- I think one of the

21  officers said, if you played the tape I might be able to

22  remember right now.

23      The city has correctly stated that you can refresh a

24  witness's recollection at any time.

25      Now these events happened in 2010, the actual events.

1  The depositions happened in 2013.  And now we're in 2017.  And

2  so it is conceptually possible that the officers's memory could

3  be refreshed as to what they heard with some level of

4  precision.  I emphasize conceptually possible.

5          But I'm keeping out the defendant -- what the

6  defendants have asked to put in from the Zone 12 on the basis

7  of 403 because I think there is a great potential for jury

8  confusion as to what each or any of the individual defendant

9  officers knew or -- or recall at the time these events

10  happened.  What they heard, more importantly, not what they

11  knew, but what they heard.

12          So they are -- because the number of defendants and

13  their lack of recall today, or at the time of their deposition,

14  more precisely, what they heard, and then the underlying

15  hearsay problem with the recordings themselves because the

16  recordings themselves are hearsay.  They're only -- or

17  potentially hearsay.  The exception -- I think the obvious

18  exception is state of mind of the defendants or witnesses, what

19  they heard at the time and why they were doing what they were

20  doing.

21          But none of the defendants said, I recall this

22  specific information, and that's what I was acting on.  As I

23  understand it, the witnesses are saying or the defendants, I

24  should say, are saying, I know there is this thing going on at

25  1300 Menard, and there is a lot of radio chatter.  And if I

1  heard the radio chatter, I might tell you I remember hearing

2  that.

3       That level of kind of ambiguity and generality I don't

4  think is going to help the jury understand why the officers did

5  what they did.  There is nothing that's going to -- in what I

6  am saying about playing the tapes, it's going to preclude the

7  defendant officers from saying, there is a lot of radio

8  chatter, I don't remember exactly what was said, anything like

9  that.  I knew that something was going on -- but I don't -- I

10 don't -- and I think that testimony is appropriate.

11      What I don't think is appropriate is for the jury to

12 hear a recording that is now seven years old and three years,

13 you know, after the deposition or three years -- the

14 depositions were 2013.  They don't remember then, they are not

15 going to now remember seven years later -- and then think,

16 well, the officers may have heard that stuff so they may have

17 known what was going on, when none of those particular things

18 even said the plaintiffs had done something.

19      In fact, the specific radio transmissions that the

20 plaintiffs want in, and I have let in, is one of the defendants

21 saying, was someone hit by a bottle?  I think is kind of the

22 general gist of that communication.  And so I think the jury

23 will be confused if they hear all of that recording and think

24 that each of the defendants heard that, and at the time they

25 acted, remembered any particular thing in there, because there

1  is no testimony that they did.

2          MS. PINKSTON:  May I?

3          THE COURT:  Yes, absolutely.

4          MS. PINKSTON:  In terms -- are you including

5  specifically defendant Officer Kushiner's testimony in that

6  conclusion as well, your Honor?

7          THE COURT:  I thought Kushiner was part of what the

8  plaintiff wanted in and we ruled on already.

9          MS. PINKSTON:  I mean, in terms of the audio, that

10  none of the defendant officers were able to recall particulars.

11  Because defendant Officer Kushiner is the person who is one of

12  the original -- I believe, somewhat undisputed, the original

13  officers to approach the vehicles.  His testimony is quite

14  specific as to his interaction with the plaintiffs and his

15  knowledge about the radio communication prior to being flagged

16  down by Keith Thorton.

17          And so while I understand your position that the

18  defendants never said this is why I acted in this particular

19  manner, in all fairness, they were never asked why did you act

20  in this particular manner.

21          THE COURT:  And they certainly can be asked that.  And

22  they can say I recall a radio transmission that said X, Y, and

23  Z, and that -- you know, if that's what their testimony is.

24          Now their deposition -- I don't know how that cross

25  examination will look.  And, you know, we can see at trial.

1    And certainly I am not precluding the plaintiff from

2    coming back to say, that type of particular information is

3    nowhere in Zone 12.

4        MS. PINKSTON:  Uh-huh.

5        THE COURT:  I don't think this would happen, but let

6    me give you an example.  If someone -- if a defendant officer

7    said, I remember hearing on the radio that a guy named Wilbon

8    had done X, Y, and Z, and that's why when I saw his name was

9    Wilbon I arrested him because I remember that, you know, I

10   doubt that's going to happen.  But certainly if that happened,

11   that would be, you know, state of mind exception to hearsay.  I

12   heard this.  I'm not saying it is true, but that's why I acted

13   the way I did.

14       And then plaintiff would certainly have a right if

15   they asked me to to say, Judge, we want something to show that

16   there is no testimony -- there is no radio transmission like

17   that.

18       But a general description of, I heard this, I remember

19   this kind of information being conveyed on Zone 12, and that's

20   why I did what I did, is -- will be generally admissible if it

21   is at a general level, subject to plaintiff trying to cross

22   examine on something if it gets too particularized.

23       And I know plaintiff had asked for some particular

24   segments to come in, which I have allowed in because I think

25   they're particularly germane, there is no jury confusion, and

1    they are relevant to the issue at hand, which is probable cause

2    for arrest.  So that's how I'm going to handle the whole Zone

3    12 issue.

4            MS. PINKSTON:  May I make one objection for the

5    record?

6            THE COURT:  Sure.

7            MS. PINKSTON:  Just for the record, to the extent that

8    the analysis is based on what they recalled three years later

9    at their deposition, and the determination is what they knew at

10   the time, just the objection that it is prejudicial to keep

11   this out given that it seems as though the determination is a

12   recollection examination versus what they actually in fact

13   heard over the zone radio, in particular to defendant Kushiner

14   and defendant Cerda and Esquivel in terms of the radio

15   communication that they did testify to.

16           THE COURT:  I want your record -- your objection to be

17   clear on the record.  I don't quite understand it, and I just

18   want --

19           MS. PINKSTON:  Sure.

20           THE COURT:  -- to make sure my ruling is clear too.

21           MS. PINKSTON:  So my understanding is that one of the

22   issues is that this is seven-year-old radio, radio dispatch

23   communications.  And what they didn't recall in 2013, they

24   conceptually are likely not to recall now another four years

25   later.  Is that correct?

1     THE COURT:  Yes, although I acknowledge that you can

2   refresh a recollection with anything at any time.  So I'm not

3   saying it is conceptually impossible, but at this point

4   unlikely.

5     MS. PINKSTON:  So for the few defendants that were

6   able to articulate with particularity in 2013 about what they

7   recall hearing three years earlier in 2010 on the radio, I

8   believe it is prejudicial for them not to have the jury hear

9   what they heard at that day because they are being penalized

10  for not recalling specifics of radio communication three years

11  later, which doesn't seem to be reasonable regarding the human

12  mind.

13    THE COURT:  That's fair.  And I'm not saying that the

14  jury cannot hear what they remember hearing that day.  What I

15  am saying is the jury cannot hear the radio transmission.

16    So, in other words, the officer is certainly free to

17  continue to say, I remember hearing this on the radio, and that

18  is certainly going to be allowed as state of mind.  I can't

19  advise in advance.  But generally seems to be state of mind

20  exception to hear.

21    I'm simply saying the transmission themselves being

22  played at trial, I'm not letting in.  But your objection is

23  noted for the record.

24    MS. PINKSTON:  Thank you.

25    THE COURT:  Okay.  Next is the objections regarding

```
 1    financial conditions.

 2            Are the plaintiffs continuing to seek punitive

 3    damages?

 4            MS. DYMKAR:  Yes.

 5            THE COURT:  All right.  And defendants -- the

 6    plaintiffs note that Judge Brown, because they are talking

 7    about a ruling from 2015, they believe have conflated --

 8    plaintiffs believe that Judge Brown conflated evidence on

 9    punitive damages, their financial condition, with

10    indemnification from the city.

11            Is that correct?

12            MS. DYMKAR:  That's right.  When she ruled on one

13    issue, the other one got thrown in.  And I don't know that it

14    was a logical jump to make, that we wouldn't get discovery on

15    finances.

16            THE COURT:  So the stipulation regarding the city

17    within the scope is one thing.

18            Where does the city stand on indemnification?

19            MS. PINKSTON:  Indemnification of compensatory damages

20    is not going to be disputed.  And obviously Illinois law

21    prohibits the City of Chicago from indemnifying on punitive

22    damages.  So the City of Chicago would not be indemnifying on

23    punitive damages.

24            THE COURT:  All right.  And do you want the jury to

25    know that the city is indemnifying the officers on compensatory
```

1  but not punitive?

2          Who represents the city?

3          MS. PINKSTON:  We do.  We all now do.

4          THE COURT:  Okay.

5          MS. PINKSTON:  It used to be separate because there

6  was a Monell claim.

7          THE COURT:  Okay.  All right.  So one of the issues in

8  these type of cases is whether you want the jury to know how

9  indemnification works.  So I am open to instructing the jury

10 that the city indemnifies the officers as to compensatory

11 damages, but does not indemnify the officers as to punitive

12 damages.

13         I'm open to considering that if that's what you want

14 instructed.  But if that's what you want instructed, that also

15 informs some of the issues here that Ms. Dymkar is raising.

16         MS. PINKSTON:  We do not want that instruction, your

17 Honor.

18         THE COURT:  All right.  So that leaves your clients

19 open to the possibility that the jury may say the award as to

20 the defendants for compensatory damages isn't that bad.  But

21 punitive damages, to teach these officers a lesson, we're going

22 to make that large.

23         So compensatory damages we'll say $25,000 across the

24 board.  Punitive damages we'll say $100,000 across the board.

25 And the jury will not know that that division, the hundred

1    thousand, will be paid by the officers.

2          MS. PINKSTON:  That's true.

3          THE COURT:  And I just want to make sure when you

4    think through this issue that that's what you -- you don't want

5    the jury to know otherwise.  Because a jury -- the only reason

6    I'm raising this is a jury may say, we think these people were

7    handled -- were treated unfairly so we want to award them.  And

8    we're going to be reasonable because compensatory isn't that

9    big of a deal.  You know, I'm not trying to minimize your

10   clients's claim.  Compensatory isn't that big of a deal, but

11   the punishment that the city needs to know they can't let this

12   happen again, so we're going to dump on the punitives, not

13   realizing that that's not going to matter one bit to the city

14   since they don't have to pay it.  And that's why --

15         MS. PINKSTON:  I understand what you are saying.

16         THE COURT:  -- I raise this issue in these type of

17   cases as to -- if you want that instruction or not.

18         MS. PINKSTON:  Your Honor, honest --

19         THE COURT:  Do you want time to think about it?

20         MS. PINKSTON:  That's what I was just going to ask

21   you.  Honestly given how you just presented the issue, I don't

22   think that we should make that decision without first talking

23   to our clients, and we will do so immediately.

24         THE COURT:  Okay.

25         Ms. Dymkar, do you want to say anything further on

1       that?

2           MS. DYMKAR:  I do because I'm a little bit confused

3   because I think the indemnification instruction is mandatory if

4   the defendants seek to assert financial hardship.  That's what

5   was briefed in our motion in limine for Judge Brown.  If they

6   assert financial hardship, their financial circumstances, then

7   the jury must be instructed that the city will indemnify the

8   plaintiffs.

9           So I guess I'm getting a little confused because

10  you're coming at it in the converse.

11          THE COURT:  Well, the jury -- the jury, if there is an

12  instruction on indemnification, and that the city indemnifies

13  the officers as to compensatory damages but will not indemnify

14  the officers as to punitive damages, then the financial --

15  their financial hardship or ability to pay is relevant, but it

16  is confined to the punitive damages.

17          If that instruction isn't provided, then as far as

18  your issue with the financial background of the officers, if

19  that is presented, the jury may not understand that it is only

20  as to punitive damages that it matters.

21          MS. DYMKAR:  Right.  And that's why indemnification is

22  -- instruction is mandatory in that circumstance.

23          THE COURT:  If they're presenting financial hardship.

24          MS. DYMKAR:  Right.

25          THE COURT:  Right now they seem to be saying that's

1    your whole issue is they haven't presented me with evidence to

2    support financial hardship.  Right?

3         MS. DYMKAR:  We're saying they never gave us

4    discovery.  But apparently some or all of the defendants still

5    want to put forth their financial circumstances.

6         THE COURT:  Right, and you're saying that's not fair.

7         MS. DYMKAR:  That's not fair, correct.

8         THE COURT:  Right.  So, one, I need to find out where

9    the city is on this.  Are they going to assert financial

10   hardship?  And, if so, in what context?  Because if they don't

11   want to talk about indemnification at all, and they don't want

12   to offer any financial hardship, and they're precluded from

13   offering financial hardship, that's a situation they should

14   fully evaluate.

15        Now if the city -- depending on where the city comes

16   out, where are you on financial hardship as to punitive

17   damages?  Because we all, as you said, Ms. Pinkston, we all at

18   this table know the punitive damages are not going to be paid

19   by the City.

20        MS. PINKSTON:  Correct.

21        THE COURT:  And the jury may -- depending on where you

22   are and where Ms. Dymkar is, the jury may or may not know that.

23        But I'm not sure how we got here.  Obviously 2015 was

24   before I got here.  So there was no discovery allowed on

25   financial circumstances of the officers.

1    MS. PINKSTON:  So some -- at this point in time, of

2    the remaining defendants, and we're -- we've now asked

3    plaintiffs's counsel to voluntarily dismiss two additional

4    defendants.

5         THE COURT:  Are you doing that?

6         MS. DYMKAR:  We're going to be, as we told counsel

7    before you came out, we're going to be evaluating the whole

8    case to see if there are ways to streamline the case.  I'm not

9    prepared to do that today.

10        THE COURT:  That's fine.

11        MS. DYMKAR:  Definitely before the pretrial

12   conference.

13        THE COURT:  Okay.  Go ahead.

14        MS. PINKSTON:  So with that in mind, that's actually,

15   in our position, how we reached this.  Because we anticipated

16   that following cross summary judgment motions we would have far

17   less clients going to trial than we do.

18        THE COURT:  Uh-huh.

19        MS. PINKSTON:  At this point in time we have reached

20   out to all of our clients.  The -- there is not a unanimous

21   decision in terms of that.  Some clients do want to assert a

22   financial condition defense, and that's why when you proposed

23   the -- the instructions the way that you presented it, I think

24   there needs to be a second discussion with them.

25        THE COURT:  Yeah.  I mean -- okay.

1    MS. PINKSTON:  Because I think that affects the

2    overall defense versus an individual basis.

3         THE COURT:  Right.  If your clients all agree they

4    want a financial hardship, they want to present financial

5    hardship as a defense or at least a -- you know, a shield of

6    sorts to punitive damages, let's just presume we go down that

7    road or if that's what you decide and plaintiffs are good with,

8    whatever, how are we going to remedy this lack of discovery?

9         MS. PINKSTON:  In my response I stated that financial

10   affidavits would be provided on or before the pretrial

11   conference of next week.  And that was my thought as to how to

12   remedy the situation.  Because those would be sworn affidavits

13   as to their current financial condition going before trial.

14        THE COURT:  And what's your view on that, Ms. Dymkar?

15        MS. DYMKAR:  I'm not sure what it will look like

16   coming from these particular attorneys.  I have seen those

17   types of affidavits before.  And sometimes there really isn't

18   much in there.  And it may be, I don't know how much I made

19   last year because my wife did the taxes.  It will be something

20   like that.  And then we're at a point where we are a week

21   before trial, and we can't really look into anything.

22        Where it seems to be deficient usually is in the

23   assets.  Officers will say, I have this credit card debt, I

24   have this mortgage, I owe this money on my boat or whatever.

25   But when it comes to the assets, sometimes we're not -- we

1    don't get the full picture of what their income is.

2           And it takes usually about ten or 20 minutes at a

3    deposition to ask these questions.  That's what's kind of

4    frustrating.  And, you know, not knowing ahead of time what

5    this affidavit is going to look like, I have a hard time

6    agreeing to it.

7           Maybe it will be a very thorough affidavit, and it

8    will include everything.  But it is kind of putting all our

9    eggs in one basket a week before trial.

10          MS. PINKSTON:  I mean, it certainly won't say, I don't

11   know what my income is because my wife does -- they can't swear

12   to that.  They would have to talk with their wife and get the

13   information to include in the affidavit.

14          THE COURT:  Yeah.  I think -- okay.

15          MS. DYMKAR:  We did make -- I'm sorry, I might have

16   interrupted you.

17          THE COURT:  No.

18          MS. DYMKAR:  We did make that -- we did have a request

19   to produce that listed all the, you know, outside income, your

20   business, your real estate, and your -- and maybe that's

21   something we should pull out and just say, that's what the

22   affidavit has to include, your compensation, your -- you know,

23   it is very detailed what we asked you to produce.

24          MS. PINKSTON:  Yeah.  So that's I believe how it first

25   began because it was date of birth, bank account numbers,

1    Social Security numbers, that's what happened at the

2    depositions as well, which led to this prohibition prior to

3    trial on discovery of the financial condition.

4              So with that in mind, we certainly could use that as a

5    reference.  I will say, however, to the extent that that

6    affidavit -- that production request did request those very

7    personal account numbers, Social Security numbers, that sort of

8    thing, I don't think that would be appropriate to include in a

9    financial affidavit.

10             MS. DYMKAR:  I don't recall asking for any of that.

11             MS. PINKSTON:  All right.  The Social Security numbers

12   were definitely asked at the deposition.

13             MS. DYMKAR:  Our request to produce has assets and,

14   you know, amounts -- the value of the assets.  I have made

15   reference to it in our motion.  I attached it as an --

16             MS. PINKSTON:  I haven't looked at the request for

17   production in some point --

18             MS. DYMKAR:  Okay.

19             MS. PINKSTON:  But what I am -- that's all I'm saying

20   is that I think that's a fair -- a fair point in terms of

21   drafting the affidavit.  And my only concern would be any of

22   that personal information that would present a security risk.

23   That's all.

24             THE COURT:  Well, that -- yeah.  Okay.  We're going to

25   table resolution of this issue to the pretrial conference.  I

1    am concerned -- I mean, I think -- I would think everyone

2    agrees with Ms. Pinkston that Social Security numbers and dates

3    of birth and, you know, bank account numbers, even though those

4    are on our checks, but that type of account information which

5    the civil rules and criminal rules treat as confidential are

6    not germane in any meaningful way for -- certainly for a jury.

7            I am concerned of Ms. Dymkar's ability to test the

8    representations made in the affidavit at this late date.  So I

9    would encourage defendants because, you know, if Ms. Dymkar is

10   in agreement that the affidavits are sufficient, and, you know,

11   I'll allow the -- she won't have an objection to presenting a

12   financial hardship defense or we'll call it defense, but that

13   solves the answer --

14           MS. PINKSTON:  Uh-huh.

15           THE COURT:  -- depending on where the city comes out

16   on this.

17           If Ms. Dymkar says this is not sufficient, and then I

18   have got to resolve it, you know, it -- there is a certain

19   level of unfairness that the city back when -- I know no one

20   here was involved then -- but said don't answer these

21   questions.  And now we're inheriting, you know, a situation

22   where on the eve of trial we're wishing, I wish I hadn't done

23   that.  I wish I had let them just say like the rest of us, I

24   got a house worth 250 and the mortgage is 220, and I have got

25   three kids, and, you know, on a good year we go to Disneyworld.

1    That's my life.

2            MS. PINKSTON:  Absolute -- yes, your Honor.

3            THE COURT:  But that's not what happened.  And that it

4    happened Ms. Dymkar wouldn't have, you know, a basis to object

5    now.

6            So I would just think about that.

7            MS. PINKSTON:  Yes, your Honor.

8            THE COURT:  All right.  So we have taken care of Zone

9    12.  We have taken care of the motions in limine.  The recently

10   filed motions in limine.

11           I think the only issue left is the show-up, and I

12   apologize because that did not get on my list.  I will have a

13   ruling on that by -- you will see an ECF Tuesday by close of

14   business.

15           And the issue there is whether -- who testified the

16   show-up happened, the -- what's the main witness's name again,

17   Mr. --

18           MS. O'MALLEY:  Thorton.

19           THE COURT:  Thorton.  He indicated there is a show-up,

20   correct?

21           MS. O'MALLEY:  Correct.

22           THE COURT:  And one of the defendants --

23           MS. PINKSTON:  Esquivel also recalls the gentleman

24   witness who identified David Wilbon being in the back of the

25   police car.  So he doesn't see him drive past, he sees him in

1  -- still in the police car explaining who the individuals are.

2  THE COURT:  Okay.  And then Mr. Wilbon says --

3  MS. PINKSTON:  Correct.

4  THE COURT:  -- the show-up happened.

5  MS. PINKSTON:  David Wilbon.

6  MS. DYMKAR:  He says -- doesn't say there was a car

7  that went by.  There was not a male and female officer.  There

8  was a car down the street.  And the -- Thorton was talking to a

9  couple of -- I mean, the facts are somewhat -- are somewhat

10 different than --

11 THE COURT:  Right.

12 MS. PINKSTON:  Defendants disagree with that.  But we

13 provided the citations the last time.

14 THE COURT:  Yeah.  I remember, yeah.

15 MS. PINKSTON:  The only thing that I would like to

16 add, your Honor, is with regard to -- I understood your -- the

17 situation last time to be how -- was the officer -- were the

18 officers relying upon this information, the show-up.  Whether

19 Keith Thorton's testimony, deposition testimony, could include

20 this information about his perception of the show-up.

21 In addition to Officer Esquivel, which I don't know --

22 believe -- I don't know if I gave you the citations the last

23 time.

24 THE COURT:  Okay.

25 MS. PINKSTON:  So 58, line 5 through 59, line 3.

1       59, line 16 through 60, line 20.

2       61, line 16 through 62, line 3.

3       65, line 12 through line 21.

4       66, line 15 through line 17.

5       68, line 15 through 70, line 17.

6       72, line 12 through 73, line 4.

7       THE COURT:  I'm sorry, 73, 4?

8       MS. PINKSTON:  Yes.

9       84, line 24 through 85, line 2.

10      91, line 22 through 92, line 1.

11      THE COURT:  I'm sorry.  Give me that last set again.

12      MS. PINKSTON:  Sorry.  91, line 22 through 92, line 1.

13      THE COURT:  Okay.

14      MS. PINKSTON:  And then additionally defendants would

15  also just argue for the record that Officer Valentin's

16  deposition relies heavily on what Officer Esquivel told him.

17      THE COURT:  Okay.

18      MS. PINKSTON:  So then that makes the show-up even

19  more relevant to Officer Valentin.

20      THE COURT:  Yeah.  And I'll look at this again.  I

21  recall at the last hearing my question was one of what

22  foundation do you need to make that the event happened for it

23  to be used as state of mind exception for hearsay purposes.

24      And I was in my head thinking kind of like a Santiago

25  proffer for conspiracy statements.  In the criminal context you

1    need to make an initial showing that there is a semblance of a

2    conspiracy to allow the statements in furtherance of the

3    conspiracy to come in at trial.  So that makes complete sense

4    in a large conspiracy case.

5            But I -- I'll look at this further.  I think I have

6    satisfied myself as to the legal concern though.  But I will

7    look at this further.

8            Go ahead, Ms. Dymkar.

9            MS. DYMKAR:  If I could be heard.

10           THE COURT:  Ms. Dymkar, you can always be heard.

11      (Laughter.)

12           MS. DYMKAR:  The decision that came out of the summary

13   judgment motions I still find confusing as to what claims got

14   left and what defendants got left, but --

15           THE COURT:  That's Judge Aspen's decision.

16           MS. DYMKAR:  That's Judge Aspen's decision.

17           But in trying to make sense of it, he did leave only

18   four officers potentially liable for the arrest of David

19   Wilbon, Rico Wilbon, and George Smith.

20           And I think for David Wilbon it is only three

21   officers.

22           THE COURT:  Okay.

23           MS. DYMKAR:  And so to the extent that we're talking

24   about false arrest claims, it would be their state of mind.  So

25   if Esquivel is talking to Valentin, but no one communicates to

1   McDermott, Kushiner, Silva, and Garcia, then that does not

2   become part of their state of mind, analysis of their state of

3   mind.

4           THE COURT:  Yeah, so this -- I know you had this in

5   your motion regarding the -- what was the issue we were just

6   reviewing?

7           MS. DYMKAR:  Limiting their testimony regarding the

8   events of 1500 North Menard.

9           THE COURT:  Yeah.  So you're saying because the

10  officers that Ms. Pinkston's directing me to aren't -- don't

11  only have liability exposure here, there is a problem.

12          MS. PINKSTON:  I don't believe that's correct though.

13  I think that the --

14          THE COURT:  Then tell me.

15          MS. PINKSTON:  I don't think that all of those

16  officers were dismissed pursuant to the false arrest claim for

17  Rico Wilbon.

18          MS. DYMKAR:  I looked at it again.  I might be wrong.

19          MS. PINKSTON:  I -- I apologize.  If I had known we

20  were going to raise this issue --

21          THE COURT:  That's all right.

22          MS. PINKSTON:  I did actually just recently make --

23          THE COURT:  A chart.

24          MS. PINKSTON:  -- a chart as to which ones were still

25  remaining.  And I agree that the officer -- the number of

1    officers for David Wilbon's false arrest claim is very limited.

2         But as to the unlawful search, the malicious

3    prosecution claims, and, I believe, the other remaining false

4    arrest claims, they are not as limited.  It is mainly Plovanich

5    and Millan who were the 25th District officers who came later

6    in time that were dismissed from those claims.  And then the

7    other remaining officers were still on.

8         But, even still, if Ms. Dymkar was correct that all of

9    these officers were -- that Esquivel, for example, was

10   dismissed pursuant to false arrest claim, and I don't -- all

11   the false arrest claims, and I don't think that he was, it

12   still is going to be relevant as -- his knowledge is going to

13   be relevant as to the unlawful search claims and the malicious

14   prosecution claims primarily because of the probable cause for

15   the charge of mob action, which is an element of malicious

16   prosecution.

17        THE COURT:  Right.  Who arrested Mr. David Wilbon and

18   Mr. Rico Wilbon?  I mean, if they have -- if there are false

19   arrest claims against some, but not all of the defendants,

20   which defendants arrested these guys?

21        MS. DYMKAR:  I'm not sure.  Are you saying what did

22   Judge Aspen decide?  Judge Aspen decided that Lieutenant

23   McDermott, Officer Kushiner, and Silva were potentially liable

24   for the arrest of David Wilbon.

25        And McDermott, Kushiner, Silva, and Garcia were

1    potentially liable to the arrest of David Wilbon.

2         Oh, wait a minute.  Wait a minute.  This is just -- I

3    just -- if I just read my own writing here or my typing here.

4    The Court ruled that only Lieutenant McDermott and Officers

5    Kushiner and Silva were potentially liable for the arrest of

6    David Wilbon for aggravated assault of a police officer.

7         And that McDermott, Kushiner, Silva, and Garcia were

8    potentially liable for the arrest of the three plaintiffs,

9    David, Rico, and George Smith for mob action.

10        So there is four officers for mob action for the three

11   plaintiffs, and three officers for aggravated assault on David

12   Wilbon.

13        MS. PINKSTON:  But does that -- are you reading from

14   his first order or from the order on your motion for

15   reconsideration?  Because there was a -- there was an error in

16   the first order on the motion for summary judgment that the

17   Court recognized and addressed in an oral proceeding.

18        And then the next reconsideration -- the order on the

19   reconsid- -- the order on the motion for reconsideration solved

20   all of that.

21        I -- if we could table this because, honestly, I -- I

22   don't have it fresh in my mind to --

23        THE COURT:  That's fine.

24        MS. PINKSTON:  -- rattle off.  But I do you agree that

25   there are different officers on each one.  I can -- with the

1   same with the chronology, I would be happy to send, you know, a

2   statement from defendants's position as to what defendants

3   remain on each claim.

4           THE COURT:  I think that would be good to do as a

5   joint venture, as opposed to each side sending their own.

6   Because if we can't even get that straightened out --

7           MS. PINKSTON:  Yes.

8           THE COURT:  -- at this late date --

9           MS. PINKSTON:  It will be a very difficult verdict

10  form.

11          THE COURT:  Yeah.

12          MS. DYMKAR:  Well, I remember spending much time,

13  that's when I first made it, and I first made the chart, was to

14  do the verdict form, which is Exhibit I to the pretrial order,

15  and I believe that correctly lists who is potentially liable

16  for what claim.

17          MS. PINKSTON:  Did you bring that with you?

18          MS. O'MALLEY:  I have it.

19          MS. DYMKAR:  Exhibit I to the pretrial order.

20          But it also makes for a pretrial order that continues

21  for pages and --

22          THE COURT:  A jury verdict form you mean.

23          MS. DYMKAR:  Yeah, I'm sorry.  Pretrial -- the jury

24  verdict form.

25          MS. PINKSTON:  Yeah.  So I believe the false

1    arrest -- I would double check it, but I think the false arrest

2    is correct on plaintiffs's verdict form in terms of the

3    remaining defendants.  And -- but as to the legal search, it is

4    everyone, other than Plovanich and Millan.

5            And then with the malicious prosecution for the mob

6    action, it is everyone, again, except for Plovanich and Millan.

7            So I think that in this particular situation, it

8    absolutely is relevant what each of these officers knew in

9    terms of a show-up or a line-up.

10           THE COURT:  All right.  Where are Plovanich and

11   Millan?  Are they still in the case?

12           MS. PINKSTON:  They are.

13           THE COURT:  For what?

14           MS. PINKSTON:  They are on for malicious prosecution

15   of aggravated assault to a police officer against David Wilbon.

16           THE COURT:  Okay.  Can you send in a chart?

17           MS. PINKSTON:  Yes.

18           THE COURT:  And we got down here, because the issue

19   was collective knowledge as to the show-up and whether the two

20   officers who recall Valentin and Esquivel --

21           MS. PINKSTON:  Valentin recalls what Esquivel told

22   him.

23           THE COURT:  Okay.  So Esquivel says, I remember the

24   show-up, and this is what I remember.  And Valentin says, I

25   talked to -- I'll look at this.  But Valentin says Esquivel

1 | told me this stuff.

2 | MS. PINKSTON:  Right.

3 | THE COURT:  And is there any connection between that

4 | information and any of the officers who are involved with the

5 | -- David Wilbon's malicious prosecution claim who say that's

6 | what Esquivel or Valentin told me?

7 | MS. PINKSTON:  With the only connection --

8 | THE COURT:  It's actually a collective knowledge issue

9 | I'm trying to get.

10 | MS. PINKSTON:  So that's where the recollection fails

11 | other officers.  When they say, I learned this information from

12 | another officer.  Who was that?  I don't recall at this point.

13 | So whether it was Esquivel or Valentin for those other

14 | officers, we do not know.

15 | Kushiner, however, has his own interaction with Keith

16 | Thorton as does Lieutenant McDermott.

17 | Garcia and Silva have -- I don't want to misspeak as

18 | to them, your Honor.  I'm sorry.

19 | THE COURT:  Okay.  No, that's all right.

20 | All right.  I will get something out by close of

21 | business Tuesday.  So it may -- my thought is that it is going

22 | to be more instructive as to the general principle.  Not that

23 | it needs to be proven by some standard that the show-up

24 | happened, but that may not answer who can testify about the

25 | show-up because they're going to need to be able to say, I do

1  remember being told that.

2       But I will drill down a bit on the show-up itself and

3  the concerns you raised last time, Ms. Dymkar.

4       All right.  Anything else that we can get done today?

5       MS. DYMKAR:  I don't think so.

6       THE COURT:  All right.

7       MS. PINKSTON:  I don't think so.

8       THE COURT:  Okay.  Thank you for sending the chart as

9  soon as possible.

10      And then your separate submissions on the other issue,

11 I would appreciate getting those as well.

12      MS. PINKSTON:  Thank you, your Honor.

13      THE COURT:  Have a good long weekend.

14      MS. PINKSTON:  You too.

15      MS. DYMKAR:  Thank you.

16     (Which concluded the proceedings:)

17                    CERTIFICATE

18      I HEREBY CERTIFY that the foregoing is a true, correct

19 and complete transcript of the proceedings had at the hearing

20 of the aforementioned cause on the day and date hereof.

21

22 */s/ Pamela S. Warren*                    September 18, 2017
   Official Court Reporter                           Date
23 United States District Court
   Northern District of Illinois
24 Eastern Division

25