1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   DAVID D. WILBON, et al.,          )
                                       )
 4             Plaintiffs,             )
                                       )
 5        vs.                          )  No. 12 C 1132
                                       )
 6   JOSEPH M. PLOVANICH, et al.,      )  Chicago, Illinois
                                       )  August 17, 2017
 7             Defendants.             )  10:10 A.M.

 8            TRANSCRIPT OF PROCEEDINGS - Status
       BEFORE THE HONORABLE M. DAVID WEISMAN, Magistrate Judge
 9
     APPEARANCES:
10

11   For the Plaintiffs:      LAW OFFICES OF IRENE K. DYMKAR
                              53 West Jackson Boulevard
12                            Suite 733
                              Chicago, Illinois  60604
13                            BY:  MS. IRENE K. DYMKAR
                                   MR. DANIEL HEINZ REGENSCHEIT
14
                              HAMILTON LAW OFFICE, LLC
15                            53 West Jackson Boulevard
                              Suite 452
16                            Chicago, Illinois  60604
                              BY:  MS. TORREYA LYNN HAMILTON
17
     For the Defendants:      CITY OF CHICAGO, DEPARTMENT OF LAW
18                            30 North LaSalle Street
                              Suite 900
19                            Chicago, Illinois  60602
                              BY:  MS. KRISTIN M. PINKSTON
20                                 MS. DANA MARIE O'MALLEY.
                                   MS. ALLISON LYNN ROMELFANGER
21

22                  PAMELA S. WARREN, CSR, RPR
                       Official Court Reporter
23                   219 South Dearborn Street
                            Room 2342
24                   Chicago, Illinois   60604
                          (312) 408-5100
25
```

1    (Proceedings had in open court.)

2    THE COURT:  All right.  Does everyone want to go

3 around and just put your names on the record and then we'll see

4 how far we can get?

5    MS. PINKSTON:  Kristin Pinkston for defendants.

6    MS. O'MALLEY:  Dana O'Malley for defendants.

7    MS. ROMELFANGER:  Allison Romelfanger for defendants.

8    MR. REGENSCHEIT:  Daniel Regenscheit for the

9 plaintiffs.

10    MS. DYMKAR:  Irene Dymkar for the plaintiffs.

11    And Torreya Hamilton will be arriving in a couple of

12 minutes for plaintiffs.

13    THE COURT:  Great.  And when Ms. Hamilton gets here,

14 we'll make that on the record.

15    All right.  So we are continuing our review of the

16 deposition that we have been going on for a while of

17 Mr. Thorton.  And we are at -- I have us at page 145.

18    Does anyone think we're somewhat different?

19    MS. DYMKAR:  144, line 25.  So it is a line before

20 that.

21    And there are a couple of matters I would like to

22 address with the Court before that.

23    THE COURT:  Sure.  Give me one second.  I want to get

24 a red pen because that's how I have been tracking it.

25    (Brief interruption.)

1    THE COURT:  I'm sorry.  Ms. Dymkar, go ahead.

2    MS. DYMKAR:  There was a preliminary ruling by the

3 Court regarding whether Keith Thorton could be asked whether he

4 told anybody that he saw people coming out of the bar.  And you

5 had asked us to try to determine which officer might have said

6 that there was a bar involved.

7    And it is Esquivel, and we have four page citations.

8 I have got a couple of the pages here.

9    So it is Esquivel, 69, 70, 74, 75, 76, and 93.  And I

10 do have a couple of them here where it just clearly says that

11 Keith Thorton said these guys were causing a disturbance

12 outside a bar.

13    MS. O'MALLEY:  I'm sorry, could you read those pages

14 again?

15    MS. DYMKAR:  Sure.  69, 70, 74, 75, 76, and 93.

16    THE COURT.  All right.  Where in the transcript of

17 Mr. Thorton's deposition does that come up?  And did you want

18 me to re- -- I'm assuming you are asking me to reconsider that.

19    MS. DYMKAR:  You said that it would come in, but it

20 was a preliminary ruling.  We just wanted to firm that up.

21    THE COURT:  Oh, perfect.  Okay.  Tell me where we are.

22    MR. REGENSCHEIT:  Page 93, 25 to 94, 18.

23    THE COURT:  Okay.  93, 25.  You are correct.  That's

24 what I have in my notes, conditional and showing an officer

25 said this happened.

1        MS. PINKSTON:  Uh-huh.

2        THE COURT:  All right.  So this exchange, it is

3  basically a question asking Mr. Thorton, is there a bar on that

4  block?  Mr. Thorton, saying, I have no idea.

5        And then some questions as to whether he told -- if he

6  remembers telling a police officer that there was a bar on the

7  block.

8        I had conditionally admitted that conditioned on

9  showing an officer said this happened.  I don't have -- I don't

10  know if I have Mr. -- or defendant Esquivel's transcript, but

11  I'm assuming -- does defense counsel?

12        MS. PINKSTON:  I did not bring it with me, your Honor.

13        MS. O'MALLEY:  No.

14        THE COURT:  One minute.  I may have it.

15        You guys brought a bunch of deps, right?

16        MS. O'MALLEY:  I believe you have all of the deps at

17  this point.

18        MS. PINKSTON:  Yes.

19        THE COURT:  All right.

20    (Brief interruption.)

21        THE COURT:  All right.  So this is page 69 of Noel

22  Esquivel's deposition, lines 13 through 17.  The question is:

23  What, if anything, you did hear him say to any officers or any

24  officers say to him?  The him referring to Mr. Wilbon.  I'm

25  sorry to Mr. Thorton.

1    And the answer:  I heard him say that he was pointing

2  to the gentleman outside the car.  Those were the guys over at

3  Menard causing a disturbance outside the bar.  And he pointed

4  directly at David Wilbon and said he is the one that threw the

5  bottle at the police officer.  So that's 69.

6    Page 70, there is a reference to Officer Esquivel

7  saying, if there was a disturbance outside the bar.  I heard

8  him say that those were the fellows that were causing the

9  disturbance outside the bar.  Again he's referring to

10  Mr. Thorton.

11    Page 74.  Did he again, Mr. Thorton, say where this

12  happened?

13    Answer:  Yeah, outside the bar.

14    Okay.  I'm satisfied that there is a showing that the

15  officer said Mr. Thorton said it happened near a bar.

16    Anything from the defendants on that point?

17    MS. PINKSTON:  No, your Honor.

18    THE COURT:  All right.  Next, Ms. Dymkar.  Thank you.

19    MS. DYMKAR:  The other thing, your Honor, we had -- we

20  filed objections back in June, the idea that maybe if the Court

21  issued a ruling on certain issues, it would go more quickly

22  going through the deposition transcript.

23    And specifically we wanted the Court to make a ruling

24  on testimony of a show-up.  And this is where Keith Thorton

25  says, there was a woman and a man officer -- this is a Document

1    415, page 2.

2           Keith Thorton said that a man and a woman officer told

3    me to get in the car.  I drove in the car past plaintiffs, and

4    I pointed out David Wilbon.

5           And what we said was that these -- the male and female

6    officers were not defendants.  They were never identified

7    throughout the whole case.  They never appeared on event

8    queries or attendance and assignment sheets.  But most

9    important, the defendants never testified that this show-up

10   occurred, that there was a police car, a marked police car,

11   with a man and woman officer that drove past the plaintiffs and

12   David -- and excuse me -- Keith Thorton pointed out the --

13   David Wilbon.  And so --

14          THE COURT:  Let me just understand.  You're saying

15   that the evidence currently based on deposition testimony is

16   that no officer says that type of show-up occurred?

17          MS. DYMKAR:  Right.

18          THE COURT:  All right.  Keep going.

19          MS. DYMKAR:  So we're saying that any alleged

20   conversations between Thorton and the male and female officers

21   are hearsay, and that it is not -- it is not -- it can't be

22   used for collective knowledge of the officers who arrested

23   plaintiffs because they never referred to any kind of a show-up

24   that took place.

25          They say there is an identification that happened a

1    different way, but not that there was a marked car, the male

2    and female officer that drove by.

3            THE COURT:  All right.  Let me stop you.  When you say

4    they say a show-up happened a different way, how different do

5    they describe it?  For example, you talked about a marked car

6    versus an unmarked car.  Are those the differences?

7            MS. DYMKAR:  No.

8            THE COURT:  Okay.

9            MS. DYMKAR:  Officer Kushiner says that Keith Thorton

10   came over on foot.  Keith Thorton denies that.

11           Keith Thorton came over on foot and that he pointed

12   out all the plaintiffs and said that they were all involved.

13   But so there is no show-up, no pointing out of David Wilbon in

14   a car with this male and female officer.

15           And I said we were -- throughout discovery we were

16   never able to identify who these officers were.  We went

17   through attendance and assignment sheets.  We came at it all

18   these different ways, and we could not identify who

19   these -- these would be uniformed officers in a marked car

20   going past.

21           And so anything he says he said to them or they said

22   to him, including an identification of David Wilbon, is all --

23   is all hearsay.

24           And most important is it is not relevant because the

25   defendant officers don't say it happened, don't say they

1    communicated with somebody who drove past for a show-up.

2           THE COURT:  All right.  First of all, for the record,

3    Ms. Hamilton has arrived.  No worries on timing.  I just want

4    the record clear on that.

5           Let me hear from defendants on that issue.

6           MS. PINKSTON:  Sure, your Honor.  This has been argued

7    before, your Honor, and this deposition testimony was provided

8    both in court as well as in Document Number 418.

9           Noel Esquivel testified that he observed a civilian in

10   the back of a marked police car who pointed to plaintiff David

11   Wilbon and identified him as the person he observed throw a

12   bottle at a police officer.

13          The citations are 58, lines 9 through 60, lines

14   20.  65 --

15          THE COURT:  I'm sorry.  Can you start again?

16          MS. PINKSTON:  Sure, 58, line 9 through 60, line 20;

17   65, line 12 through 21; 67, line 15 through 69, line 19; 72,

18   line 12 through 73, line 4; 73, line 10 through 14.

19          Additionally, while I understand it is the Court's

20   argument about what the defendants -- not the Court's argument,

21   excuse me -- the Court's position that it is most relevant as

22   to what the defendants knew at the time.  Plaintiff David

23   Wilbon also testified to observing this show-up.

24          So -- but there is testimony from Noel Esquivel as to

25   observing this civilian in the back of the marked police car.

1        MS. DYMKAR:  Esquivel testified that there was a car

2   parked down the street and that he talked to David Wilbon in

3   the car.

4        What we're concerned about is the communications that

5   he says, you know, they told me to get into the car.  I got

6   into the car.  I told them that that was David Wilbon.

7        All the communications with him are with this male,

8   female officer.  They never could establish that this male,

9   female officer said anything to anybody outside.

10       And so this -- it just -- it is baffling because we

11  could never identify who these officers were and whether this

12  show-up actually occurred.

13       But any communications he had with these two officers

14  who are not defendants, were never named, including an

15  identification of David Wilbon, does not seem to have been

16  communicated to anybody standing in the street or anybody in

17  the station, is totally disconnected from --

18       THE COURT:  So I'm not clear -- I understand the

19  argument.  So one thing I'm not comfortable ruling on now, I

20  want to look at, is what showing needs to be made that the

21  statement was made to begin with?  Because the hearsay issue,

22  presuming those statements were made, I don't see a hearsay

23  problem because it goes to the state of mind of the defendants.

24  They were told this.

25       It is not -- it may not have been true.  But

1  that -- that's what they were told.  And that's why the state

2  of mind exception exists for hearsay because it -- you know, it

3  is not being offered for the truth of the matter; i.e., what

4  the person said, it is being offered to show what the officers

5  knew and why they acted the way they did.

6         But I'm looking at the issue below that which is what

7  showing needs to be made that the statement itself was actually

8  made.  And I'm not clear what you're asking -- I'm not

9  comfortable ruling until I look at that issue.

10        MS. DYMKAR:  Okay.

11        THE COURT:  But I'm not clear on what you're asking me

12  to consider.

13        Give me just one moment, please.

14     (Brief interruption.)

15        THE COURT:  Sorry about that.

16        All right.  So what are you asking me to rule on?  I

17  understand the issue.  As I said, I want to look at the -- I

18  want to look at the issue of what showing needs to be made that

19  the statement was actually made to begin with to satisfy, you

20  know, what I think is an acceptable hearsay exception because

21  it goes to state of mind.  It is not being offered for the

22  truth of the matter.

23        But what are you asking me to do?

24        MS. DYMKAR:  It may not be helpful to addressing this

25  as an issue.  I thought it would be.  But if -- I think what

1    you are saying is you want to see what -- who said what as we

2    work our way through.  I was identifying that as an issue

3    because they -- this show-up -- first of all, we doubt that it

4    happened, but --

5            THE COURT:  Can I just make a comment on this?  So I

6    appreciate your subjective assessment of what you believe and

7    don't believe.  But, again, I'm trying to get us in a good

8    position to have an efficient trial.  And it is one thing to

9    say we doubt it happened.  That's fine.  But it is not really

10   relevant.

11           If there is places where people say this happened, and

12   you question their integrity or credibility, totally fine.  But

13   the record is not we doubt it happened, it would be -- should

14   be people say it happened.  That helps me.

15           It does not help me to decide anything to hear what

16   you believe or don't believe.

17           MS. HAMILTON:  Can I interject?

18           THE COURT:  Sure.

19           MS. HAMILTON:  It was my suggestion actually having --

20   we spent like three and a half hours going through the rest of

21   this and discussing it and trying to figure out if there was

22   stuff that we could agree on --

23           THE COURT:  I appreciate that.

24           MS. HAMILTON:  -- that would make this go a little

25   quicker.

1    THE COURT:  Yeah, I totally appreciate that.

2    MS. HAMILTON:  And so it was my suggestion that we

3  address this show-up issue first because if, depending on your

4  Honor's ruling, you know, there are certain portions -- there

5  is many portions of the next bit of the transcript that

6  plaintiff believes should be out because of the arguments that

7  Ms. Dymkar has made about the show-up being not something that

8  was communicated to the officers, so not a probable cause

9  determination.

10    So whichever way your Honor rules on that, if your

11  Honor was to say, for example, that the show-up is out, then we

12  would have -- certain -- we would be able to tell you certain

13  things.

14    And if the show-up is in, there is additional things

15  we could agree on that would make this faster.

16    So that's the reason why we bring it up first.

17    THE COURT:  Okay.  No, I appreciate that.  So as I

18  understand it, Mr. Wilbon is -- I'm sorry -- Mr. Thorton is

19  saying this show-up happened, and these are the things that I

20  did and this is how the show-up happened.

21    You're questioning the relevance of that.  If that

22  information was never communicated to the officers, okay, I

23  understand that.

24    The city is saying, at least Officer Esquivel says

25  something like this happened.

```
 1        All right.  Do you have other evidence, other than
 2   Officer Esquivel?  And I will pull 418 and look at it.
 3        But do you have other places in the record as it
 4   stands now with depositions where someone is saying something
 5   like this happened?
 6            MS. PINKSTON:  David Wilbon.
 7            THE COURT:  Okay.  And is that cited in 418?
 8            MS. PINKSTON:  No, it is not because, based upon the
 9   oral argument, my understanding was the Court's position was
10   they only wanted a citation to the defendants's testimony as to
11   what the defendants knew, but I can get those citations
12   immediately after this hearing.
13            THE COURT:  Okay.
14            MS. HAMILTON:  So maybe I could suggest, your Honor,
15   that we could just -- I can identify what portions plaintiff
16   objects to based on that issue.
17            THE COURT:  Okay.
18            MS. HAMILTON:  And then your Honor could rule.  And
19   then I think we might be able to talk again and even narrow it
20   down -- just those portions that have to do with the show-up,
21   we'll be able to --
22            THE COURT:  Yeah, we can --
23            MS. HAMILTON:  -- depending on how your Honor rules.
24            THE COURT:  Sure.  We can say this is contingent on
25   the show-up ruling.  I mean, I do -- I appreciate your
```

1    position.  I -- and I -- to me if there is a factual inquiry if

2    that information was conveyed to the officers.  You know,

3    if -- you know, if Mr. Thorton said, I pulled out my yearbook

4    and said, see, I know these guys, and -- that's great

5    information that was never communicated to the officers, I

6    don't know how relevant it is.  You know, that has been the

7    struggle with all of this.

8            So I'm happy to kind of flag that stuff and then look

9    further at the issue.

10           MS. HAMILTON:  Okay.

11           THE COURT:  As I said I'm comfortable with the

12   principle of hearsay involved.  I need to look further at when

13   someone is questioning whether the statement ever happened or

14   was conveyed to anyone.

15           So, you know, people can't use state of mind exception

16   to get in something that at the time they didn't know.  That

17   defeats the underlying principle of the rule.  So --

18           MS. DYMKAR:  Okay.

19           THE COURT:  -- why don't we -- that's a great idea.

20   As we get through those, we can identify those, and I can -- we

21   can kind of move through it more quickly.

22           All right.  Anything else we want to talk about before

23   we --

24           MS. DYMKAR:  No, your Honor.

25           THE COURT:  Okay.  So --

1    MS. O'MALLEY:  I just have one apology.  I didn't

2  print the email from Ms. Hamilton, so I am looking at my phone.

3  So I apologize I had my phone out, your Honor, but --

4    THE COURT:  Do you want a printout of it?

5    MS. O'MALLEY:  No, it is fine.  I can read use my

6  phone.

7    THE COURT:  Oh, okay.

8    MS. O'MALLEY:  I just apologize for having my phone on

9  the table.

10    THE COURT:  That's fine.

11    MS. HAMILTON:  I have it here.  It is because we don't

12  know whether the show-up thing is coming in or not --

13    MS. O'MALLEY:  Right.

14    MS. HAMILTON:  -- I am going to be flipping back and

15  forth, and I might not be as quick as I would like to be, but I

16  think I have it all.

17    THE COURT:  If anyone wants something printed out to

18  help this go quicker, I am happy -- you can send it to my

19  email, and I'm happy to print it out for you if you think

20  that's going to help.

21    MS. O'MALLEY:  I'm okay.

22    THE COURT:  I'm not offended by the phone.  Trust me,

23  I have got teenagers at home.  That's not --

24    Okay.  So Ms. Dymkar corrected me and -- properly

25  saying 144, line 25, is where we stopped.

1          MS. DYMKAR:  Yes.

2          THE COURT:  Okay.  And --

3          MS. HAMILTON:  So plaintiff has an objection based on

4     the show-up issues from 144, 25 to 145, 3.

5          THE COURT:  Okay.

6          MS. HAMILTON:  However if the show-up is in, then

7     plaintiff has no other objections to that.

8          THE COURT:  Okay.  I'm going to mark those SU for my

9     purposes, and then I will know once we rule on that.

10         MS. HAMILTON:  Okay.

11         Ready, Judge?

12         THE COURT:  Yes.  Thanks.

13         MS. HAMILTON:  So then 145, 4 to 145, 22 is agreed.

14         THE COURT:  As being in, correct?

15         MS. HAMILTON:  Yes.

16         THE COURT:  Okay.

17         MS. DYMKAR:  Wait a minute.

18         MS. HAMILTON:  Yes, 145, 23 is not because of the

19    show-up.

20         MS. DYMKAR:  146, 2.

21         THE COURT:  I'm --

22         MS. HAMILTON:  I'm not there yet.

23         MS. DYMKAR:  I'm sorry.

24      (Discussion off the record.)

25         MS. HAMILTON:  Okay.  Don't worry.

```
 1              Okay.  So then 145, 23 to 146, 2 is a show-up
 2   objection.
 3              THE COURT:  Okay.
 4              MS. HAMILTON:  If the show-up comes in, plaintiff has
 5   no other objection to that portion.
 6              THE COURT:  Great.
 7              MS. HAMILTON:  Okay.  Then 146, 3 to 147, 4, is
 8   agreed.
 9              THE COURT:  Perfect.
10              MS. HAMILTON:  Sorry.  So we're at 147.  That's the
11   next designation portion, right?
12              MS. DYMKAR:  Right.
13              MS. HAMILTON:  So 147, 12 to 154, 6, plaintiff is
14   objecting based on the show-up objection.
15              THE COURT:  Okay.
16              I'm sorry, Ms. Hamilton, where does that end, 147, 12
17   to?
18              MS. HAMILTON:  To 154, 6.
19              THE COURT:  Oh.
20              MS. HAMILTON:  So that's a big portion.  But within
21   that -- tell me when you're ready.
22              THE COURT:  Yeah, let me just mark all this, and then
23   I'll get back.
24              If you have objections --
25              MS. HAMILTON:  I have a couple of things -- yeah, a
```

```
 1    couple of things in the bag.

 2            THE COURT:  Okay.

 3            MS. O'MALLEY:  I'm sorry, what was the end of your

 4    number?

 5            MS. HAMILTON:  154, 6.

 6            MS. O'MALLEY:  Thank you.

 7            MS. HAMILTON:  But that's if the show-up.

 8            MS. O'MALLEY:  Yes.

 9            MS. HAMILTON:  And then I'm going to go back through

10    and --

11            MS. O'MALLEY:  That's fine.

12            MS. HAMILTON:  All right.

13            THE COURT:  I've got two more pages.

14            MS. HAMILTON:  Okay.

15            THE COURT:  All right.  All subject to the show-up

16    issue, and then you have additional objections.

17            MS. HAMILTON:  Yeah, and then if we could -- if we can

18    go back, right back to 147, 12, let me go back through it

19    should the show-up come in --

20            THE COURT:  Okay.

21            MS. HAMILTON:  -- sorry that is confusing, but --

22            THE COURT:  No, no, no.  I'm tracking it.

23            MS. HAMILTON:  So 147, 12 to 147, 15, if the show-up

24    is in, no objection.

25            THE COURT:  Okay.
```

1          MS. HAMILTON:  147, 15, up to the word -- I'm sorry.

2          Oh, beginning with the word and to line 20, we object

3     as hearsay.  Plaintiff objects as -- with a -- makes a hearsay

4     objection to that portion.

5          THE COURT:  Okay.  Give me a moment.

6          MS. HAMILTON:  Sure.

7          THE COURT:  Okay.  Defendants's response.

8          So we're looking at 147, line 15 through 20.

9          MS. HAMILTON:  Just beginning with the word and, your

10    Honor.

11         THE COURT:  Yes, thanks.

12         MS. PINKSTON:  I mean, we understand the objection,

13    your Honor.  However it is not being offered for the truth of

14    the matter asserted, it is being offered for context.  Because

15    if the show-up actually comes in, there needs to be some

16    context as to why he's in the back of this car.

17         THE COURT:  Response to that?

18         MS. HAMILTON:  I think that there is some context in

19    other places where he is talking about actions and not what

20    some unknown police officer is actually saying.  And I would

21    actually submit that it is being offered for the truth of the

22    matter asserted because the defendants are putting forth that

23    this show-up occurred, and we're saying that we don't think it

24    did.  So that's the plaintiffs's response.

25         THE COURT:  And Mr. Thorton says the show-up occurred?

1      MS. PINKSTON:  Correct.

2      THE COURT:  The person who is testifying to this.

3      MS. PINKSTON:  Yes.

4      THE COURT:  Okay.  So for the record, the lines that

5  are objectionable, beyond just the show-up issue, and a female

6  officer actually says, she, and the female officer said that,

7  quote, would you like to come with us?  We're going to put you

8  in the back seat of our squad car, go around the block.  The

9  individuals are standing at the vehicle.  We just want you to

10 identify who threw the bottle.  I said, okay, not a problem.

11      I'm going to overrule the objection.  I don't think it

12 is being offered for the truth of the matter.

13      I do understand your objection, Ms. Hamilton, that

14 it -- there is some semblance of it being offered for the truth

15 because it says a show-up occurred, but I think that issue will

16 get swallowed into my ruling on whether the show-up comes in or

17 not to begin with.

18      But I don't -- presuming that I think there is a

19 sufficient showing related to the show-up itself, I don't think

20 those lines are being offered for the truth of the matter over

21 your objection as noted.

22      MS. HAMILTON:  Understood.

23      Okay.  So then 147, 21 to 148, 11, the plaintiff would

24 still like -- would like to be in, even if it -- which is

25 designated by the plaintiff anyways, I believe.

 1          MS. DYMKAR:  If the show-up is in then --

 2          MS. HAMILTON:  Then the plaintiff wants that in.

 3   Which is already designated, I just want to make that clear.

 4          MS. O'MALLEY:  Defendants don't object to that, your

 5   Honor.

 6          THE COURT:  Okay.

 7          MS. HAMILTON:  Okay?  So then moving on to the next

 8   portion.  It is 148, 12 to 148, 19.

 9          THE COURT:  I'm sorry.  Can I -- I just want to make

10   sure I'm tracking it.

11          MS. HAMILTON:  Uh-huh.

12          THE COURT:  The 21 -- 147, 21, through 148, 11, you're

13   saying if the show-up comes in, you want that in.  If the show-

14   up doesn't come in, you don't want that in.

15          MS. HAMILTON:  Correct.

16          THE COURT:  Okay.  I'm tracking you.  Go ahead.

17          MS. HAMILTON:  Yeah.  Right now I'm just going through

18   the portions of the larger chunk that I gave you where if the

19   show-up is coming in, these are our objections --

20          THE COURT:  Okay.

21          MS. HAMILTON:  -- and also non-objections to this

22   portion.

23          THE COURT:  Okay.  Got it.

24          MS. HAMILTON:  So then moving on.  So 148, 12 to 148,

25   19, even if the show-up comes in, plaintiff would register a

1   hearsay objection to this portion.

2          THE COURT:  Okay.  Give me a second.

3          MS. HAMILTON:  Also duplicative.

4          THE COURT:  And based on my prior ruling, what is the

5   truth of the matter -- where in this statement do you think the

6   truth of the matter is being offered?  It is being offered for

7   the truth of the matter.

8          MS. HAMILTON:  I would just -- it is the same --

9          THE COURT:  Okay.

10         MS. HAMILTON:  -- almost the same testimony as the

11  previous objection.  I don't really see much different from it,

12  so I would just state the same objection as that I stated a

13  moment ago.

14        THE COURT:  Okay.  So for the record, the question is

15  do you know these two officers, female, male, officers, saying

16  anything about having been on the 1300 block of North Menard?

17        Answer:  No.  They just simply said, don't worry,

18  we're going to put you in the back of the squad car, and we're

19  going to drive past.  And if you see anybody that matches the

20  description that you gave us, let us know, and that's exactly

21  what they did.

22        Again, I don't see it being offered for the truth of

23  the matter.  I do see why there is some semblance of that.  It

24  is relevant to being the truth of the matter as to the show-up

25  itself occurring, but presuming that I find it -- presuming I

1   find past that issue, I don't think it does anything further

2   than show that the show-up happened.  Or Mr. -- I shouldn't say

3   that.  That Mr. Thorton says the show-up happened.  So that's

4   overruled with your objection noted.

5           MS. HAMILTON:  Okay.  So then the next portion is 148,

6   20 to 149, 12.  And should the show-up come in, then there is

7   no objection to that portion.

8           THE COURT:  Okay.

9           MS. HAMILTON:  Then 149, 13 to 149, 15,

10  plaintiff -- it is plaintiffs's designation, and plaintiff

11  withdraws the designation.  So we don't need that piece.

12          THE COURT:  Okay.

13          MS. HAMILTON:  That can come out.

14          Sorry.  Let me just make sure.

15          THE COURT:  So you want that out even if the show-up

16  part comes in?

17          MS. HAMILTON:  Yes.

18          THE COURT:  Okay.  Defendants have any objection to

19  that coming out?

20          MS. PINKSTON:  No, your Honor.

21          MS. O'MALLEY:  No.

22          THE COURT:  Okay.  So that will be out, 149, line 13

23  through 15.

24          MS. HAMILTON:  Okay.  149, line 16 through 150, line

25  9, plaintiff would like to, even if the show-up comes in, lodge

1    an objection of relevancy.

2           THE COURT:  Okay.  Let me read it.

3           MS. DYMKAR:  And that has to do with your previous

4    ruling, your Honor, about where he was going, whether he was

5    going to a gas station or fire station or it didn't matter.

6           THE COURT:  Okay.

7           MS. DYMKAR:  And so I think it is consistent with your

8    previous ruling.

9           THE COURT:  What's the city's response to relevance?

10          MS. PINKSTON:  Well, your Honor, in terms of the -- it

11   is not the context or -- excuse me -- the purpose of this

12   specific statement here with regard to him saying that he was

13   going to a firehouse is because many of the officers on -- who

14   are defendants in this case believed him to be a fireman.  And

15   so the communication that he was going to the firehouse is

16   relevant for those defendants who don't know his name but are

17   referring to the fireman witness.  So it is not about where he

18   was on his way to, it is about his identification as somehow

19   being associated with a firehouse.

20          THE COURT:  Let me hear from you.

21          MS. HAMILTON:  Yeah, in response to that, it seems

22   that -- I mean, I understand the defendants's argument.  I am

23   not sure because I wasn't part of the -- when we started going

24   through this transcript if that comes up someplace else.  But

25   if we could -- we could just limit it to that.  And it could

1  say, did you ever tell the lieutenant that you were a

2  firefighter?  And the end of that first paragraph is, I was

3  going to the firehouse, and I did tell her that.

4       But the rest of it I don't even think has anything to

5  do --

6       THE COURT:  All right.  Yeah, I like that, that

7  compromise.

8       So the first paragraph Mr. Thorton is saying -- there

9  is reference to saying, I was going to the firehouse, which,

10 again, he was not a firefighter, correct, he was in some type

11 of program.

12      MS. PINKSTON:  He was a volunteer.

13      THE COURT:  All right.  But that would give the jury

14 context.

15      And to the extent officers said they understood him to

16 be a firefighter, that also would give context to that

17 understanding.  So the part where he says, I told her I wanted

18 to go, I was going to the firehouse, I did tell her that, will

19 come in.

20      This next part then goes on, and at that point I was

21 very scared so she said to wait.

22      And then he talks about there is a scene outside and

23 they cleared it, and there is some question about what do you

24 mean by cleared what scene?  That to me is not particularly

25 relevant.  There is a danger of confusion here because whatever

1    that scene was, it may or may not have involved the plaintiffs.

2    And it doesn't seem, unless there is some other part in here,

3    it doesn't seem to get much clearer, and I think it would lead

4    to jury confusion.  So that will go out.

5          So it is out on line 22 at page 149 through line 13 on

6    page 150.

7          MS. HAMILTON:  So --

8          THE COURT:  Oh, I'm sorry --

9          MS. HAMILTON:  Line 10 you mean?

10          THE COURT:  Yeah, line 9.  Page 150, line 9.

11          MS. HAMILTON:  Right.

12          Okay.  Given that ruling, your Honor, we do believe --

13    I think, I just withdrew it -- but the prior, did you call the

14    fire station to tell them you were coming?  No, I was not.  We

15    think that that should -- I know I just told you to withdraw

16    that, but since the fire -- that issue about the firefighter

17    will be coming in, we think that that should come in as well,

18          So it should go from 13 -- you know, did you call the

19    fire station and tell them you were coming?

20          Answer:  No, I was not.

21          Did you -- did you ever tell the lieutenant, the

22    lieutenant that you were a firefighter?

23          Answer:  She asked me where I was going.  I told her I

24    wanted to go to -- I was going to the firehouse, and I did tell

25    her that.

 1          THE COURT:  All right.  That will come back in.  So

 2     line -- page 149, line 13 through 15 just adds fuller context.

 3          So that's in without objection, I take it, from the

 4     defendants, correct?

 5          MS. PINKSTON:  Correct.

 6          MS. HAMILTON:  Okay.  Then the next line would be page

 7     150, line 10 through 150, line 21.  And then if the show-up

 8     comes in, then the plaintiff has no objection to that portion.

 9          THE COURT:  Okay.

10          MS. DYMKAR:  And line 22 is just -- that should never

11     have been designated as something we wanted in.  There was just

12     some problems with the equipment.

13          MS. HAMILTON:  So plaintiff withdraws 150, line 22.

14     It is actually Irene talking to the videographer, so --

15          THE COURT:  Okay.

16          MS. PINKSTON:  And we understand we're going to be

17     removing the objections and that sort of thing as well,

18     correct?

19          MS. HAMILTON:  Yeah.

20          THE COURT:  Yeah.

21          MS. PINKSTON:  Okay.

22          THE COURT:  So just for the record, I don't think

23     there is any objection to any of this.  150 line 22 through --

24          MS. HAMILTON:  Plaintiff withdraws.

25          THE COURT:  Yeah.  You don't want that in, right?

1          MS. HAMILTON:  Correct.

2          THE COURT:  Okay.  Line -- so line 22 at 150 through

3    151, line 5, there is all this stuff with the videographer.

4          That -- if you can get that out, we'd like all that

5    out.

6          MS. PINKSTON:  Yes, your Honor.

7          MS. HAMILTON:  Okay.  Then continuing with should the

8    show-up come in, beginning line 51 -- 151, line 6 to 153, line

9    19, no objection.

10          THE COURT:  Okay.

11          MS. HAMILTON:  Okay.  Then are you ready?

12          THE COURT:  Uh-huh.

13          MS. HAMILTON:  Then 153, line 20 to 154, 6, which I

14    think brings us up to the chunk that we were talking about for

15    the show-up, we would like to make a hearsay objection --

16          THE COURT:  Okay.

17          MS. HAMILTON:  -- in addition to the show-up.

18          THE COURT:  Okay.

19          MS. PINKSTON:  I'm sorry, what was that part?

20          MS. HAMILTON:  153, 20 to 154, 6.

21          THE COURT:  Okay.  So your objection is hearsay,

22    correct?

23          MS. HAMILTON:  Yes.

24          MS. DYMKAR:  It is our alternate objection.

25          THE COURT:  Uh-huh.  What's the city's response?

1      MS. PINKSTON:  No objection.  We can take that out.

2      THE COURT:  Okay.

3      MS. HAMILTON:  Are we ready?

4      THE COURT:  Yeah.

5      MS. HAMILTON:  So then beginning 154, line 7 to 155,

6  line 9, it is agreed.

7      THE COURT:  That's all in?

8      MS. HAMILTON:  Yes.

9      THE COURT:  Great.

10      MS. HAMILTON:  Okay.  Then we have another chunk that

11  is objected to because of the show-up.  So that's 156, 4 to

12  157, 23.

13      THE COURT:  And so your objection is to show-up?

14      MS. HAMILTON:  Yes.

15      THE COURT:  Okay.

16      MS. HAMILTON:  If we could do the same thing that we

17  just did on the previous chunk --

18      THE COURT:  Yeah.

19      MS. HAMILTON:  -- we objected to, and this portion --

20  chunk is not very professional, is it?

21      THE COURT:  It is apt.  157 through 23, correct?

22      MS. HAMILTON:  Yes.

23      THE COURT:  Okay.  And do you have additional

24  objections beyond the show-up?

25      MS. HAMILTON:  Yes.

```
 1          THE COURT:  Okay.

 2          MS. HAMILTON:  Let me just get to those.

 3          So if the show-up comes in, then from 156, 4 to 156,

 4   14, plaintiff withdraws her designations.  So if this portion

 5   comes in, plaintiff withdraws the designations.  You could just

 6   withdraw them either way I suppose.

 7          THE COURT:  I'm not following that.  So if it doesn't

 8   come in because of show-up, you don't want it in.

 9          MS. HAMILTON:  It is not -- right, exactly.

10          THE COURT:  I understand.  Let me just make a note of

11   that.

12          Understood.

13          MS. HAMILTON:  Okay.  Then 150 --

14          THE COURT:  I'm sorry.  Before you move forward, does

15   the city want this in?  That was -- you didn't have that.

16          MS. HAMILTON:  156, 4 to 14.

17          MS. PINKSTON:  Yeah.

18          No, we don't have it, your Honor.  Thank you.

19          THE COURT:  Okay.  Go ahead, Ms. Hamilton.

20          MS. HAMILTON:  Okay.  156, 15 to 156, 22, should the

21   show-up come in, plaintiff has no objection to that portion.

22          THE COURT:  Okay.

23          MS. HAMILTON:  Okay.  And then 156, 23 to 157, 7,

24   plaintiff, in addition to the show-up objection, would lodge a

25   hearsay objection.
```

```
 1              THE COURT:  Hearsay.  Okay.  Let me look.
 2              MS. HAMILTON:  And a relevance objection.
 3              THE COURT:  Okay.  Let's start with your relevance
 4      objection.  I'm not tracking that one.
 5              MS. HAMILTON:  Okay.  Well, so I guess maybe this is
 6      kind of close to the show-up objection already, so I'm not sure
 7      if I am just restating it.  But because these are statements
 8      made -- that were made between him and these unknown police
 9      officers who were never identified and not subject to any sort
10      of cross examination, I'm not sure that it is relevant to the
11      case.  So I think I maybe just stated the show-up objection
12      again.
13              THE COURT:  Okay.
14              MS. HAMILTON:  Sorry.
15              THE COURT:  All right.  So you want to focus -- I'm
16      going to overrule the relevance objection because it summarizes
17      the statement he says to these two officers, albeit you can't
18      identify them, who then repeated it to one of the defendant
19      officers.
20              Can I ask a quick question?  On page 157, line 5, it
21      says, at that point they -- these were the two officers that
22      have not been identified -- pulled up.  They talked to one of
23      the officers there.
24              Are they talking about an officer at a deposition or
25      just there on the scene?
```

1      MS. PINKSTON:  In terms of what Keith Thorton knows?

2      THE COURT:  Yes.

3      MS. PINKSTON:  Keith Thorton doesn't know which

4  officer that they spoke to.

5      THE COURT:  Okay.  So the -- I think it is relevant.

6  There -- it is officers conveying information about what

7  Mr. Thorton just did, which was identify someone.  So --

8      MS. HAMILTON:  Understood.

9      THE COURT:  -- there is relevance there.  I understand

10  the show-up objection, how that is linked there.

11      MS. HAMILTON:  Okay.

12      THE COURT:  Now let me look at it for hearsay.

13      MS. DYMKAR:  Your Honor, can I state further what you

14  just read?  That they told them exactly what I said.  There is

15  abbreviation in some things that Keith Thorton said.  So he

16  said, they said exactly what I said, and we don't know what

17  that is.  And defense counsel could have questioned further

18  during the deposition about, you know, what is it that got

19  communicated from the man or woman officer in the car to

20  anybody else, and they didn't.

21      So exactly what I said, I think the Court has ruled

22  previous in this deposition transcript that you can't have this

23  telescoped.  You know, whatever I said, that's what was told to

24  them because that's not defined.

25      THE COURT:  I have done that in the past in this case

1   with this transcript where the answer was everything I just

2   told you is what I said or words to that effect.  And that was

3   so ambiguous as to everything in the deposition.  What does

4   that mean?

5           But in this context, here's a question and answer,

6   tell me exactly what you said.

7           Let me search farther back.  This is on page 156, line

8   23.

9           Question:  What, if anything, did you say to either of

10  the two officers in the car?

11          Answer:  I just told you that these -- I just told you

12  that three minutes ago, ma'am.  Quote, that's the guy right

13  there, close quote.

14          Question:  Tell me exactly what you said.

15          Answer:  Quote, that's the guy right there in the red

16  with the dreadlocks, dark skinned.  That's him right there,

17  close quote.

18          The answer continues.  At that point they pulled up,

19  they talked to one of the officers there and said they told

20  them exactly what I said, and we left.

21          To me in context they told them exactly what I said is

22  clear that he has just told -- said twice now, that's the guy

23  right there, that's the guy right there in the red with the

24  dreadlocks, dark skinned, that's him right there.  Something

25  like that.  That's how he normally communicates.

1    So I agree with you I have said in the past in this

2  transcript, you know, a general everything I just said isn't

3  sufficient.  But in context here I don't think there is any

4  ambiguity as to the gist of what he was saying.

5    You're right, defense counsel could have asked more

6  questions and so could you have.  So --

7    MS. DYMKAR:  The other --

8    THE COURT:  -- that I think we'll stay with.

9    But let me focus on the hearsay next.

10    Do you have something else before I get to hearsay?

11    MS. DYMKAR:  It might be the hearsay.

12    THE COURT:  Okay.

13    MS. DYMKAR:  But we don't know who he's talking to,

14  and we don't know if it is any of the defendants.  We had a

15  large number of officers come out of the 15th District and were

16  there.  I mean, there are certain ones we have identified and

17  were involved in this particular arrest.  But who were the two

18  officers in the car communicating to him whether it was one of

19  the defendants or not --

20    THE COURT:  Yeah, that is -- I agree with that,

21  Ms. Dymkar.

22    What's the city's response to that?

23    MS. PINKSTON:  It is not being offered for the truth

24  of the matter asserted that this is the person who threw the

25  bottle.  What it is is, and, again, the deposition citations

1    for defendant Esquivel has been provided, along with -- I will

2    provide the citations to the plaintiffs's deposition.

3         This is information that was absolutely communicated

4    to at least one defendant officer that was relied upon in

5    arresting David Wilbon.

6         So it goes, obviously, to defendants's state of mind.

7         MS. DYMKAR:  This -- I don't think any of the

8    defendants said that there was a man -- a male and a female

9    officer who communicated anything to them about an

10   identification.

11        I don't think you can identify -- there is nobody who

12   said that this -- there is no defendant who said that this

13   show-up, driveby show-up, occurred.  Esquivel says he talked to

14   Keith Thorton in a car, but that was down the street.  It

15   wasn't -- and it said that it wasn't a communication between

16   officers.

17        THE COURT:  Okay.  So we have got two levels of

18   hearsay here.  First of all, what Mr. Thorton says he said is

19   hearsay.

20        MS. DYMKAR:  Uh-huh.

21        THE COURT:  It is being offered for the truth of the

22   matter because it -- the only relevance to that is that he's

23   identified the person in this context.  Because it is true we

24   don't know who was told this information.  So simply because

25   he's present in court or via deposition, he can't repeat an

1    out-of-court statement and use it for the truth of the matter.

2              Now if the testimony had been that he said that's the

3    guy right there, and I told defendant Esquivel that that was

4    the guy, then it would not be offered for the truth of the

5    matter, it would be being offered for defendant Esquivel's

6    state of mind, why did he arrest Mr. Wilbon.

7              MS. DYMKAR:  Right.

8              THE COURT:  But that's not what we have here.  So it

9    is being offered for the truth of the matter there.

10             But there is a second level of hearsay because, as

11   Ms. Dymkar says, then he says the two officers told some other

12   officers he's picked out the guy.

13             Now I'm -- I will reconsider this if Esquivel says two

14   officers -- or you can show me some other way where Esquivel or

15   one of the defendant officers was saying, I heard this

16   information from, you know, close enough, for judicial

17   purposes, that it is -- I heard this information that Thorton

18   picked out Mr. Wilbon from one of my fellow officers that meets

19   this, this exchange, I'll reconsider.

20             But right now we have got hearsay.  Mr. Wilbon -- I'm

21   sorry -- Mr. Thorton saying to the officers, that's the guy.

22   And then the officers saying to some other officers, not our

23   defendant officers as the record stands now, that's the guy.

24             Those are two levels of hearsay.  So the hearsay

25   objection is going to be sustained.

1    MS. HAMILTON:  Okay.  So that was 156, 23 to 157, 7.

2    THE COURT:  Yes.

3    MS. HAMILTON:  Okay.  So then 157, 8 to 157, 10.  If

4    the show-up comes in, no objection.

5    THE COURT:  Okay.

6    MS. HAMILTON:  157, 11 to 157, 16, we're making a

7    hearsay objection again.

8    THE COURT:  Okay.

9    MS. HAMILTON:  Line 11 through line 16 on 157.

10    MS. O'MALLEY:  We'll agree to that, your Honor.

11    THE COURT:  Okay.  So that's out as hearsay.

12    MS. HAMILTON:  Then 157, 17 to 157, 23, should the

13    show-up testimony come in, then there is no objection to that

14    portion.

15    THE COURT:  Okay.

16    MS. HAMILTON:  Okay.  That should take care of that

17    portion.  The larger portion that I mentioned before, was all

18    objected to because of show-up.

19    Now moving on 157, 25 to 158, 8, is agreed.

20    THE COURT:  Okay.  Let me ask counsel something now.

21    So this editing, having done some of this in the past, is -- it

22    is not as easy as just highlighting on a piece of paper.  So

23    I'm just looking, as an example, page 157, line 24, and it

24    reads after you --

25    MS. PINKSTON:  Uh-huh.

1    THE COURT:  -- strike that -- after you entered the

2  police station.

3    Obviously the substantive rulings I have made and we

4  have argued, those are important.  To me -- and I just want to

5  get an agreement with the parties -- if in the editing process

6  they are like we cannot get rid of this one -- these four words

7  after you strike that after you entered the police station, I

8  want to have an agreement with the parties no one is going to

9  throw a fit or an objection if those kind of extraneous things

10  from an editing standpoint just have to stay in.

11    We're all good with that?

12    MS. HAMILTON:  We are good with that.  Where it

13  matters -- I'm actually -- where a line -- we believe a line

14  needs to be broken up for some other objectionable reason, I'm

15  noting that clearly --

16    THE COURT:  Okay.

17    MS. HAMILTON:  -- so --

18    THE COURT:  Okay.  And, city, you're good with that?

19    MS. PINKSTON:  Yes.

20    THE COURT:  Okay.  Continue, Ms. Hamilton.

21    MS. HAMILTON:  I think the next designation begins at

22  159, 6.

23    THE COURT:  Yes.  Between --

24    MS. HAMILTON:  So 159, 6 to line 18.  159, 6 to 18,

25  plaintiff is objecting because of the show-up.  The same show-

```
 1    up argument.

 2           If the show-up comes in, that's the only objection

 3    plaintiff has to that portion.

 4           THE COURT:  Okay.  Let me just read this real quick.

 5           MS. HAMILTON:  Sure.

 6       (Brief interruption.)

 7           THE COURT:  Okay.  Go ahead.

 8           MS. HAMILTON:  Okay.  I believe the next portion is --

 9    begins on 159, 22.

10           THE COURT:  Uh-huh.

11           MS. HAMILTON:  So 159, 22 to 160, 18, is agreed.

12           THE COURT:  Okay.

13           MS. HAMILTON:  And then 160, line 19 through 162, line

14    7, plaintiff has the show -- objection based on the show-up

15    argument.  And --

16           MS. O'MALLEY:  I'm sorry, 162, what?  Seven?

17           THE COURT:  Seven.

18           MS. HAMILTON:  Yes, sorry.

19           So then -- once everybody is ready.

20           THE COURT:  Okay.  Sorry.

21           MS. HAMILTON:  No problem.

22           So then I'd like to take that portion and go through

23    it --

24           THE COURT:  Okay.

25           MS. HAMILTON:  -- and give you the plaintiffs's
```

1    objections and agreements should the show-up be admissible.

2         THE COURT:  Okay.

3         MS. HAMILTON:  Okay.  So from page 160, line 19 to

4    161, line 11, that is -- plaintiff has no objection if the

5    show-up comes in.

6         THE COURT:  Okay.

7         MS. HAMILTON:  The next one is a little tricky.

8    Sorry, Judge, I need to turn to it.

9         THE COURT:  Take your time.

10        MS. HAMILTON:  Sorry.

11       (Brief interruption.)

12        THE COURT:  You can't have an objection to that though

13   because it is a question.

14        MS. HAMILTON:  I think -- I think when we were reading

15   --

16        THE COURT:  Well, I shouldn't say that.  It would be

17   hard pressed to have an objection --

18        MS. HAMILTON:  I know.

19        THE COURT:  -- seeing the question.

20        MS. HAMILTON:  So when you look at the answer, it is

21   -- clearly there is an answer of the -- there is a question at

22   the end that is what's being answered.  And so I guess

23   plaintiffs's objection would be that it is extraneous.  It is

24   not really what the witness is testifying to.  It is a

25   question, yes, but it is not actually what the testimony is

1  being provided -- it is not testimony.

2         THE COURT:  Okay.  So you're objecting 161, 12 through

3  line 15.

4         MS. HAMILTON:  161, 12 through 14 through the word

5  red.

6         THE COURT:  Red.

7         MS. HAMILTON:  The question that the witness answers

8  and the testimony provided is actually in response to the

9  question that begins at the end of line 14 with the word did.

10  Did the man or woman officer talk to any of the officers

11  outside the vehicle?

12         Answer:  I'm quite sure they went outside.  I was

13  inside so I do not know who they spoke to, if they spoke to

14  anyone.

15         THE COURT:  All right.  The part you're objecting to

16  is when you pulled up in front of the six or seven individuals

17  in handcuffs and you pointed out a person who was wearing -- in

18  dreadlocks wearing red.

19         MS. HAMILTON:  Right.

20         THE COURT:  And then the question continues, did the

21  man or a woman officer talk to any of the officers outside the

22  vehicle?

23         MS. HAMILTON:  Right.  If it doesn't make sense

24  without the first clause, when you pulled up in front of the

25  six or seven individuals in handcuffs, did the man or woman

1  officer talk to any officers outside the vehicle, I mean, just

2  to orient the question, I don't know if the videographers can

3  even do that, but we would like to make the request.

4       THE COURT:  All right.  But I just -- before I even

5  entertain it, this your question though, correct?

6       MS. HAMILTON:  Yes, sir.

7       THE COURT:  Okay.  It is going to be overruled.

8       MS. HAMILTON:  Okay.

9       THE COURT:  Just for the record, it is -- I don't see

10  there is any jury confusion.  And, generally speaking, there is

11  -- you know, the -- the question itself, it is not an answer.

12  If it misstates the record, so be it.  No one objected to it,

13  and it is your question, so --

14       MS. HAMILTON:  Understood, your Honor.

15       THE COURT:  I wouldn't be as cavalier if it were not

16  your question, but that's how you framed it.

17       MS. HAMILTON:  Understood.

18       And then 161, 20 to 162, 7, should the show-up come

19  in, plaintiff would like to also lodge a hearsay objection to

20  that portion.

21       THE COURT:  Okay.

22       MS. DYMKAR:  There is also a possible jury confusion

23  and ambiguity there in his answer.

24       THE COURT:  In the same exchange?

25       MS. DYMKAR:  Pardon me?

1          THE COURT:  In the same exchange?

2          MS. DYMKAR:  Yes.

3          THE COURT:  All right.  Let me finish reading, and

4   then I'll hear you out.

5          MS. DYMKAR:  Okay.  Sorry.

6       (Brief interruption.)

7          THE COURT:  All right.  Ms. Dymkar, I cut you short.

8   Tell me the jury confusion issue, and then we'll discuss

9   hearsay.

10          MS. DYMKAR:  Okay.  I believe the male passenger just

11  gave a thumbs up is ambiguous.  A thumbs up means yes, but yes

12  to what.  And it relates to like to what he is saying to the

13  male and female officer, which we're saying shouldn't come in.

14          So the thumbs up indication, it is a gesture, which is

15  a communication.  That's where the hearsay objection comes in.

16          But it is also ambiguous and could confuse the jury.

17          THE COURT:  All right.  I see that.  Tell me -- what's

18  the city's view on this?

19          MS. PINKSTON:  So I suppose we're operating under the

20  context that the show-up is coming in, what this particular

21  objection would be.  I don't -- if the show-up is coming in,

22  then I don't see how this is causing jury confusion.

23          Oh, you're talking about hearsay, your Honor?

24          THE COURT:  Well --

25          MS. PINKSTON:  I would have to look at case law, to be

1    honest.  I don't think this is hearsay.  They were talking

2    about a gesture.  It is not an out-of-court statement.

3          THE COURT:  Actually there is pretty good case law

4    that gestures can be -- let me get the rule.  But I know there

5    is case law on -- they looked at whether a dog indicating as a

6    positive drug test is a communication, and there is case law.

7    But I know within the -- within human communication -- let me

8    pull the rule real quick.

9          MS. PINKSTON:  I suppose -- I understand that gestures

10   can be communication.  But what is -- I think the issue is the

11   drug --

12         THE COURT:  Let me just stop you, just so the record

13   is clear.

14         MS. HAMILTON:  Sure.

15         THE COURT:  Rule 801 statement.  801(a), statement

16   means a person's oral assertion, written assertion or

17   non-verbal conduct if the person intended it as an assertion.

18   So I think it is well established that non-verbal conduct can

19   still be a statement.

20         I interrupted you.  So here's where -- here's where I

21   am on this.  So the jury confusion issue, I think Ms. Dymkar is

22   correct, it is not clear what the non-verbal thumbs up gesture

23   means because we don't know what was said to begin with.  We

24   don't know who is saying it.  And it can mean a whole bunch of

25   different things.  It could mean, let's get coffee after this.

1    I have no idea.

2            And just so I'm clear on this, the male passenger who

3    gives a thumbs up, we don't know who that is, do we?

4            MS. PINKSTON:  No, your Honor.

5            THE COURT:  Okay.  So it is not that one of the

6    defendant officers will say, yeah, I remember this happening,

7    and I gave them a thumbs up.  There is nothing like that.

8            MS. PINKSTON:  No, your Honor.

9            MS. DYMKAR:  It is not clear who the male passenger is

10   communicating to either.

11           THE COURT:  Yeah, no, I think that those are all true,

12   and I -- I think there is a hearsay issue.  But I'm more

13   concerned about how this is relevant because it -- I know there

14   is a continuation of events, but there is communication in here

15   or evidence of communication that we don't know about.  So like

16   to me there is jury confusion here and relevance.  It is not

17   clear how this is, other than context.  It is not clear to me

18   how it is relevant, so I would sustain the objection.

19           MS. HAMILTON:  So that's 161, 20 to 162, 7.

20           THE COURT:  Correct.

21           MS. HAMILTON:  Okay.

22           THE COURT:  I'm not reaching the hearsay issue though.

23           MS. HAMILTON:  Okay.  Then I believe the next portion,

24   designation, begins 162, 9.  That would be plaintiffs's

25   portion.  And plaintiff would still like that to come in.  So I

```
 1   don't know if the defendants have any objection.

 2          162, 9 to 24.

 3          THE COURT:  And this will be the last chunk before

 4   Ms. Warren needs to take a break.

 5          MS. HAMILTON:  Okay.  It is 187 pages long, so we're

 6   getting through it.

 7          THE COURT:  Yeah.

 8          MS. PINKSTON:  No objection from defendants.

 9          THE COURT:  Okay.  So one -- page 162, line 9 through

10   24 is going to come in.  Correct?

11          MS. HAMILTON:  Yes.

12          THE COURT:  All right.

13       (Brief recess.)

14          MS. PINKSTON:  While we were waiting -- oh, the

15   citations for David Wilbon, do you want it on the record?

16          THE COURT:  Sure.

17          MS. PINKSTON:  The citations to the David Wilbon

18   deposition transcript where his testimony reveals that he also

19   observed some type of show-up, page 62, line 21 through page

20   67, line 11.

21       (Discussion off the record.)

22          THE COURT:  Okay.  Back on the record.

23          MS. HAMILTON:  Okay.  Back on the record with the

24   Thorton designations.  I believe we were at 162, 25.

25          THE COURT:  Correct.
```

1    MS. HAMILTON:  So from 162, 25 to 163, 10, plaintiff

2 objects on relevance.  And just to -- this is a portion where

3 he's talking about basically sitting -- after he is sitting in

4 the police station, and he's talking about stuff that doesn't

5 really seem relevant.

6        THE COURT:  Okay.  Let me read this.

7     (Brief interruption.)

8        THE COURT:  What's the city's view on this?

9        MS. PINKSTON:  That's just what I was going to ask

10 you, if you were going to withdraw after that.

11       MS. O'MALLEY:  Yes.

12       MS. PINKSTON:  So we'll agree to that, your Honor.

13       THE COURT:  Okay.

14       MS. PINKSTON:  With the understanding that it would be

15 162, line 25 through --

16       MS. HAMILTON:  164, 2.

17       MS. PINKSTON:  -- 164, 2, yeah.

18       THE COURT:  All that is out.

19       MS. HAMILTON:  Yes.  Because plaintiffs did some --

20 just so the record is clear, plaintiff is withdrawing

21 his -- plaintiffs are withdrawing their designations from 163,

22 line 11 to 164, line 2.

23       THE COURT:  Okay.

24       MS. HAMILTON:  Okay.  Then moving on.  164, I think

25 the next designation begins at 21 --

```
 1              MS. O'MALLEY:  Correct.

 2              MS. HAMILTON:  -- to 166, 5.  There is no objection,

 3    so that --

 4              THE COURT:  That's in?

 5              MS. HAMILTON:  Yes.

 6              THE COURT:  Great.  Okay.

 7              MS. HAMILTON:  Okay.  And then the next portion I

 8    believe is 166, 9.  And so from 166, 9 to 167, 17, there is

 9    also no objection.  So that's agreed.

10              THE COURT:  Okay.

11              MS. HAMILTON:  And -- are you ready, Judge?

12              THE COURT:  Uh-huh.

13              MS. HAMILTON:  I'm sorry.

14              So then there is a -- sort of a little bit of a

15    different kind of situation.  The transcript at 166, 18 to 23,

16    if you could look there.

17              THE COURT:  Okay.

18              MS. HAMILTON:  So I have discussed this with defense

19    counsel.  There appears to be something incorrect in the

20    transcript.  And there is a video here.  And so if you see

21    where it says at line 19, it says, it names the Officer

22    Kronovich, but there is no Kronovich.  That was obviously

23    Plovanich.  And we think that the video actually says

24    Plovanich.

25              So I'd ask defense counsel if they would be willing to
```

1   stipulate and correct the transcript.  And we're going to check

2   the video and verify that it does says Plovanich.  And if it

3   does, I believe we're going to be in agreement about that.

4          MS. O'MALLEY:  That's correct.

5          THE COURT:  Okay.

6          MS. HAMILTON:  And so --

7          THE COURT:  And where -- and just so I'm clear, we're

8   talking about the video coming in anyway, correct?

9          MS. HAMILTON:  Uh-huh.

10         THE COURT:  Correct?  We're just using the

11  transcript --

12         MS. HAMILTON:  Right.

13         THE COURT:  -- to help us do that part.

14         MS. PINKSTON:  Right.

15         MS. O'MALLEY:  So our intention was we'll just watch

16  that part of the video.  I'm sure it says Plovanich.  I just

17  want to check it --

18         THE COURT:  Sure.

19         MS. O'MALLEY:  -- so we're okay.

20         THE COURT:  Okay.

21         MS. O'MALLEY:  It would make sense because the next

22  one is Millan.  So as long as it says that, then this obviously

23  can come in.

24         MS. HAMILTON:  Yeah.

25         THE COURT:  Okay.  So, Ms. Hamilton, we're -- I

1   understand where we are, line 18 through where?

2           MS. HAMILTON:  23.

3           THE COURT:  Okay.

4           MS. HAMILTON:  We think that --

5           THE COURT:  Subject to city confirming.

6           MS. HAMILTON:  Correct.

7           THE COURT:  Okay.

8           MS. HAMILTON:  So then beginning on line -- we think

9    the fact that we would like one -- line 18 to 23 ending with

10   the word ma'am to come in with the corrected transcript, you

11   know, should the transcript actually be used at trial for some

12   purpose.

13           And then plaintiff logs an objection on line 23, page

14   166, beginning with the word I, going in to page 167, line 5,

15   based on the show-up objection.

16           MS. DYMKAR:  There is a reference to the show-up, so

17   if the show-up comes in, then that whole answer should come in.

18           THE COURT:  All right.  And how far on 167 are you

19   going on that?

20           MS. HAMILTON:  167, 5.

21           THE COURT:  5.  Okay.  So this is all show-up.

22           MS. HAMILTON:  And other than that objection with

23   respect to the show-up, there is no other objection.

24           THE COURT:  Okay.

25           MS. HAMILTON:  Then 167, line 6 to 167, line 12, no

```
 1    objection.

 2            THE COURT:  Okay.

 3            MS. HAMILTON:  One -- stop me if I am going too fast.

 4            THE COURT:  No.

 5            MS. HAMILTON:  167, 19 to 169, 4, no objection.

 6            THE COURT:  And the city is in agreement, correct?

 7            MS. O'MALLEY:  That's correct.  This is what we worked

 8    out before today, your Honor.

 9            THE COURT:  Okay.  Perfect.  I'll stop asking now.

10    Unless I hear from you, I'll assume you have no objection as

11    well.

12            Okay.

13            MS. HAMILTON:  So I ended at 169, 4.  And the next

14    designation begins 169, 11 to 170, 23, no objection.

15            THE COURT:  Great.  Okay.

16            MS. HAMILTON:  Okay.  Then beginning page 170, line 24

17    to page 172, line 2, plaintiff would like to allege a couple of

18    objections.

19            THE COURT:  Okay.

20            MS. HAMILTON:  So first we'd make a hearsay objection

21    to portions of it.  We would also make a 403 prejudice, it is

22    more prejudicial than probative objection.

23            THE COURT:  Okay.

24            MS. HAMILTON:  I'm sure you want to read it now.

25            THE COURT:  Yeah.  Give me a second.
```

1      (Brief interruption.)

2          THE COURT:  And where does this stop?

3          MS. HAMILTON:  172, 2.

4          THE COURT:  Okay.

5          Okay.  All right.  I have read it.  Tell me your

6  objections.

7          MS. HAMILTON:  So we object to the conversation with

8  the assistant State's Attorney as hearsay.  And we also think

9  there is portions of that conversation that they're prejudicial

10  about how he was feeling and some other portions of it that we

11  believe are -- they are just prejudicial, and they are not

12  probative of anything, any claim or defense.

13          THE COURT:  All right.  Let me hear from the city.

14  How -- let's start with the probative issue, how does this meet

15  401 to begin with?

16          MS. O'MALLEY:  Well, your Honor, we're actually in

17  agreement with 170, 24 through 171, line 17, coming out.

18          THE COURT:  Okay.

19          MS. O'MALLEY:  Those are actually plaintiffs's --

20          MS. HAMILTON:  Oh.

21          MS. O'MALLEY:  -- designations.

22          Our offering is 171, 18 through 20, where he

23  identifies Mr. Wilbon to the ASA.

24          MS. HAMILTON:  I'm sorry, can you say again what

25  you're in agreement with?

1          MS. O'MALLEY:  Yeah, absolutely.

2          We're in agreement with 170, line 24 through 171, line

3 17.

4          MS. HAMILTON:  Okay.

5          MS. O'MALLEY:  And then we offer line 171, line 18

6 through 171, line 20.

7          THE COURT:  Okay.  So, Ms. Hamilton, let's focus on

8 171, lines 18 through 20.

9          What's your objection there?

10         MS. HAMILTON:  Irene.

11         MS. DYMKAR:  Oh, it is a hearsay objection.

12 There -- he's talking about talking to the State's Attorney and

13 identifying David Wilbon.  And then -- that's a hearsay

14 discussion with him and a State's Attorney.  And the State's

15 Attorney is not going to recall that happening.  And -- so, you

16 know, all the conversations and all the testimony in court, all

17 the happenings in court, we're saying are hearsay, in addition

18 to, you know, what he ends up saying about being afraid and

19 they're taunting and staring at me.

20         THE COURT:  Well, we're at 18 through 20.

21         MS. HAMILTON:  Yeah, just 18 through 20.

22         MS. DYMKAR:  Okay.

23         THE COURT:  All right.  So -- and whether or not the

24 State's Attorney's Office remembers this statement being made,

25 why isn't this hearsay or subject to an exemption?

1      MS. PINKSTON:  So I do recognize that in the context

2  this is an out-of-court statement because he's saying if he was

3  asked if he recognized David Wilbon.  That's correct.

4      And who asked that?  Whoever the gentleman was.

5      And you said that you recognized him as a person that

6  threw the bottle.  That is correct.  I did identify him.

7      So in terms of the actual hearsay, the -- whether the

8  action of identifying him, once again, in court goes to

9  corroborating the identification on scene, which is essential

10  to the malicious prosecution claim here.

11      It is not about, once again, whether David Wilbon is

12  -- did in fact throw the bottle, but, rather, the fact that the

13  identification occurred itself.

14      THE COURT:  All right.  Let me make sure I'm

15  understanding this.  No one is going to be questioned whether

16  Mr. Thorton identified Mr. Wilbon as the person who threw the

17  bottle, right?  There is going to be no -- do you anticipate

18  impeaching him?  I mean, you know what his testimony is going

19  to be.  Do you anticipate impeaching him on the fact or is

20  there something in here that impeaches him that he never made

21  the initial identification?

22      I know you don't believe it.  I know you don't trust

23  it.  But there is an exception of hearsay for a prior

24  consistent statement to rebut recent fabrication.  There is a

25  couple other ways you can use it to rebut.

1          But the -- if you're not doing that, this is hearsay.

2     Even though he is in court, this is what Judge Kendall refers

3     to as just because you're here you cannot -- doesn't mean you

4     can say it.  He is repeating an out-of-court statement here in

5     the deposition, which would be his testimony at trial.  And

6     the -- the only relevance I'm hearing is that he identified the

7     guy.  We already know he's done that.  He's going to say he did

8     that, and it is going to come in for other reasons.

9          But here it is to the State's Attorney.  I don't

10    know -- unless it is being used to rebut a suggestion of recent

11    fabrication or the rules have been expanded somewhat as to what

12    other reasons you can do it, he's giving it to a third party

13    whose state of mind is not relevant at all.  So to me this is

14    hearsay, unless I'm missing something.

15          MS. PINKSTON:  I don't -- I don't think the ASA's

16    state of mind is completely irrelevant, only to the extent that

17    they have to prove with the malicious prosecution claim that

18    the dismissal was indicative of innocence.  So the fact that

19    the State's Attorney is the one who dismissed the charges, the

20    reason for dismissing the charges does go to the element of

21    indicative of innocence.

22          THE COURT:  Are you calling the State's Attorney?

23          MS. PINKSTON:  I believe so.

24          MS. O'MALLEY:  I think so.

25          MS. PINKSTON:  Yeah.

1    MS. DYMKAR:  But we don't even know who Keith Thorton

2  is talking to.  You said you recognized him as the person who

3  threw the bottles.  So we don't even know who Keith Thorton

4  thinks he's talking to or he doesn't report who he's talking

5  to.

6         He refers to the gentleman.

7         MS. PINKSTON:  But our purpose isn't that it is

8  necessarily being made to the State's Attorney, but rather that

9  it is -- it is supporting his prior identification of David

10 Wilbon.

11        THE COURT:  All right.  On that basis I am going to

12 sustain the objection.  It is hearsay.

13        MS. HAMILTON:  Okay.  Then I think we're at 172, 3.

14 And from 172, 3 until -- well, hold on.

15        I have that right -- I'm sorry.

16        THE COURT:  I have got line 21, and he said, you don't

17 have to stay.

18        MS. HAMILTON:  So I believe Ms. O'Malley said that

19 they agreed.  We had objected up until 172, 2.  But they had

20 only agreed up until 17 -- we have only dealt up with to 171,

21 20.

22        Am I correct?

23        THE COURT:  That's correct.

24        MS. HAMILTON:  Okay.  So then that still leaves our

25 objection from 171, 21 to 172, 2.

1          THE COURT:  And what's your objection there?

2          But that's what you guys want in.

3          MS. HAMILTON:  Okay.  We just had it in one big chunk,

4  so we'll --

5          THE COURT:  Am I missing this?

6          MS. PINKSTON:  No, it is the designation.

7          THE COURT:  Yeah.

8          MS. HAMILTON:  It is their designation.

9          MS. O'MALLEY:  We'll agree that it is withdrawn.

10         THE COURT:  Okay.  So you -- all right.

11         And that's through 172, 2, correct?

12         MS. HAMILTON:  Correct.

13         THE COURT:  Okay.  So that's all out.

14         Now we're on 172, 3.

15         MS. HAMILTON:  Yes.  So 172, 3 to 173, 9, is mixed,

16  both plaintiff and defendant designations.  And plaintiff

17  objects to this portion based on relevance and also for

18  portions of it are hearsay.

19         THE COURT:  Okay.  You have no objection to 172, line

20  3 through line 10, correct?

21         MS. HAMILTON:  No, 172, line -- we do.  We're

22  withdrawing it.  I just am putting it in one big -- we'll

23  withdraw our designation from 173 -- '72, 3 to 172, 10,

24  depending on how you rule on the plaintiff -- on the

25  defendants's designations.

```
 1              THE COURT:  Oh, okay.
 2          MS. HAMILTON:  I was putting it altogether --
 3              THE COURT:  Got it.  Understood.
 4          MS. HAMILTON:  -- because ours is only proposed if
 5   theirs --
 6              THE COURT:  Understood.  Okay.
 7          So tell me your objections to there.
 8          MS. O'MALLEY:  Okay.  So this section we have a
 9   relevance objection and a hearsay objection for portions of it.
10   You'll see -- you'll be able to tell which ones are the
11   hearsay.
12              THE COURT:  Okay.
13          MS. DYMKAR:  And prejudice too.  The taunting, staring
14   at me.  They were taunting and staring at me.
15              THE COURT:  How far does this go, 173?
16          MS. HAMILTON:  Nine.
17              THE COURT:  Okay.
18          All right.  Let's start with the relevance, prejudice
19   objection.  Let me hear from the city on this.
20          MS. PINKSTON:  In terms of relevance, it does go to
21   the malicious prosecution claim in terms of why Mr. Thorton is
22   asking to leave.
23              THE COURT:  And is the case dropped this day?
24          MS. PINKSTON:  Yes.
25              THE COURT:  Okay.  And what does the assistant State's
```

1    Attorney say about Mr. Thorton being there and why -- how that

2    relates to whatever the disposition was.

3              MS. HAMILTON:  I think the transcript says, doesn't

4    it, that it says we have one witness here, but police officer

5    is not here.  I think that's all it says.

6              MS. PINKSTON:  That was my recollection as well, and I

7    don't -- yeah, I believe that's what it says.

8              THE COURT:  Okay.

9              MS. PINKSTON:  On the transcript for the court

10   hearing, yes.

11             THE COURT:  And is that going to be -- is that going

12   to come into evidence?

13             MS. PINKSTON:  We are not offering it.

14             THE COURT:  Is the State's Attorney -- assistant

15   State's Attorney going to -- has someone interviewed him?  Is

16   his recollection or her recollection consistent with that?

17             MS. PINKSTON:  I -- I don't -- yeah, I mean, my -- my

18   recollection is that there is not a memory of this particular

19   date.

20             THE COURT:  Okay.

21             MS. HAMILTON:  Judge, we may have to, perhaps, as past

22   recollection recorded or --

23             THE COURT:  The transcript?

24             MS. HAMILTON:  Depending on what -- right.  We

25   don't -- haven't decided yet because we actually

1   haven't -- nobody took the deposition of the State's Attorneys?

2          MS. PINKSTON:  That's correct.

3          MS. DYMKAR:  But we talked to them at the time when

4   depositions were taking place, and they had absolutely no

5   recollection.

6          MS. PINKSTON:  That was my recollection as well of

7   what happened.

8          THE COURT:  All right.  Let's kind of just do this in

9   chunks, using your legal term.

10         Page 172, line 11 through line 24 is going to be out

11  based on 403.  Here he's talking about -- Mr. Thorton is

12  talking about being taunting -- being taunted at and stared at

13  and he's uncomfortable being in the courtroom.  And

14  he's -- earlier in the testimony he -- it is not even clear who

15  they're -- who he's referring to.  There is earlier testimony.

16         The question says, you said that that there were many

17  people there.  Are you talking about David Wilbon's family

18  members?

19         Answer:  I don't -- and the question continues.

20         Or are you talking about other criminal defendants.

21         Answer:  I have no idea who they were, but they were

22  definitely with him and his party.

23         And I don't know who they were because then he says,

24  they were taunting and staring at me.  I think there is an

25  issue of jury confusion.  And it is prejudicial because what

1    Mr. Wilbon -- even if we presume to be Mr. Wilbon's family

2    members, there is a danger the jury will think that Mr. Wilbon

3    has done something wrong because his family members are doing

4    something.

5            So all that is out through line 24 on page 172.

6            So I don't know if that addresses what the plaintiffs

7    want in, but right now line 11, 172 is out.

8            Now as to the malicious prosecution, the testimony

9    then continues.

10           Question:  And this is outside the courtroom?

11           Answer:  This was in the back of the courtroom, in the

12   courtroom.

13           Question:  So he -- referring, presumably, to the

14   State's Attorney said, after you said that, he said you could

15   leave.

16           Answer:  I said -- I asked him what am I doing here?

17   I came here.  I did what I had to do.  Am I done here?

18           He said yes, everything is fine, you can go.

19           Now to me there is the same issue of the jury

20   confusion because as Ms. Dymkar correctly points out, it is not

21   even clear who he's talking to.

22           I don't understand the relevance.  The relevance

23   offered by the city is it goes to malicious prosecution claim.

24   But this doesn't change -- this really doesn't add to the

25   malicious -- malicious prosecution calculation.  It doesn't

1    explain what the State's Attorney did or why they did it.  So I

2    don't see the relevance.  It is a malicious prosecution claim.

3            MS. PINKSTON:  Yeah, based upon -- right.

4            Based upon the testimony regarding his fear and

5    asking -- and telling the who we presume to be the State's

6    Attorney that he doesn't feel safe here, defendants would agree

7    that that portion doesn't add anything.

8            THE COURT:  All right.  So all that is going to be

9    out.

10           Now Ms. --

11           MS. HAMILTON:  Yeah.

12           THE COURT:  Is line 21 on page 170 through 10, line 10

13   on 172 now out?

14           MS. HAMILTON:  Yeah.  I think we're out now all the

15   way up to 173, 10, which I know is not yet on your transcript,

16   but a --

17           THE COURT:  All right.  So now we're at 173, 10.

18           MS. HAMILTON:  So we apprised defense counsel of this,

19   but I have the right to designate, though it is not previously

20   designated and I apologize for that, line 37 -- 173, 10 through

21   174, 1.  I don't know if they have any objection.  I let them

22   know last night that we would be asking.

23           THE COURT:  Have you guys had time to think about this

24   from the city?

25           Take a second.

 1          MS. O'MALLEY:  I haven't looked at that this morning.

 2          THE COURT:  Take a second.  I'm going to -- I'm going

 3   to grab my phone.

 4       (Brief interruption.)

 5          THE COURT:  Okay.  Whenever you're ready.

 6          MS. O'MALLEY:  Based on your prior rulings, your

 7   Honor, we don't believe that this is relevant.

 8       (Discussion off the record.)

 9          MS. O'MALLEY:  And I should add, your Honor, we're

10   also willing to withdraw 174, 2 through 12, based on the

11   rulings that we talked about just a minute ago.

12          THE COURT:  Okay.

13          MS. HAMILTON:  So --

14          THE COURT:  Let me just --

15          MS. HAMILTON:  Yeah.

16          THE COURT:  All right.  Tell me why this is relevant.

17          MS. HAMILTON:  Okay.  So the only -- we don't actually

18   want the whole thing, but, unfortunately, the way that it

19   is -- the answer comes out, what we want is one little piece

20   right in the middle.  It doesn't really make sense without the

21   whole thing, so that's why we proposed it that way.

22          THE COURT:  Tell me.

23          MS. HAMILTON:  So the piece that we think is relevant

24   is the fact that Mr. Thorton says the officers were there.  And

25   I think that there will be a defense that the reason the case

1  was dismissed is because the officers weren't there, so that's

2  the -- that's the relevancy.

3          MS. PINKSTON:  Do you want us to respond, your Honor?

4          THE COURT:  Sure.

5          MS. PINKSTON:  He doesn't identify what officers they

6  are.  We don't know if these are any defendant officers or if

7  they're officers that are there for another case in the

8  courtroom.

9          THE COURT:  Yeah, I'm -- I don't see the relevance of

10  this.

11          First of all, whether the officers were there or

12  not -- well, strike that.

13          Whether Mr. Thorton saw the officers there or not does

14  not seem very probative.  Why the State's Attorney or assistant

15  State's Attorney chose to dismiss the case is the issue.  If he

16  says the officers weren't there, that's why I dismissed the

17  case.  And he was the wrong, but he's -- his reasoning was

18  still he thought the officers weren't there.  That's -- that is

19  more relevant than an ambiguous reference to the officers were

20  on the right side sitting on the benches, without more linking

21  it to any of the 11 or so defendants we'd have.

22          So I -- I don't -- I see there is a marginal probative

23  value, but the potential jury confusion in other -- and general

24  lack of relevance tells me this should stay out.

25          MS. HAMILTON:  Okay.  Then if -- I think defendants

```
 1      just withdrew their 174, 2 through 12.
 2              THE COURT:  Correct.
 3              MS. PINKSTON:  Yes.
 4              MS. HAMILTON:  So then plaintiff will withdraw 175, 5
 5      through 19.
 6              THE COURT:  Okay.
 7              MS. HAMILTON:  And also withdraw 176, 8 through 17.
 8              THE COURT:  Okay.
 9              MS. HAMILTON:  And then the next portion of
10      designation is 176, 18 to 177, 20.
11              THE COURT:  Okay.
12              MS. HAMILTON:  Plaintiff objects to that portion based
13      on hearsay.
14              THE COURT:  Okay.
15              MS. PINKSTON:  Based on prior rulings, your Honor, we
16      will he withdraw that, 176, line 18 through 177, line 20.
17              THE COURT:  All right.
18              MS. HAMILTON:  Okay.  The next portion is -- begins
19      178, 18 through 178, 22, no objection.
20              THE COURT:  Okay.
21              MS. HAMILTON:  Then beginning 178, 23 to 179, 11,
22      plaintiff objects based on hearsay.
23              THE COURT:  Okay.
24              MS. DYMKAR:  And duplicative.
25              MS. O'MALLEY:  Could we just have one minute, your
```

1    Honor?

2            THE COURT:  Sure.

3            Tell me when you're ready.

4        (Brief interruption.)

5            MS. PINKSTON:  We're ready.  I'm so sorry, your Honor.

6            THE COURT:  That's all right.  So your objection is

7    hearsay?

8            MS. O'MALLEY:  Yes, and also I think it is

9    duplicative.

10           THE COURT:  All right.  So let's talk about hearsay,

11   and then we can deal with cumulative.

12           MS. PINKSTON:  About the hearsay objection, your

13   Honor?

14           THE COURT:  Yes.  Yes, please.

15           MS. PINKSTON:  Okay.

16           THE COURT:  Is -- let me you ask this, is the lady

17   lieutenant --

18           MS. PINKSTON:  A defendant, yes.

19           THE COURT.  Okay.  Go ahead.

20           MS. PINKSTON:  So this is absolutely going to -- this

21   information was communicated to a defendant officer.  So it is

22   being offered to afford the officer's state of mind in terms of

23   the information that she received and then acted upon.

24           THE COURT:  All right.  So let me just stop you there.

25           What's your response to that for state of mind for

1    hearsay?

2         MS. DYMKAR:  She doesn't report that that's what was

3    said to her.  McDermott.

4         THE COURT:  What does Lieutenant McDermott say?

5         MS. PINKSTON:  So essentially what we're coming down

6    to in terms of the argument that's going to be made is that

7    Lieutenant McDermott testified at her deposition nearly four

8    years later that, generally speaking, this is what he

9    communicated to her.

10        So the situation in terms of these particular details,

11   that is not in her deposition transcript.  She says, I don't

12   remember the details.  I remember that he pointed out the SUV.

13   These -- this is the group of people.  He followed them here.

14        So I believe that's what Ms. Dymkar is getting to in

15   terms of Lieutenant McDermott not testifying to these exact

16   details.

17        THE COURT:  Is that what you're getting at,

18   Ms. Dymkar?

19        MS. DYMKAR:  It is, your Honor.  Unfortunately I don't

20   have McDermott's testimony here.

21        THE COURT:  That's all right.  I do.  Give me a

22   moment.  Let me see what I can find.

23     (Brief interruption.)

24        THE COURT:  All right.  This is just the first

25   reference in Officer -- Lieutenant McDermott's testimony.  This

1   is on page 99 of her deposition.

2           Question:  At that time when you learned that there

3   was -- there were people outside, there was an incident outside

4   the 15th District of the police station, at that time did you

5   speak to the private citizen who is alleging that he saw what

6   happened on the 1300 block of North Menard?

7           Answer:  I don't know specifically at that time what

8   time you're referring to.  But I did speak to the witness

9   who -- that said he observed the offenders that were charged in

10  this case or I approved probable cause or did the TRRs for,

11  that he observed them do those acts, enter that car, follow

12  them, and never lost sight of them, and that these were the

13  same offenders that were right there present on the scene.

14          Question:  Where did this conversation take place?

15          Answer:  I don't recall specifically, but I do recall

16  speaking to him in the lobby of the 15th District."

17          So that's just my first reference to lobby.  I know

18  there is lobbies -- it goes on from there.

19          MS. PINKSTON:  So, your Honor, I will represent that

20  it doesn't get much more detailed than that.  So we're

21  essentially at that same dispute between the parties that she

22  doesn't have a good recollection of this.  He obviously does

23  with the time period.  And so that's why it is -- it obviously

24  goes to her state of mind.

25          Once we get into the OEMC transcript, it is -- she

1   also calls over the radio, so it is clear that she is speaking

2   with this individual.  And so in terms of explaining her state

3   of mind, this testimony is absolutely relevant as to that.

4          THE COURT:  So just from a hearsay standpoint,

5   Ms. Dymkar, is it your position that for something to be

6   admissible as a state of mind exception, it needs to track

7   exactly what the witness whose state of mind is impacted by the

8   statement recalls?  So the declarant, as well as the person who

9   heard it, have to be in complete sync for it to be admissible?

10          MS. DYMKAR:  I wouldn't say in those absolute terms.

11          THE COURT:  Because it seems Lieutenant McDermott is

12   saying she had a conversation that generally conveys this

13   information, so I'm trying to understand the hearsay objection.

14          MS. DYMKAR:  It is that this is more detailed than her

15   general recollection was.  I'm not saying it has to track it

16   exactly, but she was very -- she was very vague throughout her

17   testimony as to what she was told.  She didn't take a

18   statement.  She doesn't know what she was told.

19          THE COURT:  All right.  I'm going to overrule the

20   objection on hearsay grounds.  I think there is also an

21   objection as being cumulative, but I don't -- I'm going to

22   overrule it on cumulative grounds as well.  I don't think there

23   has been that much testimony on this point, especially as to

24   Lieutenant McDermott.

25          So that will be in.  Line -- page 178, line 23,

1　through 179, line 11, is in.

2　　　　MS. HAMILTON:  Did you say 179, line 11?  Okay.

3　That's where we are?

4　　　　THE COURT:  Yes.

5　　　　MS. HAMILTON:  Okay.  So then 179, 12 to 179, 20,

6　plaintiffs would like still -- would like to be in.  I don't

7　know if defendants have an objection or not.

8　　　　MS. PINKSTON:  No objection.

9　　　　THE COURT:  Okay.  That should come in.

10　　　　MS. HAMILTON:  Okay.  Unfortunately, the next

11　designation is going to break a line up.  So 180, line 6 to

12　line 9, up to the word time, no objection.

13　　　　THE COURT:  Okay.

14　　　　MS. O'MALLEY:  Before that, your Honor, I think we

15　need to include 180, line 3 through 5, because it is going to

16　switch over to Ms. Pinkston at this point.  So just for jury

17　confusion.

18　　　　THE COURT:  Yeah.  You guys have no objection,

19　correct?

20　　　　MS. O'MALLEY:  We just didn't designate it, sorry.

21　　　　THE COURT:  Okay.

22　　　　MS. HAMILTON:  No objection.

23　　　　THE COURT:  All right.  So then continuing,

24　Ms. Hamilton, you're saying through time, on line 9, is coming

25　in?

1        MS. HAMILTON:  Right.

2        THE COURT:  Okay.

3        MS. HAMILTON:  And then beginning on that page on line

4   9, the word I, through line 12.  Plaintiff objects based on

5   prior hearings -- prior rulings of your Honor, hearsay, and

6   relevance.

7        THE COURT:  Through where, Ms. Hamilton?

8        MS. HAMILTON:  Through line 12 on the same page.

9        THE COURT:  Okay.

10       MS. PINKSTON:  Yes, your Honor, based upon prior

11   rulings we would agree to that.

12       THE COURT:  Okay.  So that's out.

13       MS. HAMILTON:  So the videographer is going to have to

14   break up that line 9 after the word time.

15       MS. PINKSTON:  Uh-huh.

16       MS. HAMILTON:  Okay.

17       THE COURT:  Oh, I'm sorry?

18       MS. HAMILTON:  No.  So page 180, line 13 through line

19   24, plaintiff withdraws -- plaintiffs withdraw their

20   designation.

21       THE COURT:  Okay.  So that's out.

22       Okay.

23       MS. HAMILTON:  Then line -- page 180, line 25 through

24   118, 3, plaintiff objects based on prior rulings and hearsay.

25       MS. PINKSTON:  Your Honor, I would say -- I'm sorry,

1    do you want us to respond?

2            THE COURT:  Sure.

3            MS. PINKSTON:  I think this is going to be relevant to

4    the anticipated arguments regarding the missing audio.

5            THE COURT:  Okay.  Let's deal with lines 4 through 7

6    on page 181.  That question is.  "Did you see officers with

7    their guns drawn?

8            Answer:  No, ma'am, not at all."

9            MS. HAMILTON:  We didn't get to that yet.

10           THE COURT:  Oh.

11           MS. HAMILTON:  Plaintiff has no objection to that

12   piece.

13           THE COURT:  Okay.  So that's coming in.  Thanks.

14           All right.  So you're just focusing on the 911 call.

15           MS. HAMILTON:  180, 25 to 181, 3.

16           THE COURT:  Okay.

17           MS. DYMKAR:  Your Honor, we did take the testimony of

18   Jill --

19           THE COURT:  That's right.  Tell me why him being a

20   non -- asking to be anonymous has to do with being able to find

21   the 911 call?

22           MS. O'MALLEY:  Because that -- the OEMC individual, at

23   Ms. Maderak's deposition, she was asked about anonymous calls.

24   And she said that one of the reasons -- she did speak to

25   whether a call would be marked anonymous.

```
 1              THE COURT:  But there is no call found, correct?

 2              MS. O'MALLEY:  Right.  So it would not have been -- so

 3    we asked about preservation as to whether it would have been

 4    collected when they did their search, and she spoke to

 5    anonymous calls on that issue.

 6              THE COURT:  And what does she say?

 7              MS. O'MALLEY:  I thought she said that if a call was

 8    marked anonymous, they would not be able to search the number

 9    that it came from.

10              I apologize, I can't recall it as I here sit here

11    right now.

12              MS. PINKSTON:  I was not at the deposition, but my

13    recollection was that it -- it was highly relevant as to the

14    individual dispatcher who took that call as to what information

15    would have been put in and then how it would have been

16    searchable.

17              THE COURT:  All right.  Let me ask you this.  Hold on.

18    My understanding was that there was a thorough search, not just

19    for Mr. Thorton's name or Mr. Thorton's number, but that you

20    have searched, electronically speaking, high and low to find

21    this 911 call, or is that not true?  I don't -- I don't know.

22              MS. O'MALLEY:  That is true.

23              MS. PINKSTON:  No, this is true, your Honor.

24              THE COURT:  Okay.

25              MS. PINKSTON:  I think we're dealing now with certain
```

1    issues as far as what the retention would be based upon it

2    being marked anonymous.

3            THE COURT:  That's fair.  But -- and that's what I am

4    trying to get to.  Does the -- is one of the city's

5    explanations that in our search high and low, we may not have

6    been able to search everything because we didn't retain the

7    right stuff?

8            MS. PINKSTON:  Yes.

9            THE COURT:  Ms. Dymkar, what's your --

10           MS. DYMKAR:  Yeah.

11           THE COURT:  That's what I am trying to figure out.

12           MS. DYMKAR:  The reason why we took the deposition

13   from Jill Maderak is that every time there is a 911 call, there

14   is an event number given.

15           THE COURT:  Yes.

16           MS. DYMKAR:  If you don't keep the audio, you at least

17   have the event number and you have the text of what was said.

18   And this was definitely -- would have been related to this

19   incident.

20           There is no 911 call, and there is -- and there are

21   ways that it could have been traced.

22           THE COURT:  Well, we better be careful.  There is no

23   recording of a 911 call.  Because Mr. Thorton continues to

24   persist that he made a 911 call.

25           MS. DYMKAR:  Jill Maderak confirmed in her deposition

1     that there -- that there would have been some trace of it,

2     either have the audio -- you have the audio.  You have an event

3     number.  You have the -- the text.  That's not destroyed.

4             THE COURT:  Okay.

5             MS. DYMKAR:  Now if the --

6             THE COURT:  Do you agree with that, from the city's

7     perspective?

8             MS. PINKSTON:  In terms --

9             MS. O'MALLEY:  With respect to her deposition, no.

10    What she did say was that that call would have to be linked to

11    that event number.

12           So, for example, if there is a 911 call that comes in

13    complaining about an event that's occurring on Menard, unless

14    the 911 call taker linked that 911 call to the event number at

15    Menard, it would not have been related.

16           THE COURT:  What would have been retained?  Would the

17    notes -- are the notes of every 911 call retained?

18           MS. O'MALLEY:  Yes.

19           MS. PINKSTON:  Yes.

20           MS. O'MALLEY:  Event queries are retained for four

21    years.

22           THE COURT:  Okay.

23           MS. HAMILTON:  Yes.  And they can -- and just to add

24    to this, just from previous experience, with Jill and these

25    cases, they can still -- it is not uncommon at all to be

```
1    given -- if there is an incident where lots of different people
2    are calling and some of them are remaining anonymous, if there
3    is a shooting, for example, you could get ten different events.
4    Some of them never even linked, but they are able to by the
5    time and the approx- -- the location -- the approximate
6    location, they're able to search and bring -- give you all
7    the -- all the event queries, whether or not they're
8    ever -- there is actually a term for it, whether they're
9    linked, which is the word we're using here.  There is another
10   word that they use at OEMC -- with the main event query that
11   ends up being the main event query for the incident.  So --
12         MS. DYMKAR:  You know, there is an event number given
13   to every 911 call.  When they can trace it to a particular
14   event, then they do a cross reference.
15         MS. HAMILTON:  That's the --
16      (Laughter.)
17         MS. DYMKAR:  Yeah.  So the main event number would be
18   cross referenced with this other event number.  But -- but the
19   event number for the 911 call would still continue.
20         So like you'll have these mini event queries or
21   these event reports from event queries of 911 calls.  Some of
22   them may be linked, and some of them may not be linked.  But
23   they still -- they still exist.
24         And if the Court recalls, there was a disclosure by
25   defense counsel late in the game.
```

1          MS. HAMILTON:  I recall.

2          MS. DYMKAR:  And that was the anonymous 911 calls that

3    they said that Ms. Jenea (phonetic), I think from OEMC, had

4    kept those back because she, for some reason, thought the city

5    didn't want them or whatever.  But that came in late.

6          But we got those anonymous phone calls.  And no

7    one -- no one is proposing that we use any of them.

8          But they don't just appear.  They're trackable and

9    traceable, and there is some -- there is some evidence of the

10   call, whether it is the full audio and event number and

11   event -- the text or not.  But it is -- you know, she said that

12   every -- every call that comes in there is an event number

13   given to, and --

14         THE COURT:  All right.  I have heard enough,

15   the -- I'm going to keep this out for a couple different

16   reasons.  First and primarily, the only -- the only relevance I

17   have heard is that there is a possibility that this phone call

18   was anonymous and, therefore, it may explain why the phone call

19   has not been found.  It doesn't sound like anyone is saying

20   that the phone call would not have been retained.  It is an

21   issue of finding the right phone call.

22         But there is two maybes here that make me think it --

23   under 403 it does not have sufficient probative value to get

24   in.

25         The first maybe is that the phone call was anonymous.

1    The deponent, Mr. Thorton, says, I probably said anonymous, not

2    -- that he says he definitely did.

3           And the second maybe is that maybe because it was

4    anonymous, it cannot be -- is readily linked.  But that's not

5    even clear based on what I am hearing here.  And I don't hear

6    the city objecting to factual recitations being made about the

7    tracking of the phone calls.

8           So those two probablys and maybes make it distantly

9    relevant and would seem to me to create more jury confusion

10   than clarity, so I'm keeping it out.

11          MS. HAMILTON:  So that's 180, 25 through 181, 3.

12          THE COURT:  Correct.

13          MS. HAMILTON:  So then no objection to 181, 4 through

14   7.

15          And then if I can just ask Irene.

16      (Discussion off the record.)

17          MS. HAMILTON:  Then 118, 8 through 183, 17, is

18   plaintiffs's designation, I believe.  And I don't know if the

19   city had any objection to it.

20          MS. O'MALLEY:  Yes.

21          THE COURT:  Okay.  Let me hear from you, Ms. O'Malley.

22          MS. O'MALLEY:  This is a section where there was an

23   affidavit drafted for this deposition as to why Keith Thorton

24   was unavailable to come to Chicago for his deposition.  And

25   this is Ms. Pinkston going through and following up on

1    questions that were asked by Ms. Dymkar that are not included

2    in the marked transcripts for the trial about who drafted that

3    affidavit, what assistance was given, what questions he had

4    about the affidavit.

5            There is an inference that counsel is -- in the

6    questioning from Ms. Dymkar that are not included in this

7    transcript.  There is an inference that defense counsel did

8    something wrong in trying to communicate with Mr. Thorton to

9    organize his deposition.  So it is not relevant at all to his

10   trial testimony.

11           MS. HAMILTON:  And, Judge, just to respond, so

12   the -- I guess the important piece of information here is that

13   Mr. Thorton very clearly at first says that he is the one that

14   typed up the affidavit, which forces --

15           THE COURT:  Can I just stop you there?

16           MS. HAMILTON:  Yeah.

17           THE COURT:  So I know -- I remember looking at this

18   earlier.

19           MS. HAMILTON:  Yeah.

20           THE COURT:  Is this in?  Is that portion in?

21           MS. DYMKAR:  Yeah, I believe it is.

22           THE COURT:  Okay.

23           MS. DYMKAR:  I think the Court ruled -- I think you

24   ruled that that was because of bias.

25           THE COURT:  Okay.  So -- and I just want to

1    understand, so from -- that's coming in -- you're trying to

2    show bias based on the affidavit.

3         And then even though this is the city's questioning,

4    the plaintiff wants this in.

5         MS. HAMILTON:  So --

6         THE COURT:  Go ahead.

7         MS. HAMILTON:  Right.

8         THE COURT:  So I just want to understand this.

9         MS. HAMILTON:  Because I'm on page 39 --

10        THE COURT:  Okay.

11        MS. HAMILTON:  -- line 14.  And I believe this is in.

12   It -- he is clearly asked -- I'm talking about the affidavit.

13   The affidavit is in front of him.  It is an exhibit to the

14   dep -- to the deposition.  And he's asked very clearly:  "Did

15   you type up this affidavit?

16        "Answer:  That is correct.

17        "You typed it up?

18        "That is correct."

19        So he's asked twice, and he says twice that he's the

20   one that typed it up.  Which forces Ms. Pinkston and Ms. Dymkar

21   to ask follow-up questions later, which is what we're talking

22   about now.

23        Ms. Pinkston actually has to correct him because she

24   knows that that's actually not true, so -- and so then she has

25   to ask questions to clear it up later because he actually

1    didn't type it up.

2           So it is a point of impeachment.

3           THE COURT:  I understand that.

4           MS. HAMILTON:  Yeah.

5        (Brief interruption.)

6           MS. O'MALLEY:  Your Honor, I apologize, I was wrong.

7    I had it marked that it was not coming in.

8           I guess to the extent that it was allowed, the section

9    where Ms. Dymkar was questioning, it was allowed in then.  This

10   section should come in.

11          THE COURT:  All right.  It makes -- yeah, it makes

12   sense to me.  I know Ms. Dymkar has spent a lot of effort

13   trying to impeach this witness on things that I don't think are

14   relevant.  But his statement under oath as to a fact related to

15   this litigation, that sort of turns out not to be true, I

16   think, is fair impeachment.

17          As I understand the context of where we are now,

18   Ms. Pinkston tried to clean that up in the deposition, as we

19   say, in legal lay person's term.  But clean up from the

20   plaintiffs's standpoint you think is further -- further helps

21   impeach him, I suppose.  Is that what you're getting to?

22          MS. HAMILTON:  Well, at least it was -- yes.  I mean,

23   because later on there is section where Ms. Dymkar also asks

24   about this, but this is -- happens to be Ms. Pinkston asking

25   questions because she had to --

```
 1            THE COURT:  Okay.

 2            MS. HAMILTON:  -- fix something so it wasn't perjury

 3   essentially.

 4            THE COURT:  What are the -- what are the city's

 5   objections now that we know that the first part is coming in?

 6   I just want -- I want you to be able to clearly make your

 7   record and make sure I'm not missing something.

 8         (Brief interruption.)

 9            MS. HAMILTON:  Just one second, Judge.

10            THE COURT:  Okay.

11         (Discussion off the record.)

12            MS. O'MALLEY:  So from 181, 8 through 182, 16, based

13   on the fact that the prior testimony is coming in, then we

14   don't have an objection to this.

15            THE COURT:  All right.  You persist on your objection

16   to the original stuff coming in, and you're are just not

17   objecting based on that ruling, right?

18            MS. O'MALLEY:  Correct.

19            THE COURT:  Okay.

20            MS. HAMILTON:  Okay.  And then --

21            THE COURT:  Isn't that -- we're up through 182, 17?

22            MS. HAMILTON:  Yes, sir.  So plaintiff withdraws --

23   plaintiffs withdraw their designation from 182, 17 to 183, 17.

24            THE COURT:  Okay.  So you don't want that in.

25            MS. HAMILTON:  Correct.
```

1    THE COURT:  Okay.  182, 17 is out through 183 -- what

2    line.

3    MS. HAMILTON:  17.

4    THE COURT:  Okay.

5    MS. HAMILTON:  Yes.

6    THE COURT:  Those are all out.

7    MS. HAMILTON:  So are we ready?

8    THE COURT:  I am.  Thank you.

9    MS. HAMILTON:  184, 10 to 184, 23, plaintiff

10   withdraws -- plaintiffs withdraw that designation.

11   MS. O'MALLEY:  What about 183, 18?

12   MS. DYMKAR:  183, 18.

13   You skipped that.

14   MS. HAMILTON:  Oh.

15   (Discussion off the record.)

16   MS. HAMILTON:  Plaintiff would like to keep their

17   designation from -- Irene, help me out.

18   THE COURT:  183, 18.

19   MS. DYMKAR:  183, 18 to 184, 2.

20   MS. PINKSTON:  Our only objection is that it is

21   duplicative.

22   MS. DYMKAR:  This is the issue of whether there are

23   four people in the car, three people in the car.

24   MS. PINKSTON:  Well, he testified earlier that it was

25   four.

1      MS. DYMKAR:  And that was Ms. Pinkston's question:

2   Are you sure about the number in the car?

3          And he said, yeah, it is four.

4      THE COURT:  Does he ever tell -- it is already coming

5   in if he says there were four, correct?

6      MS. DYMKAR:  Right.

7      MS. PINKSTON:  Yes.

8      MS. DYMKAR:  And this was one attempt to get him to

9   withdraw the four, and he's very firm that there were four.

10         And this is, you know, one, of the -- we're going to

11  say he has the wrong color of the car, he has got the wrong

12  people in the car -- in the SUV.

13     THE COURT:  And does he tell the officers there were

14  four people in the car.

15     MS. PINKSTON:  I don't believe there is any testimony

16  to that.

17     MS. DYMKAR:  He points to the -- I am not sure.  I

18  mean, I would have to research that.

19     THE COURT:  Okay.  I'm just going to keep this out as

20  being cumulative.  If it is coming in once already, you'll be

21  able to make that argument.

22     MS. HAMILTON:  Okay.  I think that brings us to 184,

23  10.  So 184, 10 to 184, 23, plaintiff withdraws -- plaintiffs

24  withdraw their designation.

25     THE COURT:  Okay.

1          MS. HAMILTON:  And then -- we object to 184, 24

2     through 185, 6.  And it is a little bit of a strange bit of

3     testimony because it is essentially Irene talking about a

4     private -- Mrs. Dymkar having a -- asking questions about a

5     prior telephone conversation that she had with Mr. Thorton.

6     And, frankly, the answers are, both to questions that begin

7     with, do you recall, not did you tell me this?  So I'm not sure

8     how probative that portion of the transcript is since the

9     answer is, it is ambiguous.  It could mean that he doesn't

10    recall, and it would mean that he didn't say it, so --

11         There is another portion of the transcript, your

12    Honor, that we talked about last time here where it is -- that

13    is coming, page 116, line 13 through 17, where it is very clear

14    -- the question is asked a lot more clearly, was it a dark

15    colored SUV?  And he says, yes.

16         So it is also duplicative.  And given the way it is

17    asked, I think that's a conversation with Ms. Dymkar that's

18    being questioned about, and we think it should just be out.  It

19    is confusing.

20         THE COURT:  116 where?

21         MS. HAMILTON:  Lines 13 through 17.

22         THE COURT:  From the city's perspective, why do you

23    think -- why -- what's your response to the objection to the

24    ambiguity?  It is cumulative in the same way ---

25         MS. PINKSTON:  Well --

1    MS. O'MALLEY:  They're not using it to attack his

2  credibility, so this is just -- it shows that he -- he doesn't

3  remember having a conversation.  He doesn't remember the color.

4  At one point in his testimony he says that it is -- it is dark.

5  And then at another point he says he can't really recall what

6  color it was.  So I think that part already comes in.

7    This just also -- go ahead.

8    MS. PINKSTON:  It is not -- it is not cumulative for

9  that purpose, because he gave two different answers as to the

10  color of the vehicle during the deposition testimony.  One was

11  leading; one was not.  And this is confirming that he does not,

12  as he sits there today, remember what color the car was.

13    And in terms of any objection as to -- or, I'm sorry,

14  did you only want to speak as to the ambiguity?

15    THE COURT:  No, no.  Go ahead.

16    MS. PINKSTON:  I don't think it is ambiguous because

17  the answer -- while the question does say, do you recall

18  telling me?  The answer is very clear.

19    THE COURT:  That's true.

20    MS. PINKSTON:  I don't recall the color, ma'am.

21    So there is no ambiguity as to what he's speaking of.

22    And with regard to any objection as to this witness

23  having spoken prior to the deposition with plaintiffs's

24  counsel, I think that's obviously relevant since they are going

25  to be making a bias argument that he was communicating with

1    defense counsel.

2           It is both -- both attorneys on the side have

3    communicated with this witness prior to the deposition

4    testimony.

5           THE COURT:  Okay.  I'm going to let in 184, line 24

6    through 185, line 2.

7           "Question:  Do you recall telling me on May 4, 2013,

8    that it was a dark color SUV, but you don't know exactly what

9    the color was?

10          "Answer:  I don't recall the color, ma'am."

11          MS. DYMKAR:  Your Honor --

12          THE COURT:  Hold on.  Let me make my record.

13          MS. DYMKAR:  I'm sorry.  I thought you were done.

14          THE COURT:  That's fine.  So that's going to come in

15   because I think Ms. Pinkston is correct, the question is not --

16   well, it begins in kind of an awkward way.  But the answer is

17   clear, he's saying he doesn't recall the color of the car.  And

18   it does incorporate that this particular witness spoke with

19   both counsel in advance of his testimony.

20          I'm going to keep out the next question and answer,

21   which is on page 185, line 3 through 6.

22          "Question:  Do you recall telling me on May 4, 2013,

23   that you did not know the color, but that it was that a dark

24   color?

25          "Answer:  No, no."

1    That answer is ambiguous as to whether he recalls

2    telling Ms. Dymkar that, whether he recalls telling her on May

3    4th that, and whether he recalls the color.  I have no idea

4    what he means when he says, no, no.  That's going to come out.

5    Ms. Dymkar, I interrupted you, and I apologize.  What

6    were you going to say that?

7    MS. DYMKAR:  Could I have just one second to --

8    THE COURT:  Okay.

9    MS. DYMKAR:  -- confer with Ms. Hamilton?

10   (Discussion off the record.)

11   MS. DYMKAR:  Your Honor, I'm just trying to understand

12   your ruling or the reason for the ruling on 185, 3 through 6.

13   Is it because the -- I'm referring to the conversation he had

14   with me or --

15   THE COURT:  That's part of the problem.  And the

16   answer is ambiguous.  He's saying, there are one, two -- I'm

17   counting -- counting at least three, possibly four facts in

18   this one question.  Do you recall telling me, that's one fact;

19   on May 4, 2013, second fact; that you did not know the color,

20   third fact; but that it was a dark color, fourth fact.

21   Answer:  No, no.

22   MS. DYMKAR:  I understand the Court's ruling.

23   THE COURT:  Okay.

24   (Discussion off the record.)

25   MS. HAMILTON:  Okay.  So plaintiff then withdraws

1   plaintiffs's -- I'm sorry I keep doing that -- withdraw their

2   designation of 185, 15 through -- I'm sorry, line 14 beginning

3   at the end of the line, through line 21.

4         THE COURT:  Okay.  That will be out.

5         MS. HAMILTON:  And then beginning on the next line,

6   which is 185, 22 through 187, 7, this is, again, the affidavit

7   issue, whether he typed it or not.  Plaintiff wants that in.

8         MS. O'MALLEY:  No objection.

9         MS. PINKSTON:  No objection based upon your prior

10   ruling.

11         THE COURT:  Okay.  Where do we go from there?

12         MS. HAMILTON:  Okay.  So we're on the last designation

13   is 187, 15 through line 23.  And plaintiff makes an objection

14   based on the fact that it is cumulative.

15         THE COURT:  What's the city's response?

16         MS. PINKSTON:  It is not cumulative.  I believe this

17   is the very first time that he's asked this pointed question

18   whether he is certain as he sits there today that it is the

19   same SUV.

20         MS. DYMKAR:  Also I believe that two -- both vehicles

21   with the -- with the plaintiffs and with their friends were

22   both SUVs, I believe.

23         THE COURT:  I don't understand that, what you are

24   saying there.

25         MS. DYMKAR:  He's saying is it the same SUV that was

1    in front of the 15th District police station.  There were two

2    SUVs in front of the police station.

3            THE COURT:  Okay.  I'll overrule the objection as to

4    -- as far as cumulative goes.

5            We're done.  It only took us three hearings, I think.

6    Four?  Who is counting.

7            All right.  What's next?  I don't have the docket in

8    front of me.  Do one of you know our next dates?

9            MS. DYMKAR:  Oh, yes, your Honor.  Did you want to

10   deal with the Zone 12 issues today?

11           THE COURT:  I do.  Yeah, I do.

12           Can you give me like -- are you not ready to discuss

13   it?

14           MS. O'MALLEY:  Oh, she's ready.

15           THE COURT:  Okay.  Can you give me like five minutes?

16   I want to relook at what you had submitted, and then -- so I

17   just want five minutes to refresh myself with that.

18           And please feel free to use the bathroom.

19       (Brief recess.)

20           THE COURT:  All right.  Back on the record.

21           So we're talking about the Zone 12 radio

22   transmissions.  The -- let me start with plaintiffs.  This is

23   Document 429.  The first portion the city has no objection to.

24   So that's going to come in.

25           And also I'm looking at the city's filing Document

1  430.

2       The second submission that the plaintiffs would like

3  to put in is .wav 585, 586.  I think that's probably the best

4  way for delineation.

5       And the city's objection is relevance and potential

6  for jury confusion.  I don't know if it Ms. O'Malley or

7  Ms. Pinkston or anyone else, what -- can you illuminate that

8  issue more for me?

9       MS. PINKSTON:  Sure, your Honor.  As I understand it,

10 the argument from plaintiffs's perspective is that the officers

11 knew that no police officer had been actually hit with a bottle

12 or injured by a bottle.  But here no plaintiff was charged with

13 battery.  And the officers that signed the complaints against

14 David Wilbon, it was for aggravated assault.  And they were not

15 told about anything regarding a battery.  They were told that

16 he was throwing bottles at the location where they were

17 experiencing bottles being thrown at them.

18      So in terms of the relevance, as to the claims, I fail

19 to see the relevance as to this audio for those particular

20 claims that David Wilbon is bringing.

21      And then in terms of the jury confusion, this

22 specific -- the dispatcher is talking about battery to a PO.

23 No one was charged with battery here.  And I think that there

24 is the potential for jury confusion because many lay people

25 hear the terms assault with battery, assault and battery --

1        THE COURT:  Right.

2        MS. PINKSTON:  -- and they do not realize that there

3   is a difference between the two legal terms.

4        THE COURT:  Okay.  Let's go first to relevance.

5   Ms. Dymkar, what counts is this evidence relevant to?

6        MS. DYMKAR:  It is the counts having to do with

7   arrest.  This is 4514(a).  That's Mark Kushiner.  So Mark

8   Kushiner is at the 15th District.  He has just encountered

9   Keith Thorton, and he's obviously been told that somebody got

10  hit in the head with a bottle, and he's verifying that.

11       So he calls the dispatcher.  There is a dispatcher.

12  Then talks to the 25th District, 2510R would be a sergeant in

13  the 25th District, and says that was a mistake, there is no

14  battery to a PO.

15       And then he -- he persists saying, but I heard someone

16  was throwing bottles at the police.  And then we heard that

17  too, but no one got hit.

18       So he's already got reason to believe that the

19  information coming to him from Keith Thorton is just wrong.

20       THE COURT:  Because Mr. Thorton says it hit a police

21  officer.

22       MS. DYMKAR:  Right.

23       THE COURT:  All right.  I'm going to let this in.  I

24  just want to make sure the city is not disputing 4514(a) is one

25  of the defendants, correct?

1    MS. PINKSTON:  You said that was Kushiner?

2    MS. DYMKAR:  Yeah, it is Mark Kushiner.

3    MS. PINKSTON:  Yeah.

4    Right?

5    MS. O'MALLEY:  Yeah.

6    THE COURT:  Okay.

7    MS. PINKSTON:  No, your Honor.

8    THE COURT:  Okay.  I'm going to let that get in --

9    come in.  I think it is relevant for the reasons that

10   Ms. Dymkar just articulated.  I don't -- I don't really see the

11   jury confusion.  I don't -- I don't really see this as jury

12   confusion.  I guess I understand conceptually what you're

13   saying, Ms. Pinkston.

14   MS. PINKSTON:  Okay.

15   THE COURT:  But I think the relevance far outweighs

16   any potential jury confusion as to the malicious prosecution

17   claim because it is directly relevant to the false arrest.

18   And I would say if the city is -- wants to offer some

19   type of limiting instruction or an appropriate jury instruction

20   to address that concern, I will consider it.

21   MS. PINKSTON:  Thank you, your Honor.

22   THE COURT:  All right.  So then I want to -- that

23   takes care of what the plaintiff would like in.  Correct,

24   Ms. Dymkar?

25   MS. DYMKAR:  Yes, Judge.

1        THE COURT:  See how quickly we got that done.

2        MS. DYMKAR:  Love it.

3        THE COURT:  That was good.

4     (Laughter.)

5        THE COURT:  All right.

6        MS. DYMKAR:  Now we're going to screech to a halt.

7        THE COURT:  Now we'll see what the city wants in.

8        I have a settlement conference at two, so we'll be

9  done by then.

10        MS. DYMKAR:  We'll talk fast.

11        THE COURT:  All right.  So let me go through what I

12  understand the city to be saying, why this is relevant.  The

13  audio makes clear that the -- these officers that arrested

14  plaintiff knew about the brawl.

15        There is going to be plenty of evidence that the

16  officers knew that there was a large disturbance that evening,

17  correct?

18        MS. PINKSTON:  Yes.

19        THE COURT:  Okay.

20     (Brief interruption.)

21        THE COURT:  What I am having trouble with from the

22  city's perspective is the notion that there is a brawl, that

23  they experienced it, they saw what they saw, they knew what

24  they knew, how does this radio transmission, other than

25  providing -- I don't want to belittle it -- but kind of that

1   entertainment value that a trial has?  We get to hear the real

2   life communications.  How is it furthering any of the -- how is

3   it relevant beyond that and how does it provide something more

4   or different than what the officers's testimonies -- their

5   individual and collective testimony will be about what happened

6   that evening?

7          MS. PINKSTON:  It is going to be quite different, your

8   Honor, because in this particular situation, due essentially to

9   we have got a large time gap between the time of this incident

10  and the time that discovery is taking place in the civil

11  litigation.

12         THE COURT:  Okay.

13         MS. PINKSTON:  So their deposition testimony, what

14  they're going to be able to recall on the stand, is going to

15  be, you know, general statements, is going to be what their

16  general recollections are now seven years after the fact.  But

17  that, however, is not what they had fresh in their minds on

18  that particular day.

19         Additionally, the gravity of the situation, the

20  severity of the situation, it is being communicated over the

21  radio, is going to give context as to what the situation was

22  that was unfolding that these officers did here in the moment,

23  that now they are being approached by someone saying, this is,

24  you know, what I saw, this is who I am, that sort of thing.

25         So it is not going to be cumulative in the sense of

1  this is going to be detailed, this is going to be the radio

2  zone, this is going to be the information that these officers

3  had to rely upon.

4         And put simply, I think this is one of the most

5  relevant pieces of evidence because my understanding is

6  plaintiffs's counsel's large -- largely going to argue that

7  they did not have enough information to arrest these

8  individuals.

9         And so this is the information that they had prior to

10 knowing about Keith Thorton.

11        THE COURT:  So one of the objections the

12 defendant -- or plaintiffs stated, no defendant said they heard

13 this communication.  All defendants recall hearing was just

14 some general information about fighting in the 25th District.

15        True or not true?

16        MS. PINKSTON:  That it is general?

17        THE COURT:  That no defendants said they heard this

18 communication.

19        MS. PINKSTON:  Well, in our response we provided the

20 deposition testimony regarding --

21        THE COURT:  Okay.

22        MS. PINKSTON:  So Millan, Cerda, Esquivel, Garcia,

23 Graney, Kushiner, McDermott, Silva, and Valentin all testified

24 as to the radio dispatch communications that they heard

25 regarding this incident.

```
 1              THE COURT:  Okay.  And it is from the 25th District,
 2      correct?  It is this communication.
 3              MS. PINKSTON:  That is correct.  Because 25 and 15
 4      share a zone, Zone 12.
 5              THE COURT:  How long is this?
 6              MS. PINKSTON:  Forty-nine -- lines 49, 17 to 53, 21.
 7              And the timing on it -- it is not long, your Honor.
 8              MS. DYMKAR:  May I be heard, your Honor?
 9              THE COURT:  Of course.
10              MS. DYMKAR:  Just to -- as background information, the
11      police officers all pretty much consistently testified at
12      deposition that they were -- you know, they are generally aware
13      of what was happening in the other district.  But other than a
14      couple of officers who came from that -- drove from that area,
15      they had no intention of going there.
16              In fact, they were -- I think they were at the end of
17      their shift.  So, you know, it is understandable that they
18      weren't quite focused on what was going on somewhere else that
19      they weren't going to respond to and didn't need to respond to.
20              So, in order for there to be collective knowledge, it
21      can't be just communication, just somebody in the vast police
22      department, it has to be information that's actually relayed
23      and specifically relates to the persons arrested.
24              This particular --
25              THE COURT:  So I agree with that.  But if they were in
```

1   the same zone and they testified that they heard these radio

2   communications --

3           MS. DYMKAR:  And we think they did.  That was going to

4   be my next --

5           THE COURT:  Okay.

6           MS. DYMKAR:  -- point.  We haven't -- you know, we

7   just went through, and by what we determined, Kushiner said on

8   27 and 29 of his deposition, he could hear the reports, he

9   doesn't remember the details.

10          McDermott said, I heard a distress call.  That's 88.

11  93, don't recall the details of what I heard.

12          Cerda --

13          THE COURT:  Does he -- let me stop you there.

14          MS. DYMKAR:  Okay.

15          THE COURT:  Does he ever say or any of the defendants

16  ever say, I heard the radio transmissions that day, but wasn't

17  paying attention and didn't really keep track of what was going

18  on that day?

19          MS. DYMKAR:  I --

20          THE COURT:  Because it sounds to me what you're

21  saying, as -- I just want to -- I haven't looked at these

22  transcripts.  It sounds to me what you're saying is, I recall

23  listening to radio transmissions, but today at the time of my

24  deposition I cannot tell you what they said.

25          MS. DYMKAR:  I don't think that they knew it at the

1    time.

2         THE COURT:  Why do you -- is there something in the

3    deposition that tells you that?

4         MS. DYMKAR:  Because they said -- they never said that

5    they heard -- they heard anything of this sort.  And I guess my

6    next point is going to be, how prejudicial this is because it

7    is about gangs and guns and gunshots --

8         THE COURT:  I --

9         MS. DYMKAR:  -- and all that.  And there is nobody who

10   ever -- there is no defendant who ever says, I heard that there

11   was gang, you know, warfare.

12        There were many, many calls, and we're talking about

13   a -- you know, a three by three block area, and we're talking

14   about five hours.

15        This starts at 2:00 o'clock.  Plaintiffs were stopped

16   at 2:30.  I'm not even sure, you know, how this -- this would

17   relate to our particular plaintiffs.  But they -- no officer

18   said that they heard this -- this intensity of a problem that

19   occurred in the 25th District.

20        And we're agreeing that there was a problem there.

21   But this disturbance was -- lasted over a period -- a long

22   period of time, over a big -- a big, for this type of event, a

23   big geographical area.

24        And our looking at the defendants's deposition

25   testimony, you know, the most they say is they heard is an

```
 1    immediate assistance.  Don't recall hearing about Menard.
 2    Heard the reports.  Don't remember the details.  Maybe heard
 3    over the radio something about Menard.
 4            And for the -- for the defendants to be able to say,
 5    this is exactly what we heard and that's why we did what we
 6    did, there is something missing there.  There has to be actual
 7    communication that's relayed and that is comprehended by the
 8    person who does the arrest.
 9            Just because there is somebody in the police
10    department at another location that is reporting different
11    things, doesn't mean that there's collective knowledge.
12            And our biggest point is, this is really prejudicial
13    because there is so much stuff going on in this particular
14    area.
15            THE COURT:  Okay.  I'm going to look at the deposition
16    transcripts on this one.  And you have included the transcript
17    in the earlier submission, correct?
18            MS. PINKSTON:  That's correct, your Honor.  And the
19    citations are within our response.
20            And I just want to make one point for the record.
21            THE COURT:  Sure.
22            MS. PINKSTON:  And this is -- this goes to argument
23    with the plaintiffs's position that they didn't testify as to
24    the severity because they didn't know the details.  Nearly
25    every single one of these officers testified that they heard a
```

1   10-1, and that their understanding was that is the most serious

2   call.

3          So to -- I just want to make it --

4          THE COURT: And then the 10-1 was withdrawn.

5          MS. PINKSTON: Correct. Some officers did not recall

6   that.

7          THE COURT: Okay.

8          MS. PINKSTON: And so I just want to make the argument

9   for the record that in terms of these individuals testifying as

10   to that is their recollection, I think that speaks to what they

11   perceived as the severity because what they recall is that it

12   was a 10-1.

13          THE COURT: Okay.

14          MS. HAMILTON: Judge, just so that -- just since your

15   Honor is going to reserve ruling, so I think also that the

16   hearsay objection would apply to -- if they're trying

17   to -- even for the defendants, I think, because then they're

18   proposing statements of their own parties, so also based on

19   hearsay.

20          MS. PINKSTON: That would be an exception. It is the

21   present sense impression. Some of these officers are the ones

22   that are -- bottles are being thrown at them. They're calling

23   for assistance.

24          And then in terms of the other officers, it goes to

25   their state of mind.

1          THE COURT:  All right.

2          MS. DYMKAR:  Their -- this particular excerpt of the

3    10-1 -- is -- it is disregarded almost immediately when it is

4    declared.

5          And Ms. Maderak, you know, testified that sometimes

6    the dispatchers will sense that there might be a problem,

7    declare a 10-1, and then immediately there is a disregard of

8    it.

9          It is just a -- it is just really prejudicial to the

10   plaintiffs that this would come in.  None of the beats that are

11   listed here are from the 15th District or have a -- you know,

12   are defendants or have anything to do with this case, so --

13         MS. PINKSTON:  That is --

14         MS. DYMKAR:  -- I think the defendants have to -- the

15   defendants have to say that they heard -- you know, that they

16   heard this information.  And it is so -- it is so incendiary,

17   gun, gang members, gunshots.

18         And that's not what they were dealing with in the 15th

19   District, you know, when they -- when they encountered Keith

20   Thorton and the plaintiffs.

21         THE COURT:  Okay.

22         MS. PINKSTON:  Your Honor, just for the record,

23   defendants Plovanich, Millan, Garcia, and Silva all testified

24   they were at this location.

25         MS. DYMKAR:  They're not on this -- this -- Silva and

1    Garcia are not in this -- this excerpt.

2         MS. PINKSTON:  But what you said was is that they

3    were -- none of the defendants were involved in this.  They

4    absolutely were.

5         THE COURT:  What excerpt are you referring to?

6         MS. DYMKAR:  This excerpt of the --

7         THE COURT:  The communication?

8         MS. DYMKAR:  -- the communications.

9         THE COURT:  Right.  But this is what they heard, not

10   what they -- I mean, as far as present sense impression, to

11   make it a hearsay exception, I suppose someone needs to be

12   there saying it, I suppose, although not necessarily.  But more

13   to collective knowledge and state of mind they have to hear it,

14   not say it.

15        MS. DYMKAR:  And just because it is transmitted

16   doesn't mean that they heard it.

17        THE COURT:  That's what I said --

18        MS. DYMKAR:  -- and/or comprehended it.  And that's

19   what I'm getting when you look at --

20        THE COURT:  That's what I said, they had to have heard

21   it.

22        MS. DYMKAR:  Yeah.

23        THE COURT:  That's why I said that.

24        MS. DYMKAR:  Right.

25        THE COURT:  Okay.

1          MS. DYMKAR:  And we can provide you with citations too

2     of the defendants that I was just reading out loud of when they

3     said that they -- they remember there were reports.  They

4     remember there was a disturbance.  They remember there was a

5     distress call.  Don't remember much of anything else.

6          And to assume that this is what they would have

7     remembered on that day, I think is not -- that's not clear and

8     that's not correct.

9          THE COURT:  All right.  So next is Document 413,

10    Millan.  Page 60, line 8 through page 62, line 24.

11         So is -- is it true that the plaintiffs were already

12    in custody when these communications are made?

13         Defendants, in your objection or response, you're

14    saying that that's not -- we don't know that because there is

15    no time stamp.

16         MS. PINKSTON:  Correct.

17         THE COURT:  Ms. Dymkar, why do you say that?

18         MS. DYMKAR:  Well, we have -- we have different

19    versions of the OEMC recordings that have been given over time,

20    and we do have -- we do have a talking clock.

21         But this is a -- first of all, there is a description

22    of it being at Thomas and Monitor.  And I -- I printed out a

23    Google map just so that the Court would understand the

24    distances we're talking about here.

25         1320 North Menard is on this map and Monitor and

1    Thomas is on this map.  It is four-tenths of a mile away.

2           So this is something happening at Monitor and Thomas,

3    that's happening within seconds of Kushiner encountering Keith

4    Thorton.  So -- and it is -- There is -- there are no breaks in

5    this, so it starts and says, Monitor and Thomas.  Mentions

6    somebody wearing a black shirt, blue jeans, getting into a gray

7    vehicle.

8           David Wilbon is not wearing -- he's not wearing a

9    black shirt and blue jeans.  So there -- this is coming over

10   the air from Thomas and Monitor within seconds of Kushiner

11   coming on the air saying, we just got flagged down across from

12   the 15th District.

13          So it could not relate to what was happening with the

14   plaintiffs and Kushiner.

15          THE COURT:  Okay.

16          MS. DYMKAR:  You know, it continues that there is this

17   problem at Thomas and Monitor.  And then there is -- there is

18   indication that there is some -- this 10-1 is coming from a

19   burner phone, which means that -- and it seemed to be baffling

20   to the police and the dispatcher because they initially thought

21   that this request for a 10-1 came from a police officer.

22          But then a sergeant had traced it to a burner phone,

23   and then they all seemed to be kind of -- kind of confused

24   because this really looked like then it was some private

25   citizen who was just a -- causing problems.  You know, a

1    troublemaker or a prankster.

2            But our biggest problem is that it cannot relate to

3    the plaintiffs because the plaintiffs are already at the 15th

4    District, and -- Kushiner has already --

5            THE COURT:  Okay.

6            MS. DYMKAR:  -- stopped.  They are already arrested.

7    Already at the 15th District.

8            And then if you -- if you refer to, you know, any of

9    the -- anything having to do with the location, Thomas and

10   Monitor is not -- is not near 1320 North Menard.

11           THE COURT:  Tell me.

12           MS. PINKSTON:  So if my understanding is correct,

13   plaintiffs are going to argue that Kushiner never spoke with

14   Keith Thorton, is that correct?

15           MS. DYMKAR:  I think Kushiner is going to say that he

16   did.

17           MS. PINKSTON:  Right.  And are you going to attack his

18   credibility on that issue?

19           MS. DYMKAR:  Well, Keith Thorton says that he didn't

20   speak to Kushiner.  Kushiner said he did speak to Keith

21   Thorton.  So there is some discrepancy there.

22           MS. PINKSTON:  So this is not coming in for the truth

23   of the matter asserted, which I believe is essentially what

24   you're saying is that this could not be true, is that this is

25   related.

1        It is, however, related because this is exactly as

2   Officer Kushiner testified his encounter with Keith Thorton to

3   be.  That he was flagged down by citizen who said that he had

4   witnessed this individual throw the bottle.

5        So this is going to rehabilitate Officer Kushiner

6   after you attack his credibility.

7        THE COURT:  Tell me that.  So if that's --

8        (Laughter.)

9        THE COURT:  That has the makings of a prior consistent

10  statement.

11       MS. DYMKAR:  Yeah, if they're referring to that one

12  little part where Kushiner says, we got flagged down.  There is

13  someone saying the offenders are across from the 15th District

14  station on Madison, we're pulling up on them, hold on.  I would

15  think that that would come in.

16       But everything before that having to do with Thomas

17  and Monitor, immediately before that, like within seconds of

18  Kushiner coming on the air, and then all that stuff afterwards

19  is just not -- it is not relevant, and it is prejudicial.

20       THE COURT:  What's your view on that, Ms. Pinkston?

21       MS. PINKSTON:  I -- everything before that is relevant

22  as to the officers's describing the 10-1 they heard and that

23  sort of thing.  Because while -- again, it is going to -- it is

24  going to be corroborating the details that they do remember

25  hearing over the radio that night.

1    THE COURT:  Okay.

2    MS. PINKSTON:  And of course they can argue that those

3    details that they recall were either not correct or that they

4    misheard, that it wasn't related.  But that's all argument.

5    This -- to the extent that they're going to be

6    attacking them on those issues, this is corroborating their

7    recollection --

8    THE COURT:  Okay.

9    MS. PINKSTON:  -- and their state of -- and

10   essentially it goes directly to their state of mind.

11   THE COURT:  I'm tracking that.  What about after?

12   MS. PINKSTON:  In terms of -- okay.  So this is July

13   24th.

14   THE COURT:  So after Officer Kushiner says, I'm

15   getting flagged down, I'm getting pulled over, I'll be back,

16   that is, you know, potentially a prior consistent statement.

17   That's a present sense impression.

18   But after --

19   MS. PINKSTON:  Oh, after, after he's saying, looks

20   like my guy said that he followed these guys from over here we

21   got two carloads of guys.  You have got another car.  Step over

22   here right across from the 15th District.  This all goes to him

23   corroborating Kushiner's story that he was specifically told by

24   Keith Thorton that he followed them over specifically to this

25   location, and these officers --

1      THE COURT:  Those are all part of a prior -- to me

2  potentially prior consistent statement if the focus of the

3  plaintiffs's attack is going to be that Thorton never provided

4  that information to Kushiner.

5      I'm sorry, Kushiner not Kushiner.

6      MS. DYMKAR:  Your Honor, anything that Kushiner is

7  saying on the air is not the problem, it is everything in

8  between.  So there are all these conversations happening at

9  once.

10     What they're saying is happening at Thomas and Monitor

11 while Kushiner is talking to the -- talking to Keith Thorton

12 shouldn't come in.

13     And then even the -- our clock says it starts at

14 2:00 -- 2:22 at Monitor and Thomas.  They want to get in the

15 description of somebody with a black shirt, blue jeans, someone

16 who just battered a police officer, but that -- nobody says

17 that our clients are at Thomas and Monitor.  And David Wilbon

18 is not wearing a black shirt, blue jeans.

19     THE COURT:  Okay.

20     MS. DYMKAR:  So they're trying to piggyback on the

21 description.

22     And there are plenty of descriptions.  And we have

23 listened to the whole five hours.  Plenty of descriptions of

24 people running through yards and what they were wearing, what

25 they looked like.

1    But you can't take something that might be similar to,

2 you know, our clients because they're black, I guess, because

3 it is not the same clothes, and say that, you know, that this

4 has to be -- this has to be our client.

5    This Thomas and Monitor is really far from 1320 North

6 Menard.

7    THE COURT:  I think she's got a point on that.

8 Explain.

9    MS. PINKSTON:  They -- so --

10    THE COURT:  Anything Officer Kushiner is saying, I

11 understand that.  I get why that's -- I'm going to overrule

12 those objections.

13    But if there is -- I have listened to a lot of zone

14 radio from CPD, and there is a lot of things going on.  And,

15 you know, it actually takes, I would say, a trained ear, an

16 experienced ear -- I'm sure everyone at this table can do it --

17 where you can sit and decipher what's related to -- what you

18 were listening to.

19    And that's because we have all dealt with that type of

20 communication.  But I -- I remember the first time I heard it,

21 I was like -- I had to listen to even figure out what zone I

22 was supposed to be listening to.

23    So we're -- that all creates in my mind jury

24 confusion.  If we're focusing on what Kushiner heard and

25 Kushiner said, and, you know, presumably the collective

1  knowledge doctrine would say would be relevant certainly for

2  Officer Kushiner and perhaps others, that's one thing.

3          But to hear the whole zone and is kind of unfettered

4  is -- I think we run into a jury who will be confused and, you

5  know, entertained and not -- you know, in a constructive way as

6  to what was going on that night, and get them away from what is

7  at issue, which is what do these defendant officers know.  And

8  they do have a trained ear.  They do know what they're

9  listening for.

10         MS. PINKSTON:  So if I understand you correctly then,

11  it would be essentially page 61, line -- what would come in is

12  60, line 18.

13         THE COURT:  Do you have a second set of what you're

14  looking at there?  They don't have lines.

15         MS. PINKSTON:  I do not.  It was the attachment to

16  Document 413 dash 1.  And I believe it was an attachment to

17  430 as well.

18         It is the transcript we provided you guys with.

19         THE COURT:  You know, let's do this, let's do this

20  because I -- we're starting to get -- we did a really nice job,

21  but we're starting to get a little bit sloppy here.  I have got

22  a 2:00 o'clock settlement conference, so -- although it is a

23  case that I have already done two on, the same case.  I don't

24  need a lot of prep time.  But I do think as a group we're kind

25  of losing our focus.

1        So let me -- is there anything else on the record we

2    need to do?  Because I would like to get Ms. Warren out of

3    here.  I just want to look at the docket and see when we're

4    supposed to get together again and see if we need to do this,

5    Zone 12, sooner than we get together again.

6            MS. PINKSTON:  No, your Honor.

7            THE COURT:  Anything else on the record first?  Tell

8    me that.  Which is fine if you do.  Let's just get that done.

9            MS. PINKSTON:  No, your Honor.

10           THE COURT:  Okay.  From the plaintiffs's standpoint?

11           MS. DYMKAR:  No.

12           THE COURT:  Okay.

13           MS. DYMKAR:  We have another excerpt to go through

14   but --

15           THE COURT:  Sure.  All right.  Thanks so much.

16           Okay.  Let me -- when are we supposed to get together

17   again?

18           MS. DYMKAR:  September 13th for a pretrial conference.

19           THE COURT:  All right.  Is that going to give -- so

20   that I'm -- so that the deposition editing can go forward?  I

21   don't actually know, how much does it take to do the zone

22   editing in the deposition?

23           MS. PINKSTON:  The deposition cannot go forward until

24   we know your ruling on --

25           THE COURT:  Okay.

1       MS. PINKSTON:  Yeah.

2       MS. DYMKAR:  I apologize.

3       THE COURT:  Oh, okay.

4       MS. PINKSTON:  But the zone editing will not take long

5  at all.

6     (Laughter.)

7       THE COURT:  So you're saying -- Ms. Dymkar, you're

8  saying September 12th?

9       MS. DYMKAR:  13th.

10       MS. PINKSTON:  13th.

11       THE COURT:  Do you guys have time next week?

12       MS. PINKSTON:  I do, your Honor.

13       MS. DYMKAR:  I'm sorry, what was the question, your

14  Honor?

15       THE COURT:  Do you guys have time next week?

16       I would like to get the -- maybe we can get the ruling

17  on the show-up taken care of and we can get this transcript

18  issue taken care of.

19       MS. HAMILTON:  What day is your Honor looking at?

20       THE COURT:  I can't do Monday.  Tuesday I can't do.

21  What about Wednesday?

22     (Discussion off the record.)

23       MS. PINKSTON:  I have depositions all day in a case

24  where we represent different parties, so I believe --

25       THE COURT:  On the 24th?

1          MS. PINKSTON:  On the 24th, yeah.

2          THE COURT:  Okay.

3          MS. DYMKAR:  We have depositions, subpoenaed

4   depositions, on the 24th and 25th.

5          MS. HAMILTON:  Well, that takes care of that week.

6          MS. DYMKAR:  There was a problem with the 23rd?

7          MS. HAMILTON:  Yes, there are no court reporters.

8          MS. DYMKAR:  Oh.

9          THE COURT:  Well, I can tell you -- the 28th, so the

10  week of the 28th I have other judicial obligations, but I will

11  be here.  My schedule is light because these other obligations

12  are hard to predict.

13         So I would like to get us in so we could get that done

14  sooner.

15         Let's go off the record.

16     (Discussion off the record.)

17         THE COURT:  All right.  So let's say September 1st,

18  1:30.  I'll rule on the show-up issue, and -- I may put an

19  order out in advance on this issue.

20         And then we can go through the transcript of the

21  calls.

22         MS. HAMILTON:  So, Judge, just -- I don't need to be

23  here because Ms. Dymkar is handling this.

24         THE COURT:  Okay.

25         MS. HAMILTON:  I cannot be here September 1st, but --

1          THE COURT:  Okay.

2          MS. HAMILTON:  -- you should go ahead without me.

3          THE COURT:  All right.

4          MS. HAMILTON:  Thanks.  I will be in -- on my way to

5    Wales.

6          THE COURT:  Oh, good.

7          MS. HAMILTON:  Yes.

8          THE COURT:  That must be for vacation.

9          MS. HAMILTON:  My husband is Welsh.  We are going to

10   visit his family.

11         THE COURT:  Oh, good.

12      (Discussion off the record.)

13      (Which concluded the proceedings:)

14                        CERTIFICATE

15         I HEREBY CERTIFY that the foregoing is a true, correct

16   and complete transcript of the proceedings had at the hearing

17   of the aforementioned cause on the day and date hereof.

18

19   */s/ Pamela S. Warren*              September 20, 2017
     Official Court Reporter                    Date
20   United States District Court
     Northern District of Illinois
21   Eastern Division

22

23

24

25